# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

Estate of Thomas Smith, by
Shannon Bryfczynski,
Special Administrator,

    Plaintiff,

    v.                                      Case No. 19-cv-972

Oneida County, the Town of Minocqua,
And, in their Individual Capacities,
Gary Loduha and
Stetson Grant,

    Defendants.

# COMPLAINT

## I.    NATURE OF ACTION

101.    This is a civil rights action arising out of the unlawful seizure of the person of the Plaintiff, by the individual Defendants, in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States.

## II. JURISDICTION AND VENUE

201. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

202. The Western District of Wisconsin is the proper venue for this action because the Plaintiff's claims arose within the geographical boundaries of the Western District of Wisconsin within the meaning of 28 U.S.C. § 1391(b).

## III. PARTIES

### A. Plaintiff

301. The Plaintiff, the Estate of Thomas Smith, is a legal entity with the capacity to sue and be sued in this Court.

### B. Defendants

304. Defendant Gary Loduha is, on information and belief, an adult resident of Wisconsin. At all times relevant to this lawsuit, Defendant Loduha was employed as a police officer for the Town of Minocqua, acting under color of law within the meaning of 42 U.S.C. § 1983, and within the scope of his employment as that term is used in Wis. Stats. §895.46.

305. Defendant Stetson Grant is, on information and belief, an adult resident of Wisconsin. At all times relevant to this lawsuit, Defendant Grant was employed as a deputy sheriff for Oneida County, acting under color of law within the meaning of 42

U.S.C. § 1983, and within the scope of his employment as that term is used in Wis. Stats. §895.46.

306. Defendant Town of Minocqua is a Wisconsin town with the capacity to sue and be sued in this Court. Defendant Town of Minocqua is liable for the unlawful acts of the Defendant Loduha because he was acting within the scope of his employment pursuant to Sec. 895.46, Wis. Stats. The Plaintiff does not allege that the wrongful acts alleged herein were carried out pursuant to a custom or policy of the Town of Minocqua.

307. Defendant Oneida County is a Wisconsin county with the capacity to sue and be sued in this Court. Defendant Oneida County is liable for the unlawful acts of Defendant Grant because he was acting within the scope of his employment pursuant to Sec. 895.46, Wis. Stats. The Plaintiff does not allege that the wrongful acts alleged herein were carried out pursuant to a custom or policy of Oneida County.

**IV.  ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION**

401. Thomas A. Smith, who is now deceased, lived at 10 Sanns Street, in Rhinelander, Wisconsin.

402. As of April 7, 2017, Thomas Smith was 65 years old. He had experienced a cerebrovascular accident (a CVA, or stroke), and had been unable to speak for about two years. He was suffering from a Parkinsonian-type illness called Multiple System Atrophy. He had difficulty walking and problems with coordination when performing

even the simplest tasks. In addition, he was an insulin-dependent diabetic. He was quite frail and slow.

403. Thomas Smith's son, Alan Smith, lived with his father to assist him with the tasks of daily living, serving as his primary caretaker.

404. On April 7, 2017, Alan Smith was scheduled to leave his father's home in the afternoon, to attend his daughter's birthday party. As he prepared to leave, he observed that his father seemed in fine condition, partaking of his usual snack and asking Alan to wish his daughter a happy birthday.

405. After Alan left, Thomas Smith, who was then home alone, began experiencing a medical problem and wanted assistance, so he telephoned 911, the emergency dispatch number.

406. When his call was answered, he was unable to verbally answer questions, so the 911 dispatcher asked Thomas Smith to press buttons on his phone in order to respond to the dispatcher's queries.

407. Thomas Smith tried to respond to the dispatcher's questions by pressing buttons on the phone, but he could not coherently convey his situation to the dispatcher, who got a wildly erroneous impression of his circumstances.

408. The dispatcher interpreted his responses to mean that there may have been a medical emergency but also that there was a hostage situation with gunshot injuries to one or more persons in the house and a bomb located somewhere on the property.

409. There was no truth to any of the conclusions of anti-social behavior or criminal conduct which were drawn by the dispatchers and other authorities from Mr. Smith's signals transmitted by pushing buttons on his phone.

410. After approximately fifty-five minutes, the call was terminated by Thomas Smith.

411. Law enforcement responded to his call by sending the Marathon - Oneida County Sheriffs' Bomb Squad, which deployed a Bearcat armored vehicle, as well as by sending officers from the Minocqua Police Department, the Rhinelander Police Department and the Oneida County Sheriff's Department to Mr. Smith's home at 10 Sanns Street, Rhinelander, Wisconsin.

