UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

___

ESTATE OF THOMAS SMITH, by
Shannon Bryfczynski, Special Administrator

        Plaintiff,

   v.

ONEIDA COUNTY,
TOWN OF MINOCQUA,
GARY LODUHA, and
STETSON GRANT.

        Defendants.

Case No. 19-CV-972

___

## DECLARATION OF GARY LODUHA
___

1. I am an adult resident of the state of Wisconsin. I am a Deputy Sheriff with the Oneida County Sheriff's Department.

2. I make this declaration on my personal knowledge.

3. On April 7, 2017, I was an officer employed by the Minocqua Police Department. However, that evening, I responded to an incident at 10 Sanns Street (the "Property") in Rhinelander, WI as a member of the Oneida County Special Response Team ("SRT"). Pursuant to a Memorandum of Understanding executed in September 2015, I was a member of the SRT and, when I responded to SRT calls, I was a deputized member of the SRT within the Oneida County Sheriff's Department.

4. The SRT was mobilized to respond to an incident on 10 Sanns Street (the "Property") in Rhinelander, WI. In response to the SRT call-out for mobilization I reported to the command post which was located near the intersection of West Davenport and Maple Street. The

1

command post was located slightly down hill and northeast of the Property. The Property was not visible from the command post. At the command post, I entered into the back of the SRT Bearcat. The Bearcat is a large, armored vehicle used for law enforcement that is shaped most similarly to a cross between a UPS truck and a military "Humvee." The Bearcat drove east along Davenport towards the Property. No patrol units had been sent to the Property before the Bearcat because the individual who called in the incident reported that there were explosives at the Property.

5. Prior to our reconnaissance of the Property, we had been informed that the 911 caller had identified Thomas Smith as the suspect who was responsible for potentially injuring one individual, killing a young adolescent, and planting explosives at the Property.

6. The Bearcat has windows throughout the back seating area where I was located. While driving by the Property, I observed a male in a window near, what looked to me, to be a sink. The male matched the description of Thomas Smith. Smith then retreated away from the window, back into the Property and out of sight.

7. The Bearcat continued to drive by the Property for additional reconnaissance and look for any exterior signs of the explosives that had been reported. The Bearcat turned onto Sanns Street from Davenport Street, heading north. When the Bearcat was parallel with the front of the Property on Sanns Street, I observed Smith through a large window on the front of the Property. It appeared that Smith observed the Bearcat because he looked out the window directly at the Bearcat. At that point, the Bearcat stopped in front of the Property and Great Lakes Indian Fish & Wildlife Comm. Warden Riley Brooks, who was a member of the SRT in the Bearcat, began to give commands to Smith over the PA system in the Bearcat. Warden Brooks commanded Smith to exit the Property. Smith closed the blinds after Warden Brooks began giving him commands. Smith was then seen looking out through the closed blinds. After a few moments, he opened the

2

blinds and then closed them again. During this entire time, Warden Brooks was commanding Smith to exit the Property.

8. Approximately five minutes after Warden Brooks first began issuing commands, Smith opened the front door of the Property. There was an exterior door (either screen or glass; I could see Smith through the exterior door) that he kept closed. A few moments later, he opened the exterior door and stood at the threshold, again ignoring Warden Brooks' commands to exit the Property. While he stood at the threshold of the Property, I observed Smith was wearing blue jeans and a green sweatshirt, which matched the description of the suspect that, I was told, was provided by the 911 caller. I also observed dark schmear of some substance on Smith's sweatshirt that, from my vantage point, looked like blood. The clothing, as well as the apparent blood on Smith's shirt, corroborated the reports that I received, which included, among other things, that Smith was the individual who had injured and/or killed one or more individuals in the Property.

9. Warden Brooks continued to issue commands to Smith over the PA system. Smith was instructed to slowly approach the Bearcat and raise his hands. Smith, eventually, began to approach the Bearcat. I did not observe that Smith had any trouble walking. He appeared to be physically capable of responding to Warden Brooks' commands, based on my training and experience in dealing with members of the general public. However, Smith would not fully comply with Warden Brooks' commands. For example, Smith was instructed to raise his hands above his hand and raise his shirt so that we could assess whether he had any weapons, explosives, or explosive triggers on him. Given that the 911 caller had indicated there were explosives in the Property, we were extremely concerned that Smith may have a vest or other trigger device hidden on him. When Warden Brooks instructed Smith to raise his hands and lift his shirt, Smith would begin to raise his hands and then bring them back down. As another example, Smith was instructed

to turn around 360 degrees with his hands above his head, so that we could try to see if he had any weapons in the waistband of his pants. He would turn to one side and then immediately turn back to facing the Bearcat. Because of our concerns regarding the explosive devices, I believed that Smith was attempting to concern a weapon or explosive device when he refused to lift his shirt. I did not observe any signs or any indication that Smith was physically incapable of performing the tasks he was commanded to perform.

