# In The Matter Of:
*ESTATE OF THOMAS SMITH, et al. vs.*
*ONEIDA COUNTY, et al.*

*DEPOSITION OF STETSON GRANT*
*July 30, 2020*

*Willette Court Reporting, LLC*
*Certified Professional Court Reporters*
*www.WilletteCourtReporting.com*
*(715)355-4384*
*(877)355-4384*



Min-U-Script® with Word Index

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF STETSON GRANT
July 30, 2020

## Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

ESTATE OF THOMAS SMITH,
by Shannon Bryfczynski, Special Administrator,

     Plaintiff,

-VS-

ONEIDA COUNTY,
TOWN OF MINOCQUA,
GARY LODUHA, and STETSON GRANT,

     Defendants.

DEPOSITION OF:
STETSON O. GRANT
CASE NO. 19-CV-972

---

     Deposition examination of STETSON O. GRANT, taken at the instance of the Plaintiff, under and pursuant to Section 804 of the Wisconsin Statutes and the acts amendatory thereof and supplementary thereto, pursuant to Notice upon the parties, before Payton J. Sorenson, a Notary Public in and for the State of Wisconsin, at the Days Inn & Suites by Wyndham Rhinelander, 70 North Stevens Street, Rhinelander, Wisconsin, on the 30th day of July 2020 commencing at 1:59 p.m. and ending at 2:59 p.m.

## Page 2

### A P P E A R A N C E S

APPEARING ON BEHALF OF THE PLAINTIFF:

    JEFF S. OLSON, Esq.
    The Jeff Scott Olson Law Firm, S.C.
    131 West Wilson Street, Suite 1200
    Madison, Wisconsin 53703
    jsolson@scofflaw.com

APPEARING ON BEHALF OF THE DEFENDANT:

    DANIELLE B. TIERNEY, Esq.
    Axley Brynelson, LLP
    2 East Mifflin Street, Suite 200
    Madison, Wisconsin 53703
    dtierney@axley.com

ALSO PRESENT: NONE

     The original transcript of the deposition of STETSON O. GRANT was filed with Attorney Olson.

## Page 3

I N D E X   P A G E

E X A M I N A T I O N
                                                 PAGE
STETSON O. GRANT
    EXAMINATION BY MR. OLSON ........... 5
    EXAMINATION BY MS. TIERNEY ......... 44

---

E X H I B I T S
                                               MARKED
Exh. 1 (Marked in previous deposition.)
Exh. 2 (Marked in previous deposition.)
Exh. 3 (Marked in previous deposition.)
Exh. 4 (Marked in previous deposition.)
Exh. 5 (Marked in previous deposition.)
Exh. 6 (Marked in previous deposition.)
Exh. 7 (Marked in previous deposition.)

     (The originals of the above exhibits were sealed in the original transcript; copies thereof were included with each transcript copy, as requested. PDF electronic files of the exhibits were provided to counsel, as requested.)

---

O B J E C T I O N S
                                      PAGE    LINE
BY MS. TIERNEY ........................ 10     6
BY MS. TIERNEY ........................ 10    17
BY MS. TIERNEY ........................ 15    10
BY MS. TIERNEY ........................ 24    25
BY MS. TIERNEY ........................ 26     1
BY MS. TIERNEY ........................ 26    20
BY MS. TIERNEY ........................ 28    23
BY MS. TIERNEY ........................ 36    15
BY MS. TIERNEY ........................ 40    16
BY MS. TIERNEY ........................ 40    24
BY MS. TIERNEY ........................ 41     6
BY MS. TIERNEY ........................ 41    13
BY MS. TIERNEY ........................ 41    17
BY MS. TIERNEY ........................ 41    23
BY MS. TIERNEY ........................ 42    18
BY MS. TIERNEY ........................ 42    25
BY MS. TIERNEY ........................ 43     8
BY MS. TIERNEY ........................ 43    20

## Page 4

BY MS. TIERNEY ........................ 44     5

---

P R O D U C T I O N   R E Q U E S T S

                      NONE

Page 5

1  P R O C E E D I N G S
2  STETSON O. GRANT, after having been first
3  duly sworn, was examined and testified as follows:
4  **THE WITNESS:** I do.
5
6  **EXAMINATION BY MR. OLSON:**
7  Q. Please state your name.
8  A. Stetson Grant.
9  Q. Are you the Stetson Grant that's a defendant
10  in this case?
11  A. Yes.
12  Q. Where were you born?
13  A. Minneapolis, Minnesota.
14  Q. In what year?
15  A. 1986.
16  Q. What's your folks do for a living when you
17  were growing up?
18  A. My dad was a Michelin tire territory sales
19  manager, and my mom was an architect.
20  Q. Can you give me a history of your formal
21  education?
22  A. I went to Amery High School and got my
23  diploma there. Then I went to UW-Whitewater as a
24  business major. I then transferred to UW-Eau Claire
25  where I got my bachelor of arts in criminal justice,

Page 6

1  and I went to the police academy at Chippewa Valley
2  Technical College in Eau Claire.
3  Q. What year did you graduate from high school?
4  A. 2005.
5  Q. And what did you do after that?
6  A. I went to UW-Whitewater.
7  Q. And full-time student for how long?
8  A. From 2006 to 2011.
9  Q. And then you went to UW-Eau Claire?
10  A. Correct.
11  Q. Full-time student?
12  A. Yes.
13  Q. From when to when?
14  A. 2006 to 2011. So Whitewater was from 2005
15  to 2006. Well, fall of 2005 to spring of 2006. And
16  then fall of 2006 to 2011, Eau Claire.
17  Q. And when you graduated from UW-Eau Claire,
18  what did you do?
19  A. I applied to different agencies. I didn't
20  go to the police academy for about a year because I
21  was trying to get into a bigger city to get paid to
22  go and not pay my way -- self through the Wisconsin
23  academy.
24  Q. And what happened?
25  A. I didn't get hired by any bigger cities so I

Page 7

1  just put myself through the police academy the
2  following year.
3  Q. How long a program is that?
4  A. It was 520 hours at the time.
5  Q. And where did you go?
6  A. Chippewa Valley Technical College in Eau
7  Claire.
8  Q. What did you do when you got out of the
9  police academy?
10  A. I worked landscaping jobs in the summer, and
11  then I got hired by Osceola Police Department
12  part-time.
13  Q. Osseo?
14  A. Osceola.
15  Q. Oh, Osceola.
16  How long did you work there?
17  A. From January 2013 until about August, and
18  then I got hired by the Oneida County Sheriff's
19  Office in October.
20  Q. Of 2013?
21  A. Yeah.
22  Q. And what has been your rank in the sheriff's
23  department?
24  A. I was a -- started out as a deputy, and then
25  I was task force investigator in the drug unit, and

Page 8

1  then I got promoted to -- and then I went back on the
2  road, still as a deputy, and then I got promoted to
3  sergeant.
4  Q. Are you -- when were you promoted to
5  sergeant?
6  A. January 2019.
7  Q. And you're a sergeant over the patrol
8  deputies?
9  A. Correct.
10  Q. In your training at the police academy, did
11  you have training in the Wisconsin Justice Department
12  publication called Defensive and Arrest Tactics?
13  A. Yes.
14  Q. That's the main source of information and
15  training for arrest tactics, is it not?
16  A. Correct.
17  Q. And do you remember being trained in the
18  difference between passive resistance and active
19  resistance?
20  A. Yes.
21  Q. In your own words, how would you describe
22  that difference?
23  A. Passive resistance is if I tell you to put
24  your hands behind your back and you say, "No. I'm
25  not doing that." Active resistance, to me, is if I

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF STETSON GRANT
July 30, 2020

Page 9

1  try to arrest you, and you start pulling away and
2  fighting me.
3  Q. I want to read just two short paragraphs
4  from page 37 of the defensive and arrest tactics
5  publication to see if these coincide with your
6  current understanding of the difference between
7  passive resistance and active resistance.
8      Quote, "Passive resistance refers to
9  noncompliant but nonthreatening behavior. An example
10 would be a person who refuses to get out of a car
11 when ordered to do so. The person is not fighting
12 with you. He or she is simply not complying with
13 your orders. Protesters often use passive resistance
14 as a political tactic, staging sit-ins to advance
15 their agendas.
16     "Active resistance, on the other hand,
17 refers to behaviors that physically counteract an
18 officer's attempts to control a subject and which
19 pose a risk of harm to the officer, subject, and
20 others. Examples of active resistance include
21 attempting to pull away from the officer's grasp,
22 running away, getting up after being directed to the
23 ground, and so on."
24     Do those paragraphs coincide with your
25 understanding of the difference between active and

Page 10

1  passive resistance?
2  A. Yes.
3  Q. And what's the -- why do we train police
4  officers to recognize active versus passive
5  resistance?
6      MS. TIERNEY: Foundation.
7      I might stick in objections. You
8  still answer.
9      THE WITNESS: Oh, I was going to see
10 who rules on --
11     MS. TIERNEY: The court reporter.
12     THE WITNESS: Can you repeat that?
13     BY MR. OLSON:
14 Q. Sure.
15     Why do we train police officers to
16 recognize active versus passive resistance?
17     MS. TIERNEY: Same objection.
18     THE WITNESS: Because it depends on
19 what level of force is used.
20     BY MR. OLSON:
21 Q. Generally speaking, greater force is
22 appropriate when an officer encounters active
23 resistance than when he merely encounters passive
24 resistance; correct?
25 A. Correct.

Page 11

1  Q. Does the Oneida County Sheriff's Department
2  have "use of force" policies?
3  A. Yes.
4  Q. And do those policies make the distinction
5  between active resistance and passive resistance?
6  A. I can't recall right off -- without looking
7  at the policy.
8  Q. Is that something you think you knew at one
9  time, but you just don't know now?
10 A. Yeah. I just don't remember it right now.
11 I don't remember it verbatim on what the policy says.
12 Q. Do you have an independent recollection of
13 the events at Thomas Smith's house on April 7, 2017?
14 A. Yes.
15 Q. What do you recall?
16 A. That it was a special response team call
17 that we had been called out. It was a hostage
18 situation. I had learned that there was a dead
19 nine-year-old child in the garage, there was another
20 gunshot victim in the garage, and then it was
21 conveyed to me that Thomas Smith was a suspect, and I
22 was shown a picture of that. There was also
23 explosives at the front door and at the garage.
24 Q. And it turned out that none of those reports
25 of criminal conduct or dangerous behavior or weapons

Page 12

1  or explosives or hostages were true; correct?
2  A. Correct.
3  Q. They all came from information Mr. Smith had
4  conveyed by pressing buttons on his phone without
5  speaking; correct?
6  A. After the fact, that's -- I found that out,
7  yes.
8  Q. I understand it wasn't necessarily clear to
9  you at the time.
10     Do you know if anything's been done in
11 the sheriff's department or the dispatch center to
12 make sure that something like that won't happen
13 again?
14 A. I don't.
15 Q. Because I was thinking about this. If the
16 dispatcher would have asked Mr. Smith to press one if
17 the entire Croatian Army is in your house, he
18 probably would have pressed one. And then maybe we
19 could have had an idea that he didn't know what he
20 was talking about, but I suppose that's for -- a
21 suggestion I should make to the 911 people.
22     I want to see if you can give me some
23 help understanding some of these exhibits. So take a
24 look in your folder, and take a look at Exhibit 1
25 there.

