**In The Matter Of:**

*ESTATE OF THOMAS SMITH, et al. vs.*
*ONEIDA COUNTY, et al.*

---

*DEPOSITION OF GARY LODUHA*
*July 30, 2020*

---

*Willette Court Reporting, LLC*
*Certified Professional Court Reporters*
*www.WilletteCourtReporting.com*
*(715)355-4384*
*(877)355-4384*



Min-U-Script® with Word Index

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

Page 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---------------------------------------------------

ESTATE OF THOMAS SMITH,
by Shannon Bryfczynski, Special Administrator,

    Plaintiff,

  -VS-           DEPOSITION OF:
                 GARY A. LODUHA
                 CASE NO. 19-CV-972
ONEIDA COUNTY,
TOWN OF MINOCQUA,
GARY LODUHA, and STETSON GRANT,

    Defendants.

---------------------------------------------------

      Deposition examination of GARY A.

LODUHA, taken at the instance of the Plaintiff, under

and pursuant to Section 804 of the Wisconsin Statutes

and the acts amendatory thereof and supplementary

thereto, pursuant to Notice upon the parties, before

Payton J. Sorenson, a Notary Public in and for the

State of Wisconsin, at the Days Inn & Suites by

Wyndham Rhinelander, 70 North Stevens Street,

Rhinelander, Wisconsin, on the 30th day of July 2020

commencing at 12:56 p.m. and ending at 1:52 p.m.

Page 2

A P P E A R A N C E S

APPEARING ON BEHALF OF THE PLAINTIFF:

    JEFF S. OLSON, Esq.
    The Jeff Scott Olson Law Firm, S.C.
    131 West Wilson Street, Suite 1200
    Madison, Wisconsin  53703
    jsolson@scofflaw.com

APPEARING ON BEHALF OF THE DEFENDANT:

    DANIELLE B. TIERNEY, Esq.
    Axley Brynelson, LLP
    2 East Mifflin Street, Suite 200
    Madison, Wisconsin  53703
    dtierney@axley.com

ALSO PRESENT: NONE

      The original transcript of the

deposition of GARY A. LODUHA was filed with Attorney

Olson.

Page 3

I N D E X   P A G E

E X A M I N A T I O N

                       PAGE
GARY A. LODUHA
    EXAMINATION BY MR. OLSON ........... 5
    EXAMINATION BY MS. TIERNEY ......... 42

---------------------------------------------------

E X H I B I T S
                            MARKED
Exh. 1 Detail Call for Service Report ........ 5
Exh. 2 Incident Report ...................... 5
Exh. 3 Oneida County Sheriff's Office ....... 5
      Detective Bureau Supplemental Report
Exh. 4 Mr. Brooks's and Mr. Loduha's report .. 5
Exh. 5 Rhinelander Police Department
      Detective Bureau Supplemental Report .. 5
Exh. 6 Addendum B - Use of Report ........... 5
Exh. 7 Provisional Autopsy Findings .......... 5

      (The originals of the above exhibits
were sealed in the original transcript; copies
thereof were included with each transcript copy, as
requested.  PDF electronic files of the exhibits were
provided to counsel, as requested.)

---------------------------------------------------

O B J E C T I O N S
                      PAGE   LINE
BY MS. TIERNEY ...................... 10     4
BY MS. TIERNEY ...................... 10    11
BY MS. TIERNEY ...................... 11     2
BY MS. TIERNEY ...................... 11    11
BY MS. TIERNEY ...................... 12     6
BY MS. TIERNEY ...................... 17     4
BY MS. TIERNEY ...................... 18     3
BY MS. TIERNEY ...................... 21    11
BY MS. TIERNEY ...................... 21    15
BY MR. OLSON ........................ 26    10
BY MS. TIERNEY ...................... 27     5
BY MS. TIERNEY ...................... 39    16
BY MS. TIERNEY ...................... 39    25
BY MS. TIERNEY ...................... 40    16

Page 4

BY MS. TIERNEY ...................... 40    23

BY MS. TIERNEY ...................... 41     3

BY MS. TIERNEY ...................... 41    18

---------------------------------------------------

P R O D U C T I O N   R E Q U E S T S

NONE

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

Page 5

1  P R O C E E D I N G S
2  (Exhibits 1-7 marked for identification.)
3      GARY A. LODUHA, after having been
4  first duly sworn, was examined and testified as
5  follows:
6      **THE WITNESS:** I do.
7
8      **EXAMINATION BY MR. OLSON:**
9  Q.  **Please state your name.**
10  A.  Gary Loduha.
11  Q.  **Are you the Gary Loduha who is a defendant**
12  **in this case?**
13  A.  Yes.
14  Q.  **And where were you born?**
15  A.  Milwaukee, Wisconsin.
16  Q.  **And what year were you born?**
17  A.  1987.
18  Q.  **What's your folks do for a living when you**
19  **were growing up?**
20  A.  My dad's been -- done construction his whole
21  life, and my mom was a teacher.
22  Q.  **Can you give me a history of your formal**
23  **education?**
24  A.  I graduated from high school, have an
25  associate's degree in criminal justice.

Page 6

1  Q.  **What year did you graduate from high school?**
2  A.  2006.
3  Q.  **What did you do after that?**
4  A.  I went into the military.
5  Q.  **What branch?**
6  A.  Army.
7  Q.  **And as we said before the deposition, 101st**
8  **airborne; correct?**
9  A.  Yes.
10  Q.  **And what was your job?**
11  A.  11 bravo light infantry.
12  Q.  **From when to when were you in the Army?**
13  A.  From 2006 to near the end of 2009.
14  Q.  **And what were the circumstances of leaving**
15  **the Army?  Just the end of your enlistment?**
16  A.  Yep.
17  Q.  **What did you do after you left the Army?**
18  A.  I attended college.
19  Q.  **Which one?**
20  A.  Nicolet College.
21  Q.  **And was that where you got your associate's**
22  **degree?**
23  A.  Yes, it is.
24  Q.  **That was a two-year program?**
25  A.  Yes.

Page 7

1  Q.  **So got that degree in 2011?**
2  A.  2013.
3  Q.  **2013.**
4      **What did you do then?**
5  A.  I worked security for Thrivent Financial in
6  Appleton until I got hired by the Minocqua Police
7  Department.
8      **MR. OLSON:** Ms. Reporter, is this okay
9  for you?
10      (Discussion held off the record.)
11      **BY MR. OLSON:**
12  Q.  **You were hired by the Minocqua Police**
13  **Department when?**
14  A.  The summer of 2014.
15  Q.  **And what kind of training did you have in**
16  **connection with getting a police officer job with**
17  **Minocqua Police Department?**
18  A.  Just the associate's degree in criminal
19  justice as well as the basic law enforcement academy.
20  Q.  **And where did you attend the law enforcement**
21  **academy?**
22  A.  At Nicolet College here in Rhinelander.
23  Q.  **And did you have training using the**
24  **Wisconsin Department of Justice application called**
25  **Defensive and Arrest Tactics?**

Page 8

1  A.  Yes.
2  Q.  **That was the basic training resource for**
3  **that part of your training, was it not?**
4  A.  Yes.
5  Q.  **Have you had any other sorts of training**
6  **outside of training in the defensive and arrest**
7  **tactics in arrest techniques?**
8  A.  Besides the annual defense and arrest
9  tactics training that we do at the department, no, I
10  do not go to any specialized courses for advanced
11  tactics.
12  Q.  **Do you remember learning, in connection with**
13  **your training in defensive and arrest tactics, about**
14  **the distinction between active resistance and passive**
15  **resistance?**
16  A.  Yes.
17  Q.  **Can you put into your own words what the**
18  **distinction is?**
19  A.  Active resistance is an individual who's
20  actively resisting, and passive resistance is
21  somebody who's passively resisting.  So somebody
22  saying "no" would be an example.
23  Q.  **I just want to read the two paragraphs from**
24  **page 37 of Wisconsin Defensive and Arrest Tactics.**
25  **You don't have that as an exhibit but --**

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

Page 9

1    MS. TIERNEY: Off the record really
2  quick.
3    (Discussion held off the record.)
4    BY MR. OLSON:
5  Q.  These two paragraphs say, quote, "Passive
6  resistance refers to noncompliant but nonthreatening
7  behavior.  An example would be a person who refuses
8  to get out of a car when ordered to do so.  The
9  person is not fighting with you.  He is -- he or she
10 is simply not complying with your orders.  Protesters
11 often use passive resistance as a political tactic,
12 staging sit-ins to advance their agendas."
13   Next paragraph, "Active resistance, on
14 the other hand, refers to behaviors that physically
15 counteract an officer's attempts to control a subject
16 and who pose a risk -- and which pose a risk either
17 to the officer, subject, and others.  Examples of
18 active resistance include attempting to pull away
19 from the officer's grasp, running away, getting up
20 after being directed to the ground, and so on."
21   Do those paragraphs correspond with
22 your understanding of the difference between active
23 and passive resistance?
24 A.  Yes.
25 Q.  And according to your training, is there a

Page 10

1  difference between active and passive resistance in
2  terms of the appropriate control tactics that an
3  officer ought to employ in dealing with a suspect?
4    MS. TIERNEY: Object to the form.
5    You can go ahead and answer.
6    THE WITNESS: Oh.  Yes.  But it is
7  also situational at the same time too.
8    BY MR. OLSON:
9  Q.  Does the Minocqua Police Department have
10 policies regarding the use of force?
11   MS. TIERNEY: Foundation.
12   Any time I object, you can still
13 answer.
14   THE WITNESS: Yes.
15   BY MR. OLSON:
16 Q.  And the foundation objection, I think, is an
17 objection that suggests that you might not know the
18 answer, which seems strange to me.
19   But do those policies talk about
20 active resistance versus passive resistance?
21 A.  I believe so.
22 Q.  And they do that basically to convey the
23 message that, in almost all situations, less force is
24 appropriate when dealing with a passively resisting
25 suspect than when dealing with an actively resisting

