# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

ESTATE OF THOMAS SMITH, by
Shannon Bryfczynski, Special Administrator

        Plaintiff,

    v.

                                     Case No. 19-CV-972

ONEIDA COUNTY,
TOWN OF MINOCQUA,
GARY LODUHA, and
STETSON GRANT.

        Defendants.

---

## DEFENDANTS' PROPOSED FINDINGS OF FACT

---

NOW COME Defendants, Oneida County, the Town of Minocqua, Gary Loduha, and Stetson Grant, by their undersigned attorneys, and submit the following Proposed Findings of Fact in support of their Motion for Summary Judgment:

1.      Oneida County is a county within the State of Wisconsin and within the jurisdiction of the United States District Court for the Western District of Wisconsin. [Dkt. 2, ¶ 307; Dkt. 6, ¶ 307.][1]

2.      The Town of Minocqua is a town within the State of Wisconsin and within the jurisdiction of the United States District Court for the Western District of Wisconsin. [Dkt. 2, ¶ 306; Dkt. 6, ¶ 306.][2]

---

[1] The Court may take judicial notice that Oneida County is within the jurisdiction of the United States District Court for the Western District of Wisconsin. *See U.S. v. Mendell*, 447 F.2d 639, 641 (7th Cir. 1971).

[2] The Court may take judicial notice that the Town of Minocqua is within the jurisdiction of the United States District Court for the Western District of Wisconsin. *See Mendell*, 447 F.2d at 641.

3.      Stetson Grant is an adult resident of the State of Wisconsin and, at all times relevant to this lawsuit, was employed as a deputy sheriff for Oneida County. [Dkt. 6, ¶ 305.]

4.      Grant is a member of the Oneida County Special Response Team ("SRT") and was a member of that team on April 7, 2017. [Dkt. 17, ¶ 3.]

5.      The SRT is a group of law enforcement officers from within the County assigned to a specialized team to address situations like barricaded suspects, high-risk warrants, hostage situations, and any other sort of call that is determined to be extremely high risk. [Dkt. 20, 13:19-24.]

6.      Gary Loduha is an adult resident of the State of Wisconsin and, at all times relevant to this lawsuit, a police officer for the Town of Minocqua. [Dkt. 6, ¶ 304.]

7.      Loduha is a member of the SRT and was a member of that team on April 7, 2017. [Dkt. 16, ¶ 3; Dkt. 14, ¶ 9; Ex. A.]

8.      Thomas Smith, now deceased, lived at 10 Sanns Street in Rhinelander, Wisconsin (the "Property"). [Dkt. 2, ¶ 401; Dkt. 6, ¶ 401.]

9.      Smith's daughter, Shannon Bryfczynski, is the special administrator of Smith's estate. [Dkt. 21, 7:8-10; 38:24-39:2.]

10.     At approximately 6:39 p.m. on April 7, 2017, Oneida County Telecommunicator Jack Lilek received a 911 call from a home landline located inside the Property. [Dkt. 15, ¶ 1, 3.]

11.     Lilek identified himself to the caller and asked what the caller's emergency was, but the caller did not respond audibly. [Dkt. 15, ¶ 3.]

12.     Lilek heard what he believed was a woman grunting. [Dkt. 15, ¶ 3.]

13.     Lilek asked the caller if they needed an ambulance, but the caller did not respond. [Dkt. 15, ¶ 3.]

14.     When the caller did not respond to Lilek's questions, Lilek asked the caller to push a button on the phone if they needed help. [Dkt. 15, ¶ 3.]

15.     The caller responded by pressing a button. [Dkt. 15, ¶ 3.]

16.     Lilek then asked the caller to press a button once if they needed an ambulance, and the caller responded by pressing a button. [Dkt. 15, ¶ 3.]

17.     Lilek then asked the caller to press a button twice if they needed police, and they responded by pressing a button twice. [Dkt. 15, ¶ 3.]

18.     Lilek's initial impression after trying to communicate with the caller was that the caller was non-verbal and in need of some sort of assistance. [Dkt. 15, ¶ 4.]

19.     Lilek employed the button-pressing method with the caller because it is the most logical method of communication with a non-verbal caller. [Dkt. 15, ¶ 4.]

20.     Lilek had previously seen the button-pressing method used and had also personally previously used that method. [Dkt. 15, ¶ 4.]

