# In the
# United States District Court
## For the
### Western District of Wisconsin

Estate of Thomas Smith, by
Shannon Bryfczynski,
Special Administrator,

       Plaintiff,

   v.                           Case No. 19-cv-972

Oneida County, the Town of Minocqua,
Gary Loduha and Stetson Grant,

       Defendants.

---

## PLAINTIFF'S PROPOSED FINDINGS OF FACT

---

The Plaintiff, by its attorneys, William Laman Law Office, by William F. Laman, and The Jeff Scott Olson Law Firm, S.C., by Attorney Jeff Scott Olson, hereby submits the following Proposed Findings of Fact:

1.     As of April 7, 2017, Thomas Smith was 65 years old. (Alan Smith Declaration, ¶ 1.)

2.     He had experienced a cerebrovascular accident (a CVA, or stroke), and had been unable to speak at all since late 2016. (Alan Smith Declaration, ¶ 2.) He communicated by writing notes. (Alan Smith Deposition, 15:19 – 16:4.)

3. He was suffering from a Parkinsonian-type illness called Multiple System Atrophy. (Alan Smith Declaration, ¶ 3.)

4. He had difficulty walking and problems with coordination when performing even the simplest tasks. (Alan Smith Declaration, ¶ 4; Alan Smith Deposition, 22:2-7.)

5. In addition, he was an insulin-dependent diabetic. (Alan Smith Declaration, ¶ 5.)

6. He was quite frail and slow. (Alan Smith Declaration, ¶ 6.)

7. Thomas Smith's son, Alan Smith, lived with his father to assist him with the tasks of daily living, serving as his primary caretaker. (Alan Smith Declaration, ¶ 7.) He had grown up in that house (Alan Smith Deposition, 6:2-3), and had been living there continuously since 2008 or 2009 (Alan Smith Deposition, 8:24 – 9:3), at first with both his mother and father and then, after his mother died in 2015 or 2016, with his father only (Alan Smith Deposition, 9:11-20; 11:7-10).

8. The records from Thomas Smith's last visit to his doctor before the incident giving rise to this case, on February 8, 2017, show that he was suffering from, among other things: hypertension, asthma, degenerative joint disease, diabetes, "Bulbar weakness[1] with severe dysarthria [a motor speech disorder in which the muscles that

---

[1] "Bulbar weakness (or bulbar palsy) refers to bilateral impairment of function of the lower cranial nerves IX, X, XI and XII, which occurs due to lower motor neuron lesion either at nuclear or fascicular level in the medulla or from bilateral lesions of the lower cranial nerves outside the brain-stem. Bulbar weakness is often associated with difficulty in chewing, weakness of the

are used to produce speech are damaged, paralyzed, or weakened] and some upper extremity weakness." (Declaration of Jeff Scott Olson, ¶ 13, Exhibit 10, pp. PLA 002-3.)

9.      On April 7, 2017, Alan Smith was scheduled to leave his father's home in the afternoon, to attend his daughter's birthday party. (Alan Smith Declaration, ¶ 8.)

10.     As Alan prepared to leave, he observed that his father seemed in fine condition, partaking of his usual snack and asking Alan, by writing a note (Alan Smith Deposition, 24:11-14) to wish his daughter a happy birthday. (Alan Smith Declaration, ¶ 9.)

11.     At the time of the arrest of Thomas Smith, Jacqueline Falck lived in a house at 804 W. Davenport St., on the corner of Sanns Street and Davenport Street, directly across the street from Thomas Smith's house at 10 Sanns St. (Jacqueline Falck Deposition, 6.)

12.     Falck was then and is now employed as a caregiver, providing in-home care for disabled people of all ages who are unable to care for themselves. (Falck Deposition, 55.)

13.     She had moved in to her house on Davenport St. in October of 2015 and got to know Thomas Smith as a neighbor. (Jacqueline Falck Deposition, 7.)

---

facial muscles, dysarthria, palatal weakness and regurgitation of fluids, dysphagia, and dysphonia. [from HPO]." National Center for Biotechnology Information, U.S. National Library of Medicine,  https://www.ncbi.nlm.nih.gov/medgen/898626, last accessed November 24, 2020.