412. The officers and deputies surrounded the home and officers with bull horns demanded that the occupant come out and surrender.

413. After a period of time, Thomas Smith exited the house.

414. When he was seen outside his home, an officer with a bull horn commanded him to put his hands on his head.

415. As Thomas Smith moved forward, the officer with the bull horn commanded him to turn around with his hands on his head.

416. Because of Mr. Smith's medical conditions, walking was difficult for him, and he moved with a shuffling gait.

417. Because of Mr. Smith's medical conditions, he could not raise his arms over his head.

418. He could not turn around, or did not understand the command to do so, and, thus, Mr. Smith continued to move forward down his driveway, shuffling slowly along in his bedroom slippers, while officers surrounded him with guns drawn.

419. It was obvious by then to the officers surrounding Thomas Smith that he was a disabled and demented old man who was not a danger to anyone and who might very well be unable to comply with police commands to respond verbally or to take certain physical actions, and it was obvious that he could be led to go wherever the officers wanted him to go with the most minimal of guidance and without applying any significant degree of physical force, much less sufficient force to throw him to the ground or otherwise injure him, if they were just patient with his slowness.

420. There was no objective need for the officers present to inflict any degree of physical force on Thomas Smith, much less sufficient force to potentially injure him.

421. Nevertheless, Thomas Smith was then set upon by Defendants Grant and Loduha, who took hold of him, threw him to the ground, dragged him around the Bearcat armored vehicle, and threw him to the pavement again.

422. While he was on the pavement, the individual Defendants shackled Mr. Smith's ankles and handcuffed his wrists.

423. Then they picked him up and tossed him into the back of the Bearcat.

424. All of this rough handling of a physically compromised and frail elderly man caused significant injury to Thomas Smith.

425. Alan Smith had arrived on the scene before his father had come out of his house.

426. Alan Smith had received a telephone call from his sister Shannon at approximately 7:25 p.m. on April 7, 2017, telling him there was an active law enforcement operation of some sort near Thomas Smith's home.

427. Alan and his fiancé, Trisha Swenson, had left his daughter's birthday party and driven to the scene, which was teeming with police vehicles and law enforcement officers, who had formed a cordon around Thomas Smith's home.

428. Alan Smith had approached Oneida County Sheriff's Department Captain Terry Cook, and told her that he needed to check on his father, who had Parkinson's disease.

429. Captain Cook had told Alan Smith to wait.

430. Captain Cook had then spoken to a detective, who told Alan Smith to wait in the detective's squad car.

431. The detective had shown Alan Smith a picture of his father and had told him that Thomas had been shot and that Alan Smith's daughter had also been shot.

432. Alan Smith had replied that his daughter was at a birthday party, was not present at 10 Sanns Street, and that his father had Parkinson's disease.

433. The detective had then asked Alan Smith if there were weapons in the home and Alan Smith had replied that there were none -- no guns, no bombs, no bows, no weapons of any kind.

434. Alan Smith had then been left alone in the squad car for approximately 20 minutes.

435. During this time he heard verbal communications among the law enforcement officers on the squad car radio that included, "Gentleman has Parkinson's" and, at 8:03 p.m., "subject coming out wearing green shirt and blue jeans."

436. Shortly thereafter, out of Alan Smith's field of view, the above use of force upon Thomas Smith occurred.

437. At 8:16 p.m. Alan Smith, still in the squad car, saw the Bearcat approaching his location.

438. It stopped, and he saw two SWAT officers dragging Thomas Smith out of the armored vehicle to a waiting ambulance, with their arms under Thomas Smith's arms, and with Thomas Smith's hands in handcuffs.

439. The ambulance then drove away from the scene.

440. Shortly after that, Alan Smith was told by the detective that he was not allowed to go to the hospital to see his father.

441. Alan Smith gave his cellular phone to his fiancé and asked her to call his sister to find out what was going on.

442. After about 40 more minutes, the detective came back to the squad car in which Alan Smith was sequestered, told Alan Smith that no one at the hospital where Thomas Smith had been taken, St. Mary's Hospital in Rhinelander, could communicate with his father, and said that Alan Smith should accompany the detective to the hospital to assist in the questioning of Thomas Smith.

443. Alan Smith was not allowed to drive himself; he and his fiancé were driven to the hospital by the detective.

444. Alan Smith arrived at the hospital at 9:25 p.m. on April 7, 2017.

445. At the detective's behest, he went into the room where his father was being held.

446. In his father's hospital room stood an Oneida County Sheriff's deputy and a City of Rhinelander police officer.

447. Thomas Smith's hands were handcuffed to his bed.

448. He was wearing a neck brace, and he had cuts to the right side of his face and big bumps on his right forehead.

449. None of these injuries had been visible when Alan Smith had last spoken with his father earlier in the day.

450. The officers removed Thomas Smith's handcuffs and Mr. Smith was allowed to write on a piece of paper in order to communicate with the officers and Alan.