10. When Smith was approximately 10-15 feet from the Bearcat, he was instructed by Warden Brooks to get onto the ground. In response, Smith would begin to lean forward and then immediately stand straight back up. After a few moments, Smith began to glance backwards towards the Property, also known as "targeting glances," and I was concerned that Smith was going to head back into the Property. At that point, the SRT made the decision to exit the Bearcat and take Smith into custody; we did not want him to return back into the Property out of fear that he may trigger the explosives or put the 911 caller in further danger.

11. Stetson Grant, Jake Simkins, Kurt Helke, and myself exited the back of the Bearcat. Simkins and Helke got into a position to watch the perimeter, and Grant and I approached Smith. Grant and I watched Smith to ensure he did not reach for a weapon. Smith was positioned in front of the front passenger door of the Bearcat. I raised my department-issued rifle and commanded Smith to get to the ground. Smith's left side was bladed to me, so I could only see his left side. Smith looked at me but did not comply in response to my commands.

12. When I exited the Bearcat, my primary concern was getting Smith into custody as quickly and safely as possible. Because Smith refused to respond to Warden Brooks' commands about raising his shirt and turning in a circle (which would have allowed us to conduct at least a partial visual search for weapons), I had no idea if Smith had weapons, explosives, or an explosive

trigger on him when I was approaching him. Likewise, I had no idea if the Property was timed to explode or whether Smith had some sort of trigger on him. I needed to get Smith into custody quickly so that I could move him (and myself and the SRT members) away from the Property and out of the area of danger if an explosion occurred.

13. I approached Smith from his left. When I was approximately one arms' length away, I transitioned my rifle down and to my side and secured Smith's left arm. My right hand was on Smith's left upper arm, around by his armpit, and my left hand was on Smith's wrist. I attempted to decentralize Smith by myself. A solo decentralization technique requires that I pull the individual's arm down and towards my body while turning in a circular motion; this forces the individual off balance and allows for me to control their descent to the ground. When I began to pull on Smith's arm, Smith looked directly at me and actively resisted by pulling his arm away from me.

14. I estimate that it was approximately 10-15 seconds between exiting the Bearcat and approaching Smith.

15. At that point, Stetson approached Smith's right side and took Smith's other arm. We then performed a two-man decentralization technique. The two-man decentralization technique is more controlled and a safer technique than a one-man decentralization. When two officers perform a decentralization together, the officers have more control over the individual's descent because the individual's weight is divided between two officers. In a two-man decentralization technique, the officers guide the individual's arms and shoulders forward to take the individual off balance, and, as the individual goes forward to the ground, the officers control the individual's descent by holding back their upper arm as they descend.

16. Once Smith was safely on the ground, I placed his left hand into a handcuff. I heard Grant tell Smith to stop resisting, and then Smith brought his other hand to me to place into the handcuffs. After Smith was handcuffed, I quickly swept my hand down Smith's back, turned him on his right side, and then swept my hand down the front of his shirt. I wanted to quickly perform a check for any obvious explosive devices or weapons before moving Smith.

17. I estimate that it was approximately 10-15 seconds between my initial physical contact with Smith and placing him into handcuffs. I estimate it was another 10-15 seconds to perform the pat down of Smith, and another 5-10 seconds to stand Smith up from the ground.

18. Grant and I then picked up Smith by his upper arms/armpits. Smith then refused to stand on his own or walk, so we picked up him a bit higher and carried him by his armpits around the front of the Bearcat, away from the Property. Again, we wanted to get ourselves and Smith out of the area in the event an explosive device went off at the Property.

19. It seemed that Smith was resisting us when we were directing him away from the Property when he refused to walk or stand on his own. I had just seen him walk out of the Property without issue, so I knew that he was physically capable of walking. I understood that he was just continuing to resist and actively rebuff our directions.

20. Once we were on the other side of the Bearcat, we advised Smith to get on the ground and he refused. We needed to place Smith on the ground, because he refused to stand on his own, so that we could conduct a more complete search of Smith; at that point, we were unsure if Smith had any explosive devices or triggers on him. Smith also refused to bend his legs and seemed to be actively keeping them straight to make it difficult for us to move him. So Grant and I each took a step forward, bent our back legs at the knee like a lunge, and leaned Smith forward to place him on the ground. We controlled his movement by holding onto his upper arms and under

his armpits and guiding him to the ground. We laid Smith down straight, almost as if he were a board. Smith's toes stayed on the ground and were sort of a fulcrum. Grant and I kept our hands on Smith's upper arms and under his armpits to control his descent until he was flat on the ground. I understood that Smith was continuing to physically resist us by keeping his legs straight and refusing to bend his legs to go onto the ground.