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF STETSON GRANT
July 30, 2020

Page 13

1  A. Okay.
2  Q. Are you familiar with documents like
3  Exhibit 1, that detail call for service report?
4  A. Yes.
5  Q. Okay. What's this?
6  A. This is just a summary of the call. So this
7  is what would come up on our squad computers. It's
8  just stating the time of everything that's happening.
9  Q. Okay. So on your squad computer, does it
10 show the date and time?
11 A. I was not in a squad -- we did not have a
12 squad computer in the BearCat.
13 Q. Okay. But if you would have been in your
14 squad computer, would it show the date and time?
15 A. Yeah.
16 Q. And would it show the information under the
17 column headed "narrative"?
18 A. Yes.
19 Q. So the officers, at least who had squad
20 computers, could read everything on Exhibit 1 as it
21 was being entered in by the dispatchers; correct?
22 A. Not necessarily.
23 Q. Why not?
24 A. Because everyone that was there was either
25 out of their squads doing a perimeter or things like

Page 14

1  that. They would not have been around a computer.
2  Q. The column headed "created by" contains the
3  name J-L-i-l-e-k. How do you pronounce that?
4  A. Jack Lilek.
5  Q. Okay. He's one of the dispatchers?
6  A. Yes.
7  Q. And what about "AMertz"?
8  A. Mertz is a Rhinelander police sergeant.
9  Q. And what about "MRaddatz"?
10 A. Mark Raddatz is a police officer with
11 Rhinelander Police Department.
12 Q. And they could send out these messages over
13 this system?
14 A. If they were -- they can add to the
15 narrative if they're in their squads.
16 Q. Okay. So look at the fourth [sic] page of
17 this exhibit, which is DEF0008 at the bottom and --
18 A. 008?
19 Q. Yeah.
20    In the "time" column, look at the
21 entry for 20:09:41.
22 A. All right.
23 Q. That's "JLilek," Jack Lilek, entering the
24 following information: "Male in windows wearing
25 Packer shirt, green sweatshirt, blue jeans, looking

Page 15

1  out window."
2     Where would Jack have gotten that
3  information?
4  A. From the BearCat.
5  Q. Were you in the BearCat at that time?
6  A. Yes.
7  Q. And same thing with 20:10:05, "front door
8  opening." That would have been information Jack got
9  from the BearCat?
10    MS. TIERNEY: Foundation.
11    THE WITNESS: Yes. Well, I don't --
12 he could have got that from the BearCat. He could
13 have gotten that from someone on perimeter.
14    BY MR. OLSON:
15 Q. Okay.
16 A. I don't know exactly who gave him that
17 information.
18 Q. And then a couple of entries down at
19 20:12:28, Jack Lilek is writing "one in custody." So
20 can we tell how much time elapsed between the front
21 door opening and the time there was one in custody?
22 It's, like, about 2 minutes and 21 seconds?
23 A. I don't know if you can come to that
24 conclusion as a matter of fact because sometimes it
25 gets called out at different times so I don't know.

Page 16

1  Q. There might have been some delay in making
2  these entries?
3  A. I don't know.
4  Q. Okay. If you look at DEF00010, it's showing
5  a column of units, a column of primary units, yes or
6  no, column of radio numbers, and column of personnel.
7  You're in there, under personnel, at "7070 Grant"?
8  A. Yes.
9  Q. And what's 7070?
10 A. That's just my employee number.
11 Q. Okay. And what's the radio number 721?
12 A. That was my former call number. I'm now
13 715. That's how they call me on the radio.
14 Q. Okay. But at this time, you were 721?
15 A. Yes.
16 Q. And that's also unit 721?
17 A. Yes.
18 Q. Okay. What's the difference between the
19 radio number and the unit, if there is one?
20 A. I don't know. You'd have to ask the people
21 that set up this computer system.
22 Q. Okay. And Loduha was 339?
23 A. Correct.
24 Q. Some of these entries just say "unit check
25 in." Can you tell me what the significance of that

Page 17

1  is?
2      I can show you one if you want to see
3  it but...
4  A.  Yeah.  If you would.
5  Q.  Look at page 22, second one from the top.
6  A.  I actually don't know.  I've never seen a
7  page like this.  I don't know what this means.
8  Q.  Okay.  Somehow, I find that a little
9  comforting because I don't know what that means
10 either.  I see all kinds of things like this.  It
11 must mystify me.
12     Exhibit 2, I think, is a listing of
13 some personnel that were involved in this incident,
14 and you're in there.  Again, unit 721?
15 A.  Correct.
16 Q.  And employee number 7070?
17 A.  Yep.
18 Q.  So tell me what you remember happening after
19 you learned the SRT was being mobilized?
20 A.  When we pulled up to the front door --
21 Q.  Before that.  Back when you were at the
22 staging area.
23     Did you go to the staging area
24 initially?
25 A.  I don't remember where we drove to, where I

Page 18

1  met up.  I know it was a hurry to get in the BearCat
2  because it was conveyed to me that it was a hostage
3  situation.
4  Q.  Do you remember where you got into the
5  BearCat?
6  A.  I don't.
7  Q.  Did the BearCat drive up to the street
8  adjacent to Mr. Smith's front door?
9  A.  Yes.
10 Q.  Who was driving the BearCat?
11 A.  I don't remember.
12 Q.  If we indicated that it was a game warden
13 named Brooks, according to the reports we have, would
14 you dispute that?
15 A.  No.
16 Q.  Do you remember Game Warden Brooks being
17 involved in this operation?
18 A.  Yes.
19 Q.  Do you remember anything about his
20 involvement?
21 A.  I remember him giving commands on the radio.
22 Q.  From inside the BearCat?
23 A.  Correct.
24 Q.  When the BearCat was next to Mr. Smith's
25 house?

Page 19

1  A.  Correct.
2  Q.  And do you remember what commands he gave?
3  A.  No.
4  Q.  Do you remember who else was in the BearCat?
5  A.  Barbour, Brooks, me, and Loduha.  That's all
6  I remember.  And Jake Simkins.
7  Q.  And what happened after the BearCat got to
8  Mr. Smith's house?
9  A.  Brooks started making commands to Mr. Smith.
10 Mr. Smith came out of the residence.  On his
11 sweatshirt, he had -- it looked like blood to me at
12 the time.  And then he was given more commands, and
13 he was -- he wasn't following those commands.  And
14 then me and Loduha got out of the BearCat, pointed
15 our rifles at Smith, and told him to get on the
16 ground.  He refused.
17     We then slung our rifles and tried to
18 handcuff him, and he was resisting getting the cuffs
19 on.  And we ended up decentralizing him on the ground
20 and getting the handcuffs on him.  We then picked him
21 up, took him to the BearCat, put him in the BearCat.
22 That's when we realized that something was wrong with
23 this guy, and he needed medical attention.  So we
24 took him back to the command post, and he was taken
25 in the ambulance.

Page 20

1  Q.  Did you see him in his home before he came
2  out?
3  A.  I didn't identify him right away.  I just
4  saw a subject in the kitchen going back and forth.
5  Q.  Could you tell what he was doing?
6  A.  No.
7  Q.  Did he appear to be doing anything odd other
8  than ordinary things one might do in one's kitchen?
9  A.  I just saw a subject in the kitchen.
10 Q.  Okay.  And when Brooks got on the public --
11 got on the amplifier -- what do you call that?
12 Speaker system?
13 A.  Loudspeaker.
14 Q.  Loudspeaker.  Loudspeaker.
15     When Brooks got on the loudspeaker and
16 told Mr. Smith to come out of his house, Mr. Smith
17 came out the front door; correct?
18 A.  Correct.
19 Q.  And you did not see him in the possession of
20 any weapons; correct?
21 A.  Well, nothing was in his hands.
22 Q.  And do you remember what commands he was
23 given after he came out of his house?
24 A.  Not by Brooks over the loudspeaker.
25 Q.  Do you remember -- was somebody who was in

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF STETSON GRANT
July 30, 2020

Page 21

1 the BearCat in charge of the officers in the BearCat?
2 A. That would have been Barbour. He's the team
3 leader.
4 Q. And did he decide when you and Mr. Loduha
5 should get out -- or you and Officer Loduha should
6 get out of the BearCat?
7 A. I don't remember him -- I mean, somebody
8 said something to go get him, but I don't remember
9 who it was. It would have came from the team leader.
10 Q. Was Barbour in the BearCat?
11 A. I can't say for sure.
12 Q. Before you got out of the BearCat, had
13 Barbour assigned you to be part of the arrest team?
14 A. I don't remember that.
15 Q. Had somebody --
16 A. It's kind of based on where you're sitting
17 in the BearCat because it's -- I guess it's the --
18 wherever you sit is the fastest guy to get out, I
19 guess.
20 Q. So when you and Officer Loduha got out of
21 the BearCat -- had you worked together previously, by
22 the way?
23 A. Well, he was a Minocqua police officer so I
24 guess we kind of -- I guess you'd interact every once
25 in a while, but it wasn't, like, somebody that was on

Page 22

1 the Oneida County Sheriff's Office, a partner.
2 Q. Anyway, do you remember what precipitated
3 your getting out of the vehicle?
4 A. It was an order from somebody to get out of
5 the vehicle and go arrest that -- the suspect, who we
6 believed at the time was Mr. Smith.
7 Q. So after you received that order, you and
8 Loduha got out?
9 A. Correct.
10 Q. And walked to Mr. Smith?
11 A. Yeah.
12 Q. With your -- both of you with your rifles
13 pointed at him?
14 A. Correct.
15 Q. And did you say anything to Mr. Smith as you
16 approached him?
17 A. I don't remember who gave the commands for
18 him to get on the ground, but I just remember me or
19 Loduha telling him to get on the ground.
20 Q. And he did not get on the ground on his own
21 volition, I take it?
22 A. Correct.
23 Q. And you and Mr. Loduha got up to Mr. Smith,
24 and did you say that you tried to handcuff him while
25 he was standing up?

Page 23

1 A. Correct.
2 Q. And did you have one of his arms?
3 A. Yes.
4 Q. And did Mr. Loduha have his other arm?
5 A. Yes.
6 Q. And is it your recollection that you were
7 not strong enough to bring those arms together behind
8 his back close enough to get the handcuffs on?
9 A. Correct.
10 Q. And how long did that last where you were
11 trying to get the handcuffs on while he was standing
12 up?
13 A. I don't recall the specific time, but it was
14 a short amount of period.
15 Q. And was there any communication between you
16 and Loduha about taking him to the ground with force?
17 A. I don't remember.
18 Q. But that's what you did; correct?
19 A. Correct.
20 Q. And he went to the ground front-first?
21 A. Yes.
22 Q. On his driveway?
23 A. I believe it would have been the street.
24 Q. On the street?
25 A. Yes.