Page 11

1  suspect; correct?
2    MS. TIERNEY: Form.
3    THE WITNESS: From my understanding,
4  it sets the guideline depending on the situation that
5  we have so we can act accordingly.
6  Q.  Generally, according to your policies, less
7  force is appropriate when dealing with passive
8  resistance and when dealing with active resistance;
9  correct?
10   MS. TIERNEY: Asked and answered.
11   THE WITNESS: It is situational.
12   BY MR. OLSON:
13 Q.  Does whether you're facing active resistance
14 versus passive resistance have any bearing on your
15 reaction to dealing with a particular subject under
16 your policies of the Minocqua Police Department?
17 A.  It depends on the threat level at that time.
18 Q.  So whether you're encountering active or
19 passive resistance might or might not make a
20 difference to you depending on the threat level?
21 A.  It's situationally dependant.  So the policy
22 is considered a guideline as to how to act in
23 situations.
24 Q.  I interrupted what it says about active

Page 12

1  versus passive resistance though.  Does it use those
2  concepts in any way?
3  A.  They're in the policy, yes.
4  Q.  And what does your policy convey about those
5  concepts?
6    MS. TIERNEY: Foundation.
7    BY MR. OLSON:
8  Q.  If you know.
9  A.  Off the top of my head, at this time, I
10 can't accurately describe what's verbatim in that
11 policy.
12 Q.  Do you have an independent recollection of
13 the events of April 7, 2017, when Thomas Smith was
14 taken into custody?
15 A.  I have a recollection of my actions, yes.
16 Q.  Fairly clear recollection?
17 A.  Fairly, yes.
18 Q.  Have you reviewed any documents in
19 preparation for your testimony here today?
20 A.  I reviewed my report.
21 Q.  And if you look in the stack of exhibits in
22 front of you -- I should have numbered mine when I
23 was being so smart about it.
24   In Exhibit 4, the second -- the last
25 two pages are your report; correct?

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

Page 13

1  A.  Exhibit 4?
2  Q.  Yeah.
3  A.  No.  That would be Riley Brooks's report.
4  Q.  Well, that's the first two pages.  Take a
5  look at pages 3 and 4 starting at DEF0047 at the
6  bottom.
7  A.  Oh, yes.  There it is.  Sorry.
8      MS. TIERNEY: Off the record.
9      (Discussion held off the record.)
10     BY MR. OLSON:
11 Q.  The last two pages of Exhibit 4 are your
12 report; correct?
13 A.  Yes.
14 Q.  And so on the first page of Exhibit 4 --
15 well, excuse me.  The first page of your report,
16 which is actually page 3 of Exhibit 4, DEF0047, you
17 say that you received a special response team call
18 for a hostage situation.
19     What's the special response team?
20 A.  It's a group of law enforcement officers
21 within the county assigned to the specialized team
22 for instances such as barricaded suspects, high-risk
23 warrants, hostage situations, any call that's
24 determined to be of extremely high risk in nature.
25 Q.  Now, apparently in the initial callout for

Page 14

1  the special response team, information was conveyed
2  to you that the suspect was still in the house with a
3  gun, it was a hostage situation, and the address.
4      Who conveyed that information if you
5  know?
6  A.  I do not know who conveyed that information.
7  It was just attached to the callout.
8      Usually, what happens is we receive a
9  location of either the incident or a location to
10 stage at.
11 Q.  Did it come over the radio as a voice
12 communication?
13 A.  No.  It's sent through the Rave Alert system
14 at the sheriff's office to -- either you can have it
15 sent to your personal phone or your work phone, and
16 that's how they page individuals out.
17 Q.  And it comes as a text message then?
18 A.  It comes as a text message as well as a
19 phone call.
20 Q.  And the phone call is from a person?
21 A.  It's from an automated system.
22 Q.  And based on that callout, you went to the
23 area that had been identified as the staging area at
24 Balsam Street and Maple Street?
25 A.  That is correct.

Page 15

1  Q.  And you wrote that, "While en route to the
2  staging area, I heard multiple updates over the radio
3  of a possible explosive device and a deceased
4  nine-year-old child."
5      Who was talking over the radio?
6  A.  That was our dispatcher, I believe, Jack
7  Lilek, that was relaying information that he was
8  obtaining.
9  Q.  And Jack who?
10 A.  Lilek.
11 Q.  How do you spell that?
12 A.  I believe it's L-i-l-e-k.
13 Q.  And he was a dispatcher situated where?
14 A.  At the Oneida County Sheriff's Office.
15 Q.  And did he tell you how he was getting this
16 information?
17 A.  I was not aware at the time of how he was
18 obtaining that information.
19 Q.  You did learn later that the 911 caller had
20 not spoken to the dispatcher; correct?
21 A.  Yes.
22 Q.  But the 911 caller had pressed buttons on
23 his phone in response to the dispatcher's requests,
24 and the dispatcher took that as conveying certain
25 information?

Page 16

1  A.  He was responding to his questions using,
2  from what I could understand, controlled presses, so
3  yes.
4  Q.  And so it was through these pressing of
5  buttons on the caller's phone that the information
6  was conveyed that there was a possible explosive
7  device and a deceased nine-year-old child?
8  A.  From my understanding, yes.
9  Q.  And in the next paragraph you write that you
10 were "assigned to the quick reaction team as a member
11 of the arrest team and staged in the rear of the
12 BearCat."
13     Who made that assignment if you
14 recall?
15 A.  That was our team commander, Detective
16 Sergeant Brian Barbour.
17 Q.  And you write, "I was also informed that I
18 may deploy into a sniper position if given the
19 opportunity."  That was also by Detective Sergeant
20 Barbour?
21 A.  Yes.
22 Q.  You write, "I was provided a short briefing
23 that there was possibly one armed suspect, one victim
24 possibly wounded, one nine-year-old possibly deceased
25 in the garage, and possible explosive devices on or

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

1 inside the residence."
2     All that information came from
3 Barbour?
4     MS. TIERNEY: Form.
5     THE WITNESS: I believe so.
6     BY MR. OLSON:
7 Q.  And you did not know at that point, I take
8 it, that it was coming to the dispatch by button
9 pressing on a phone?
10 A.  As far as I could recall, they were in
11 contact with an individual inside and believed that
12 they were trying not to speak as to give away their
13 location inside the residence.  So it seemed like
14 they were hiding from the suspect.
15 Q.  You write, quote, "I was then briefed on the
16 suspect description and advised on what he was
17 wearing," end quote.
18     Was that, again, briefing by Barbour?
19 A.  I believe it was briefing by Barbour and
20 Captain Terri Hook.
21 Q.  And what did they say the suspect was
22 wearing?
23 A.  From my recollection, it was a green
24 sweatshirt and blue jeans.
25 Q.  You write -- or do you know how they knew

1 that?  Had he been seen by that point in his
2 residence --
3     MS. TIERNEY: Foundation.
4     BY MR. OLSON:
5 Q.  -- or in the residence?
6     MS. TIERNEY: Sorry.  Foundation.
7     THE WITNESS: I'm not sure how they
8 came across that.
9     BY MR. OLSON:
10 Q.  You write, "We proceeded to conduct various
11 reconnaissance runs of the residence to collect
12 information on the layout of the house, yard, and to
13 observe any activity."
14     What does "reconnaissance runs" mean?
15 A.  We turn the lights off on the BearCat
16 because we were advised it was an armed suspect with
17 possible explosives.  We didn't want to expose
18 ourselves more than we needed to.  So it was trying
19 to drive up to the residence as quitely as possible
20 to see if we could observe anything.
21 Q.  This was April 7 at 1853 which is, like,
22     6:53 in the evening?  P.m.?
23 A.  That was the time that I had received the
24 page.
25 Q.  And by the time you got there, it's probably

1 what?  More like 7:30?
2 A.  I'm not exactly sure of the exact time, but
3 I remember that it was becoming dark out.
4 Q.  Were the lights on in the house?
5 A.  I can't recall.
6 Q.  You saw the man, who was later learned to be
7 Thomas A. Smith, inside his residence, looking
8 through his windows; correct?
9 A.  Yes.  I believe I observed him by the --
10 what appeared to be a kitchen sink.
11 Q.  And in the next paragraph you write, quote,
12 "While performing reconnaissance on the one side, I
13 observed Smith look out a window at us," period.  "At
14 this point, I heard an SRT member call Smith out over
15 the loudspeaker," end quote.
16     By "call Smith out," you mean somebody
17 was using an amplification device to tell him to come
18 out of his house; correct?
19 A.  Yes.
20 Q.  You then write, quote, "Smith proceeded to
21 follow directions over the loudspeaker but appeared
22 to be reluctant and at times did not comply with
23 orders," end quote.
24     Are you writing about him while he's
25 in the house or while he's out of the house or both?

1 A.  Both.
2 Q.  You write, "Smith had a smear of an unknown
3 dark substance on the front of his shirt.  At a
4 distance, this smear appeared to be blood," end
5 quote.
6     Did that observation play a role in
7 any of your subsequent decisions or actions?
8 A.  No.
9 Q.  You then write, "After various orders, Smith
10 was in a position to attempt an apprehension."
11     Was it your intention to arrest him?
12 A.  Yes.
13 Q.  What for?
14 A.  I'm sorry?
15 Q.  What for?
16 A.  Because of the hostage situation that we
17 were advised of inside the residence.
18 Q.  You thought that he was holding a hostage
19 inside the residence?
20 A.  That was the information that we were
21 provided.
22 Q.  And what was the basis for believing that
23 Mr. Smith was the perpetrator rather than a victim of
24 whatever mischief was going on inside the residence?
25 A.  Because I was informed that Mr. Smith was

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

Page 21

1  identified as the suspect.
2  Q.  And do you know who made that decision?
3  A.  It was through information gathering that I
4  was not a part of.
5  Q.  So the answer is you don't know who decided
6  that Mr. Smith was to be identified as the suspect?
7  A.  Correct.
8  Q.  When you saw Mr. Smith, could you tell that
9  he was frail?
10  A.  No.
11  MS. TIERNEY: Form.
12  BY MR. OLSON:
13  Q.  Could you tell, as you saw him move outside
14  his home, that he had difficulty walking?
15  MS. TIERNEY: Form. Assumes facts not
16  in evidence.
17  THE WITNESS: No.
18  MR. OLSON: Counsel, are you
19  suggesting that it's inappropriate for me to use
20  leading questions?
21  MS. TIERNEY: No.
22  MR. OLSON: Okay.
23  BY MR. OLSON:
24  Q.  Do you remember anybody telling Mr. Smith to
25  walk backwards?