21.     Lilek had previously used the button-pressing method at least twice prior to April 7, 2017. [Dkt. 15, ¶ 4.]

22.     After the caller pressed a button to confirm that they needed an ambulance, Lilek continued to ask questions of the caller and instructed the caller to answer by pressing a set number of buttons, such as pressing once for yes or twice for no. [Dkt. 15, ¶ 5.]

23.     While Lilek asked the questions, he would change up how the caller was instructed to respond, such as changing to press twice for yes or once for no, so that he could validate the caller's responses. [Dkt. 15, ¶ 5.]

24.     As Lilek obtained information from the caller, he contemporaneously conveyed the information to members of the Oneida County Sheriff's Department in real time both over the phone and radio. [Dkt. 15, ¶ 6.]

25.     Lilek also contemporaneously entered the information he received from the caller into the Detail Call for Service Report. [Dkt. 15, ¶ 6.]

26.     Through his communications with the caller, Lilek was informed that the caller was injured and the person who injured the caller (the "Suspect") was still at the Property. [Dkt. 15, ¶ 7.]

27.     Through his communications with the caller, Lilek was informed that the Suspect had a pistol, and the Suspect had shot the caller in the shoulder. [Dkt. 15, ¶ 7.]

28.     Through his communications with the caller, Lilek was informed that the caller was unable to talk. [Dkt. 15, ¶ 7.]

29.     Through his communications with the caller, Lilek was informed that the Suspect was looking out of the window of the Property, facing Davenport Street. [Dkt. 15, ¶ 7.]

30.     Sanns Street in Rhinelander, Wisconsin runs perpendicular to Davenport Street.[3]

31.     Through his communications with the caller, Lilek was informed that the Suspect lived at the Property, the Suspect was Smith, and the caller was Alan Smith. [Dkt. 15, ¶ 7.]

32.     Alan Smith is Smith's oldest son who lived at the Property with Smith. [Dkt. 18, 9:4-7; Dkt. 21, 7:8-21.]

33.     Through his communications with the caller, Lilek was informed that the Suspect had other weapons, including explosives that may be rigged to the front door of the Property. [Dkt. 15, ¶ 7.]

---

[3] The Court may take judicial notice of the location, and intersection, of Sanns Street and Davenport Street. *See Mendell*, 447 F.2d at 641.

34.     Through his communications with the caller, Lilek was informed that a 9-year-old was also in the Property, the caller and the 9-year-old were unable to leave the Property, and the 9-year-old may have been either shot or fatally injured. [Dkt. 15, ¶ 7.]

35.     Lilek did receive some conflicting information from the caller. [Dkt. 15, ¶ 11.]

36.     When Lilek received information that conflicted with a prior response, Lilek repeated the question, asked the question in a different way, or changed how the caller was instructed to respond to the question so that he could validate the information. [Dkt. 15, ¶ 11.]

37.     The majority of the information Lilek received was consistent and Lilek believed that the caller's button presses were deliberate and intentional, which he believed factored into the reliability of the information the caller provided. [Dkt. 15, ¶ 11.]

38.     Lilek relayed all information that he received from the caller to members of the Oneida County Sheriff's Department over the radio and documented it in the Call for Service Report. [Dkt. 15, ¶¶ 6, 12.]

39.     The first law enforcement officer reported that they arrived on scene at 6:43 p.m. and two other law enforcement officers reported that they had a visual of the Property at approximately 7:02/7:03 p.m. [Dkt. 15, ¶¶ 8-9; Ex. A.]

40.     A call out for the SRT to respond to the reported incident at the Property went out at approximately 6:46 p.m., based on the information Lilek received from the caller. [Dkt. 15, ¶¶ 8-9; Ex. A.]

41.     Grant and Loduha both responded to the SRT call. [Dkt. 16, ¶ 4; Dkt. 17, ¶¶ 3-4.]

42.     While en route to the staging area, Loduha heard multiple updates from Lilek over the radio including information about a possible explosive device and a deceased nine-year-old child. [Loduha, 15:1-14.]

43.     SRT was reportedly en route to the Property at approximately 7:18 p.m. and reportedly mobilized on scene by approximately 7:53 p.m. [Dkt. 15, ¶¶ 8-9; Ex. A.]

44.     Through his communications with the caller, the caller informed Lilek that the suspect knew that law enforcement were on site and wanted law enforcement to come to the Property. [Dkt. 15, ¶ 7.]

45.     Lilek remained on the line with the caller from approximately 6:39 p.m. until the caller ended the call at approximately 7:34 p.m. [Dkt. 15, ¶ 10.]