14.     Thomas Smith had such a difficult time communicating with her that their conversations were mostly by hand gestures or yes-or-no questions that Falck would ask. (Jacqueline Falck Deposition, 7.)

15.     Faulk observed that Thomas Smith had trouble walking. (Jacqueline Falck Deposition, 8-9.)

16.     His walk was like a slow shuffle. (Jacqueline Falck Deposition, 9.)

17.     On April 7, 2017, Jacqueline Falck went to let her dog into her house. (Jacqueline Falck Deposition, 13.)

18.     Her dog had been tied outside the Sanns Street door of her home, and she took him in and out by that door. (Jacqueline Falck Deposition, 13.)

19.     She saw a large military type vehicle (Jacqueline Falck Deposition, 13), on Sanns Street (Falck Deposition, 14).

20.     She let her dog into her house, and then stood outside watching the vehicle for a few minutes. She then returned to her house and looked out the door to see where the vehicle was going to go. (Jacqueline Falck Deposition, 14, 17.)

21.     She was looking through her screen door, in which the bottom was made of screen and the top was made of glass, on the Sanns Street side of her house. (Falck Deposition, 17.)

22.     The vehicle was stopped on Sanns Street at a point where it blocked her view of part of Thomas Smith's driveway, but she could see his front door and about half of the driveway. (Falck Deposition, 18.)

4

23. Faulk heard the law enforcement officers in the Bearcat giving commands. (Falck Deposition, 19-20.)

24. She heard a voice over loudspeakers saying, "Oneida County Sheriff, come out slowly with hands upon your head." (Falck Deposition, 20.)

25. She recalls hearing that command once before Smith came out of his house. (Falck Deposition, 20.)

26. Before Thomas Smith left his home, Dispatcher Lilek had recorded in his Detail Call for Service Report and conveyed to the deputies of the Oneida County Sheriff's Department in the field by phone and radio (Dkt. # 15, ¶ 6), that he was "starting to get conflicting information" from inside the house. (Dkt. 15-1, p. DEF00000, 19:07:31.)

27. Falck saw Thomas Smith pause in his doorway and then come out. (Falck Deposition, 21.)

28. She saw Thomas Smith come down the steps from his door to his driveway, and observed that he was walking very slowly and seemed confused. (Falck Deposition, 21.)

29. Although at this point Defendant Loduha saw a smear of a dark substance on Smith's clothing, the fact that he thought it might be blood is immaterial because this observation did not play a role in any of Loduha's subsequent decisions or actions. (Loduha Deposition, 20:2-8.)

30. Smith was looking to the right and the left and up and down and his arms were raised a little bit as if he were trying to keep his balance, and he kept shuffling along until he finally stopped. (Falck Deposition, 22.)

31. As he shuffled down his driveway, he seemed confused and started to turn around, but couldn't make it all the way around and turned back. (Falck Deposition, 47.)

32. It took him a few steps to turn around and a few steps to turn back. (Falck Deposition, 52:21-23.)

33. It appeared to Falck that he couldn't make heads or tails of what was being asked of him. (Falck Deposition, 47.)

34. Eventually, as he shuffled down his driveway, he got his hands about as high as his shoulders. (Falck Deposition, 49.)

35. Smith said nothing throughout the entire sequence of events. (Falck Deposition, 22; Loduha Deposition, 30:23-25.)

36. Falck had a clear view of Thomas Smith. (Falck Deposition, 23, see also Falck Declaration, ¶¶ 2-3, and Exhibit 16.)

37. The Bearcat's spotlight was illuminating the entrance to Mr. Smith's home and the driveway. (Grant Deposition, 29, 9-12.)

38. After Smith stopped, he was surrounded by several officers pointing guns at him. (Falck Deposition, 23.)

6

39.     Although at least Loduha has been trained that when officers confront a suspect they need to control or take into custody, only one officer should do the talking (Loduha Deposition, 29, 2-6), both Loduha (Loduha Deposition, 28:24 – 29:12) and Grant (Grant Deposition, 34:7-15) yelled commands at Smith after they got out of the Bearcat.