451. Alan Smith asked his father, "Who did it?"

452. Thomas Smith pointed to the Sheriff's deputy.

453. The detective wanted to know where the bomb was located in the home. Alan Smith told his father to squeeze his hand once for the answer: "No, there is no bomb," and twice for "Yes, there is a bomb."

454. Thomas Smith squeezed Alan's hand once, signifying that there was no bomb.

455. Thomas Smith was taken by hospital personnel for a CT exam, and, at approximately 9:40 p.m., the detective took Alan Smith and his fiancé back to Alan Smith's vehicle.

456. Alan Smith took his fiancé to her home and then waited for a call from the detective telling him it was all right to go to his father's home at 10 Sanns Street.

457. When he was informed that it was permitted, he went back to his father's home.

458. When Alan Smith arrived at the home at 10 Sanns Street, he found his father's slippers and broken glasses strewn about the driveway, street, and yard.

459. The ambulance crew had originally taken Thomas Smith to the St. Mary's Hospital emergency room, and the emergency room doctor admitted him to the hospital because his blood sugar reading was abnormal and he required intravenous insulin.

460. He was also developing pneumonia and required treatment for that.

461. Four days later, on April 11, 2017, Thomas Smith's physician, Dr. S. Brooks, requested that a competency evaluation of Mr. Smith be done by Harriet I Walker, Ph.D., to determine whether or not Mr. Smith needed a guardian and/or protective placement.

462. Dr. Walker evaluated Mr. Smith and concluded that he was neither competent nor capable of making informed healthcare decisions.

463. On April 15, 2017, Thomas Smith was discharged to his home at 10 Sanns Street, with hospice care.

464. His discharge diagnosis was pneumonia, right lower lobe; closed head injury with abrasion/laceration of the right periorbital region (the tissue surrounding the right eye); Type 2 diabetes with hyperglycemia, chronic; urinary retention, acute, discharged with catheter; multiple system atrophy, Parkinsonian type, chronic, severe, and progressive; chronic kidney disease, stage 3; cachectic ( a diagnosis of general ill health with emaciation) with weight loss secondary to the multiple system atrophy.

465. Thomas A. Smith died three days later, at 6:25 a.m. on April 18, 2017, at his home at 10 Sanns Street, Rhinelander, Wisconsin.

466. Within a month prior to April 7, 2017, Thomas A. Smith's son Alan Smith, had been told by Thomas Smith's primary care physician that it would be six to eight months before Mr. Smith would need nursing home care.

## V. BASIS OF LIABILITY

### A. Fourth Amendment.

501. The individual Defendants violated Thomas Smith's right to be free from unreasonable seizure when they employed excessive force in arresting him after he came out of his house.

## VI. DAMAGES.

### A. Compensatory Damages.

601. By virtue of the unlawful actions of the Defendants alleged above, Thomas Smith suffered loss of liberty, and physical and emotional distress, and

premature death, for which his estate seeks an award of compensatory damages in an amount deemed just by the Court.

### B. Punitive Damages.

602. Because the acts of the individual Defendants herein alleged were carried out maliciously or with reckless disregard for Mr. Smith's fundamental rights, the Plaintiff seeks awards of punitive damages against the individual Defendants to deter them and others similarly situated from similar wrongful acts in the future.

## VII. CONDITIONS PRECEDENT

701. All conditions precedent to this action within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or have otherwise occurred.

## VIII. JURY REQUST

801. The Plaintiff requests trial by jury of all issues triable of right by jury.

## IX. PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays the court to grant a judgment against the Defendants awarding it damages, costs, attorney's fees and such other and further relief as the Court deems just.

Dated this Wednesday, November 27, 2019.

Respectfully submitted,

Estate of Thomas Smith,

Plaintiff

By

WILLIAM LAMAN LAW OFFICE
WILLIAM F. LAMAN
State Bar Number 1014544
118 E Grand Ave
Eau Claire WI 54701-3638
Phone: 715 835-7779
Fax: 715 835-2573
Email: wflamanlaw@ameritech.net

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar Number 1016284
131 West Wilson Street, Suite 1200
Madison, WI 53703
Phone: 608 283-6001
Fax: 608 283 0945
E-mail: jsolson@scofflaw.com


/s/ Jeff Scott Olson
_____
Jeff Scott Olson

ATTORNEYS FOR PLAINTIFF