21. I estimate it took approximately 10-15 seconds to place Smith on the ground.

22. When Smith was on the ground, I conducted a more full search. I lifted his shirt, checked the waistband and pockets of his pants, and checked his ankles. I estimate the search took approximately 20-25 seconds.

23. Grant and I picked Smith back up from the ground and, again, he refused to stand on his own or walk. Again, I understood that he was continuing to resist. Grant and I carried Smith by his armpits and upper arms to the back of the Bearcat. I instructed Smith to step up onto the ledge on the back of the Bearcat so that he could step into the back. He looked at me and did not move. I again instructed him to step up and he did not move. Grant and I then stepped up on the back ledge of the Bearcat, which was a step down from the back door. I instructed Smith again to step up. He looked at me again and did not move. At that point, Grant stepped into the back of the Bearcat and we lifted Smith up by his upper arms and armpits. As Grant moved into the Bearcat with one of Smith's arms, I moved behind Smith to pick him up from his legs. Grant pulled Smith in by his arm while I pushed him in by his hips and waist. We laid Smith on his stomach and sort of slid him into the back of the Bearcat. Smith remained rigid and refused to assist us during this entire process. The technique we used was very similar to how we would have placed a downed officer into the back of the Bearcat.

24. I estimate that it took less than a minute to get Smith into the back of the Bearcat.

25. Once Smith was in the back of the Bearcat, I held security on the Property while Simkins and Helke got back into the Bearcat. Once they were inside, I entered the back and the Bearcat headed back to the command post.

26. At the command post, an ambulance was waiting when the Bearcat arrived. We opened the back of the Bearcat and stood Smith back up. We instructed Smith to step down and he just looked at us and stood there. He began to sort of lean forward and I pulled him back so that he would not fall out of the Bearcat. We then picked him up by his upper arms and armpits and lifted him out of the Bearcat and stood him up on the ground. Other individuals at the command post then assisted him onto a gurney. The SRT members got back into the back of the Bearcat and headed back to the Property to attempt to locate the explosives and enter the house.

27. I never observed any physical injuries or impairments on Smith at any time during my interaction with him. I also never observed Smith hit his head at any time during my interaction with him.

28. I never heard any information about Smith's physical condition or any information about Smith's apparent inability to speak while on the SRT call at the Property. I have since become aware of allegations that he had Parkinson's disease and could not speak and allegations that the information was communicated over the radio prior to taking Smith into custody. If that was indeed conveyed over the radio, I never heard it. However, even if I had heard that Smith reportedly had Parkinson's disease or could not speak, I would not have taken any different actions. My focus during the entire incident was getting the suspect into custody as safely and quickly as possible. Smith, and the reported explosive devices, were a perceived threat to myself and the rest of the SRT members during the entire interaction with Smith.

29. The training I received through Defensive and Arrest Tactics training, as well as my trainings throughout my career, instructed me to control the scene at the Property and Smith as quickly as possible to prevent further escalation. I am trained to perform each stabilization technique – whether a compliance hold, decentralization, or further escalated force that may be needed – at 100% every time I engage with an individual, without regard for my personal perception of that individual. If I were to perform a decentralization technique at 50% because I personally believed the individual was weaker or capable of control with less effort, but my personal perception was incorrect and the individual actively resisted and evaded me, the situation would then escalate and I may be forced to escalate my response accordingly. For that reason, I am trained to perform each technique correctly and at 100% every time to quickly and safely control the situation and prevent escalation.

30. Based on my training and experience, the actions I took on April 7, 2017 were reasonable in response to the overwhelming danger that that situation presented. Throughout my entire interaction with Smith, I was extremely aware of the threat of explosives at the Property. We needed to secure Smith and then secure the scene as quickly as possible to locate the reported explosives and then enter the Property to secure and assist the individuals who were reportedly inside.

31. We used the least amount of force necessary to quickly and safely take Smith into custody and secure the scene at the Property.

32. Ultimately, the information regarding the injured hostage, deceased nine-year-old, and explosives was not correct. However, we did not learn that the information we were provided was not correct until after Smith was taken into custody, after we conducted a thorough exterior review of the Property to locate explosives and triggers, and after we entered the Property.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated this 29th day of October, 2020.

*/s/ Gary Loduha*
Gary Loduha