Page 24

1 Q. Was he injured?
2 A. I don't know. He didn't say anything.
3 Q. Was he handcuffed after he was on the
4 ground?
5 A. Yes. When we got him on the ground, we were
6 able to handcuff him.
7 Q. And he didn't say anything the whole time he
8 was in your presence, did he?
9 A. No.
10 Q. Did you later learn that he was unable to
11 speak?
12 A. Yes.
13 Q. Did you ever see anything throughout the
14 course of events of that evening that contradicted
15 the idea that he was unable to speak?
16 A. No.
17 Q. Did he appear to be having any other
18 physical difficulties in your observations besides
19 being unable to speak?
20 A. No.
21 Q. Was he coordinated?
22 A. He was able to walk out of the BearCat.
23 Q. Did he walk in a slow or hesitating manner
24 indicative of frailty?
25    MS. TIERNEY: Form.

Page 25

1  THE WITNESS: I don't remember.
2  BY MR. OLSON:
3  Q. Once he had been handcuffed, did you take
4  him to the BearCat?
5  A. Yes.
6  Q. And what did you do there?
7  A. We put him in the back of the BearCat, and
8  that's when I -- when things settled down, he just
9  had a thousand-yard stare, and he wasn't responding
10 to -- because I was asking him how many people are in
11 the house, and he wasn't responding to that so we got
12 him to the ambulance.
13 Q. How did you get him into the BearCat?
14 A. Picked him up and loaded him in the middle
15 of the floor.
16 Q. Between the bench seats that face each other
17 in the back of the BearCat?
18 A. Yes.
19 Q. On the floor?
20 A. Yes.
21 Q. Handcuffed?
22 A. Yes.
23 Q. Any possibility that he was injured during
24 that procedure?
25 A. No.

Page 26

1  MS. TIERNEY: Foundation.
2  BY MR. OLSON:
3  Q. In your perception that he was a person who
4  was potentially in need of medical care was based on
5  his appearance and his lack of verbal responses to
6  your questions; correct?
7  A. Yes.
8  Q. Did you see any physical injuries on
9  Mr. Smith at any point?
10 A. No.
11 Q. Did Brooks drive the BearCat over to the
12 staging area where the paramedics and the ambulance
13 were?
14 A. I don't remember if he was in the driver's
15 seat. Initially, he probably would have.
16 Q. Did you take Mr. Smith out of the BearCat to
17 turn him over to the paramedics?
18 A. I don't remember.
19 Q. Was Mr. Smith in custody at that point?
20 MS. TIERNEY: Calls for a legal
21 conclusion.
22 THE WITNESS: Well, he was our
23 suspect, so yeah, he would have been in custody,
24 detained.
25 BY MR. OLSON:

Page 27

1  Q. Did anybody make any arrangements for his
2  security after he was turned over to the paramedics
3  if you know?
4  A. I don't know.
5  Q. I want to direct your attention to
6  Exhibit 3. This is several reports by members of the
7  sheriff's department.
8  A. I don't think I have that.
9     Oh, there it is. Okay.
10 Q. And if I want to refer to these pages, I'm
11 going to just refer to the last two numbers --
12 A. Okay.
13 Q. -- rather than saying "DEF000" every time.
14 A. Sounds good.
15 Q. Thank you.
16    The first report beginning on page 36
17 is the report of Detective Sergeant Barbour who was
18 the team leader; correct?
19 A. Correct.
20 Q. I want to go to the next page, page 37, and
21 up near the top of the page in that first paragraph,
22 this says, quote, "Barbour was in the front passenger
23 seat while Brooks was driving the BearCat," end
24 quote. Was that correct?
25 A. Yes. If it was in the report.

Page 28

1  Q. He goes on to say, quote, "More than one
2  reconnaissance pass-by with BearCat was completed,"
3  end quote. Does that mean that you drove the BearCat
4  by the house slowly to look and see what you could
5  see a few times before you stopped in the front of
6  the house?
7  A. Yeah.
8  Q. He goes on to write, quote, "On one pass-by
9  as the BearCat approached the residence from the
10 east, Barbour could see a male matching the suspect
11 description in the kitchen window. Barbour could see
12 the male open and close several times what Barbour
13 believed to be a refrigerator door. The male was
14 looking out the kitchen window from an elevated
15 position in comparison to the BearCat. Barbour noted
16 nothing suspicious in regards to explosives on the
17 south and east exterior sides of the residence. As
18 the BearCat traveled around the west side of the
19 residence, Barbour, again, noted nothing suspicious."
20    I take it that he had a better vantage
21 point than you do, and he was able to see a little
22 bit more of what was going on in the house?
23 MS. TIERNEY: Foundation.
24 THE WITNESS: Yeah. He's in the front
25 seat so he's got more windows to look out.

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF STETSON GRANT
July 30, 2020

Page 29

BY MR. OLSON:
Q. He goes on to write, "Barbour saw the male subject inside the living room residence (west side of residence). Barbour saw the male look out the living room window," end quote.
    Do you remember seeing him looking out the living room window?
A. No.
Q. Barbour writes, "The BearCat spotlights illuminated the residence entrance and driveway area," end quote. Is that accurate?
A. If it's in Barbour's report, it must be.
Q. Was it getting dark?
A. Yeah. I think it was getting towards the evening.
Q. When Mr. Smith came out of his house, do you remember what he was wearing?
A. A Packer sweatshirt.
Q. Barbour goes on in his report, quote, "Brooks began to call the male out of the residence using the BearCat public announcement," -- paren -- "(PA)" -- close paren -- "system. Brooks identified the personnel as being law enforcement and requested the male to exit the residence. The male came to the front door and opened the front door, momentarily

Page 30

standing in the threshold," end quote. Do you remember that?
A. Yes.
Q. Barbour goes on to write, quote, "The male was slow to respond, was unresponsive to commands. The male stepped out of the residence into the driveway," end quote. Do you remember that?
A. Yes.
Q. At that point, the only command he had been given was to come out of the house; correct?
A. Correct.
Q. Barbour writes, "Barbour saw what Barbour believed to be a dark wet substance on the front of the subject's Green Bay Packers shirt. Barbour believed the substance to possibly be blood" -- paren -- "(later believed to be vomit)" -- close paren, period.
    Did that correspond with your observations when you saw Mr. Smith up close, that the substance on his shirt was vomit?
A. I didn't know -- I thought it was blood.
Q. Barbour goes on to write, quote, "Barbour was still concerned with the threat of explosives, and the concern grew as the suspect remained only mildly responsive to commands given over the PA. The

Page 31

subject would face the BearCat after being told to walk backwards toward the BearCat." Do you remember that?
A. Yes.
Q. Did you think about the possibility that maybe this old guy can't walk backwards?
A. No.
Q. Why not?
A. I guess that's not one of the things going through your mind when you think there's explosives at the front door.
Q. Barbour goes on to write, quote, "The subject was repeatedly told to face away from the BearCat," period. "As the subject faced the BearCat, subject continued to slowly walk toward the passenger side of the vehicle, not following directions," end quote. And, again, do you remember that?
A. All I remember is that he was not following directions. I don't remember specific details unless I look at the report here.
Q. Okay. Looks like in Barbour's report, the direction he was not following was the direction to walk backward instead of frontward. Do you remember him being given the direction to walk backwards?
A. I don't.

Page 32

Q. Barbour goes on to write, quote, "Barbour observed Loduha and Grant decentralize the subject and place the subject in handcuffs," end quote. That means that you and Loduha took him to the ground and put handcuffs on him; correct?
A. Correct.
Q. Barbour goes on to write, quote, "Barbour saw Loduha and Grant move the subject to a location of cover on the driver side of the BearCat," end quote. First of all, the driver side of the BearCat was, at that point, the side opposite, away from the house; correct?
A. Correct.
Q. And is it correct that you took him initially to the driver's side of the BearCat, before you put him into the BearCat?
A. Yes.
Q. Barbour goes on to write, quote, "Loduha told Barbour the subject needed medical attention," end quote. Do you remember that?
A. No. I don't remember who told Barbour that.
Q. Do you remember somebody saying that to Barbour?
A. Yeah. Because I remember thinking it -- or I remember saying it myself. Pretty much the whole

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF STETSON GRANT
July 30, 2020

Page 33

Page 35

1 team said it in the BearCat.
2 Q. More than one person said "this guy needs
3 medical attention"?
4 A. I believe so.
5 Q. And Barber told you to put him into the
6 BearCat so he could be taken to the command post or
7 staging area and turned over to the paramedics?
8 A. Yeah. He was going to be put in the back of
9 the BearCat regardless.
10 Q. Going onto page 39, this is your report;
11 correct?
12 A. Yes.
13 Q. Have you reviewed any documents in
14 preparation for your deposition today?
15 A. Just this report.
16 Q. On page 40, the first full paragraph you
17 write, quote, "The plan was for Helke and Simkins to
18 cover the house and Loduha and Grant take Smith into
19 custody," end quote. Was that, in fact, the plan?
20 A. Yes.
21 Q. And that was a plan made by Barbour and
22 communicated to you from him?
23 A. I don't remember who made the plan, but
24 Barbour was in agreement with that because he's the
25 team leader. We don't do anything without him giving

1 Q. Now, you did not write in here -- in your
2 report -- about any attempt to handcuff Mr. Smith
3 while he was standing up, did you?
4 A. No.
5 Q. As far as what you wrote in your report,
6 there is no active resistance on Mr. Smith's part;
7 correct?
8 A. Not that's in my report.
9 Q. If there had been active resistance in the
10 form of trying to resist being handcuffed, isn't that
11 something that should have been written in the
12 report?
13 A. I should have put it in there.
14 Q. Do you know why you did not?
15 A. I guess I wrote a bad report on that
16 instance. I should have mentioned that in the
17 report.
18 Q. In your report, you wrote, quote, "Smith was
19 handcuffed by Loduha," end quote. Was that -- did
20 you have any role in placing the handcuffs on
21 Mr. Smith?
22 A. Well, I would have been holding Smith's
23 right arm so I didn't have the handcuffs in my hand,
24 but I guess I was part of the handcuff team so...
25 Q. And then you went on to write, quote, "Grant

Page 34

Page 36

1 the "okay" on it.
2 Q. And "cover the house" means get your rifles
3 aimed at the house, and be ready to fire if there's a
4 need for that; correct?
5 A. Correct. To protect me, Loduha, and
6 Mr. Smith.
7 Q. And then you write, quote, "Grant told Smith
8 several times to get on the ground and actively
9 pointed Grant's rifle at Smith."
10    That means you told Mr. Smith to get
11 down on the ground, and you pointed your rifle at
12 him; correct?
13 A. Yes.
14 Q. And that is accurate, is it not?
15 A. Yes.
16 Q. And then you write, quote, "Smith did not
17 comply with Grant's commands," end quote. By that,
18 you mean he did not get on the ground; correct?
19 A. Correct.
20 Q. You write, quote, "Grant and Loduha
21 decentralized Smith to the ground," period, end
22 quote.
23    You had his right arm or left arm if
24 you recall?
25 A. I recall the right arm.