Page 22

1  A.  Riley Brooks was using a PA system to
2  provide commands. In regards to the exact commands
3  he gave him, I cannot recall.
4  Q.  You wrote that, "Mr. Smith did not comply
5  with orders." Actually, he complied with some orders
6  and not others; correct?
7  A.  He did not comply with the orders that were
8  provided to him.
9  Q.  Well, he complied with the order to come out
10  of his house, didn't he?
11  A.  Correct.
12  Q.  And he complied with the order to come down
13  the sidewalk?
14  A.  He complied to the point where he did exit
15  the residence, but to ensure that he did not have any
16  weapons or explosive devices on him, we were not able
17  to properly clear him from the BearCat.
18  Q.  He did not comply with the order to get on
19  the ground?
20  A.  No, he did not.
21  Q.  Were there any other orders that he did not
22  comply with?
23  A.  He did not comply with raising his hands or
24  showing his waistline.
25  Q.  Did it occur to you that it might have been

Page 23

1  possible that he was incapable of raising his hands
2  above his head?
3  A.  No.
4  Q.  Why didn't that occur to you?
5  A.  Because it didn't appear as if he was
6  reluctant to raise his hands. It appeared -- he
7  would start to raise his hands and then put them back
8  down to his side.
9  Q.  Did it occur to you that it might have been
10  impossible for reasons of physical disability for him
11  to get on the ground?
12  A.  No.
13  Q.  Any particular reasons why that didn't occur
14  to you?
15  A.  Because he appeared to be moving. He had a
16  face that was -- appeared appropriate for his age.
17  He appeared to be about 70ish years old.
18  Q.  He was moving like a reasonably fit and
19  coordinated 70-year-old person?
20  A.  It appeared so, yes.
21  Q.  You write that you ordered Mr. Smith to get
22  on the ground multiple times, and he did not comply
23  with those orders; is that correct?
24  A.  Yes.
25  Q.  And then you said that you approached Smith

Page 24

1  and pointed at him with your weapon, ordering him
2  multiple times to go to the ground, and he still did
3  not comply; correct?
4  A.  Yes.
5  Q.  And then you had a handgun in your hand
6  aimed at Mr. Smith?
7  A.  No. It was my department-issued rifle.
8  Q.  Okay. But aimed at Mr. Smith?
9  A.  Yes.
10  Q.  What kind of rifle?
11  A.  It's an AR-15.
12  Q.  You say you proceeded to place Smith into an
13  escort hold, ordering him to the ground, and he still
14  did not comply. What do you mean by an "escort
15  hold"?
16  A.  I placed one arm -- or one hand on his upper
17  arm and the other hand around his wrist, producing
18  him into an escort hold.
19  Q.  So is that done when you're standing
20  face-to-face with Mr. Smith?
21  A.  Mr. Smith was bladed towards me. I could
22  not see his right side.
23  Q.  So you did this with his left arm?
24  A.  Yes.
25  Q.  And did you think about trying to place

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

Page 25

1  Mr. Smith into handcuffs while he was standing up?
2  A.  No.
3  Q.  Why not?
4  A.  Because I did not know if he was either
5  armed with a firearm or explosives at that point.
6  Q.  You had seen both of his hands, had you not?
7  A.  I could not determine if he was concealing
8  anything underneath his shirt, his pants, his
9  waistline.
10  Q.  You had, though, seen both of his hands as
11  he had come out of the house?
12  A.  Yes.  But he was bladed towards me when I
13  approached him.
14  MS. TIERNEY: Make sure you speak up.
15  You're getting kind of quiet.
16  THE WITNESS: Sorry.
17  MS. TIERNEY: That's okay.
18  BY MR. OLSON:
19  Q.  And you say, "Deputy Grant and I proceeded
20  to escort Smith to the ground at a controlled rate of
21  descent."
22  Was he taken to the ground face-first?
23  A.  The direction that he went was towards his
24  chest, yes.
25  Q.  And with you on his left arm and Grant on

Page 26

1  his right arm?
2  A.  I do not know the exact position of Grant
3  because I could not see him.  The only thing that I
4  could see was Mr. Smith in front of me.
5  Q.  And was he taken down onto his sidewalk?
6  A.  I am not sure the exact platform in which he
7  was taken down on.
8  Q.  Did he hit the ground hard enough to cause
9  visible injuries?
10  MS. TIERNEY: Form of the question.
11  THE WITNESS: At the time, after he
12  was placed under arrest, I did not see any visible
13  injuries on him.
14  BY MR. OLSON:
15  Q.  After he was on the ground, he was placed in
16  handcuffs; correct?
17  A.  Yes.
18  Q.  Up to that point, had Mr. Smith engaged in
19  any active resistance?
20  A.  Yes.
21  Q.  What would you say was the active
22  resistance?
23  A.  When I initially had contact with Mr. Smith,
24  I attempted to take him -- to perform a
25  decentralization technique, at which time he pulled

Page 27

1  away from me.  He pulled up on me as I pulled --
2  Q.  He tried to pull his arm away from you?
3  A.  Yes.
4  Q.  Did he ever make any effort to injure you?
5  MS. TIERNEY: Form or foundation.
6  THE WITNESS: Not a direct threat
7  towards myself, but the threat was that he was
8  possibly armed with a firearm as well as the
9  explosives that were described to me.
10  BY MR. OLSON:
11  Q.  Other than pulling his arm away from you,
12  did he engage in any other active resistance?
13  A.  No.
14  Q.  And he did engage in passive resistance by
15  failing to obey the commands that were given to him
16  by you and other officers; correct?
17  A.  Yes.
18  Q.  How many different officers were giving
19  Mr. Smith commands?
20  A.  There was the commands that were given by
21  the PA system, which was done by one member of the
22  special response team.  And then as I made my
23  approach towards him, I was the only one that I could
24  recall giving him commands to go to the ground.
25  Q.  Well, was there a time when you were giving

Page 28

1  him commands to go to the ground and another law
2  enforcement officer was giving him commands to walk
3  backwards toward the BearCat?
4  A.  Those were separate times.
5  Q.  Which happened first?
6  A.  The announcement through the PA system.
7  Q.  And that was to come out of the house;
8  correct?
9  A.  Yes.
10  Q.  And do you remember Mr. Smith being told to
11  turn around and walk backwards toward the BearCat?
12  A.  I cannot specifically recall that command.
13  Q.  So that might have been being given at the
14  same time you were giving your commands to get on the
15  ground?
16  A.  No, it was not.  I was still inside the
17  BearCat.
18  Q.  You were still inside the BearCat when what
19  happened?
20  A.  As the directives were given through the PA
21  system.  Because we were in there for safety reasons
22  due to the fact that there was an armed suspect with
23  those explosives advised to us.
24  Q.  After you got out of the BearCat, is it your
25  testimony that only you spoke to Mr. Smith?

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

Page 29

1  A.  As far as I can recall, yes.
2  Q.  And were you trained that, when a group of
3  officers are dealing with a suspect like that and
4  need to control him or take him into custody, only
5  one officer should be the one doing the talking?
6  A.  Yes.
7  Q.  And had there been any decision made that
8  that officer would be you in this situation?
9  A.  I don't believe a decision was made.  I
10  believe, since I was the first one approaching him, I
11  started giving commands, and I could not hear anybody
12  else giving commands at that time.
13  Q.  When Mr. Smith was on the ground, did he
14  actively resist being handcuffed?
15  A.  I knew it took Deputy Grant some time to get
16  his right arm out from underneath him.
17  That would be a question for Grant.  I
18  had his left arm.  Grant had his right arm.
19  Q.  So when he was taken to the ground, he fell
20  on his right arm?
21  A.  I'm not sure exactly how his right arm got
22  underneath him.  I was only controlling his left arm.
23  That was my main focus point at that time.
24  Q.  Okay.  In your report you write, "Once Smith
25  was apprehended, Deputy Grant and I helped Smith up

Page 30

1  and escorted him to cover behind the BearCat for his
2  safety."
3  So that means that, once he was
4  handcuffed, you helped him get to his feet; correct?
5  A.  Yes.  Once he was handcuffed, I did a quick
6  pat-down search on him due to the overwhelming danger
7  we had behind us of a possible explosive device, not
8  knowing if there were any other suspects inside,
9  proceeded to lift him up, and escorted him to the
10  other side of the BearCat.
11  Q.  And you did not find any weapons or
12  contraband on Mr. Smith; correct?
13  A.  Upon doing a secondary search, my main
14  focus, again, was either weapons or explosive
15  devices, and that was not located on him.
16  Q.  And you say you escorted him to cover behind
17  the BearCat.  That was in a position where you could
18  not be shot from the house; correct?
19  A.  Either sustain incoming rounds from the
20  house if there was another suspect inside, or if an
21  explosive device were to go off, that would protect
22  him from that blast.
23  Q.  Mr. Smith never said anything throughout
24  this entire encounter; correct?
25  A.  Not that I can recall.

Page 31

1  Q.  And his family says that he had had a stroke
2  a couple years earlier and was unable to speak.  Did
3  you ever see any evidence that that was incorrect?
4  A.  Could you --
5  Q.  Yeah.
6  His family says he had a stroke and
7  was unable to speak --
8  A.  Okay.
9  Q.  -- at the time of this incident.
10  Did you ever see any indication that
11  that was incorrect?
12  A.  I did not see any indication that he had a
13  stroke.  I'm not a medical professional that can
14  assess that from a distance.
15  Q.  You say, "We proceeded to place Smith in the
16  rear of the BearCat."  What's the rear of the BearCat
17  like?
18  A.  The rear of the BearCat has two doors that
19  open up separately.  There is a huge area on the
20  inside that's the flat floor, and then there's bench
21  seats on each side.  So he was placed in that middle
22  section.
23  Q.  So essentially on the floor between the
24  bench seats?
25  A.  Yes.