46.     Lilek called the caller back at approximately 7:36 p.m. [Dkt. 15, ¶ 10.]

47.     When the caller picked the phone up, the caller indicated that they could hear Lilek, that the Suspect heard the phone ring, and that the Suspect was in the room. [Dkt. 15, ¶ 10.]

48.     The caller hung up again at 7:37 p.m., and Lilek did not speak with the caller again. [Dkt. 15, ¶ 10.]

49.     SRT reported to the command post, which was located near the intersection of West Davenport and Maple Street. [Dkt. 16, ¶ 4.]

50.     The Property was not visible from the command post. [Dkt. 16, ¶ 4.]

51.     SRT members received information about the situation at the Property via the Rave Alert system, which was sent via text message and automated phone call. [Dkt. 20, 14:1-21.]

52.     The SRT call-out had conveyed that there was a possible hostage situation, a deceased nine-year-old in the garage of the residence, explosives at the front door and garage, and that Thomas Smith was the reported suspect. [Dkt. 19, 11:18-23.]

53.     Although Loduha was employed as a member of the Minocqua Police Department on that date, he responded to incident at the Property as a member of the Oneida County SRT. [Dkt. 16, ¶ 3.]

54.     The Oneida County Sheriff's Department SRT and the Minocqua Police Department executed a Memorandum of Understanding ("MOU") on or about September 17, 2015. [Dkt. 14, ¶ 9.]

55.     The MOU specifically addressed Loduha's involvement with the Oneida County SRT. [Dkt. 14, ¶ 9.]

56.     When Loduha responded to SRT calls, like the call on April 7, 2017, he was a deputized member of the SRT within the Oneida County Sheriff's Department. [Dkt. 16, ¶ 3; Dkt. 14, ¶ 9, Ex. A.]

57.     Pursuant to the MOU, Loduha was an employee of Oneida County when responding to SRT calls, including for purposes of Wis. Stat. §§ 895.35 and 895.46, pursuant to Wis. Stat. § 66.0313.  [Dkt. 14, Ex. A, ¶ 5.]

58.     While at the staging area, SRT received a short briefing and was informed that there was possibly one armed suspect, one wounded victim, one potentially deceased nine-year-old child in the garage, and possible explosive devices on or inside the residence. [Dkt. 20, 16:22-17:5.]

59.     When SRT was briefed, Loduha understood that the information had come from the individual inside the residence who was trying to conceal them self from the suspect. [Dkt. 20, 17:10-14.]

60.     SRT was also briefed by Detective Sergeant Brian Barber and Captain Terri Hook on the suspect's description, including that he was reportedly wearing a green sweatshirt and blue jeans. [Dkt. 20, 17:15-21.]

61.     The SRT commander, Detective Sergeant Brian Barber, assigned Loduha to the quick reaction team and staged him near the rear of the Bearcat. [Dkt. 20, 16:9-16.]

62.     When SRT was mobilized, the members, including Loduha and Grant, entered the back of the Bearcat. [Dkt. 16, ¶ 4; Dkt. 17, ¶ 4.]

63.     The Bearcat is a large, armored vehicle used for law enforcement that is shaped most similarly to a cross between a UPS truck and a military "Humvee." [Dkt. 16, ¶ 4.]

64.     The Bearcat has windows throughout the back seating area so that members of the SRT, including Loduha, could look out at the Property. [Dkt. 16, ¶ 4.]

65.     No patrol units had been sent to the Property before the Bearcat because the individual who called in the incident reported that there were explosives at the Property. [Dkt. 16, ¶ 4.]

66.     The Bearcat drove east along Davenport towards the Property. [Dkt. 16, ¶ 4.]

67.     Prior to performing any reconnaissance of the Property, the SRT had been informed that the 911 caller identified Smith as the suspect in the hostage situation, and that Smith was responsible for potentially injuring one individual, killing a young adolescent, and planting explosives at the Property. [Dkt. 16, ¶ 5; Dkt. 19 11:16-23.]

68.     While the Bearcat drove by the Property, Loduha observed a male in a window near, what he believed was, a sink. [Dkt. 16, ¶ 6.]

69.     The male Loduha observed matched the description of Smith. [Dkt. 16, ¶ 6.]

70.     After Loduha observed Smith through the window, Smith moved out of sight. [Dkt. 16, ¶ 6.]

71.     The Bearcat continued to drive by the Property for additional reconnaissance and to allow the SRT to look for any exterior signs of the explosives that had been reported. [Dkt. 16, ¶ 7.]