40.     Defendant Grant took hold of Smith's right arm (Grant Deposition, 34:23-25), and Defendant Loduha took hold of Smith's left arm (Loduha Deposition, 24:12-24.)

41.     These officers moved him forward, shuffling along, until he was out of Falck's sight on the other side of the Bearcat. (Falck Deposition 23-24.)

42.     Then Falck saw Loduha and Grant shuffle Smith around the north side of Bearcat and when they were on the side of the Bearcat nearest to her, they picked him up and threw him on the ground. (Falck Deposition, 26-27.)

43.     The two officers were holding Mr. Smith one on each side as they came around the Bearcat, all kind of shuffling along (Falck Deposition, 30) and then they both picked him up and threw him to the pavement. (Falck Deposition, 27.)

44.     Her recollection is that they lifted him a little bit, forcefully, until he was off the ground a few inches, and threw him down forcefully. (Falck Deposition, 29-30.)

45.     They did this deliberately. (Falck Deposition, 35:11-15.)

46.     Falck describes this as "a very forceful shove to the ground." (Falck Deposition, 36:16-17.)

47.     After the officers shoved Smith, their hands were not on him anymore. (Falck Deposition, 38:2-6.) They had let go before he hit the ground. (Falck Deposition, 38:14.)

48.     After he was thrown on the ground, Smith was positioned with his head to the north, parallel with Sanns Street and the Bearcat. (Falck Deposition, 31.)

49.     The officers were standing above him, and one of them said that Smith had hit his head. (Falck Deposition, 31.)

50.     Almost every officer in the Bearcat said that Mr. Smith appeared to need medical attention. (Grant Deposition, 32:18 – 33:4.)

51.     Mr. Smith was on the ground for some time, and then the same two officers grabbed him, one taking his hands or wrists and the other taking his feet or ankles, and picked him up, opened the door to the vehicle, and threw him in. (Falck Deposition, 33.)

52.     The two officers swung him back and then threw him in through the open back door of the Bearcat. (Falck Deposition, 34.)

53.     The rear of the Bearcat has two doors that open up separately onto a large flat floor with bench seats on each side. (Loduha Deposition, 31:18-21.)

54.     Smith did not physically resist the officers or try to injure any of them at any point during the entire sequence of events. (Falck Deposition, 57.)

55.     Grant wrote a report about the arrest of Smith and did not state in it that Smith ever exhibited any active resistance to the officers. (Grant Deposition, 35:5-8.)

56.     If Smith had exhibited any active resistance, that is something that should have been in Grant's report. (Grant Deposition, 35:9-13.)

57.     Both Loduha and Grant were trained using the Wisconsin Department of Justice Defensive and Arrest Tactics Training Guide for Law Enforcement Officers as primary authority. (Grant Deposition 8:10-16; Loduha Deposition 7:23 – 8:11.)

58.     That manual requires officers to perform a "tactical evaluation" including a "threat assessment" prior to any use of force and, in doing so, to consider a subject's age, size and strength. (Declaration of Jeff Scott Olson, Exhibit 14, pp. CD747-749.)

59.     Wisconsin law enforcement officers are trained, using the Wisconsin Department of Justice Defensive and Arrest Tactics Training Guide for Law Enforcement Officers, in several techniques for taking suspects to the ground under the heading of passive countermeasures. (Olson Declaration, Exhibit 14, p. CD789.)

60.     Officers are trained to employ these "decentralization" techniques "if you reasonably believe that you will be unable to achieve control with the subject standing." (Olson Declaration, Exhibit 14, p. CD789.)

61.     Officers are trained:

> Any decentralization technique used however, must allow you to follow these critical guidelines to minimize the chance of injury to the subject:
>
> • Protect the subject's head and neck as much as possible
>
> • Control the speed of the subject's descent

(Olson Declaration, Exhibit 14, p. CD789.)

62.     Sheriff's Department Dispatcher Jack Lilek had access to Sheriff's Department records from previous business involving the 10 Sanns Street address, and from those records he learned that Thomas Smith and Alan Smith were associated with the address in some fashion, and so asked his button-pressing 911 caller about those names in particular. (Lilek Deposition, 13:9 – 14:19.)