1 and Loduha brought Smith behind the BearCat. Grant
2 asked Smith several times as to how many people were
3 inside the residence. Smith did not speak and just
4 stared at Grant," end quote.
5 A. Correct.
6 Q. Was that one of the things that led you to
7 believe that Mr. Smith was in need of medical
8 attention?
9 A. Yes.
10 Q. And you write, quote, "At that time, it was
11 decided that medical attention was required for
12 Smith," end quote. And your testimony is that that
13 was the opinion of almost everybody in the BearCat;
14 correct?
15    MS. TIERNEY: Foundation.
16    THE WITNESS: Well, it was the opinion
17 of me, Loduha -- but -- yeah. I guess I don't know
18 if everybody saw him. Obviously Brooks couldn't see
19 him but -- yeah. I guess it was the general
20 consensus.
21    BY MR. OLSON:
22 Q. I want to now look at Exhibit 4. The first
23 two pages of Exhibit 4 are the report of Game Warden
24 Riley Brooks. Do you see that?
25 A. Yes.

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF STETSON GRANT
July 30, 2020

Page 37

1 Q. He was driving the BearCat?
2 A. Yes.
3 Q. I want to look at page 46 and starting with
4  the first complete sentence on page 46. So at the
5  end of the first line on the page. It says, quote,
6  "Brooks then informed the suspect that they would
7  like to talk to him and asked him to exit his
8  residence," period. "The suspect began walking down
9  the driveway toward the BearCat," period. "When the
10  suspect was at approximately the middle of the
11  driveway, Brooks told the suspect to stop, face his
12  residence, and put his hands above his head," period,
13  end quote. Does that coincide with your
14  recollection?
15 A. I don't remember his specific commands, but
16  that is your typical.
17 Q. Do you have any recollection of Mr. Smith
18  being told at any time to put his hands above his
19  head?
20 A. I don't.
21 Q. Brooks goes on to write, "The suspect began
22  to turn and face his residence. However, the suspect
23  continued rotating a full 360 degrees and was, again,
24  facing the BearCat. The suspect also failed to raise
25  his hands above his head," end quote.

Page 38

1    I'm guessing you don't remember those
2  details?
3 A. Not those specific details.
4 Q. He goes on, quote, "Brooks, again, told the
5  suspect to turn and face his residence. The suspect
6  began to rotate towards his residence. When the
7  suspect was facing his residence, Brooks told him to
8  stop. It appeared to Brooks that he was going to
9  continue rotating a full 360 degrees again. Brooks
10  then told the suspect to walk backwards toward the
11  sound of his voice. The suspect began to walk
12  backwards," end quote. Do you remember any of those
13  details?
14 A. Not specifically.
15 Q. Going on, quote, "When the suspect was
16  approximately 10 to 15 feet away from the BearCat,
17  Brooks told the suspect 'stop.' Brooks then told the
18  suspect to go down to his knees." Do you remember
19  Brooks giving those commands?
20 A. Not specifically.
21 Q. He goes on, quote, "The suspect remains
22  standing and did not go down to his knees," period.
23  "SRT members then exited the rear of the BearCat to
24  handcuff the suspect," period, end quote. Did
25  anybody exit at that time besides you and Loduha?

Page 39

1 A. I don't recall the people that were covering
2  the house. Technically, would be outside of the
3  BearCat with their guns.
4 Q. So they had been in the BearCat and they
5  exited, but their role was to take up positions,
6  maybe using the BearCat for cover and to cover the
7  house?
8 A. Correct. Somehow or another.
9 Q. Now, Brooks's goes on to state, quote, "A
10  member of the SRT near the suspect stated that the
11  suspect did not appear to be doing well and that he
12  may need medical attention," end quote. Do you
13  remember who that was?
14 A. No.
15 Q. Take a look at Exhibit 6. What's Exhibit 6
16  if you know?
17 A. It's a use of force report.
18 Q. Do you know who filled this out?
19 A. I did.
20 Q. And is this something you have to fill out
21  whenever you use force against a subject?
22 A. Correct.
23 Q. And in this case, you had to fill it out
24  because you and Loduha took Mr. Smith to the ground?
25 A. Correct.

Page 40

1 Q. And at the bottom, there's a checkbox for
2  "narrative report attached." Would that be the
3  report we just looked at?
4 A. Yes.
5 Q. Is it -- let's look at Exhibit 7. Mr. Smith
6  died a few days after this incident, and this is
7  handwritten notes that accompanied the provisional
8  autopsy findings. Down in the lower left-hand
9  corner, there's a list of blunt force traumatic
10  injuries. Do you see that?
11 A. Yes.
12 Q. The first one listed under subheading A is
13  "scabbed abrasions to right lateral face and
14  forehead." Is it possible that those injuries
15  occurred when you took Mr. Smith to the ground?
16    MS. TIERNEY: Foundation.
17    THE WITNESS: I don't remember. I
18  mean, they could have happened, yeah.
19    BY MR. OLSON:
20 Q. Subheading B says "abrasions to knees with
21  contusion to left knee." Is it possible that those
22  injuries occurred either when Mr. Smith was taken to
23  the ground or when he was put into the BearCat?
24    MS. TIERNEY: Foundation.
25    THE WITNESS: Yes. Because we were on

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF STETSON GRANT
July 30, 2020

Page 41

1 the concrete or road.
2     BY MR. OLSON:
3  Q.  C says "abrasion to right scapular area of
4  back of right elbow."  Is it possible that that
5  injury occurred during your encounter with Mr. Smith?
6     MS. TIERNEY: Foundation.  Form.
7     THE WITNESS: It could have.
8     BY MR. OLSON:
9  Q.  And D says "contusion to upper posterior
10  right arm."  Is it possible that Mr. Smith got a
11  contusion to the upper back of his right arm during
12  his encounter with you and Officer Loduha?
13     MS. TIERNEY: Same objections.
14     THE WITNESS: It could have.
15     BY MR. OLSON:
16  Q.  How could that have happened?
17     MS. TIERNEY: Foundation.
18     THE WITNESS: Because we're going to
19  the ground on cement.
20     BY MR. OLSON:
21  Q.  Do you think that could have happened from
22  the strength of an officer's grip on his arm?
23     MS. TIERNEY: Foundation.
24     THE WITNESS: I don't know.
25     BY MR. OLSON:

Page 42

1  Q.  It's possible.  You don't have the medical
2  expertise to know one way or the other?
3  A.  Correct.
4  Q.  Is there a detective or a deputy or somebody
5  in the sheriff's deputy named Cook?
6  A.  Cook?
7     Hook, H-o-o-k?
8  Q.  Maybe.  Maybe Hook.
9  A.  There's Captain Terri Hook.
10  Q.  Anyway -- yeah.  I bet that's who it is.
11     Did you ever know that Alan Smith,
12  Thomas Smith's son, had been living with him at the
13  time of this incident?
14  A.  No.
15  Q.  Did you ever know that Alan Smith had
16  arrived at the scene of the incident while it was
17  occurring before his father came out of the house?
18     MS. TIERNEY: Form.
19     THE WITNESS: No.
20     BY MR. OLSON:
21  Q.  Did you ever learn that Alan Smith had
22  conveyed information about his father to Captain
23  Hook?
24  A.  No.
25     MS. TIERNEY: Form.

Page 43

1     BY MR. OLSON:
2  Q.  If Alan Smith had conveyed to Captain Hook
3  that his father had medical conditions that made it
4  impossible for him to talk and difficult to walk or
5  engage in coordinated physical activity, is that
6  something that Captain Cook -- Hook should have
7  written a report about?
8     MS. TIERNEY: Form.  Foundation.
9     THE WITNESS: You'd have to ask
10  Captain Hook that.
11     BY MR. OLSON:
12  Q.  Are there guidelines for who writes reports
13  about things and who doesn't?
14  A.  If you're a part of the call, you would
15  write a report, I guess.
16  Q.  So many members of the sheriff's department
17  were part of this call; correct?
18  A.  Correct.
19  Q.  And a number of them wrote reports?
20     MS. TIERNEY: Form.
21     THE WITNESS: The only reports I know
22  about are the ones that are in front of me that you
23  showed me.  I don't read everybody else's reports.
24     BY MR. OLSON:
25  Q.  So there might not be an answer to this

Page 44

1  question, but is there anything in your training or
2  in the policies of the sheriff's department that
3  indicates when you have to write a report about your
4  involvement in an incident and when it's okay not to?
5     MS. TIERNEY: Form and foundation.
6     THE WITNESS: I don't believe there is
7  a policy on when you have to write a report and when
8  you don't.
9     MR. OLSON: No further questions.
10     Thanks for coming.
11     EXAMINATION BY MS. TIERNEY:
12  Q.  I have a couple questions.
13     You were asked about being on the
14  arrest team to take Mr. Smith into custody.  Were you
15  instructed to specifically arrest him or bring him
16  either into custody or detain him?
17  A.  If we are going out to get somebody and
18  they're a suspect, they're going in handcuffs before
19  they get to the BearCat.
20  Q.  Okay.  So is that detaining or arresting?
21  A.  It would have been arrested.  He was our
22  suspect.
23  Q.  Okay.  So you placed Mr. Smith under arrest?
24  A.  Yes.
25  Q.  At any point prior to bringing -- placing

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF STETSON GRANT
July 30, 2020

Page 45

1  Mr. Smith in handcuffs and bringing him by the
2  BearCat, were you aware that he was reportedly unable
3  to speak?
4  A.  No.
5  Q.  Prior to bringing him to the BearCat, did
6  you have any indication or any perception that he
7  needed any sort of medical attention?
8  A.  Can you repeat that?
9  Q.  Sure.
10     I believe you testified that once you
11  brought Mr. Smith behind the BearCat, you believed he
12  needed medical attention; right?
13  A.  Correct.
14  Q.  Prior to that point, did you ever have any
15  indication or perceive anything that led you to
16  believe that he needed medical attention?
17  A.  No.
18  Q.  All right.  I believe you also testified in
19  response to a question about one of the things that
20  made you believe he needed medical attention.  Were
21  there -- was there anything else beyond him looking
22  at you and being nonresponsive that you thought
23  warranted medical attention?
24  A.  No.  That was the only thing.  It was just a
25  feeling of "something is wrong with this guy right

Page 46

1  now."
2  Q.  Okay.  Did you see any -- we were looking at
3  Exhibit 7, and there was reference of contusions and
4  abrasions.  When you brought Mr. Smith into custody,
5  did you see any injuries on him?
6  A.  From this point remembering, I don't
7  remember anything on him.  But in my use of force, it
8  says that the subject had blood on his head.
9  Q.  Okay.  But sitting here today, you don't
10  have any recollection?
11  A.  Sitting here today, I don't remember
12  anything about any contusion on the head.
13     MS. TIERNEY:  Okay.  Those are the
14  only questions I have for you.
15     (Deposition concluded at 2:59 p.m.)
16        *   *   *   *   *   *