Page 32

1  Q.  And how did he get into the BearCat?  Can
2  you tell me what happened?
3  A.  He would not step on the platform.  There's
4  a platform that goes to the back of the BearCat.  He
5  would not step on that.  So Deputy Grant and I set
6  him up on that platform, and then he would not get
7  into the BearCat so then he was placed on his
8  stomach.  We were able to slide him in with the
9  assistance of other members.
10  Q.  Face-first on his stomach.  So his feet were
11  pointing towards the rear of the BearCat, and his
12  head was toward the front of the BearCat?
13  A.  Yes.  And then once he was inside the
14  BearCat, we made sure to place him on his side.
15  Q.  And you write that you brought him back to
16  the staging area to be assessed by medical personnel.
17  Why was that done?
18  A.  That was a decision that was made by command
19  staff, that anybody that was coming outside the
20  residence to be assessed by medical personnel.
21  Q.  And you say, "Once at the staging area, I
22  assisted Smith out of the BearCat and handed him over
23  to paramedics."  Did they put him on a gurney?
24  A.  They did.
25  Q.  Did they put him in an ambulance?

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

Page 33

1 A. Yes, they did.
2 Q. Did they take him to the hospital?
3 A. Yes, they did.
4 Q. And did they tell you what was going to
5 happen with him?
6 A. No. Due to the situation still inside the
7 residence, we still had to ensure the safety of the
8 two hostages that were inside so we proceeded to head
9 back to the residence.
10 Q. Was there any law enforcement participation
11 in Mr. Smith's transportation to the hospital?
12 A. As far as that goes, I cannot say if there
13 was or was not because I was already back in the
14 BearCat and on the way back to the residence.
15 Q. As soon as he was given to the paramedics,
16 somebody else's -- he was somebody else's
17 responsibility?
18 A. It was a very fast changeover. I believe
19 there were members from Rhinelander Police Department
20 that were there.
21 But, like I said, as soon as he was
22 placed into their custody, I proceeded to enter the
23 BearCat again, and we proceeded to go back to the
24 residence.
25 Q. I'd like you to look at the first two pages

Page 34

1 of Exhibit 4, which is the report of Fish & Wildlife
2 Commission Warden Riley Brooks, and I'm going to read
3 a part of this to you and ask you whether you
4 disagree with any of it. It may be that some parts
5 you can't agree or disagree with because you don't
6 remember or because you didn't have a chance to
7 observe. But my first question's going to be is
8 there any parts with which you positively disagree.
9 I'm going to start at the bottom of
10 the first page in the second-to-last paragraph, last
11 sentence. Quote, "The suspect then walked to the
12 front door of the residence and opened the main door
13 and was looking out through the screen door, standing
14 near the threshold of the doorway."
15 Paragraph, quote, "While the suspect
16 was near the threshold of the doorway, Brooks used
17 the BearCat's PA system and announced to the suspect
18 that they were with the sheriff's department. Brooks
19 then informed the suspect that they would like to
20 talk to him and asked him to exit his residence. The
21 suspect began walking down the driveway toward the
22 BearCat. When the suspect was at approximately the
23 middle of the driveway, Brooks told the suspect to
24 stop, face his residence, and put his hands above his
25 head. The suspect began to turn and face his

Page 35

1 residence. However, the suspect continued rotating a
2 full 360 degrees and was again facing the BearCat.
3 The suspect also failed to raise his hands above his
4 head."
5 Let's stop there and ask you --
6 anything that I read so far that you disagree with?
7 A. No. I believe the commands through the PA
8 system were given as soon as he was seen in the
9 bayview window of his house.
10 Q. Brooks goes on to write, quote, "Brooks
11 again told the suspect to turn and face his
12 residence. The suspect began to rotate towards his
13 residence. When the suspect was facing his
14 residence, Brooks told him to stop. It appeared to
15 Brooks that he was going to continue rotating a full
16 360 degrees again. Brooks then told the suspect to
17 walk backwards towards the sound of his voice. The
18 suspect began to walk backwards. When the suspect
19 was approximately 10 to 15 feet away from the
20 BearCat, Brooks told the suspect to stop."
21 Do you disagree with any of that?
22 A. From my recollection, that seems like what
23 transpired.
24 Q. Going on, quote, "Brooks then told the
25 suspect to go down to his knees. The suspect

Page 36

1 remained standing and did not go down to his knees.
2 SRT members then exited the rear of the BearCat to
3 handcuff the suspect. A member of the SRT near the
4 suspect stated that the suspect did not appear to be
5 doing well and that he may need medical attention."
6 Stopping there, do you disagree with
7 anything so far?
8 A. I do not recollect ever hearing anybody
9 saying that.
10 Q. How many members of the SRT were near the
11 suspect at that point?
12 A. I do not know which point that he is talking
13 about.
14 Q. Well, he is talking about with Mr. Smith
15 approximately 10 to 15 feet away from the BearCat,
16 and "SRT members then exited the rear of the BearCat
17 to handcuff the suspect." So Mr. Smith is 10 to
18 15 feet away and members of the SRT have exited the
19 BearCat.
20 Which members of the SRT exited the
21 BearCat?
22 A. I did.
23 Q. Anybody else?
24 A. Deputy Grant, I believe, Officer Jake
25 Simkins.

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

Page 37

1 Q. Anybody else?
2 A. There was Officer Kurt Helke who was also
3 inside the BearCat, but he is not a member of SRT.
4 He was placed there only for additional numbers.
5 Q. So if Brooks is correct that a member of the
6 SRT near the suspect stated that the suspect did not
7 appear to be doing well and that he may need medical
8 attention, that wasn't you that said that; correct?
9 A. I do not recall ever saying anything like
10 that.
11 Q. And it might or might not have been Deputy
12 Grant?
13 A. I don't recall Grant ever saying that
14 either.
15 Q. It might or might not have been Deputy
16 Simkins?
17 A. I do not know who could have made that
18 statement.
19 Q. Going on, quote, "The suspect was then
20 loaded into the BearCat by SRT members. Brooks then
21 operated the BearCat to the command post where
22 medical personnel met them and began medical care on
23 the suspect," end quote.
24     Do you disagree with anything in that
25 last part?

Page 38

1 A. As far as medical care goes, as far as my
2 observations were -- because I did escort Mr. Smith
3 out of the BearCat and did transfer him to medical
4 personnel. The extent of the medical care he
5 received is he was placed on a gurney and placed in
6 the back of an ambulance.
7 Q. Take a look at Exhibit 5. Did you have any
8 role in filling out Exhibit 5?
9 A. No.
10 Q. I think this is a standardized sheriff's
11 department document so I don't think you would have
12 been involved in this, but I just wanted to ask.
13     MS. TIERNEY: Jeff, I think you're
14 looking at 6 because this is 5.
15     MR. OLSON: Okay.
16     MS. TIERNEY: Are you looking at this
17 one? It looks like you're looking at this one;
18 right?
19     MR. OLSON: Yeah.
20     MS. TIERNEY: That would be 6.
21 (Discussion held off the record.)
22     BY MR. OLSON:
23 Q. What we were just talking about, the
24 document headed "Addendum B - Use of Report" is
25 Exhibit 6. And my understanding of your testimony is

Page 39

1 that you did not have a role in completing that form;
2 correct?
3 A. No, I did not.
4 Q. And take a look at Exhibit 7. This is a
5 page of handwritten provisional autopsy findings from
6 after Mr. Smith died a few days after this incident.
7 Down in the lower left-hand corner in section roman
8 numeral six, there's a section headed "blunt force
9 traumatic injuries." Do you see that section?
10 A. Yes.
11 Q. Subheading A is "scabbed abrasions to right
12 lateral face and forehead." Did anything happen to
13 Mr. Smith while you were dealing with him that could
14 have accounted for scabbed abrasions to right lateral
15 face and forehead?
16     MS. TIERNEY: Foundation.
17     THE WITNESS: That may have happened
18 during the decentralization technique. I know I had
19 his left side. And as we were escorting him to the
20 ground, he was looking at me.
21     BY MR. OLSON:
22 Q. Subheading B says, "abrasions to knees with
23 contusion to left knee." Might that have happened
24 during the decentralization?
25     MS. TIERNEY: Foundation.

Page 40

1     THE WITNESS: That, I cannot say
2 because I never saw his knees.
3     BY MR. OLSON:
4 Q. So you can't rule it out, but you can't say
5 that something happened that might have caused it
6 either; correct?
7 A. I can't say that the injuries to his knees
8 was in direct contact or contact with Mr. Smith.
9 Q. It's possible that they happened during the
10 decentralization, but you didn't see it happen?
11 A. No.
12 Q. C is "abrasion to right scapular area" --
13 that's shoulder blade -- "of back and right elbow."
14 Did anything happen to Mr. Smith while he was dealing
15 with you that would have explained those injuries?
16     MS. TIERNEY: Foundation.
17     THE WITNESS: Not that I can think of.
18     BY MR. OLSON:
19 Q. And then D is "contusion to upper posterior
20 of right arm." Did anything happen to him that might
21 have explained a contusion on the upper back of his
22 right arm?
23     MS. TIERNEY: Foundation.
24     THE WITNESS: Not that I can think of.
25     BY MR. OLSON:

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

Page 41

1  Q.  Could that have been from the grasp of an
2  officer?
3     MS. TIERNEY: Foundation.
4     THE WITNESS: I do not know.
5     BY MR. OLSON:
6  Q.  Apparently, this was a huge
7  misunderstanding.  Do I understand that to be the
8  case?
9  A.  I wouldn't say a "misunderstanding."  The
10  information that was provided to us indicated that
11  there was a hostage situation involving two
12  individuals, one possibly deceased as well as
13  explosive devices on the residence.
14  Q.  Well, do you have any reason to believe that
15  Mr. Smith was providing misinformation intentionally
16  as opposed to just being an adult, confused old man
17  pressing buttons more or less at random?
18     MS. TIERNEY: Form.
19     THE WITNESS: No.
20     BY MR. OLSON:
21  Q.  Has anything been done since then, if you
22  know, to make sure that that kind of situation won't
23  occur again?
24  A.  No.
25     MR. OLSON: I don't have any more