72.     The Bearcat turned onto Sanns Street from Davenport Street, heading north. [Dkt. 16, ¶ 7.]

73.     When the Bearcat was parallel with the front of the Property on Sanns Street, Loduha observed Smith through a large window on the front of the Property. [Dkt. 16, ¶ 7.]

74.     It appeared to Loduha that Smith observed the Bearcat because he looked out the window directly at the Bearcat. [Dkt. 16, ¶ 7.]

75.     At that point, the Bearcat stopped in front of the Property and Great Lakes Indian Fish & Wildlife Comm. Warden Riley Brooks, who was a member of the SRT in the Bearcat, began to give commands to Smith over the PA system in the Bearcat. [Dkt. 16, ¶ 7.]

76.     Warden Brooks commanded Smith to exit the Property. [Dkt. 16, ¶ 7.]

77.     Smith closed the blinds after Warden Brooks began giving him commands. [Dkt. 16, ¶ 7.]

78.     Loduha then observed Smith looking out through the closed blinds. [Dkt. 16, ¶ 7.]

79.     After a few moments, Smith opened the blinds and then closed them again. [Dkt. 16, ¶ 7.]

80.     During the time Smith was near the window, Warden Brooks was commanding him to exit the Property. [Dkt. 16, ¶ 7.]

81.     Approximately five minutes after Warden Brooks first began issuing commands, Smith opened the front door of the Property, but kept an interior door closed. [Dkt. 16, ¶ 8.]

82.     Smith reportedly opened the front door at approximately 8:08:36 p.m. [Dkt. 14, ¶ 5.]

83.     A few moments later, Smith opened the exterior door and stood at the threshold, again ignoring Warden Brooks' commands to exit the Property. [Dkt. 16, ¶ 8.]

84.     While Smith stood in the doorway, Loduha and Grant observed Smith was wearing blue jeans and a green sweatshirt, which also matched the description of the suspect that, they was told, had provided by the 911 caller. [Dkt. 16, ¶ 8.]

85.     Loduha and Grant also observed a dark schmear of some substance on Smith's sweatshirt that, from their vantage point, looked like blood. [Dkt. 16, ¶ 8.]

86.     The clothing and the apparent blood on Smith's shirt corroborated the reports that Grant and Loduha received which included, among other things, that Smith was the individual who had injured and/or killed one or more individuals in the Property. [Dkt. 16, ¶ 8; Dkt. 17, ¶ 5.]

87.     Warden Brooks continued to issue commands to Smith over the PA system and Smith was instructed to slowly approach the Bearcat and raise his hands. [Dkt. 16, ¶ 9.]

88.     Smith, eventually, began to approach the Bearcat. [Dkt. 16, ¶ 9.]

89.     Neither Loduha nor Grant observed that Smith had any trouble walking. [Dkt. 16, ¶ 9; Dkt. 17 ¶ 6.]

90.     Loduha did not observe any signs or any indication that Smith was physically incapable of performing the tasks he was commanded to perform. [Dkt. 16, ¶ 9.]

91.     Both Loduha and Grant concluded that Smith appeared to be physically capable of responding to Warden Brooks' commands. [Dkt. 16, ¶ 9; Dkt. 17, ¶ 6.]

92.     However, Smith would not fully comply with Warden Brooks' commands. [Dkt. 16, ¶ 9.]

93.     For example, Smith was instructed to raise his hands above his hand and raise his shirt so that SRT could assess whether he had any weapons, explosives, or explosive triggers on him. [Dkt. 16, ¶ 9.]

94.     Given that the 911 caller had indicated there were explosives in the Property, SRT members were extremely concerned that Smith may have a vest or other trigger device hidden on him. [Dkt. 16, ¶ 9.]

95.     When Warden Brooks instructed Smith to raise his hands and lift his shirt, Smith would begin to raise his hands and then bring them back down. [Dkt. 16, ¶ 9.]

96.     Grant's impression of Smith was that he was choosing only to partially comply with Warden Brooks' commands. [Dkt. 17, ¶ 6.]

97.     As another example, Smith was instructed to turn around 360 degrees with his hands above his head, so that SRT could try to see if he had any weapons in the waistband of his pants, but Smith would turn to one side and then immediately turn back to facing the Bearcat. [Dkt. 16, ¶ 9.]