63.     It was the Sheriff's Department in-house records that also led Lilek to ask about Alan Smith's nine-year-old daughter. (Lilek Deposition, 114:20 – 15:1.)

64.     Alan Smith, who was then at his daughter's birthday party across town, had received a telephone call from his sister Shannon at approximately 7:25 p.m. on April 7, 2017, telling him there was an active law enforcement operation of some sort near Thomas Smith's home.  (Alan Smith Declaration, ¶ 7.)

65.     Alan and his fiancé, Trisha Swenson, had left his daughter's birthday party and driven to the scene, which was teeming with police vehicles and law enforcement officers, who had formed a cordon around Thomas Smith's home. (Alan Smith Declaration, ¶ 11.)

66. Alan Smith had approached Oneida County Sheriff's Department Captain Terri Hook, and told her that he needed to check on his father, who had Parkinson's disease. (Alan Smith Declaration, ¶ 12.)

67. Captain Hook had told Alan Smith to wait. (Alan Smith Declaration, ¶ 13.)

68. Captain Hook had then spoken to a detective, whom Alan Smith did not know but who is now known to have been Brian Zohimsky (Hook Deposition, 14:8-13), who told Alan Smith to wait in the detective's squad car. (Alan Smith Declaration, ¶ 14.)

69. Since Jack Lilek had told the officers in the field that the 911 caller with whom he was in communication was Alan Smith, if Alan Smith showed up in the vicinity of the command post and identified himself to either Sheriff's Department personnel or Rhinelander Police Department personnel, Lilek would expect the officer or officers to relay that information immediately to him. (Lilek Deposition, 18:3-15.)

70. Communicating the fact that Alan Smith had shown up in the vicinity of the command post would have been quite important. (Lilek Deposition, 19:4-8.)

71. Detective Zohimsky had shown Alan Smith a picture of his father and had told him that Thomas had been shot and that Alan Smith's daughter had also been shot. (Alan Smith Declaration, ¶ 15.)

72.     Alan Smith had replied that his daughter was at a birthday party, was not present at 10 Sanns Street.  (Alan Smith Declaration, ¶ 16.)

73.     Alan had told the detective that his father had Parkinson's disease. (Alan Smith Declaration, ¶ 16; Alan Smith Deposition, 37:20-23.)

74.     Detective Zohimsky had asked Alan Smith if there were weapons in the home and Alan Smith had replied that there were none -- no guns, no bombs, no bows, no weapons of any kind. (Alan Smith Declaration, ¶ 17.)

75.     Detective Zohimsky had then walked to the command post (Alan Smith Deposition, 38:14-17), and Alan Smith had then been left alone in the squad car for approximately 20 minutes. (Alan Smith Declaration, ¶ 18.)

76.     During this time he heard verbal communications among the law enforcement officers on the squad car radio that included, after Detective Zohimsky had gone into he command post (Alan Smith Deposition, 41:12-16), "Subject has Parkinson's" (Alan Smith Deposition, 40:9-15), and, at 8:03 p.m., after Detective Zohimsky had returned to his squad car (Alan Smith Deposition, 41:13-15), "subject coming out wearing green shirt and blue jeans."  (Alan Smith Declaration, ¶ 19.)

77.     Captain Terri Hook heard the bulletin that the subject had Parkinson's disease, and believes that was put out over the radio to all the officers. (Hook Deposition, 15:3-14.)

78.     During this operation, both the 911 dispatcher, Jack Lilek, and the law enforcement officers in the field were in constant radio contact. (Lilek Deposition, 8:25 – 9:2.)

79.     At the Sherriff's Department Dispatch center where Lilek does his work, a radio "channel" is a particular frequency. (Lilek Deposition, 7, 7-10.)

80.     The Sheriff's Department uses one channel, the EMS uses a separate channel, and the Rhinelander Police Department uses either channel. (Lilek Deposition, 7, 8-10.)

81.     Everything said over the radio, by the dispatchers or by the officers in the field goes to all the on-duty Sheriff's Department personnel and Rhinelander Police officers in the field. (Lilek Deposition, 10:9 – 11:19.)