Page 47

1              CERTIFICATION PAGE
2  STATE OF WISCONSIN  )
   ONEIDA COUNTY       )
3
4       I, PAYTON J. SORENSON, Notary Public in
   and for the State of Wisconsin, do hereby certify;
5
        That prior to being examined, the
6  Deponent named in the foregoing deposition, STETSON
   O. GRANT, was by me duly sworn to testify the truth,
7  the whole truth, and nothing but the truth.  Said
   deponent did not request the opportunity to read and
8  sign the transcript.
9       That said deposition was taken before
   me at the time, date and place set forth; and I
10 hereby certify the foregoing is a full, true and
   correct transcript of my shorthand notes so taken and
11 thereafter reduced to computerized transcription
   under my direction and supervision.
12
        I further certify that I am neither
13 counsel for nor related to any party to said action,
   nor in any way interested in the outcome thereof; and
14 that I have no contract with the parties, attorneys,
   or persons with an interest in the action that
15 affects or has a substantial tendency to affect
   impartially, that requires me to relinquish control
16 of an original deposition transcript before it is
   certified and delivered to the custodial attorney, or
17 that requires me to provide any service not made
   available to all parties to the action.
18
        IN WITNESS WHEREOF, I have hereunto
19 subscribed my name this 10th day of August 2020.
20
21     *Payton Sorenson* (signature)
22
23 Payton J. Sorenson
24 Notary Public - State of Wisconsin
   My Commission Expires March 23, 2022
25

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF STETSON GRANT
July 30, 2020

**[**

**[sic] (1)**
14:16

**A**

**able (3)**
24:6,22;28:21
**above (3)**
37:12,18,25
**abrasion (1)**
41:3
**abrasions (3)**
40:13,20;46:4
**academy (6)**
6:1,20,23;7:1,9;
8:10
**accompanied (1)**
40:7
**according (1)**
18:13
**accurate (2)**
29:11;34:14
**active (12)**
8:18,25;9:7,16,20,
25;10:4,16,22;11:5;
35:6,9
**actively (1)**
34:8
**activity (1)**
43:5
**actually (1)**
17:6
**add (1)**
14:14
**adjacent (1)**
18:8
**advance (1)**
9:14
**again (7)**
12:13;17:14;28:19;
31:17;37:23;38:4,9
**against (1)**
39:21
**agencies (1)**
6:19
**agendas (1)**
9:15
**agreement (1)**
33:24
**aimed (1)**
34:3
**Alan (4)**
42:11,15,21;43:2
**almost (1)**
36:13
**ambulance (3)**
19:25;25:12;26:12
**AMertz (1)**
14:7
**Amery (1)**
5:22
**amount (1)**
23:14
**amplifier (1)**
20:11
**announcement (1)**
29:21
**anything's (1)**
12:10
**appear (3)**
20:7;24:17;39:11
**appearance (1)**
26:5
**appeared (1)**
38:8
**applied (1)**
6:19
**approached (2)**
22:16;28:9
**appropriate (1)**
10:22
**approximately (2)**
37:10;38:16
**April (1)**
11:13
**architect (1)**
5:19
**area (6)**
17:22,23;26:12;
29:11;33:7;41:3
**arm (8)**
23:4;34:23,23,25;
35:23;41:10,11,22
**arms (2)**
23:2,7
**Army (1)**
12:17
**around (2)**
14:1;28:18
**arrangements (1)**
27:1
**Arrest (9)**
8:12,15;9:1,4;
21:13;22:5;44:14,15,
23
**arrested (1)**
44:21
**arresting (1)**
44:20
**arrived (1)**
42:16
**arts (1)**
5:25
**assigned (1)**
21:13
**attached (1)**
40:2
**attempt (1)**
35:2
**attempting (1)**
9:21
**attempts (1)**
9:18
**attention (12)**
19:23;27:5;32:19;
33:3;36:8,11;39:12;
45:7,12,16,20,23
**August (1)**
7:17
**autopsy (1)**
40:8
**aware (1)**
45:2
**away (7)**
9:1,21,22;20:3;
31:13;32:11;38:16

**B**

**bachelor (1)**
5:25
**back (11)**
8:1,24;17:21;19:24;
20:4;23:8;25:7,17;
33:8;41:4,11
**backward (1)**
31:23
**backwards (5)**
31:2,6,24;38:10,12
**bad (1)**
35:15
**Barber (1)**
33:5
**Barbour (33)**
19:5;21:2,10,13;
27:17,22;28:10,11,12,
15,19;29:2,4,9,19;
30:4,12,12,12,14,22,
22;31:12;32:1,1,7,7,
18,19,21,23;33:21,24
**Barbour's (2)**
29:12;31:21
**based (2)**
21:16;26:4
**Bay (1)**
30:14
**BearCat (64)**
13:12;15:4,5,9,12;
18:1,5,7,10,22,24;
19:4,7,14,21,21;21:1,
1,6,10,12,17,21;
24:22;25:4,7,13,17;
26:11,16;27:23;28:2,
3,9,15,18;29:9,21;
31:1,2,14,14;32:9,10,
15,16;33:1,6,9;36:1,
13;37:1,9,24;38:16,
23;39:3,4,6;40:23;
44:19;45:2,5,11
**began (5)**
29:20;37:8,21;38:6,
11
**beginning (1)**
27:16
**behavior (2)**
9:9;11:25
**behaviors (1)**
9:17
**behind (4)**
8:24;23:7;36:1;
45:11
**bench (1)**
25:16
**besides (2)**
24:18;38:25
**bet (1)**
42:10
**better (1)**
28:20
**beyond (1)**
45:21
**bigger (2)**
6:21,25
**bit (1)**
28:22
**blood (4)**
19:11;30:15,21;
46:8
**blue (1)**
14:25
**blunt (1)**
40:9
**born (1)**
5:12
**both (1)**
22:12
**bottom (2)**
14:17;40:1
**bring (2)**
23:7;44:15
**bringing (3)**
44:25;45:1,5
**Brooks (23)**
18:13,16;19:5,9;
20:10,15,24;26:11;
27:23;29:20,22;
36:18,24;37:6,11,21;
38:4,7,8,9,17,17,19
**Brooks's (1)**
39:9
**brought (3)**
36:1;45:11;46:4
**business (1)**
5:24
**buttons (1)**
12:4

**C**

**call (9)**
11:16;13:3,6;16:12,
13;20:11;29:20;
43:14,17
**called (3)**
8:12;11:17;15:25
**Calls (1)**
26:20
**came (9)**
12:3;19:10;20:1,17,
23;21:9;29:16,24;
42:17
**Can (9)**
5:20;10:12;12:22;
14:14;15:20,23;
16:25;17:2;45:8
**Captain (5)**
42:9,22;43:2,6,10
**car (1)**
9:10
**care (1)**
26:4
**case (2)**
5:10;39:23
**cement (1)**
41:19
**center (1)**
12:11
**charge (1)**
21:1
**check (1)**
16:24
**checkbox (1)**
40:1
**child (1)**
11:19
**Chippewa (2)**
6:1;7:6
**cities (1)**
6:25
**city (1)**
6:21
**Claire (6)**
5:24;6:2,9,16,17;
7:7
**clear (1)**
12:8
**close (5)**
23:8;28:12;29:22;
30:16,19
**coincide (3)**
9:5,24;37:13
**College (2)**
6:2;7:6
**column (7)**
13:17;14:2,20;16:5,
5,6,6
**comforting (1)**
17:9
**coming (1)**
44:10
**command (3)**
19:24;30:9;33:6
**commands (12)**
18:21;19:2,9,12,13;
20:22;22:17;30:5,25;
34:17;37:15;38:19
**communicated (1)**
33:22
**communication (1)**
23:15
**comparison (1)**
28:15

**complete (1)**
37:4
**completed (1)**
28:2
**comply (1)**
34:17
**complying (1)**
9:12
**computer (5)**
13:9,12,14;14:1;
16:21
**computers (2)**
13:7,20
**concern (1)**
30:24
**concerned (1)**
30:23
**concluded (1)**
46:15
**conclusion (2)**
15:24;26:21
**concrete (1)**
41:1
**conditions (1)**
43:3
**conduct (1)**
11:25
**consensus (1)**
36:20
**contains (1)**
14:2
**continue (1)**
38:9
**continued (2)**
31:15;37:23
**contradicted (1)**
24:14
**control (1)**
9:18
**contusion (4)**
40:21;41:9,11;
46:12
**contusions (1)**
46:3
**conveyed (5)**
11:21;12:4;18:2;
42:22;43:2
**Cook (3)**
42:5,6;43:6
**coordinated (2)**
24:21;43:5
**corner (1)**
40:9
**correspond (1)**
30:18
**counteract (1)**
9:17
**County (3)**
7:18;11:1;22:1
**couple (2)**
15:18;44:12
**course (1)**
24:14

**court (1)**
10:11
**cover (5)**
32:9;33:18;34:2;
39:6,6
**covering (1)**
39:1
**created (1)**
14:2
**criminal (2)**
5:25;11:25
**Croatian (1)**
12:17
**cuffs (1)**
19:18
**current (1)**
9:6
**custody (8)**
15:19,21;26:19,23;
33:19;44:14,16;46:4

**D**

**dad (1)**
5:18
**dangerous (1)**
11:25
**dark (2)**
29:13;30:13
**date (2)**
13:10,14
**days (1)**
40:6
**dead (1)**
11:18
**decentralize (1)**
32:2
**decentralized (1)**
34:21
**decentralizing (1)**
19:19
**decide (1)**
21:4
**decided (1)**
36:11
**DEF000 (1)**
27:13
**DEF00010 (1)**
16:4
**DEF0008 (1)**
14:17
**defendant (1)**
5:9
**Defensive (2)**
8:12;9:4
**degrees (2)**
37:23;38:9
**delay (1)**
16:1
**Department (9)**
7:11,23;8:11;11:1;
12:11;14:11;27:7;
43:16;44:2

**depends (1)**
10:18
**deposition (2)**
33:14;46:15
**deputies (1)**
8:8
**deputy (4)**
7:24;8:2;42:4,5
**describe (1)**
8:21
**description (1)**
28:11
**detail (1)**
13:3
**details (4)**
31:19;38:2,3,13
**detain (1)**
44:16
**detained (1)**
26:24
**detaining (1)**
44:20
**Detective (2)**
27:17;42:4
**died (1)**
40:6
**difference (5)**
8:18,22;9:6,25;
16:18
**different (2)**
6:19;15:25
**difficult (1)**
43:4
**difficulties (1)**
24:18
**diploma (1)**
5:23
**direct (1)**
27:5
**directed (1)**
9:22
**direction (3)**
31:22,22,24
**directions (2)**
31:16,19
**dispatch (1)**
12:11
**dispatcher (1)**
12:16
**dispatchers (2)**
13:21;14:5
**dispute (1)**
18:14
**distinction (1)**
11:4
**documents (2)**
13:2;33:13
**done (1)**
12:10
**door (10)**
11:23;15:7,21;
17:20;18:8;20:17;
28:13;29:25,25;31:11