Page 42

1  questions.  Thanks for coming.
2     THE WITNESS: Thank you.
3     EXAMINATION BY MS. TIERNEY:
4  Q.  I just have one clarification question.
5     You were asked about arresting
6  Mr. Smith.  Were you instructed by somebody to arrest
7  him or take him into custody?
8  A.  I believe it was to take into custody.  At
9  that time, the charges would have been homicide.
10     MS. TIERNEY: Okay.  That's the only
11  question I have.
12     (Deposition concluded at 1:52 p.m.)
13     *   *   *   *   *   *
14
15
16
17
18
19
20
21
22
23
24
25

Page 43

1                  CERTIFICATION PAGE
2  STATE OF WISCONSIN  )
   ONEIDA COUNTY       )
3
4        I, PAYTON J. SORENSON, Notary Public in
   and for the State of Wisconsin, do hereby certify;
5
          That prior to being examined, the
6  Deponent named in the foregoing deposition, GARY A.
   LODUHA, was by me duly sworn to testify the truth,
7  the whole truth, and nothing but the truth.  Said
   deponent did not request the opportunity to read and
8  sign the transcript.
9          That said deposition was taken before
   me at the time, date and place set forth; and I
10  hereby certify the foregoing is a full, true and
   correct transcript of my shorthand notes so taken and
11  thereafter reduced to computerized transcription
   under my direction and supervision.
12
          I further certify that I am neither
13  counsel for nor related to any party to said action,
   nor in any way interested in the outcome thereof; and
14  that I have no contract with the parties, attorneys,
   or persons with an interest in the action that
15  affects or has a substantial tendency to affect
   impartially, that requires me to relinquish control
16  of an original deposition transcript before it is
   certified and delivered to the custodial attorney, or
17  that requires me to provide any service not made
   available to all parties to the action.
18
          IN WITNESS WHEREOF, I have hereunto
19  subscribed my name this 10th day of August 2020.
20
21
22
23  Payton J. Sorenson
24  Notary Public - State of Wisconsin
   My Commission Expires March 23, 2022
25

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

## A

**able (2)**
22:16;32:8
**above (3)**
23:2;34:24;35:3
**abrasion (1)**
40:12
**abrasions (3)**
39:11,14,22
**academy (2)**
7:19,21
**according (2)**
9:25;11:7
**accordingly (1)**
11:5
**accounted (1)**
39:14
**accurately (1)**
12:10
**across (1)**
18:8
**act (2)**
11:5,23
**actions (2)**
12:15;20:7
**active (14)**
8:14,19;9:13,18,22;
10:1,20;11:9,14,19,
25;26:19,21;27:12
**actively (3)**
8:20;10:25;29:14
**activity (1)**
18:13
**actually (2)**
13:16;22:5
**Addendum (1)**
38:24
**additional (1)**
37:4
**address (1)**
14:3
**adult (1)**
41:16
**advance (1)**
9:12
**advanced (1)**
8:10
**advised (4)**
17:16;18:16;20:17;
28:23
**again (7)**
17:18;30:14;33:23;
35:2,11,16;41:23
**age (1)**
23:16
**agendas (1)**
9:12
**agree (1)**
34:5
**ahead (1)**
10:5

**aimed (2)**
24:6,8
**airborne (1)**
6:8
**Alert (1)**
14:13
**almost (1)**
10:23
**ambulance (2)**
32:25;38:6
**amplification (1)**
19:17
**announced (1)**
34:17
**announcement (1)**
28:6
**annual (1)**
8:8
**answered (1)**
11:11
**apparently (2)**
13:25;41:6
**appear (3)**
23:5;36:4;37:7
**appeared (9)**
19:10,21;20:4;23:6,
15,16,17,20;35:14
**Appleton (1)**
7:6
**application (1)**
7:24
**apprehended (1)**
29:25
**apprehension (1)**
20:10
**approach (1)**
27:23
**approached (2)**
23:25;25:13
**approaching (1)**
29:10
**appropriate (4)**
10:2,24;11:8;23:16
**approximately (3)**
34:22;35:19;36:15
**April (2)**
12:13;18:21
**AR-15 (1)**
24:11
**area (7)**
14:23,23;15:2;
31:19;32:16,21;40:12
**arm (15)**
24:16,17,23;25:25;
26:1;27:2,11;29:16,
18,18,20,21,22;40:20,
22
**armed (5)**
16:23;18:16;25:5;
27:8;28:22
**Army (4)**
6:6,12,15,17
**around (2)**

24:17;28:11
**Arrest (10)**
7:25;8:6,7,8,13,24;
16:11;20:11;26:12;
42:6
**arresting (1)**
42:5
**assess (1)**
31:14
**assessed (2)**
32:16,20
**assigned (2)**
13:21;16:10
**assignment (1)**
16:13
**assistance (1)**
32:9
**assisted (1)**
32:22
**associate's (3)**
5:25;6:21;7:18
**Assumes (1)**
21:15
**attached (1)**
14:7
**attempt (1)**
20:10
**attempted (1)**
26:24
**attempting (1)**
9:18
**attempts (1)**
9:15
**attend (1)**
7:20
**attended (1)**
6:18
**attention (1)**
36:5;37:8
**automated (1)**
14:21
**autopsy (1)**
39:5
**aware (1)**
15:17
**away (9)**
9:18,19;17:12;27:1,
2,11;35:19;36:15,18

## B

**back (10)**
23:7;32:4,15;33:9,
13,14,23;38:6;40:13,
21
**backwards (3)**
21:25;28:3,11;
35:17,18
**Balsam (1)**
14:24
**Barbour (5)**
16:16,20;17:3,18,
19

**barricaded (1)**
13:22
**based (1)**
14:22
**basic (2)**
7:19;8:2
**basically (1)**
10:22
**basis (1)**
20:22
**bayview (1)**
35:9
**BearCat (35)**
16:12;18:15;22:17;
28:3,11,17,18,24;
30:1,10,17;31:16,16,
18;32:1,4,7,11,12,14,
22;33:14,23;34:22;
35:2,20;36:2,15,16,
19,21;37:3,20,21;38:3
**BearCat's (1)**
34:17
**bearing (1)**
11:15
**becoming (1)**
19:3
**began (5)**
34:21,25;35:12,18;
37:22
**behavior (1)**
9:7
**behaviors (1)**
9:14
**behind (3)**
30:1,7,16
**believing (1)**
20:22
**bench (2)**
31:20,24
**Besides (1)**
8:8
**blade (1)**
40:13
**bladed (1)**
24:21;25:12
**blast (1)**
30:22
**blood (1)**
20:4
**blue (1)**
17:24
**blunt (1)**
39:8
**born (2)**
5:14,16
**both (4)**
19:25;20:1;25:6,10
**bottom (2)**
13:6;34:9
**branch (1)**
6:5
**bravo (1)**
6:11

**Brian (1)**
16:16
**briefed (1)**
17:15
**briefing (3)**
16:22;17:18,19
**Brooks (14)**
22:1;34:2,16,18,23;
35:10,10,14,15,16,20,
24;37:5,20
**Brooks's (1)**
13:3
**brought (1)**
32:15
**button (1)**
17:8
**buttons (3)**
15:22;16:5;41:17

## C

**call (6)**
13:17,23;14:19,20;
19:14,16
**called (1)**
7:24
**caller (2)**
15:19,22
**caller's (1)**
16:5
**callout (3)**
13:25;14:7,22
**came (2)**
17:2;18:8
**Can (12)**
5:22;8:17;10:5,12;
11:5;14:14;29:1;
30:25;31:13;32:1;
40:17,24
**Captain (1)**
17:20
**car (1)**
9:8
**care (3)**
37:22;38:1,4
**case (2)**
5:12;41:8
**cause (1)**
26:8
**caused (1)**
40:5
**certain (1)**
15:24
**chance (1)**
34:6
**changeover (1)**
33:18
**charges (1)**
42:9
**chest (1)**
25:24
**child (2)**
15:4;16:7

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

circumstances (1)
6:14
clarification (1)
42:4
clear (2)
12:16;22:17
collect (1)
18:11
college (3)
6:18,20;7:22
coming (3)
17:8;32:19;42:1
command (3)
28:12;32:18;37:21
commander (1)
16:15
commands (12)
22:2,2;27:15,19,20,
24;28:1,2,14;29:11,
12;35:7
Commission (1)
34:2
communication (1)
14:12
completing (1)
39:1
complied (4)
22:5,9,12,14
comply (9)
19:22;22:4,7,18,22,
23;23:22;24:3,14
complying (1)
9:10
concealing (1)
25:7
concepts (2)
12:2,5
concluded (1)
42:12
conduct (1)
18:10
confused (1)
41:16
connection (2)
7:16;8:12
considered (1)
11:23
construction (1)
5:20
contact (4)
17:11;26:23;40:8,8
continue (1)
35:15
continued (1)
35:1
contraband (1)
30:12
control (3)
9:15;10:2;29:4
controlled (2)
16:2;25:20
controlling (1)
29:22

contusion (3)
39:23;40:19,21
convey (2)
10:22;12:4
conveyed (4)
14:1,4,6;16:6
conveying (1)
15:24
coordinated (1)
23:19
corner (1)
39:7
correspond (1)
9:21
Counsel (1)
21:18
counteract (1)
9:15
county (2)
13:21;15:14
couple (1)
31:2
courses (1)
8:10
cover (2)
30:1,16
criminal (2)
5:25;7:18
custody (5)
12:14;29:4;33:22;
42:7,8

D

dad's (1)
5:20
danger (1)
30:6
dark (2)
19:3;20:3
days (1)
39:6
dealing (9)
10:3,24,25;11:8,9,
16;29:3;39:13;40:14
deceased (1)
15:3;16:7,24;41:12
decentralization (4)
26:25;39:18,24;
40:10
decided (1)
21:5
decision (4)
21:2;29:7,9;32:18
decisions (1)
20:7
DEF0047 (2)
13:5,16
defendant (1)
5:11
defense (1)
8:8
Defensive (4)