98.     Because of the reports of explosive devices, Loduha believed that Smith was attempting to conceal a weapon or explosive device when he refused to lift his shirt. [Dkt. 16, ¶ 9.]

99.     When Smith was approximately 10-15 feet from the Bearcat, he was instructed by Warden Brooks to get onto the ground. [Dkt. 16, ¶ 10.]

100.    In response, Smith leaned forward and then stood straight back up. [Dkt. 16, ¶ 10.]

101.    After a few moments, Smith began to glance backwards towards the Property, also known as "targeting glances," and Loduha was concerned that Smith was going to head back into the Property. [Dkt. 16, ¶ 10.]

102.    At that point, the SRT made the decision to exit the Bearcat and take Smith into custody; SRT did not want him to go back into the Property out of fear that he may trigger the explosives or put the 911 caller in further danger. [Dkt. 16, ¶ 10.]

103. Grant, Loduha, and SRT members Jake Simkins, Kurt Helke exited the back of the Bearcat. [Dkt. 16, ¶ 11; Dkt. 17, ¶ 7.]

104. Simkins and Helke got into a position to watch the perimeter, and Grant and Loduha approached Smith. [Dkt. 16, ¶ 11.]

105. Grant and Loduha watched Smith to ensure he did not reach for a weapon, while Simkins and Helke got into a position to watch the perimeter. [Dkt. 16, ¶ 11.]

106. When Grant and Loduha exited the Bearcat, their primary concern was getting Smith into custody as quickly and safely as possible. [Dkt. 16, ¶ 12; Dkt. 17, ¶ 8.]

107. Because Smith refused to respond to Warden Brooks' commands about raising his shirt and turning in a circle (which would have allowed SRT to conduct at least a partial visual search for weapons), neither Grant nor Loduha knew if Smith had weapons, explosives, or an explosive trigger on him when they approached him. [Dkt. 16, ¶ 12; Dkt. 17, ¶ 8.]

108. Grant and Loduha had no idea if the Property was timed to explode or whether Smith had some sort of trigger on him. [Dkt. 16, ¶ 12; Dkt. 17, ¶ 8.]

109. Grant and Loduha needed to get Smith into custody quickly so that they could move him, move themselves, and move the SRT members away from the Property and out of the area of danger if an explosion occurred. [Dkt. 16, ¶ 12; Dkt. 17, ¶ 8.]

110. Smith was standing near the front passenger door of the Bearcat. [Dkt. 16, ¶ 11.]

111. Grant approached Smith from Smith's right side, and Loduha approached Smith from Smiths' left side. [Dkt. 16, ¶ 11; Dkt. 17 ¶ 7.]

112. Smith's body was bladed to Loduha, so Loduha could only see Smith's left side. [Dkt. 16, ¶ 11.]

113. Loduha had his department-issued rifle raised and he commanded Smith to get to the ground. [Dkt. 16, ¶ 11.]

114. Smith looked at Loduha in response, but did not respond to his command. [Dkt. 16, ¶ 11.]

115. As Loduha got closer to Smith, he transitioned his rifle down and put his right hand on Smith's upper left arm, around by his armpit, and put his left hand on Smith's wrist to attempt to decentralize Smith. [Dkt. 16, ¶ 13.]

116. A solo decentralization technique requires that an officer pull the individual's arm down and towards the officer's body while turning in a circular motion, which forces the individual off balance and allows for the officer to control their descent to the ground. [Dkt. 16, ¶ 13.]

117. When Loduha began to pull on Smith's arm, Smith looked directly at him and actively resisted by pulling his arm away from Loduha. [Dkt. 16, ¶ 13.]

118. Loduha estimated that it was approximately 10-15 seconds between exiting the Bearcat and approaching Smith. [Dkt. 16, ¶ 14.]

119. Grant then approached Smith from his right side and tried to take his hand to begin to handcuff him while standing, but Smith resisted and pulled his arm away from Grant. [Dkt. 17, ¶ 9.]

120. After Smith pulled his arm away from Grant, Grant took Smith's arm by both hands and to decentralize Smith with Loduha. [Dkt. 17, ¶ 9.]

121. The two-man decentralization technique is more controlled and a safer technique than a one-man decentralization because the officers have more control over the individual's descent when the individual's weight is divided between two officers. [Dkt. 16, ¶ 15.]