82.     As was standard practice, during this operation, Lilek had both channels open at the same time. (Lilek Deposition, 11:24 – 12:3.)

83.     When the officers were in their squad cars, they could hear radio communications and broadcast them over their squad car radios, and when they were out of their squad cars, they could hear and broadcast radio communications over their portable radios. (Lilek Deposition, 8:21 – 9-9.)

84.     If Alan Smith could hear the announcement that Thomas Smith had Parkinson's disease over the radio in the squad car where he was being detained, the law enforcement officers in the field and the dispatchers heard it as well. (Reasonable inference from three preceding findings.)

85.     Thomas Smith was brought down to the ambulance between ten and fifteen minutes after Alan Smith heard the announcement that the subject had Parkinson's disease. (Alan Smith Deposition, 61:13-25.)

86.     Shortly thereafter, out of Alan Smith's field of view, the above use of force upon Thomas Smith occurred.

87.     At 8:16 p.m. Alan Smith, still in the squad car, saw the Bearcat approaching his location. (Alan Smith Declaration, ¶ 20.)

88.      It stopped, and he saw two SWAT officers dragging Thomas Smith out of the armored vehicle to a waiting ambulance, with their arms under Thomas Smith's arms, and with Thomas Smith's hands in handcuffs.  (Alan Smith Declaration, ¶ 21.)

89.     Thomas was in an upright position but not walking under his own power. (Alan Smith Deposition, 44:14 – 45:9.)

90.     The ambulance then drove away from the scene. (Alan Smith Declaration, ¶ 22.)

91.     The paramedics in the ambulance crew found that Smith had a bruise and swelling above his right eye, abrasions on his right cheek, and minor abrasions on his knees. (Declaration of Jeff Scott Olson, Exhibit 11, p. PLA 0028.)

92.     The paramedics in the ambulance crew found that the only command Smith was able to follow was to wiggle his toes. He was unable to follow any other commands. (Declaration of Jeff Scott Olson, Exhibit 11, p. PLA 0028.)

93.     Shortly after the ambulance drove away from the staging area, Alan Smith was told by Detective Zohimsky that he was not allowed to go to the hospital to see his father. (Alan Smith Declaration, ¶ 23.)

94.     Alan Smith gave his cellular phone to his fiancé and asked her to call his sister to find out what was going on.  (Alan Smith Declaration, ¶ 24.)

95.     After about 40 more minutes, Detective Zohimsky came back to the squad car in which Alan Smith was being held, told Alan Smith that no one at the hospital where Thomas Smith had been taken, St. Mary's Hospital in Rhinelander, could communicate with his father, and said that Alan Smith should accompany Detective Zohimsky to the hospital to assist in the questioning of Thomas Smith.  (Alan Smith Declaration, ¶ 25.)

96.     Alan Smith was not allowed to drive himself; he and his fiancé were driven to the hospital by Detective Zohimsky.  (Alan Smith Declaration, ¶ 26.)

97.     Alan Smith arrived at the hospital at 9:25 p.m. on April 7, 2017. (Alan Smith Declaration, ¶ 27.)

98.     At Detective Zohimsky's behest, he went into the room where his father was being held. (Alan Smith Declaration, ¶ 28.)

99.     In his father's hospital room stood an Oneida County Sheriff's deputy and a City of Rhinelander police officer.   (Alan Smith Declaration, ¶ 29.)

100.     Thomas Smith's hands were handcuffed to his bed. (Alan Smith Declaration, ¶ 30.)

101.    He was wearing a neck brace, and he had cuts to the right side of his face and big bumps on his right forehead. (Alan Smith Declaration, ¶ 31.)

102.    This is a photograph of the injuries to Thomas Smith's face taken on April 8, 2017. (Declaration of Shannon Bryfczynski, ¶ 2, Exh. 15.)



103. This is a photograph of the injuries to Thomas Smith's right leg. (Declaration of Shannon Bryfczynski, ¶ 2, Exh. 15.)



104.    None of these injuries had been present when Alan Smith had last spoken with his father earlier in the day. (Alan Smith Declaration, ¶ 33.)