**down (7)**
15:18;25:8;34:11;
37:8;38:18,22;40:8
**drive (2)**
18:7;26:11
**driver (2)**
32:9,10
**driver's (2)**
26:14;32:15
**driveway (5)**
23:22;29:10;30:7;
37:9,11
**driving (3)**
18:10;27:23;37:1
**drove (2)**
17:25;28:3
**drug (1)**
7:25
**duly (1)**
5:3
**during (3)**
25:23;41:5,11

**E**

**east (2)**
28:10,17
**Eau (3)**
6:2,16;7:6
**education (1)**
5:21
**either (4)**
13:24;17:10;40:22;
44:16
**elapsed (1)**
15:20
**elbow (1)**
41:4
**elevated (1)**
28:14
**else (2)**
19:4;45:21
**else's (1)**
43:23
**employee (2)**
16:10;17:16
**encounter (2)**
41:5,12
**encounters (2)**
10:22,23
**end (22)**
27:23;28:3;29:5,11;
30:1,7;31:16;32:3,9,
20;33:19;34:17,21;
35:19;36:4,12;37:5,
13,25;38:12,24;39:12
**ended (1)**
19:19
**enforcement (1)**
29:23
**engage (1)**
43:5
**enough (2)**

23:7,8
**entered (1)**
13:21
**entering (1)**
14:23
**entire (1)**
12:17
**entrance (1)**
29:10
**entries (3)**
15:18;16:2,24
**entry (1)**
14:21
**evening (2)**
24:14;29:15
**events (2)**
11:13;24:14
**everybody (3)**
36:13,18;43:23
**everyone (1)**
13:24
**exactly (1)**
15:16
**EXAMINATION (2)**
5:6;44:11
**examined (1)**
5:3
**example (1)**
9:9
**Examples (1)**
9:20
**Exhibit (12)**
12:24;13:3,20;
14:17;17:12;27:6;
36:22,23;39:15,15;
40:5;46:3
**exhibits (1)**
12:23
**exit (3)**
29:24;37:7;38:25
**exited (2)**
38:23;39:5
**expertise (1)**
42:2
**explosives (5)**
11:23;12:1;28:16;
30:23;31:10
**exterior (1)**
28:17

**F**

**face (7)**
25:16;31:1,13;
37:11,22;38:5;40:13
**faced (1)**
31:14
**facing (2)**
37:24;38:7
**fact (3)**
12:6;15:24;33:19
**failed (1)**
37:24

**fall (2)**
6:15,16
**familiar (1)**
13:2
**far (1)**
35:5
**fastest (1)**
21:18
**father (3)**
42:17,22;43:3
**feeling (1)**
45:25
**feet (1)**
38:16
**few (2)**
28:5;40:6
**fighting (2)**
9:2,11
**fill (2)**
39:20,23
**filled (1)**
39:18
**find (1)**
17:8
**findings (1)**
40:8
**fire (1)**
34:3
**first (9)**
5:2;27:16,21;32:10;
33:16;36:22;37:4,5;
40:12
**floor (2)**
25:15,19
**folder (1)**
12:24
**folks (1)**
5:16
**following (6)**
7:2;14:24;19:13;
31:16,18,22
**follows (1)**
5:3
**force (9)**
7:25;10:19,21;11:2;
23:16;39:17,21;40:9;
46:7
**forehead (1)**
40:14
**Form (8)**
24:25;35:10;41:6;
42:18,25;43:8,20;
44:5
**formal (1)**
5:20
**former (1)**
16:12
**forth (1)**
20:4
**found (1)**
12:6
**Foundation (12)**
10:6;15:10;26:1;

28:23;36:15;40:16,
24;41:6,17,23;43:8;
44:5
**fourth (1)**
14:16
**frailty (1)**
24:24
**front (14)**
11:23;15:7,20;
17:20;18:8;20:17;
27:22;28:5,24;29:25,
25;30:13;31:11;43:22
**front-first (1)**
23:20
**frontward (1)**
31:23
**full (3)**
33:16;37:23;38:9
**full-time (2)**
6:7,11
**further (1)**
44:9

**G**

**game (3)**
18:12,16;36:23
**garage (3)**
11:19,20,23
**gave (3)**
15:16;19:2;22:17
**general (1)**
36:19
**Generally (1)**
10:21
**gets (1)**
15:25
**given (5)**
19:12;20:23;30:10,
25;31:24
**giving (3)**
18:21;33:25;38:19
**goes (14)**
28:1,8;29:2,19;
30:4,22;31:12;32:1,7,
18;37:21;38:4,21;
39:9
**good (1)**
27:14
**graduate (1)**
6:3
**graduated (1)**
6:17
**GRANT (12)**
5:2,8,9;16:7;32:2,8;
33:18;34:7,20;35:25;
36:1,4
**Grant's (2)**
34:9,17
**grasp (1)**
9:21
**greater (1)**
10:21

**green (2)**
14:25;30:14
**grew (1)**
30:24
**grip (1)**
41:22
**ground (19)**
9:23;19:16,19;
22:18,19,20;23:16,20;
24:4,5;32:4;34:8,11,
18,21;39:24;40:15,
23;41:19
**growing (1)**
5:17
**guess (10)**
21:17,19,24,24;
31:9;35:15,24;36:17,
19;43:15
**guessing (1)**
38:1
**guidelines (1)**
43:12
**guns (1)**
39:3
**gunshot (1)**
11:20
**guy (5)**
19:23;21:18;31:6;
33:2;45:25

**H**

**hand (2)**
9:16;35:23
**handcuff (6)**
19:18;22:24;24:6;
35:2,24;38:24
**handcuffed (5)**
24:3;25:3,21;35:10,
19
**handcuffs (9)**
19:20;23:8,11;32:3,
5;35:20,23;44:18;
45:1
**hands (5)**
8:24;20:21;37:12,
18,25
**handwritten (1)**
40:7
**happen (1)**
12:12
**happened (5)**
6:24;19:7;40:18;
41:16,21
**happening (2)**
13:8;17:18
**harm (1)**
9:19
**head (5)**
37:12,19,25;46:8,
12
**headed (2)**
13:17;14:2

**Helke (1)**
33:17
**help (1)**
12:23
**hesitating (1)**
24:23
**High (2)**
5:22;6:3
**hired (3)**
6:25;7:11,18
**history (1)**
5:20
**holding (1)**
35:22
**home (1)**
20:1
**Hook (7)**
42:7,8,9,23;43:2,6,
10
**H-o-o-k (1)**
42:7
**hostage (2)**
11:17;18:2
**hostages (1)**
12:1
**hours (1)**
7:4
**house (19)**
11:13;12:17;18:25;
19:8;20:16,23;25:11;
28:4,6,22;29:16;
30:10;32:12;33:18;
34:2,3;39:2,7;42:17
**hurry (1)**
18:1

**I**

**idea (2)**
12:19;24:15
**identified (1)**
29:22
**identify (1)**
20:3
**illuminated (1)**
29:10
**impossible (1)**
43:4
**incident (5)**
17:13;40:6;42:13,
16;44:4
**include (1)**
9:20
**independent (1)**
11:12
**indicated (1)**
18:12
**indicates (1)**
44:3
**indication (2)**
45:6,15
**indicative (1)**
24:24

**information (8)**
8:14;12:3;13:16;
14:24;15:3,8,17;
42:22
**informed (1)**
37:6
**initially (3)**
17:24;26:15;32:15
**injured (2)**
24:1;25:23
**injuries (5)**
26:8;40:10,14,22;
46:5
**injury (1)**
41:5
**inside (3)**
18:22;29:3;36:3
**instance (1)**
35:16
**instead (1)**
31:23
**instructed (1)**
44:15
**interact (1)**
21:24
**into (11)**
6:21;18:4;25:13;
30:6;32:16;33:5,18;
40:23;44:14,16;46:4
**investigator (1)**
7:25
**involved (2)**
17:13;18:17
**involvement (2)**
18:20;44:4

**J**

**Jack (5)**
14:4,23;15:2,8,19
**Jake (1)**
19:6
**January (2)**
7:17;8:6
**jeans (1)**
14:25
**JLilek (1)**
14:23
**J-L-i-l-e-k (1)**
14:3
**jobs (1)**
7:10
**justice (2)**
5:25;8:11

**K**

**kind (2)**
21:16,24
**kinds (1)**
17:10
**kitchen (5)**
20:4,8,9;28:11,14

**knee (1)**
    40:21
**knees (3)**
    38:18,22;40:20
**knew (1)**
    11:8

**L**

**lack (1)**
    26:5
**landscaping (1)**
    7:10
**last (2)**
    23:10;27:11
**later (2)**
    24:10;30:16
**lateral (1)**
    40:13
**law (1)**
    29:23
**leader (4)**
    21:3,9;27:18;33:25
**learn (2)**
    24:10;42:21
**learned (2)**
    11:18;17:19
**least (1)**
    13:19
**led (2)**
    36:6;45:15
**left (2)**
    34:23;40:21
**left-hand (1)**
    40:8
**legal (1)**
    26:20
**level (1)**
    10:19
**Lilek (3)**
    14:4,23;15:19
**line (1)**
    37:5
**list (1)**
    40:9
**listed (1)**
    40:12
**listing (1)**
    17:12
**little (2)**
    17:8;28:21
**living (5)**
    5:16;29:3,5,7;42:12
**loaded (1)**
    25:14
**location (1)**
    32:8
**Loduha (24)**
    16:22;19:5,14;21:4,
    5,20;22:8,19,23;23:4,
    16;32:2,4,8,18;33:18;
    34:5,20;35:19;36:1,
    17;38:25;39:24;41:12

**long (4)**
    6:7;7:3,16;23:10
**look (14)**
    12:24,24;14:16,20;
    16:4;17:5;28:4,25;
    29:4;31:20;36:22;
    37:3;39:15;40:5
**looked (2)**
    19:11;40:3
**looking (6)**
    11:6;14:25;28:14;
    29:6;45:21;46:2
**Looks (1)**
    31:21
**Loudspeaker (5)**
    20:13,14,14,15,24
**lower (1)**
    40:8

**M**

**main (1)**
    8:14
**major (1)**
    5:24
**making (2)**
    16:1;19:9
**Male (11)**
    14:24;28:10,12,13;
    29:2,4,20,24,24;30:4,
    6
**manager (1)**
    5:19
**manner (1)**
    24:23
**many (3)**
    25:10;36:2;43:16
**Mark (1)**
    14:10
**matching (1)**
    28:10
**matter (1)**
    15:24
**may (1)**
    39:12
**maybe (5)**
    12:18;31:6;39:6;
    42:8,8
**mean (4)**
    21:7;28:3;34:18;
    40:18
**means (5)**
    17:7,9;32:4;34:2,10
**medical (14)**
    19:23;26:4;32:19;
    33:3;36:7,11;39:12;
    42:1;43:3;45:7,12,16,
    20,23
**member (1)**
    39:10
**members (3)**
    27:6;38:23;43:16
**mentioned (1)**