7:25;8:6,13,24
degree (4)
5:25;6:22;7:1,18
degrees (2)
35:2,16
Department (10)
7:7,13,17,24;8:9;
10:9;11:17;33:19;
34:18;38:11
department-issued (1)
24:7
dependant (1)
11:22
depending (2)
11:4,21
depends (1)
11:18
deploy (1)
16:18
deposition (2)
6:7;42:12
Deputy (7)
25:19;29:15,25;
32:5;36:24;37:11,15
descent (1)
25:21
describe (1)
12:10
described (1)
27:9
description (1)
17:16
Detective (2)
16:15,19
determine (1)
25:7
determined (1)
13:24
device (5)
15:3;16:7;19:17;
30:7,21
devices (4)
16:25;22:16;30:15;
41:13
died (1)
39:6
difference (3)
9:22;10:1;11:21
different (1)
27:18
difficulty (1)
21:14
direct (2)
27:6;40:8
directed (1)
9:20
direction (1)
25:23
directions (1)
19:21
directives (1)
28:20
disability (1)

23:10
disagree (7)
34:4,5,8;35:6,21;
36:6;37:24
Discussion (4)
7:10;9:3;13:9;
38:21
dispatch (1)
17:8
dispatcher (4)
15:6,13,20,24
dispatcher's (1)
15:23
distance (2)
20:4;31:14
distinction (2)
8:14,18
document (2)
38:11,24
documents (1)
12:18
done (5)
5:20;24:19;27:21;
32:17;41:21
door (3)
34:12,12,13
doors (1)
31:18
doorway (2)
34:14,16
down (8)
22:12;23:8;26:5,7;
34:21;35:25;36:1;
39:7
drive (1)
18:19
driveway (2)
34:21,23
due (3)
28:22;30:6;33:6
duly (1)
5:4
during (3)
39:18,24;40:9

E

earlier (1)
31:2
education (1)
5:23
effort (1)
27:4
either (7)
14:9,14;25:4;30:14,
19;37:14;40:6
elbow (1)
40:13
else (3)
29:12;36:23;37:1
else's (2)
33:16,16
employ (1)

10:3
en (1)
15:1
encounter (1)
30:24
encountering (1)
11:19
end (7)
6:13,15;17:17;
19:15,23;20:4;37:23
enforcement (5)
7:19,20;13:20;28:2;
33:10
engage (2)
27:12,14
engaged (1)
26:18
enlistment (1)
6:15
enough (1)
26:8
ensure (2)
22:15;33:7
enter (1)
33:22
entire (1)
30:24
escort (5)
24:13,14,18;25:20;
38:2
escorted (3)
30:1,9,16
escorting (1)
39:19
essentially (1)
31:23
evening (1)
18:22
events (1)
12:13
evidence (2)
21:16;31:3
exact (4)
19:2;22:2;26:2,6
exactly (2)
19:2;29:21
EXAMINATION (2)
5:8;42:3
examined (1)
5:4
example (2)
8:22;9:7
Examples (1)
9:17
excuse (1)
13:15
exhibit (11)
8:25;12:24;13:1,11,
14,16;34:1;38:7,8,25;
39:4
Exhibits (2)
5:2;12:21
exit (2)

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

22:14;34:20
**exited (4)**
36:2,16,18,20
**explained (2)**
40:15,21
**explosive (8)**
15:3;16:6,25;22:16;
30:7,14,21;41:13
**explosives (4)**
18:17;25:5;27:9;
28:23
**expose (1)**
18:17
**extent (1)**
38:4
**extremely (1)**
13:24

## F

**face (6)**
23:16;34:24,25;
35:11;39:12,15
**face-first (2)**
25:22;32:10
**face-to-face (1)**
24:20
**facing (3)**
11:14;35:2,13
**fact (1)**
28:22
**facts (1)**
21:15
**failed (1)**
35:3
**failing (1)**
27:15
**Fairly (2)**
12:16,17
**family (2)**
31:1,6
**far (7)**
17:10;29:1;33:12;
35:6;36:7;38:1,1
**fast (1)**
33:18
**feet (5)**
30:4;32:10;35:19;
36:15,18
**fell (1)**
29:19
**few (1)**
39:6
**fighting (1)**
9:9
**filling (1)**
38:8
**Financial (1)**
7:5
**find (1)**
30:11
**findings (1)**
39:5

**firearm (2)**
25:5;27:8
**first (9)**
5:4;13:4,14,15;
28:5;29:10;33:25;
34:7,10
**Fish (1)**
34:1
**fit (1)**
23:18
**flat (1)**
31:20
**floor (2)**
31:20,23
**focus (2)**
29:23;30:14
**folks (1)**
5:18
**follow (1)**
19:21
**follows (1)**
5:5
**force (4)**
10:10,23;11:8;39:8
**forehead (2)**
39:12,15
**form (9)**
10:4;11:2;17:4;
21:11,15;26:10;27:5;
39:1;41:18
**formal (1)**
5:22
**Foundation (11)**
10:11,16;12:6;18:3,
6;27:5;39:16,25;
40:16,23;41:3
**frail (1)**
21:9
**front (5)**
12:22;20:3;26:4;
32:12;34:12
**full (2)**
35:2,15

## G

**garage (1)**
16:25
**GARY (3)**
5:3,10,11
**gathering (1)**
21:3
**gave (1)**
22:3
**Generally (1)**
11:7
**given (7)**
16:18;27:15,20;
28:13,20;33:15;35:8
**giving (7)**
27:18,24,25;28:2,
14;29:11,12
**goes (4)**

32:4;33:12;35:10;
38:1
**graduate (1)**
6:1
**graduated (1)**
5:24
**Grant (11)**
25:19,25;26:2;
29:15,17,18,25;32:5;
36:24;37:12,13
**grasp (2)**
9:19;41:1
**green (1)**
17:23
**ground (16)**
9:20;22:19;23:11,
22;24:2,13;25:20,22;
26:8,15;27:24;28:1,
15;29:13,19;39:20
**group (2)**
13:20;29:2
**growing (1)**
5:19
**guideline (2)**
11:4,23
**gun (1)**
14:3
**gurney (2)**
32:23;38:5

## H

**hand (4)**
9:14;24:5,16,17
**handcuff (2)**
36:3,17
**handcuffed (3)**
29:14;30:4,5
**handcuffs (2)**
25:1;26:16
**handed (1)**
32:22
**handgun (1)**
24:5
**hands (8)**
22:23;23:1,6,7;
25:6,10;34:24;35:3
**handwritten (1)**
39:5
**happen (5)**
33:5;39:12;40:10,
14,20
**happened (7)**
28:5,19;32:2;39:17,
23;40:5,9
**happens (1)**
14:8
**hard (1)**
26:8
**harm (1)**
9:16
**head (6)**
12:9;23:2;32:12;

33:8;34:25;35:4
**headed (2)**
38:24;39:8
**hear (1)**
29:11
**heard (2)**
15:2;19:14
**hearing (1)**
36:8
**held (4)**
7:10;9:3;13:9;
38:21
**Helke (1)**
37:2
**helped (2)**
29:25;30:4
**hiding (1)**
17:14
**high (3)**
5:24;6:1;13:24
**high-risk (1)**
13:22
**hired (2)**
7:6,12
**history (1)**
5:22
**hit (1)**
26:8
**hold (3)**
24:13,15,18
**holding (1)**
20:18
**home (1)**
21:14
**homicide (1)**
42:9
**Hook (1)**
17:20
**hospital (2)**
33:2,11
**hostage (6)**
13:18,23;14:3;
20:16,18;41:11
**hostages (1)**
33:8
**house (12)**
14:2;18:12;19:4,18,
25,25;22:10;25:11;
28:7;30:18,20;35:9
**huge (2)**
31:19;41:6

## I

**identification (1)**
5:2
**identified (3)**
14:23;21:1,6
**impossible (1)**
23:10
**inappropriate (1)**
21:19
**incapable (1)**

23:1
**incident (3)**
14:9;31:9;39:6
**include (1)**
9:18
**incoming (1)**
30:19
**incorrect (2)**
31:3,11
**independent (1)**
12:12
**indicated (1)**
41:10
**indication (2)**
31:10,12
**individual (2)**
8:19;17:11
**individuals (2)**
14:16;41:12
**infantry (1)**
6:11
**information (13)**
14:1,4,6;15:7,16,18,
25;16:5;17:2;18:12;
20:20;21:3;41:10
**informed (1)**
16:17;20:25;34:19
**initial (1)**
13:25
**initially (1)**
26:23
**injure (1)**
27:4
**injuries (5)**
26:9,13;39:9;40:7,
15
**inside (16)**
17:1,11,13;19:7;
20:17,19,24;28:16,18;
30:8,20;31:20;32:13;
33:6,8;37:3
**instances (1)**
13:22
**instructed (1)**
42:6
**intention (1)**
20:11
**intentionally (1)**
41:15
**interrupted (1)**
11:25
**into (14)**
6:4;8:17;12:14;
16:18;24:12,18;25:1;
29:4;32:1,7;33:22;
37:20;42:7,8
**involved (1)**
38:12
**involving (1)**
41:11