122.     In a two-man decentralization technique, the officers guide the individual's arms and shoulders forward to take the individual off balance, and, as the individual goes forward to the ground, the officers control the individual's descent by holding back their upper arm as they descend. [Dkt. 16, ¶ 15.]

123.     Loduha and Grant performed the two-man decentralization technique on Smith. [Dkt. 16, ¶ 15; Dkt. 17, ¶ 9.]

124.     Once Smith was on the ground, Loduha placed his left hand into a handcuff and Grant moved Smith's right hand so Loduha could handcuff him. [Dkt. 16., ¶ 16; Dkt. 17, ¶ 10.]

125.     Smith actively resisted Grant while he moved his right hand; Smith would not submit and he tensed up, making it more difficult to get him into handcuffs. [Dkt. 17, ¶ 10.]

126.     Loduha estimated that it was approximately 10-15 seconds between his initial physical contact with Smith and placing him into handcuffs. [Dkt. 16, ¶ 17.]

127.     Smith was reportedly in custody at approximately 8:10:58 p.m. [Dkt. 14, ¶ 6.]

128.     After Smith was handcuffed, Loduha quickly swept his hand down Smith's back, turned him on his right side, and swept his hand down the front of Smith's shirt to quickly perform a check for any obvious explosive devices or weapons before moving Smith. [Dkt. 16, ¶ 16.]

129.     Loduha estimated that it was approximately 10-15 seconds to perform the patdown of Smith after he was handcuffed. [Dkt. 16, ¶ 17.]

130.     After performing the pat down, Loduha and Grant needed to move themselves and Smith out of the area in the event an explosive device went off at the Property. [Dkt. 16, ¶ 18.]

131.     Grant and Loduha picked Smith up by his upper arms and armpits to stand him upright, but Smith would not stand on his own or walk. [Dkt. 16, ¶ 18; Dkt. 17, ¶ 11.]

132.     Loduha estimated that it took approximately 10-15 seconds to stand Smith up from the ground. [Dkt. 16, ¶ 17.]

133.     Grant and Loduha thought it was odd that Smith would not stand or walk on his own, because he had just seen Smith walk out of the Property, so both interpreted Smith's actions as continued resistance and refusal to comply. [Dkt. 16, ¶ 19; Dkt. 17, ¶11.]

134.     When Smith refused to walk, Grant and Loduha picked Smith up a bit higher and carried him by his armpits around the front of the Bearcat to the other side of the Bearcat, away from the Property, so all three of them would be out of the area in the event an explosive device went off at the Property. [Dkt. 16, ¶ 18; Dkt. 17, ¶12.]

135.     Once Loduha, Grant, and Smith were on the other side of the Bearcat, Loduha advised Smith to get on the ground, but he refused. [Dkt. 16, ¶ 20.]

136.     Loduha and Grant needed to place Smith on the ground so that they could conduct a more complete search of Smith, because they were unsure if he had any explosive devices or trigger on him, and they could not do while he was standing because he refused to stand on his own. [Dkt. 16, ¶ 20.]

137.     When Smith refused to bend his legs so he could be lowered to the ground, Grant and Loduha each took a step forward, bent their back legs at the knee like a lunge, and leaned Smith forward to place him on the ground. [Dkt. 16, ¶ 20.]

138.     Loduha and Grant controlled Smith's movement by holding onto his upper arms and under his armpits and guiding him to the ground. [Dkt. 16, ¶ 20.]

139.     Because Smith seemed to be actively keeping himself straight, Grant and Loduha laid Smith down almost as if he were a board; Smith's toes stayed on the ground and were a fulcrum. [Dkt. 16, ¶ 20.]

140.    Grant and Loduha kept their hands on Smith's upper arms and under his armpits to control his descent until he was flat on the ground.  [Dkt. 16, ¶ 20.]

141.    Loduha again understood that Smith was continuing to physically resist the officers by keeping his legs straight and refusing to bend his legs to go onto the ground. [Dkt. 16, ¶ 20.]

142.    Loduha estimated that it took approximately 10-15 seconds to place Smith on the ground. [Dkt. 16, ¶ 21.]

143.    When Smith was back on the ground, Loduha conducted a more full search of Smith by lifting his shirt, checking his waistband and pants pockets, and checking his ankles. [Dkt. 16, ¶ 22.]

144.    Loduha estimated that it took approximately 20-25 seconds to conduct the search. [Dkt. 16, ¶ 22.]

145.    Grant and Loduha again picked Smith up from the ground and, again, Smith refused to stand or walk on his own. [Dkt. 16, ¶ 23; Dkt. 17, ¶ 13.]