105.    The officers removed Thomas Smith's handcuffs and Mr. Smith was allowed to write on a piece of paper in order to communicate with the officers and Alan.  (Alan Smith Declaration, ¶ 34.)

106.    Alan Smith asked his father, "Who did it?"  (Alan Smith Declaration, ¶ 35.)

107.    Thomas Smith pointed to the Sheriff's deputy. (Alan Smith Declaration, ¶ 36.)

108.    The detective wanted to know where the bomb was located in the home. (Alan Smith Declaration, ¶ 37.)

109.    Because Thomas Smith was shaking too badly to be able to write intelligibly (Alan Smith Deposition, 54:7-13), Alan Smith told his father to squeeze his hand once for the answer: "No, there is no bomb," and twice for "Yes, there is a bomb." (Alan Smith Declaration, ¶ 38.)

110.    Thomas Smith squeezed Alan's hand once, signifying that there was no bomb. (Alan Smith Declaration, ¶ 39.)

111.    When he was informed that it was permitted, Alan Smith went back to his father's home. (Alan Smith Declaration, ¶ 42.)

112.     When Alan Smith arrived at the home at 10 Sanns Street, he found his father's slippers and broken glasses strewn about the driveway, street, and yard. (Alan Smith Declaration, ¶ 43.)

113.     The ambulance crew took Thomas Smith to the St. Mary's Hospital emergency room, and the emergency room doctor there admitted him to the hospital. (Declaration of Jeff Scott Olson, Exhibit 12, p. PLA 043.)

114.     Four days later, on April 11, 2017, Thomas Smith's physician, Dr. S. Brooks, requested that a competency evaluation of Mr. Smith be done by Harriet I. Walker, Ph.D., to determine whether or not Mr. Smith needed a guardian and/or protective placement.  (Declaration of Jeff Scott Olson, Exhibit 13, p. PLA 066.)

115.     Dr. Walker evaluated Mr. Smith and concluded that he was neither competent nor capable of making informed healthcare decisions.   (Declaration of Jeff Scott Olson, Exhibit 13, p. PLA 068.)

116.     On April 15, 2017, Thomas Smith was discharged to his home at 10 Sanns Street, with hospice care.  (Declaration of Jeff Scott Olson, Exhibit 13, p. PLA 081.)

117.     He was determined to be eligible for hospice care "due to his significant weight loss, being nonverbal, [and] dramatic decline in functional capacity." (Declaration of Jeff Scott Olson, Exhibit 13, p. PLA 073.)

118.     His discharge diagnosis included closed head injury with abrasion/laceration of the right periorbital region [the tissue surrounding the right eye]; Type 2 diabetes with hyperglycemia, chronic; multiple system atrophy, Parkinsonian

type, chronic, severe, and progressive; cachectic ( a diagnosis of general ill health with emaciation) with weight loss secondary to the multiple system atrophy. (Declaration of Jeff Scott Olson, Exhibit 13, p. PLA 081.)

119. Thomas A. Smith died at 6:25 a.m. on April 18, 2017, at his home at 10 Sanns Street, Rhinelander, Wisconsin. (Alan Smith Declaration, ¶ 44; Alan Smith Deposition, 71:8-10.)

Dated this Monday, November 30, 2020.

Respectfully submitted,

Estate of Thomas Smith,

Plaintiff

By

WILLIAM LAMAN LAW OFFICE
WILLIAM F. LAMAN
State Bar Number 1014544
118 E Grand Ave
Eau Claire WI 54701-3638
Phone:      715 835-7779
Fax:         715 835-2573
Email:      wflamanlaw@ameritech.net

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar Number 1016284
131 West Wilson Street, Suite 1200
Madison, WI  53703

Phone:     608 283-6001
Fax:       608 283 0945
E-mail:    jsolson@scofflaw.com


/s/    Jeff Scott Olson

_____

Jeff Scott Olson

ATTORNEYS FOR PLAINTIFF


**Certificate of Service**

I hereby certify that on Monday, November 30, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Lori Lubinsky and Danielle Tierney and I hereby certify that I have mailed by United States Postal Service the document to the following non ECF participants: none.

/s/ Jeff Scott Olson_____