    35:16
**merely (1)**
    10:23
**Mertz (1)**
    14:8
**messages (1)**
    14:12
**met (1)**
    18:1
**Michelin (1)**
    5:18
**middle (2)**
    25:14;37:10
**might (4)**
    10:7;16:1;20:8;
    43:25
**mildly (1)**
    30:25
**mind (1)**
    31:10
**Minneapolis (1)**
    5:13
**Minnesota (1)**
    5:13
**Minocqua (1)**
    21:23
**minutes (1)**
    15:22
**mobilized (1)**
    17:19
**mom (1)**
    5:19
**momentarily (1)**
    29:25
**more (5)**
    19:12;28:1,22,25;
    33:2
**move (1)**
    32:8
**MRaddatz (1)**
    14:9
**much (2)**
    15:20;32:25
**must (2)**
    17:11;29:12
**myself (2)**
    7:1;32:25
**mystify (1)**
    17:11

**N**

**name (2)**
    5:7;14:3
**named (2)**
    18:13;42:5
**narrative (3)**
    13:17;14:15;40:2
**near (2)**
    27:21;39:10
**necessarily (2)**
    12:8;13:22
**need (4)**

    26:4;34:4;36:7;
    39:12
**needed (6)**
    19:23;32:19;45:7,
    12,16,20
**needs (1)**
    33:2
**next (2)**
    18:24;27:20
**nine-year-old (1)**
    11:19
**noncompliant (1)**
    9:9
**none (1)**
    11:24
**nonresponsive (1)**
    45:22
**nonthreatening (1)**
    9:9
**noted (2)**
    28:15,19
**notes (1)**
    40:7
**number (6)**
    16:10,11,12,19;
    17:16;43:19
**numbers (2)**
    16:6;27:11

**O**

**objection (1)**
    10:17
**objections (2)**
    10:7;41:13
**observations (2)**
    24:18;30:19
**observed (1)**
    32:2
**Obviously (1)**
    36:18
**occurred (3)**
    40:15,22;41:5
**occurring (1)**
    42:17
**October (1)**
    7:19
**odd (1)**
    20:7
**off (1)**
    11:6
**Office (2)**
    7:19;22:1
**officer (7)**
    9:19;10:22;14:10;
    21:5,20,23;41:12
**officers (4)**
    10:4,15;13:19;21:1
**officer's (3)**
    9:18,21;41:22
**often (1)**
    9:13
**old (1)**

    31:6
**OLSON (20)**
    5:6;10:13,20;15:14;
    25:2;26:2,25;29:1;
    36:21;40:19;41:2,8,
    15,20,25;42:20;43:1,
    11,24;44:9
**once (3)**
    21:24;25:3;45:10
**one (19)**
    11:8;12:16,18;14:5;
    15:19,21;16:19;17:2,
    5;20:8;23:2;28:1,8;
    31:9;33:2;36:6;40:12;
    42:2;45:19
**Oneida (3)**
    7:18;11:1;22:1
**ones (1)**
    43:22
**one's (1)**
    20:8
**only (5)**
    30:9,24;43:21;
    45:24;46:14
**onto (1)**
    33:10
**open (1)**
    28:12
**opened (1)**
    29:25
**opening (2)**
    15:8,21
**operation (1)**
    18:17
**opinion (2)**
    36:13,16
**opposite (1)**
    32:11
**order (2)**
    22:4,7
**ordered (1)**
    9:11
**orders (1)**
    9:13
**ordinary (1)**
    20:8
**Osceola (3)**
    7:11,14,15
**Osseo (1)**
    7:13
**others (1)**
    9:20
**out (39)**
    7:8,24;9:10;11:17,
    24;12:6;13:25;14:12;
    15:1,25;19:10,14;
    20:2,16,17,23;21:5,6,
    12,18,20;22:3,4,8;
    24:22;26:16;28:14,
    25;29:4,6,16,20;30:6,
    10;39:18,20,23;
    42:17;44:17
**outside (1)**

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF STETSON GRANT
July 30, 2020

39:2
**over (8)**
8:7;14:12;20:24;
26:11,17;27:2;30:25;
33:7
**own (2)**
8:21;22:20

### P

**PA (2)**
29:22;30:25
**Packer (2)**
14:25;29:18
**Packers (1)**
30:14
**page (13)**
9:4;14:16;17:5,7;
27:16,20,20,21;33:10,
16;37:3,4,5
**pages (2)**
27:10;36:23
**paid (1)**
6:21
**paragraph (2)**
27:21;33:16
**paragraphs (2)**
9:3,24
**paramedics (4)**
26:12,17;27:2;33:7
**paren (4)**
29:21,22;30:16,17
**part (5)**
21:13;35:6,24;
43:14,17
**partner (1)**
22:1
**part-time (1)**
7:12
**pass-by (2)**
28:2,8
**passenger (2)**
27:22;31:15
**passive (10)**
8:18,23;9:7,8,13;
10:1,4,16,23;11:5
**patrol (1)**
8:7
**pay (1)**
6:22
**people (5)**
12:21;16:20;25:10;
36:2;39:1
**perceive (1)**
45:15
**perception (2)**
26:3;45:6
**perimeter (2)**
13:25;15:13
**period (9)**
23:14;30:17;31:14;
34:21;37:8,9,12;
38:22,24

**person (4)**
9:10,11;26:3;33:2
**personnel (4)**
16:6,7;17:13;29:23
**phone (1)**
12:4
**physical (3)**
24:18;26:8;43:5
**physically (1)**
9:17
**picked (2)**
19:20;25:14
**picture (1)**
11:22
**place (1)**
32:3
**placed (1)**
44:23
**placing (2)**
35:20;44:25
**plan (4)**
33:17,19,21,23
**Please (1)**
5:7
**pm (1)**
46:15
**point (8)**
26:9,19;28:21;30:9;
32:11;44:25;45:14;
46:6
**pointed (4)**
19:14;22:13;34:9,
11
**police (12)**
6:1,20;7:1,9,11;
8:10;10:3,15;14:8,10,
11;21:23
**policies (3)**
11:2,4;44:2
**policy (3)**
11:7,11;44:7
**political (1)**
9:14
**pose (1)**
9:19
**position (1)**
28:15
**positions (1)**
39:5
**possession (1)**
20:19
**possibility (2)**
25:23;31:5
**possible (5)**
40:14,21;41:4,10;
42:1
**possibly (1)**
30:15
**post (2)**
19:24;33:6
**posterior (1)**
41:9
**potentially (1)**

26:4
**precipitated (1)**
22:2
**preparation (1)**
33:14
**presence (1)**
24:8
**press (1)**
12:16
**pressed (1)**
12:18
**pressing (1)**
12:4
**Pretty (1)**
32:25
**previously (1)**
21:21
**primary (1)**
16:5
**prior (3)**
44:25;45:5,14
**probably (2)**
12:18;26:15
**procedure (1)**
25:24
**program (1)**
7:3
**promoted (3)**
8:1,2,4
**pronounce (1)**
14:3
**protect (1)**
34:5
**Protesters (1)**
9:13
**provisional (1)**
40:7
**public (2)**
20:10;29:21
**publication (2)**
8:12;9:5
**pull (1)**
9:21
**pulled (1)**
17:20
**pulling (1)**
9:1
**put (12)**
7:1;8:23;19:21;
25:7;32:5,16;33:5,8;
35:13;37:12,18;40:23

### Q

**Quote (44)**
9:8;27:22,24;28:1,
3,8;29:5,11,19;30:1,4,
7,22;31:12,17;32:1,3,
7,10,18,20;33:17,19;
34:7,16,17,20,22;
35:18,19,25;36:4,10,
12;37:5,13,25;38:4,
12,15,21,24;39:9,12

### R

**Raddatz (1)**
14:10
**radio (5)**
16:6,11,13,19;
18:21
**raise (1)**
37:24
**rank (1)**
7:22
**rather (1)**
27:13
**read (3)**
9:3;13:20;43:23
**ready (1)**
34:3
**realized (1)**
19:22
**rear (1)**
38:23
**recall (6)**
11:6,15;23:13;
34:24,25;39:1
**received (1)**
22:7
**recognize (2)**
10:4,16
**recollection (5)**
11:12;23:6;37:14,
17;46:10
**reconnaissance (1)**
28:2
**refer (2)**
27:10,11
**reference (1)**
46:3
**refers (2)**
9:8,17
**refrigerator (1)**
28:13
**refused (1)**
19:16
**refuses (1)**
9:10
**regardless (1)**
33:9
**regards (1)**
28:16
**remained (1)**
30:24
**remains (1)**
38:21
**remember (48)**
8:17;11:10,11;
17:18,25;18:4,11,16,
19,21;19:2,4,6;20:22,
25;21:7,8,14;22:2,17,
18;23:17;25:1;26:14,
18;29:6,17;30:2,7;
31:2,17,18,19,23;
32:20,21,22,24,25;

33:23;37:15;38:1,12,
18;39:13;40:17;46:7,
11
**remembering (1)**
46:6
**repeat (2)**
10:12;45:8
**repeatedly (1)**
31:13
**report (25)**
13:3;27:16,17,25;
29:12,19;31:20,21;
33:10,15;35:2,5,8,12,
15,17,18;36:23;
39:17;40:2,3;43:7,15;
44:3,7
**reportedly (1)**
45:2
**reporter (1)**
10:11
**reports (7)**
11:24;18:13;27:6;
43:12,19,21,23
**requested (1)**
29:23
**required (1)**
36:11
**residence (17)**
19:10;28:9,17,19;
29:3,4,10,20,24;30:6;
36:3;37:8,12,22;38:5,
6,7
**resist (1)**
35:10
**resistance (19)**
8:18,19,23,25;9:7,7,
8,13,16,20;10:1,5,16,
23,24;11:5,5;35:6,9
**resisting (1)**
19:18
**respond (1)**
30:5
**responding (2)**
25:9,11
**response (2)**
11:16;45:19
**responses (1)**
26:5
**responsive (1)**
30:25
**reviewed (1)**
33:13
**Rhinelander (2)**
14:8,11
**rifle (2)**
34:9,11
**rifles (4)**
19:15,17;22:12;
34:2
**right (15)**
11:6,10;14:22;20:3;
34:23,25;35:23;
40:13;41:3,4,10,11;

45:12,18,25
**Riley (1)**
  36:24
**risk (1)**
  9:19
**road (2)**
  8:2;41:1
**role (2)**
  35:20;39:5
**room (3)**
  29:3,5,7
**rotate (1)**
  38:6
**rotating (2)**
  37:23;38:9
**rules (1)**
  10:10
**running (1)**
  9:22