## J

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

**Jack (2)**
15:6,9

**Jake (1)**
36:24

**jeans (1)**
17:24

**Jeff (1)**
38:13

**job (2)**
6:10;7:16

**justice (3)**
5:25;7:19,24

**K**

**kind (4)**
7:15;24:10;25:15;
41:22

**kitchen (1)**
19:10

**knee (1)**
39:23

**knees (5)**
35:25;36:1;39:22;
40:2,7

**knew (2)**
17:25;29:15

**knowing (1)**
30:8

**Kurt (1)**
37:2

**L**

**last (4)**
12:24;13:11;34:10;
37:25

**later (2)**
15:19;19:6

**lateral (2)**
39:12,14

**law (5)**
7:19,20;13:20;28:1;
33:10

**layout (1)**
18:12

**leading (1)**
21:20

**learn (1)**
15:19

**learned (1)**
19:6

**learning (1)**
8:12

**leaving (1)**
6:14

**left (7)**
6:17;24:23;25:25;
29:18,22;39:19,23

**left-hand (1)**
39:7

**less (3)**
10:23;11:7;41:17

**level (2)**
11:18,21

**life (1)**
5:21

**lift (1)**
30:9

**light (1)**
6:11

**lights (2)**
18:15;19:4

**Lilek (2)**
15:7,10

**L-i-l-e-k (1)**
15:12

**living (1)**
5:18

**loaded (1)**
37:20

**located (1)**
30:15

**location (3)**
14:9,9;17:13

**LODUHA (3)**
5:3,10,11

**look (6)**
12:21;13:5;19:13;
33:25;38:7;39:4

**looking (6)**
19:7;34:13;38:14,
16,17;39:20

**looks (1)**
38:17

**loudspeaker (2)**
19:15,21

**lower (1)**
39:7

**M**

**main (3)**
29:23;30:13;34:12

**man (2)**
19:6;41:16

**many (2)**
27:18;36:10

**Maple (1)**
14:24

**marked (1)**
5:2

**may (5)**
16:18;34:4;36:5;
37:7;39:17

**mean (3)**
18:14;19:16;24:14

**means (1)**
30:3

**medical (10)**
31:13;32:16,20;
36:5;37:7,22,22;38:1,
3,4

**member (6)**
16:10;19:14;27:21;
36:3;37:3,5

**members (8)**
32:9;33:19;36:2,10,
16,18,20;37:20

**message (3)**
10:23;14:17,18

**met (1)**
37:22

**middle (2)**
31:21;34:23

**might (13)**
10:17;11:20,20;
22:25;23:9;28:13;
37:11,11,15,15;39:23;
40:5,20

**military (1)**
6:4

**Milwaukee (1)**
5:15

**mine (1)**
12:22

**Minocqua (5)**
7:6,12,17;10:9;
11:17

**mischief (1)**
20:24

**misinformation (1)**
41:15

**misunderstanding (2)**
41:7,9

**mom (1)**
5:21

**more (4)**
18:18;19:1;41:17,
25

**move (1)**
21:13

**moving (2)**
23:15,18

**multiple (3)**
15:2;23:22;24:2

**myself (1)**
27:7

**N**

**name (1)**
5:9

**nature (1)**
13:24

**near (6)**
6:13;34:14,16;36:3,
10;37:6

**need (3)**
29:4;36:5;37:7

**needed (1)**
18:18

**Next (3)**
9:13;16:9;19:11

**Nicolet (2)**
6:20;7:22

**nine-year-old (1)**
15:4;16:7,24

**noncompliant (1)**

9:6

**nonthreatening (1)**
9:6

**numbered (1)**
12:22

**numbers (1)**
37:4

**numeral (1)**
39:8

**O**

**obey (1)**
27:15

**Object (2)**
10:4,12

**objection (2)**
10:16,17

**observation (1)**
20:6

**observations (1)**
38:2

**observe (3)**
18:13,20;34:7

**observed (2)**
19:9,13

**obtaining (2)**
15:8,18

**occur (5)**
22:25;23:4,9,13;
41:23

**off (9)**
7:10;9:1,3;12:9;
13:8,9;18:15;30:21;
38:21

**office (2)**
14:14;15:14

**officer (9)**
7:16;9:17;10:3;
28:2;29:5,8;36:24;
37:2;41:2

**officers (4)**
13:20;27:16,18;
29:3

**officer's (2)**
9:15,19

**often (1)**
9:11

**old (2)**
23:17;41:16

**OLSON (30)**
5:8;7:8,11;9:4;10:8,
15;11:6,13;12:7;
13:10;17:6;18:4,9;
21:12,18,22,23;25:18;
26:14;27:10;38:15,
19,22;39:21;40:3,18,
25;41:5,20,25

**Once (1)**
29:24;30:3,5;32:13,
21

**one (15)**
6:19;16:23,23,24;

**19:12;24:16,16;**
27:21,23;29:5,10;
38:17,17;41:12;42:4

**Oneida (1)**
15:14

**only (7)**
26:3;27:23;28:25;
29:4,22;37:4;42:10

**onto (1)**
26:5

**open (1)**
31:19

**opened (1)**
34:12

**operated (1)**
37:21

**opportunity (1)**
16:19

**opposed (1)**
41:16

**order (3)**
22:9,12,18

**ordered (2)**
9:8;23:21

**ordering (2)**
24:1,13

**orders (8)**
9:10;19:23;20:9;
22:5,5,7,21;23:23

**others (2)**
9:17;22:6

**ought (1)**
10:3

**ourselves (1)**
18:18

**out (18)**
9:8;14:16;19:3,13,
14,16,18,25;22:9;
25:11;28:7,24;29:16;
32:22;34:13;38:3,8;
40:4

**outside (3)**
8:6;21:13;32:19

**over (6)**
14:11;15:2,5;19:14,
21;32:22

**overwhelming (1)**
30:6

**own (1)**
8:17

**P**

**PA (6)**
22:1;27:21;28:6,20;
34:17;35:7

**page (8)**
8:24;13:14,15,16;
14:16;18:24;34:10;
39:5

**pages (5)**
12:25;13:4,5,11;
33:25

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

**pants (1)**
25:8
**paragraph (5)**
9:13;16:9;19:11;
34:10,15
**paragraphs (3)**
8:23;9:5,21
**paramedics (2)**
32:23;33:15
**part (4)**
8:3;21:4;34:3;
37:25
**participation (1)**
33:10
**particular (2)**
11:16;23:13
**parts (2)**
34:4,8
**passive (12)**
8:14,20;9:5,11,23;
10:1,20;11:8,15,20;
12:1;27:14
**passively (2)**
8:21;10:24
**pat-down (1)**
30:6
**perform (1)**
26:24
**performing (1)**
19:12
**period (1)**
19:13
**perpetrator (1)**
20:23
**person (4)**
9:7,9;14:20;23:19
**personal (1)**
14:15
**personnel (4)**
32:16,20;37:22;
38:4
**phone (7)**
14:15,15,19,20;
15:23;16:5;17:9
**physical (1)**
23:10
**physically (1)**
9:14
**place (4)**
24:12,25;31:15;
32:14
**placed (9)**
24:16;26:12,15;
31:21;32:7;33:22;
37:4;38:5,5
**platform (4)**
26:6;32:3,4,6
**play (1)**
20:6
**Please (1)**
5:9
**Pm (2)**
18:22;42:12

**point (9)**
17:7;18:1;19:14;
22:14;25:5;26:18;
29:23;36:11,12
**pointed (1)**
24:1
**pointing (1)**
32:11
**Police (7)**
7:6,12,16,17;10:9;
11:17;33:19
**policies (4)**
10:10,19;11:7,17
**policy (4)**
11:22;12:3,4,11
**political (1)**
9:11
**pose (2)**
9:16,16
**position (4)**
16:18;20:10;26:2;
30:17
**positively (1)**
34:8
**possible (8)**
15:3;16:6,25;18:17,
19;23:1;30:7;40:9
**possibly (5)**
16:23,24,24;27:8;
41:12
**post (1)**
37:21
**posterior (1)**
40:19
**preparation (1)**
12:19
**pressed (1)**
15:22
**presses (1)**
16:2
**pressing (3)**
16:4;17:9;41:17
**probably (1)**
18:25
**proceeded (9)**
18:10;19:20;24:12;
25:19;30:9;31:15;
33:8,22,23
**producing (1)**
24:17
**professional (1)**
31:13
**program (1)**
6:24
**properly (1)**
22:17
**protect (1)**
30:21
**Protesters (1)**
9:10
**provide (1)**
22:2
**provided (4)**

16:22;20:21;22:8;
41:10
**providing (1)**
41:15
**provisional (1)**
39:5
**pull (2)**
9:18;27:2
**pulled (3)**
26:25;27:1,1
**pulling (1)**
27:11
**put (5)**
8:17;23:7;32:23,25;
34:24

**Q**

**question's (1)**
34:7
**quick (3)**
9:2;16:10;30:5
**quiet (1)**
25:15
**quitely (1)**
18:19
**quote (14)**
9:5;17:15,17;19:11,
15,20,23;20:5;34:11,
15;35:10,24;37:19,23

**R**

**radio (3)**
14:11;15:2,5
**raise (3)**
23:6,7;35:3
**raising (2)**
22:23;23:1
**random (1)**
41:17
**rate (1)**
25:20
**rather (1)**
20:23
**Rave (1)**
14:13
**reaction (2)**
11:16;16:10
**read (3)**
8:23;34:2;35:6
**really (1)**
9:1
**rear (7)**
16:11;31:16,16,18;
32:11;36:2,16
**reason (1)**
41:14
**reasonably (1)**
23:18
**reasons (3)**
23:10,13;28:21
**recall (10)**

16:14;17:10;19:5;
22:3;27:24;28:12;
29:1;30:25;37:9,13
**receive (1)**
14:8
**received (3)**
13:17;18:23;38:5
**recollect (1)**
36:8
**recollection (5)**
12:12,15,16;17:23;
35:22
**reconnaissance (3)**
18:11,14;19:12
**record (6)**
7:10;9:1,3;13:8,9;
38:21
**refers (2)**
9:6,14
**refuses (1)**
9:7
**regarding (1)**
10:10
**regards (1)**
22:2
**relaying (1)**
15:7
**reluctant (2)**
19:22;23:6
**remained (1)**
36:1
**remember (5)**
8:12;19:3;21:24;
28:10;34:6
**report (8)**
12:20,25;13:3,12,
15;29:24;34:1;38:24
**Reporter (1)**
7:8
**requests (1)**
15:23
**residence (24)**
17:1,13;18:2,5,11,
19;19:7;20:17,19,24;
22:15;32:20;33:7,9,
14,24;34:12,20,24;
35:1,12,13,14;41:13
**resist (1)**
29:14
**resistance (22)**
8:14,15,19,20;9:6,
11,13,18,23;10:1,20,
20;11:9,9,14,15,20;
12:1;26:19,22;27:12,
14
**resisting (4)**
8:20,21;10:24,25
**resource (1)**
8:2
**responding (1)**
16:1
**response (5)**
13:17,19;14:1;

15:23;27:22
**responsibility (1)**
33:17
**reviewed (2)**
12:18,20
**Rhinelander (1)**
7:22;33:19
**rifle (2)**
24:7,10
**right (13)**
24:22;26:1;29:16,
18,20,21;38:18;39:11,
14;40:12,13,20,22
**Riley (3)**
13:3;22:1;34:2
**risk (3)**
9:16,16;13:24
**role (3)**
20:6;38:8;39:1
**roman (1)**
39:7
**rotate (1)**
35:12
**rotating (2)**
35:1,15
**rounds (1)**
30:19
**route (1)**
15:1
**rule (1)**
40:4
**running (1)**
9:19
**runs (2)**
18:11,14