146.    Loduha again understood Smith's refusal to stand or walk to be continued resistance. [Dkt. 16, ¶ 23.]

147.    Grant and Loduha carried Smith by his armpits and upper arms to the back of the Bearcat and Loduha instructed him to step onto the back ledge so he could get into the back of the Bearcat. [Dkt. 16, ¶ 23.]

148.    Smith looked at Loduha but did not move. [Dkt. 16, ¶ 23.]

149.    Loduha again instructed Smith to step up on the ledge and Smith did not move. [Dkt. 16, ¶ 23.]

150.    Grant and Loduha then stepped up on the back ledge of the Bearcat, which was a step down from the backdoor, and Loduha again instructed Smith to step up. [Dkt. 16, ¶ 23.]

151.     When Smith did not move, Grant stepped into the back of the Bearcat and he and Loduha lifted Smith up by his arms and armpits. [Dkt. 16, ¶ 23.]

152.     As Grant moved into the Bearcat with one of Smith's arms, Loduha moved behind Smith to pick him up from his legs. [Dkt. 16, ¶ 23.]

153.     Grant pulled Smith into the Bearcat by his arm while Loduha pushed Smith in by his hips and waist. [Dkt. 16, ¶ 23.]

154.     Grant and Loduha laid Smith on his stomach and sort of slid him into the back of the Bearcat, similar to the technique they would have used for getting a downed officer into the back of the Bearcat. [Dkt. 16, ¶ 23.]

155.     While Grant was helping Smith into the Bearcat, he asked Smith questions, including whether he needed medical attention (which was a standard question asked after any force is used). [Dkt. 17, ¶ 13.]

156.     Smith just stared at Grant and did not respond, at which point, Grant began to suspect that something was wrong with Smith. [Dkt. 17, ¶ 13.]

157.     Regardless of any perceived issues with Smith, Grant was still operating under the assumption that Smith had reportedly placed explosives in the Property, and had reportedly injured one person and fatally injured a second. [Dkt. 17, ¶ 13.]

158.     Grant and Loduha needed to secure Smith and return to the Property as quickly as possible to locate the explosives and enter the Property to render aid. [Dkt. 17, ¶ 13.]

159.     Loduha estimated that it took less than a minute to get Smith into the back of the Bearcat. [Dkt. 16, ¶ 24.]

160.     At approximately 8:12:23 p.m., SRT reported it would be taking Smith back to the command post to see medics. [Dkt. 14, ¶ 7.]

161. After Smith was in the back of the Bearcat, Loduha held a security position on the Property while Simkins and Helke joined Grant back into the Bearcat, before Grant entered the back and the Bearcat headed back to the command post. [Dkt. 16, ¶ 25.]

162. At approximately 8:13:22 p.m., SRT advised it was back en route to the command post. [Dkt. 14, ¶5.]

163. An ambulance was waiting at the command post when the Bearcat arrived. [Dkt. 16, ¶ 26.]

164. SRT members stood Smith back up and instructed him to step down out of the back of the Bearcat, but Smith again just stared at the SRT members and did not move. [Dkt. 16, ¶ 26.]

165. SRT members lifted Smith up by his upper arms and armpits, lifted him out of the Bearcat, and stood him up on the ground, where other individuals assisted him onto a gurney. [Dkt. 16, ¶ 26.]

166. SRT members got back into the back of the Bearcat and headed back to the Property to attempt to locate the explosives and enter the house. [Dkt. 16, ¶ 26.]

167. Neither Loduha nor Grant ever observed any physical injuries or impairments on Smith at any time during their interaction with him. [Dkt. 16, ¶ 27; Dkt. 17, ¶ 14.]

168. Neither Loduha nor Grant ever witnessed Smith hit his head at any time during their interaction with him. [Dkt. 16, ¶ 27; Dkt. 17, ¶ 14.]

169. Neither Loduha nor Grant ever heard any information about Smith's physical condition, including an apparent inability to speak, while on the SRT call at the Property. [Dkt. 16, ¶ 28; Dkt. 17, ¶ 15.]

170.    Even if Loduha or Grant had heard any information about alleged physical condition or limitations, neither Loduha nor Grant would have heard information, neither individual would have taken any different actions. [Dkt. 16, ¶ 28; Dkt. 17, ¶ 15.]