**S**

**sales (1)**
  5:18
**Same (3)**
  10:17;15:7;41:13
**saw (8)**
  20:4,9;29:2,4;
  30:12,19;32:8;36:18
**saying (3)**
  27:13;32:22,25
**scabbed (1)**
  40:13
**scapular (1)**
  41:3
**scene (1)**
  42:16
**School (2)**
  5:22;6:3
**seat (3)**
  26:15;27:23;28:25
**seats (1)**
  25:16
**second (1)**
  17:5
**seconds (1)**
  15:22
**security (1)**
  27:2
**seeing (1)**
  29:6
**self (1)**
  6:22
**send (1)**
  14:12
**sentence (1)**
  37:4
**sergeant (5)**
  8:3,5,7;14:8;27:17
**service (1)**
  13:3
**set (1)**
  16:21

**settled (1)**
  25:8
**several (4)**
  27:6;28:12;34:8;
  36:2
**Sheriff's (9)**
  7:18,22;11:1;12:11;
  22:1;27:7;42:5;43:16;
  44:2
**shirt (3)**
  14:25;30:14,20
**short (2)**
  9:3;23:14
**show (4)**
  13:10,14,16;17:2
**showed (1)**
  43:23
**showing (1)**
  16:4
**shown (1)**
  11:22
**side (7)**
  28:18;29:3;31:16;
  32:9,10,11,15
**sides (1)**
  28:17
**significance (1)**
  16:25
**Simkins (2)**
  19:6;33:17
**simply (1)**
  9:12
**sit (1)**
  21:18
**sit-ins (1)**
  9:14
**sitting (3)**
  21:16;46:9,11
**situation (2)**
  11:18;18:3
**slow (2)**
  24:23;30:5
**slowly (2)**
  28:4;31:15
**slung (1)**
  19:17
**Smith (48)**
  11:21;12:3,16;19:9,
  10,15;20:16,16;22:6,
  10,15,23;26:9,16,19;
  29:16;30:19;33:18;
  34:6,7,9,10,16,21;
  35:2,18,21;36:1,2,3,7,
  12;37:17;39:24;40:5,
  15,22;41:5,10;42:11,
  15,21;43:2;44:14,23;
  45:1,11;46:4
**Smith's (7)**
  11:13;18:8,24;19:8;
  35:6,22;42:12
**somebody (8)**
  20:25;21:7,15,25;
  22:4;32:22;42:4;

44:17
**Somehow (2)**
  17:8;39:8
**someone (1)**
  15:13
**sometimes (1)**
  15:24
**son (1)**
  42:12
**sort (1)**
  45:7
**sound (1)**
  38:11
**Sounds (1)**
  27:14
**source (1)**
  8:14
**south (1)**
  28:17
**speak (5)**
  24:11,15,19;36:3;
  45:3
**Speaker (1)**
  20:12
**speaking (2)**
  10:21;12:5
**special (1)**
  11:16
**specific (4)**
  23:13;31:19;37:15;
  38:3
**specifically (3)**
  38:14,20;44:15
**spotlights (1)**
  29:9
**spring (1)**
  6:15
**squad (6)**
  13:7,9,11,12,14,19
**squads (2)**
  13:25;14:15
**SRT (3)**
  17:19;38:23;39:10
**staging (5)**
  9:14;17:22,23;
  26:12;33:7
**standing (5)**
  22:25;23:11;30:1;
  35:3;38:22
**stare (1)**
  25:9
**stared (1)**
  36:4
**start (1)**
  9:1
**started (2)**
  7:24;19:9
**starting (1)**
  37:3
**state (2)**
  5:7;39:9
**stated (1)**
  39:10

**stating (1)**
  13:8
**stepped (1)**
  30:6
**STETSON (3)**
  5:2,8,9
**stick (1)**
  10:7
**still (3)**
  8:2;10:8;30:23
**stop (2)**
  37:11;38:8
**stop' (1)**
  38:17
**stopped (1)**
  28:5
**street (3)**
  18:7;23:23,24
**strength (1)**
  41:22
**strong (1)**
  23:7
**student (2)**
  6:7,11
**subheading (2)**
  40:12,20
**subject (15)**
  9:18,19;20:4,9;
  29:3;31:1,13,14,15;
  32:2,3,8,19;39:21;
  46:8
**subject's (1)**
  30:14
**substance (3)**
  30:13,15,20
**suggestion (1)**
  12:21
**summary (1)**
  13:6
**summer (1)**
  7:10
**suppose (1)**
  12:20
**Sure (4)**
  10:14;12:12;21:11;
  45:9
**suspect (26)**
  11:21;22:5;26:23;
  28:10;30:24;37:6,8,
  10,11,21,22,24;38:5,
  5,7,10,11,15,17,18,21,
  24;39:10,11;44:18,22
**suspicious (2)**
  28:16,19
**sweatshirt (3)**
  14:25;19:11;29:18
**sworn (1)**
  5:3
**system (4)**
  14:13;16:21;20:12;
  29:22

**T**

**tactic (1)**
  9:14
**Tactics (3)**
  8:12,15;9:4
**talk (2)**
  37:7;43:4
**talking (1)**
  12:20
**task (1)**
  7:25
**team (9)**
  11:16;21:2,9,13;
  27:18;33:1,25;35:24;
  44:14
**Technical (2)**
  6:2;7:6
**Technically (1)**
  39:2
**telling (1)**
  22:19
**Terri (1)**
  42:9
**territory (1)**
  5:18
**testified (3)**
  5:3;45:10,18
**testimony (1)**
  36:12
**Thanks (1)**
  44:10
**thinking (2)**
  12:15;32:24
**Thomas (3)**
  11:13,21;42:12
**thought (2)**
  30:21;45:22
**thousand-yard (1)**
  25:9
**threat (1)**
  30:23
**threshold (1)**
  30:1
**throughout (1)**
  24:13
**TIERNEY (22)**
  10:6,11,17;15:10;
  24:25;26:1,20;28:23;
  36:15;40:16,24;41:6,
  13,17,23;42:18,25;
  43:8,20;44:5,11;
  46:13
**times (5)**
  15:25;28:5,12;34:8;
  36:2
**tire (1)**
  5:18
**today (3)**
  33:14;46:9,11
**together (2)**
  21:21;23:7

**told (16)**
  19:15;20:16;31:1,
  13;32:19,21;33:5;
  34:7,10;37:11,18;
  38:4,7,10,17,17
**took (6)**
  19:21,24;32:4,14;
  39:24;40:15
**top (2)**
  17:5;27:21
**toward (4)**
  31:2,15;37:9;38:10
**towards (2)**
  29:14;38:6
**train (2)**
  10:3,15
**trained (1)**
  8:17
**training (4)**
  8:10,11,15;44:1
**transferred (1)**
  5:24
**traumatic (1)**
  40:9
**traveled (1)**
  28:18
**tried (2)**
  19:17;22:24
**true (1)**
  12:1
**try (1)**
  9:1
**trying (3)**
  6:21;23:11;35:10
**turn (3)**
  26:17;37:22;38:5
**turned (3)**
  11:24;27:2;33:7
**two (3)**
  9:3;27:11;36:23
**typical (1)**
  37:16

**U**

**unable (4)**
  24:10,15,19;45:2
**under (4)**
  13:16;16:7;40:12;
  44:23
**unit (5)**
  7:25;16:16,19,24;
  17:14
**units (2)**
  16:5,5
**unless (1)**
  31:19
**unresponsive (1)**
  30:5
**up (17)**
  5:17;9:22;13:7;
  16:21;17:20;18:1,7;
  19:19,21;22:23,25;

  23:12;25:14;27:21;
  30:19;35:3;39:5
**upper (2)**
  41:9,11
**use (5)**
  9:13;11:2;39:17,21;
  46:7
**used (1)**
  10:19
**using (2)**
  29:21;39:6
**UW-Eau (3)**
  5:24;6:9,17
**UW-Whitewater (2)**
  5:23;6:6

**V**

**Valley (2)**
  6:1;7:6
**vantage (1)**
  28:20
**vehicle (3)**
  22:3,5;31:16
**verbal (1)**
  26:5
**verbatim (1)**
  11:11
**versus (2)**
  10:4,16
**victim (1)**
  11:20
**voice (1)**
  38:11
**volition (1)**
  22:21
**vomit (2)**
  30:16,20

**W**

**walk (10)**
  24:22,23;31:2,6,15,
  23,24;38:10,11;43:4
**walked (1)**
  22:10
**walking (1)**
  37:8
**warden (3)**
  18:12,16;36:23
**warranted (1)**
  45:23
**way (3)**
  6:22;21:22;42:2
**weapons (2)**
  11:25;20:20
**wearing (2)**
  14:24;29:17
**west (2)**
  28:18;29:3
**wet (1)**
  30:13
**What's (7)**

  5:16;10:3;13:5;
  16:9,11,18;39:15
**whenever (1)**
  39:21
**wherever (1)**
  21:18
**Whitewater (1)**
  6:14
**whole (2)**
  24:7;32:25
**window (5)**
  15:1;28:11,14;29:5,
  7
**windows (2)**
  14:24;28:25
**Wisconsin (2)**
  6:22;8:11
**without (3)**
  11:6;12:4;33:25
**WITNESS (19)**
  5:4;10:9,12,18;
  15:11;25:1;26:22;
  28:24;36:16;40:17,
  25;41:7,14,18,24;
  42:19;43:9,21;44:6
**words (1)**
  8:21
**work (1)**
  7:16
**worked (2)**
  7:10;21:21
**write (19)**
  28:8;29:2;30:4,22;
  31:12;32:1,7,18;
  33:17;34:7,16,20;
  35:1,25;36:10;37:21;
  43:15;44:3,7
**writes (3)**
  29:9;30:12;43:12
**writing (1)**
  15:19
**written (2)**
  35:11;43:7
**wrong (2)**
  19:22;45:25
**wrote (4)**
  35:5,15,18;43:19

**Y**

**year (4)**
  5:14;6:3,20;7:2
**Yep (1)**
  17:17

**0**

**008 (1)**
  14:18

**1**

**1 (3)**

  12:24;13:3,20
**10 (1)**
  38:16
**15 (1)**
  38:16
**1986 (1)**
  5:15

**2**

**2 (2)**
  15:22;17:12
**2:59 (1)**
  46:15
**20:09:41 (1)**
  14:21
**20:10:05 (1)**
  15:7
**20:12:28 (1)**
  15:19
**2005 (3)**
  6:4,14,15
**2006 (5)**
  6:8,14,15,15,16
**2011 (3)**
  6:8,14,16
**2013 (2)**
  7:17,20
**2017 (1)**
  11:13
**2019 (1)**
  8:6
**21 (1)**
  15:22
**22 (1)**
  17:5

**3**

**3 (1)**
  27:6
**339 (1)**
  16:22
**36 (1)**
  27:16
**360 (2)**
  37:23;38:9
**37 (2)**
  9:4;27:20
**39 (1)**
  33:10

**4**

**4 (2)**
  36:22,23
**40 (1)**
  33:16
**46 (2)**
  37:3,4

**5**


  520 (1)
  7:4

**6**

**6 (2)**
  39:15,15

**7**

**7 (3)**
  11:13;40:5;46:3
**7070 (3)**
  16:7,9;17:16
**715 (1)**
  16:13
**721 (4)**
  16:11,14,16;17:14

**9**

**911 (1)**
  12:21