**S**

**safety (3)**
28:21;30:2;33:7
**same (2)**
10:7;28:14
**saw (4)**
19:6;21:8,13;40:2
**saying (4)**
8:22;36:9;37:9,13
**scabbed (2)**
39:11,14
**scapular (1)**
40:12
**school (2)**
5:24;6:1
**screen (1)**
34:13
**search (2)**
30:6,13
**seats (2)**
31:21,24
**second (1)**
12:24
**secondary (1)**
30:13
**second-to-last (1)**

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

34:10
**section (4)**
31:22;39:7,8,9
**security (1)**
7:5
**seemed (1)**
17:13
**seems (2)**
10:18;35:22
**sent (2)**
14:13,15
**sentence (1)**
34:11
**separate (1)**
28:4
**separately (1)**
31:19
**Sergeant (2)**
16:16,19
**set (1)**
32:5
**sets (1)**
11:4
**sheriff's (4)**
14:14;15:14;34:18;
38:10
**shirt (2)**
20:3;25:8
**short (1)**
16:22
**shot (1)**
30:18
**shoulder (1)**
40:13
**showing (1)**
22:24
**side (7)**
19:12;23:8;24:22;
30:10;31:21;32:14;
39:19
**sidewalk (2)**
22:13;26:5
**Simkins (2)**
36:25;37:16
**simply (1)**
9:10
**sink (1)**
19:10
**sit-ins (1)**
9:12
**situated (1)**
15:13
**situation (8)**
11:4;13:18;14:3;
20:16;29:8;33:6;
41:11,22
**situational (2)**
10:7;11:12
**situationally (1)**
11:22
**situations (3)**
10:23;11:24;13:23
**six (1)**

39:8
**slide (1)**
32:8
**smart (1)**
12:23
**smear (2)**
20:2,4
**Smith (45)**
12:13;19:7,13,14,
16,20;20:2,9,23,25;
21:6,8,24;22:4;23:21,
25;24:6,8,12,20,21;
25:1,20;26:4,18,23;
27:19;28:10,25;
29:13,14,25;30:12,23;
31:15;32:22;36:14,
17;38:2;39:6,13;40:8,
14;41:15;42:6
**Smith's (1)**
33:11
**sniper (1)**
16:18
**somebody (6)**
8:21,21;19:16;
33:16,16;42:6
**soon (3)**
33:15,21;35:8
**Sorry (4)**
13:7;18:6;20:14;
25:16
**sorts (1)**
8:5
**sound (1)**
35:17
**speak (4)**
17:12;25:14;31:2,7
**special (4)**
13:17,19;14:1;
27:22
**specialized (2)**
8:10;13:21
**specifically (1)**
28:12
**spell (1)**
15:11
**spoke (1)**
28:25
**spoken (1)**
15:20
**SRT (10)**
19:14;36:2,3,10,16,
18,20;37:3,6,20
**stack (1)**
12:21
**staff (1)**
32:19
**stage (1)**
14:10
**staged (1)**
16:11
**staging (5)**
9:12;14:23;15:2;
32:16,21

**standardized (1)**
38:10
**standing (4)**
24:19;25:1;34:13;
36:1
**start (2)**
23:7;34:9
**started (1)**
29:11
**starting (1)**
13:5
**state (1)**
5:9
**stated (2)**
36:4;37:6
**statement (1)**
37:18
**step (2)**
32:3,5
**still (8)**
10:12;14:2;24:2,13;
28:16,18;33:6,7
**stomach (2)**
32:8,10
**stop (4)**
34:24;35:5,14,20
**Stopping (1)**
36:6
**strange (1)**
10:18
**Street (2)**
14:24,24
**stroke (3)**
31:1,6,13
**Subheading (2)**
39:11,22
**subject (3)**
9:15,17;11:16
**subsequent (1)**
20:7
**substance (1)**
20:3
**suggesting (1)**
21:19
**suggests (1)**
10:17
**summer (1)**
7:14
**sure (7)**
18:7;19:2;25:14;
26:6;29:21;32:14;
41:22
**suspect (42)**
10:3,25;11:1;14:2;
16:23;17:14,16,21;
18:16;21:1,6;28:22;
29:3;30:20;34:11,15,
17,19,21,22,23,25;
35:1,3,11,12,13,16,18,
18,20,25,25;36:3,4,4,
11,17;37:6,6,19,23
**suspects (1)**
13:22;30:8

**sustain (1)**
30:19
**sweatshirt (1)**
17:24
**sworn (1)**
5:4
**system (8)**
14:13,21;22:1;
27:21;28:6,21;34:17;
35:8

## T

**tactic (1)**
9:11
**Tactics (7)**
7:25;8:7,9,11,13,
24;10:2
**talk (2)**
10:19;34:20
**talking (5)**
15:5;29:5;36:12,14;
38:23
**teacher (1)**
5:21
**team (8)**
13:17,19,21;14:1;
16:10,11,15;27:22
**technique (2)**
26:25;39:18
**techniques (1)**
8:7
**telling (1)**
21:24
**terms (1)**
10:2
**Terri (1)**
17:20
**testified (1)**
5:4
**testimony (3)**
12:19;28:25;38:25
**Thanks (1)**
42:1
**Thomas (2)**
12:13;19:7
**though (2)**
12:1;25:10
**thought (1)**
20:18
**threat (4)**
11:18,21;27:6,7
**threshold (2)**
34:14,16
**Thrivent (1)**
7:5
**throughout (1)**
30:23
**TIERNEY (28)**
9:1;10:4,11;11:2,
11;12:6;13:8;17:4;
18:3,6;21:11,15,21;
25:14,17;26:10;27:5;

38:13,16,20;39:16,25;
40:16,23;41:3,18;
42:3,10
**times (4)**
19:22;23:22;24:2;
28:4
**today (1)**
12:19
**told (7)**
28:10;34:23;35:11,
14,16,20,24
**took (2)**
15:24;29:15
**top (1)**
12:9
**toward (4)**
28:3,11;32:12;
34:21
**towards (8)**
24:21;25:12,23;
27:7,23;32:11;35:12,
17
**trained (1)**
29:2
**training (9)**
7:15,23;8:2,3,5,6,9,
13;9:25
**transfer (1)**
38:3
**transpired (1)**
35:23
**transportation (1)**
33:11
**traumatic (1)**
39:9
**tried (1)**
27:2
**trying (3)**
17:12;18:18;24:25
**turn (4)**
18:15;28:11;34:25;
35:11
**two (9)**
8:23;9:5;12:25;
13:4,11;31:18;33:8,
25;41:11
**two-year (1)**
6:24

## U

**unable (2)**
31:2,7
**under (2)**
11:16;26:12
**underneath (3)**
25:8;29:16,22
**unknown (1)**
20:2
**up (11)**
5:19;9:19;18:19;
25:1,14;26:18;27:1;
29:25;30:9;31:19;

ESTATE OF THOMAS SMITH, et al. vs.
ONEIDA COUNTY, et al.

DEPOSITION OF GARY LODUHA
July 30, 2020

32:6
**updates (1)**
15:2
**Upon (1)**
30:13
**upper (3)**
24:16;40:19,21
**use (5)**
9:11;10:10;12:1;
21:19;38:24
**used (1)**
34:16
**using (4)**
7:23;16:1;19:17;
22:1
**Usually (1)**
14:8

**V**

**various (2)**
18:10;20:9
**verbatim (1)**
12:10
**versus (3)**
10:20;11:15;12:1
**victim (2)**
16:23;20:23
**visible (2)**
26:9,12
**voice (2)**
14:11;35:17

**W**

**waistline (2)**
22:24;25:9
**walk (5)**
21:25;28:2,11;
35:17,18
**walked (1)**
34:11
**walking (2)**
21:14;34:21
**Warden (1)**
34:2
**warrants (1)**
13:23
**way (2)**
12:2;33:14
**weapon (1)**
24:1
**weapons (3)**
22:16;30:11,14
**wearing (2)**
17:17,22
**What's (4)**
5:18;12:10;13:19;
31:16
**whole (1)**
5:20
**who's (2)**
8:19,21

**Wildlife (1)**
34:1
**window (2)**
19:13;35:9
**windows (1)**
19:8
**Wisconsin (3)**
5:15;7:24;8:24
**within (1)**
13:21
**WITNESS (18)**
5:6;10:6,14;11:3,
12;17:5;18:7;21:17;
25:16;26:11;27:6;
39:17;40:1,17,24;
41:4,19;42:2
**words (1)**
8:17
**work (1)**
14:15
**worked (1)**
7:5
**wounded (1)**
16:24
**wrist (1)**
24:17
**write (14)**
16:9,17,22;17:15,
25;18:10;19:11,20;
20:2,9;23:21;29:24;
32:15;35:10
**writing (1)**
19:24
**wrote (2)**
15:1;22:4

**Y**

**yard (1)**
18:12
**year (2)**
5:16;6:1
**years (2)**
23:17;31:2
**Yep (1)**
6:16

**1**

**1:52 (1)**
42:12
**10 (3)**
35:19;36:15,17
**101st (1)**
6:7
**11 (1)**
6:11
**15 (3)**
35:19;36:15,18
**1-7 (1)**
5:2
**1853 (1)**
18:21

**1987 (1)**
5:17

**2**

**2006 (2)**
6:2,13
**2009 (1)**
6:13
**2011 (1)**
7:1
**2013 (2)**
7:2,3
**2014 (1)**
7:14
**2017 (1)**
12:13

**3**

**3 (2)**
13:5,16
**360 (2)**
35:2,16
**37 (1)**
8:24

**4**

**4 (7)**
12:24;13:1,5,11,14,
16;34:1

**5**

**5 (3)**
38:7,8,14

**6**

**6 (3)**
38:14,20,25
**6:53 (1)**
18:22

**7**

**7 (3)**
12:13;18:21;39:4
**7:30 (1)**
19:1
**70ish (1)**
23:17
**70-year-old (1)**
23:19

**9**

**911 (2)**
15:19,22