171.    Loduha and Grant's focus during the entire incident was getting Smith into custody as safely and quickly as possible, and Smith and the reported explosive devices were a perceived threat to Loduha, Grant, and the rest of the SRT members during the entire interaction with Smith. [Dkt. 16, ¶ 28; Dkt. 17, ¶ 15.]

172.    The training Grant and Loduha received through Defensive and Arrest Tactics training, as well as their trainings throughout their career, instructed them to control the scene at the Property and Smith as quickly as possible to prevent further escalation. [Dkt. 16, ¶ 29; Dkt. 17, ¶ 16.]

173.    Loduha and Grant are trained to perform each stabilization technique – whether a compliance hold, decentralization, or further escalated force that may be needed – at 100% every time they engage with an individual, without regard for their personal perception of that individual. [Dkt. 16, ¶ 29; Dkt. 17, ¶ 16.]

174.    If Loduha or Grant were to perform a decentralization technique at 50% because they personally believed the individual was weaker or capable of control with less effort, but their personal perception was incorrect and the individual actively resisted and evaded them, the situation would then escalate and they may be forced to escalate their response accordingly. [Dkt. 16, ¶ 29; Dkt. 17, ¶ 16.]

175.    For that reason, Grant and Loduha are trained to perform each technique correctly and at 100% every time to quickly and safely control the situation and prevent escalation. [Dkt. 16, ¶ 29; Dkt. 17, ¶ 16.]

176. Based on their training and experience, the actions Loduha and Grant took on April 7, 2017 were reasonable in response to the overwhelming danger that the situation presented. [Dkt. 16, ¶ 30; Dkt. 17, ¶ 17.]

177. During their entire interaction with Smith, Loduha and Grant were extremely aware of the threat of explosives at the Property and needed to secure Smith and the scene as quickly as possible to locate the reported explosives so they could enter the Property to secure and assist the individuals who were reportedly inside. [Dkt. 16, ¶ 30; Dkt. 17, ¶ 17.]

178. Loduha and Smith used the least amount of force necessary to quickly and safely take Smith into custody and secure the scene at the Property. [Dkt. 16, ¶ 31; Dkt. 17, ¶ 18.]

179. Ultimately, the reports of injuries, hostages, decedents, and explosives turned out not to be correct. [Dkt. 19, 11:24-12:2.]

180. While the information regarding the injured hostage, deceased nine-year-old, and explosives turned out to be incorrect, Loduha and Grant did not learn that the information they had been provided was not correct until after Smith was taken into custody, after they conducted a thorough exterior review of the Property to locate explosives and triggers, and after they entered the Property. [Dkt. 16, ¶ 32; Dkt. 17, ¶ 19.]

181. Smith was completely non-verbal as of January 1, 2017. [Dkt. 18, 15:10-18.]

182. When Alan Smith communicated with Smith after Smith was in custody, Alan Smith used a similar method to the one employed by Lilek to communicate with Smith. [Dkt. 18, 54:20-55:1]

183. Specifically, Alan Smith held Smith's hand, asked Smith a question, and then asked Smith to squeeze his hand a number of times for each response since Smith could not respond verbally. [Dkt. 18, 54:20-55:1]

184.    Alan Smith admitted that the 911 operator's method of communicating with his non-verbal father was reasonable, considering that Alan Smith employed the same method to communicate with his father. [Dkt. 18, 55:22-56:15.]

185.    In fact, because Smith did not have a text-to-talk phone or any other device to communicate with law enforcement, there was no way for Smith to communicate with the 911 other than the button-pushing method. [Dkt. 18, 57:24-58:15.]

186.    Alan also admitted that the 911 operator had no way of knowing what was going on at the Property other than what Smith was conveying to him. [Dkt. 18, 58:23-59:1.]

187.    As of the beginning of April 2017, Smith's only physical limitation was that he shuffled his feet when he walked; he was otherwise able to "do everything" else with the exception of "maybe opening up a pickle jar…." [Dkt. 18, 21:2-14.]

Dated this 30th day of October, 2020.

AXLEY BRYNELSON, LLP

*/s/ Danielle Baudhuin Tierney*
Lori M. Lubinsky, SBN 1027575
Danielle Baudhuin Tierney, SBN: 1096371
Attorneys for Defendants
P.O. Box 1767
Madison, WI 53701-1767
Telephone: (608) 257-5661
Email: llubinsky@axley.com / dtierney@axley.com