# United States District Court
## For the
## Western District of Wisconsin

Estate of Thomas Smith, by
Shannon Bryfczynski,
Special Administrator,

       Plaintiff,

    v.                                   Case No. 19-cv-972

Oneida County, the Town of Minocqua,
Gary Loduha and Stetson Grant,

           Defendants.

## Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment

Police excessive force cases in which the alleged victim is deceased often require courts to carefully examine available inferences from circumstantial evidence because the plaintiff's "sole eyewitness is dead." *Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005). The advent of ubiquitous video has changed the landscape somewhat, but, despite the presence of a large number of law enforcement officers from several jurisdictions and an armored police vehicle, there is no video record of the arrest of Thomas Smith. So it is perhaps understandable that the Defendants' Motion for Summary Judgment treats this case as one in which the only first-hand evidence comes from the accounts of the participating law enforcement officers. It is not such a case. A civilian eyewitness, Jacqueline Falck, sat on the steps behind her screen door across the street and watched the entire operation. Her version of events is very different from that of the officers, but their moving papers do not so much as mention her name, and thus, "defendants ignore the obligation of the court in deciding motions for summary judgment to view the facts in the light most favorable to the non-moving party." *Chapin v. Sell*, No. 04-C-0208, 2005 WL 2076591, at *5 (E.D. Wis. Aug. 25, 2005). Consideration of Ms. Falck's evidence requires that the Defendants' motion be denied.

# Table of Contents

Introduction ........................................................................................................................... 1

Argument ............................................................................................................................... 2

I.    On a motion for summary judgment, the movant selects the issues and the non-movant gets the benefits of having all factual disputes resolved in its favor and of having all reasonable inferences drawn in its favor. ........................................................... 2

    A.    The Defendants have not asked for summary judgment under some available theories, in particular, qualified immunity. ..................................................................... 3

II.    Excessive force is analyzed under the Fourth Amendment's objective reasonableness standard. ......................................................................................................... 3

III.    A reasonable trier of fact could find that Grant and Loduha had some appreciation of the fact that they were dealing with an elderly and feeble man who had difficulties obeying the commands he was given. ...................................................... 6

IV.    A reasonable trier of fact could find that Grant and Loduha probably knew that the information they had been given about the severity of the criminal offenses believed to have occurred in the house was largely false. ................................................. 9

V.    A reasonable trier of fact could find that, whether or not they knew that neither Alan Smith nor his daughter had not been in Thomas Smith's home during the 911 call, Grant and Loduha employed excessive force when they threw Thomas Smith to the ground. ..................................................................................................................... 10

VI.    A reasonable trier of fact could find that, whether or not they knew that neither Alan Smith nor his daughter had not been in Thomas Smith's home during the 911 call, Grant and Loduha employed excessive force when they threw Thomas Smith into the back of the Bearcat. ................................................................................................ 16

VII.    There is no reason to analyze *Monell* claims that were expressly waived in the pleadings. ......................................................................................................................... 17

    A.    Any *Monell* claims were waived. ........................................................................... 17

    B.    The individual Defendants are sued in their individual capacities. ................ 18

VIII.    Since Oneida County has stepped forward as Defendant Loduha's employer, the Town of Minocqua may be dismissed. ......................................................................... 19

IX.    The Court ought not dismiss the punitive damages claims at this juncture. ...... 20

Conclusion ........................................................................................................................... 21

## Introduction

Since "the *Graham* reasonableness inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [courts] have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (internal quotation marks and citation omitted); *Sallenger v. Oakes*, 473 F.3d 731, 742 (7th Cir. 2007).

In an excessive force case where the alleged victim is dead, "a defendant knows that the only person likely to contradict him or her is beyond reach. So a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial." *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir.1994), *cert. denied*, 513 U.S. 820 (1994); *see also, e.g. Abdullahi*, 423 F.3d at 722 (noting that police excessive force cases often must rely on logical inferences from undisputed facts and competent evidence because "the plaintiff's sole eyewitness is dead."). Where there is testimony from one or more eyewitnesses that contradicts the law enforcement version of events, it is all the more important to scrupulously honor the "court's obligation at summary judgment to consider the evidence in the light most favorable to [the Plaintiff] and to refrain from making credibility determinations." *Estate of Perry v. Wenzel*, 872 F.3d 439, 454 (7th Cir. 2017).

## Argument

**I.** **On a motion for summary judgment, the movant selects the issues and the non-movant gets the benefits of having all factual disputes resolved in its favor and of having all reasonable inferences drawn in its favor.**

It is repeated *ad infinitum* that summary judgment is proper if the evidence of record shows that there is no issue as to any material fact, and the moving party is entitled to judgment based on the material facts as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). What this means is that there can be genuine disputes as to some facts, but summary judgment may still be granted as long as those facts are not material to the movant's entitlement to judgment. Factual conflicts are material if differing resolutions of those factual conflicts might result in different outcomes of the case. *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999). The burden of establishing the lack of any genuine issue of material fact is always upon the movant. *Outlaw v. Newkirk*, 259 Fed.3d 833, 837 (7th Cir. 2001).

The Court may not weigh the evidence or the credibility of witnesses; the record must be examined with all factual disputes resolved in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court must observe the "fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Tolan v. Cotton,* 572 U.S. 650, 660 (2014).

2

### A. The Defendants have not asked for summary judgment under some available theories, in particular, qualified immunity.

A "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion . . ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (internal quotation marks and citations omitted). This is particularly important where a party has chosen to move for summary judgment on fewer than all of the grounds that might have been available to it. For example, in this case, the Defendants have not moved for summary judgment on the ground of qualified immunity, or on the issue of whether the force they applied to Thomas Smith during his arrest hastened his death.

### II. Excessive force is analyzed under the Fourth Amendment's objective reasonableness standard.

All claims of excessive force, no matter the context of the seizure, are analyzed under the Fourth Amendment's objective reasonableness standard. *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005), *citing Graham v. Connor*, 490 U.S. 386 (1989). This standard invokes balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests" and "the countervailing governmental interests at stake," under the "totality of the circumstances." *Id.*, *citing Graham* 490 U.S. 386 at 396 and *Tennessee v. Garner,* 471 U.S. 1, 8-9 (1985).

Because it "is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure…warrant a man of

reasonable caution in the belief that the action taken was appropriate?"  *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968), the Court should reject Defendants' many suggestions that the officers' subjective beliefs are material to the case.  In an analysis of whether a particular application of force was objectively reasonable, the "officer's subjective beliefs and motivations are irrelevant."  *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018). Rather, the question is the objective reasonableness of their actions in light of the totality of the circumstances.  *Phillips v. Community Insurance Corporation,* 678 F.3d 513, 523 (7th Cir.2012).  "Under the circumstances refers only to those circumstances known and information available to the officer at the time of his action."  *Deering v. Reich*, 183 F.3d 645, 653 (7th Cir. 1999).

Courts must "balance the nature of the force used—from lethal through the spectrum of non-lethal options such as flash bang devices, [rifles equipped with] bean bags, pepper spray and tasers—with the governmental interest at stake."  *Williams v. Indiana Stat Police Dep't*, 797 F.3d at 484.

"[F]orce is only reasonable when it is proportional to the threat posed."  *Alicea v. Thomas*, 815 F.3d 283, 289 (7th Cir. 2016).  That is, the "actual and imminent threat to the lives of [others]," including the officers involved, considering factors such as the number of lives at risk and their relative culpability in creating the dangerous situation.  *Scott v. Harris,* 550 U.S. 372, 384 (2007).  "An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the arrest, the officer uses greater force than was reasonably necessary to effectuate the arrest.  *Phillips v. Community Insurance Corporation,* 678 F.3d 513, 519 (7th Cir.2012).

4

"When there is no need for force, any force used is constitutionally unreasonable." *Headwaters Forest Defense v. County of Humboldt*, 240 F. 3d 1185, 1904 (9th Cir. 2000, citing *Hammer v. Gross*, 932 F. 2d 842, 846 (9th Cir. 1991). See, e.g., *Kingsley v. Hendrickson*, 801 F.3d 828, 832 (7th Cir. 2015) (citing cases in which use of force was unreasonable where confined detainee was not resisting or presenting any threat). "[T]he use of any force by officers simply because a suspect is argumentative, contentious, or vituperative" is not to be condoned. *Agee v. Hickman*, 490 F.2d 210, 212 (8th Cir.1974), cert. denied, 417 U.S. 972 (1974). "Force can only be used to overcome physical resistance or threatened force . . ." *Id. Sheth v. Webster*, 137 F.3d 1447, 1453 (11th Cir. 1998)(minimal force alleged but no evidence of resistance; "because of the absence of any justification for . . . use of force. . . every reasonable officer [would] conclude that the force was unlawful."); *Ikerd v. Blair*, 101 F.3d 430, 433 (5th Cir. 1996)(violent jerk of right arm of thirteen year old girl actionable in part because no need to use any force); *Courville v. Town of Barre, Mass.*, 818 F. Supp. 23 (D. Mass. 1993)(summary judgment granted against police officer for slapping thirteen year old misdemeanant).

In a 2004, unpublished opinion, the Tenth Circuit held that even where, as here, the offense for which an arrest is being made is very serious, no force may be employed against an arrestee who is not resisting. *Smith v. Wampler*, 108 Fed. Appx. 560 (10th Cir. 2004). In *Smith*, the actionable force was employed "while Smith was on the floor, handcuffed, and making no attempt to resist. Even though Smith's criminal activity was severe (drug possession and possible distribution), the totality of the circumstances demonstrate [the officer]'s conduct was not reasonable." *Id*. at 564-565.

5

"Although injury is a relevant factor in determining whether an officer used excessive force, an excessive force claim does not require any particular degree of injury." *Chelios v. Heavener,* 520 F.3d 678, 690 (7th Cir. 2008). Accord, *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 687 (7th Cir. 2007). In this case, for example, the visible injuries to Thomas Smith's face corroborate Jacqueline Falck's testimony that the officers threw Smith to the pavement. (PPFOF ¶ 102, Declaration of Shannon Bryfczynski, ¶ 2, Exh. 15.) In contrast, the Champaign, Illinois, police officers who got the case against them dismissed in *Turner v. City of Champaign*, 979 F.3d 563 (7th Cir. 2020) were, despite their need to control a continually and actively resisting detainee, sufficiently careful that there were no signs of trauma to the detainee's body. *Id*., 979 F.3d 563 at ___.

### III. A reasonable trier of fact could find that Grant and Loduha had some appreciation of the fact that they were dealing with an elderly and feeble man who had difficulties obeying the commands he was given.

From across the street, Jaqueline Falck observed that as Thomas Smith came down the steps from his door to his driveway and walked down the driveway, he was walking very slowly and seemed confused. (PPFOF ¶ 28.) He was looking to the right and the left and up and down and his arms were raised a little bit as if he were trying to keep his balance, and he kept shuffling along until he finally stopped. (PPFOF ¶ 30.) As he shuffled down his driveway, he seemed confused and started to turn around, but couldn't make it all the way around and turned back. (PPFOF ¶ 31, Falck Deposition, 47.) It took him a few steps to turn around and a few steps to turn back. (PPFOF ¶ 32,

Falck Deposition, 52:21-23.) It appeared to Falck that he couldn't make heads or tails of what was being asked of him. (PPFOF ¶ 33, Falck Deposition, 47.) Eventually, as he shuffled down his driveway, he got his hands about as high as his shoulders. (PPFOF ¶ 34, Falck Deposition, 49.)  Smith said nothing the whole time. (PPFOF ¶ 35.)  If Falck could make these observations from across the street, the Defendants, who were much closer, could plainly have made them as well, although they claim not to have noticed Smith's physical limitations. (Loduha Deposition, 23:18-19: Smith was "moving like a reasonably fit and coordinated 70-year-old person.")

In addition, after Alan Smith showed up near the command post and was placed into a squad car and questioned by Rhinelander Police Detective Brian Zohimsky, he told the detective that his father had Parkinson's disease. (PPFOF ¶¶ 66-73, Alan Smith Declaration, ¶ 16; Alan Smith Deposition, 37:20-23.) The detective then walked to the command post (Alan Smith Deposition, 38:14-17), and Alan Smith was left alone in the squad car for approximately 20 minutes. (PPFOF ¶ 75, Alan Smith Declaration, ¶ 18.) During this time he heard verbal communications among the law enforcement officers on the squad car radio that included, after the detective had gone into the command post (Alan Smith Deposition, 41:12-16), "Subject has Parkinson's" (Alan Smith Deposition, 40:9-15), and, at 8:03 p.m., after the detective had returned to his squad car (Alan Smith Deposition, 41:13-15), "subject coming out wearing green shirt and blue jeans."  (PPFOF ¶ 76, Alan Smith Declaration, ¶ 19.) Captain Terri Hook also heard the bulletin that the subject had Parkinson's disease, and believes that it was put out over the radio to all the officers. (PPFOF ¶ 77, Hook Deposition, 15:3-14.)

During this operation, the 911 dispatcher, Jack Lilek, and the law enforcement officers in the field were in constant radio contact. (PPFOF ¶ 78, Lilek Deposition, 8:25 – 9:2.)

At the Sheriff's Department dispatch center where Lilek does his work, a radio "channel" is a particular frequency. (PPFOF ¶ 79, Lilek Deposition, 7, 7-10.)  The Sheriff's Department uses one channel, the EMS uses a separate channel, and the Rhinelander Police Department uses either channel. (PPFOF ¶ 80, Lilek Deposition, 7, 8-10.) As was standard practice, during this operation, Lilek had both channels open at the same time. (PPFOF ¶ 82, Lilek Deposition, 11:24 – 12:3.) Everything said over the radio, by the dispatchers or by the officers in the field, went out to all the on-duty Sheriff's Department personnel and Rhinelander Police officers in the field. (PPFOF ¶ 81, Lilek Deposition, 10:9 – 11:19.) When the officers were in their squad cars, they could hear radio communications and broadcast them over their squad car radios, and when they were out of their squad cars, they could hear and broadcast radio communications over their portable radios. (PPFOF ¶ 83, Lilek Deposition, 8:21 – 9-9.)

Surely a reasonable trier of fact could infer that, if Alan Smith and Captain Hook could hear the announcement that Thomas Smith had Parkinson's disease over the radio, the other law enforcement officers in the field and the dispatchers heard it as well. Thanks to Michael J. Fox and Muhammed Ali, most people who have not been living in a cave for the last twenty years know that Parkinson's disease is a disorder of the nervous system "that leads to shaking, stiffness, and difficulty with walking, balance, and coordination." U.S. Department of Health and Human Services, National

8

Institute on Aging website, "Parkinson's Disease,"

https://www.nia.nih.gov/health/parkinsons-disease, last accessed November 21, 2020.

A jury could find that a reasonable law enforcement officer would have at least a vague

idea of what Parkinson's disease is.

**IV.    A reasonable trier of fact could find that Grant and Loduha probably knew that the information they had been given about the severity of the criminal offenses believed to have occurred in the house was largely false.**

The Defendants state, "It is also undisputed, however, that the officers did not

learn that the information [about the guns, bombs, bows and nine-year old dead girl]

was incorrect until well after Smith was in custody." (Defendants' Brief, dkt. # 23, 22.)

But a reasonable trier of fact could infer that the Defendants probably had grave reasons

to doubt the reliability of any of the information that had been represented as coming to

them from a 911 caller inside the house at 10 Sanns Street.

The 911 dispatcher, Jack Lilek, had conveyed to the field officers that the 911

caller inside the house was Alan Smith (DPFOF ¶ 31) and that the caller had been shot

in the shoulder (DPFOF ¶ 27). He had also relayed that the nine-year old girl he asked

about because he had seen records associating Alan Smith's daughter with the 10 Sanns

Street address, was dead. (DPFOF ¶ 42.) But, before his father was arrested, Alan Smith

showed up near the command post unharmed, and after Rhinelander Police Detective

Brian Zohimsky told Alan that his daughter had been killed, Alan told Zohimsky that

he had just come, not from the 10 Sanns Street house, but from his daughter's birthday

party, and she had been there as well. (PPFOF ¶¶ 66-68, 71-72.)  A reasonable jury could

infer that this information was so important that it was all but certain to have been broadcast over the operation's radio channel where it would have been heard by all of the field officers and the dispatcher. (PPFOF ¶¶ 69-70.)  And everyone who learned about Alan Smith's appearance at the staging area would have known immediately that a large proportion of the most important information they had gleaned, directly or indirectly, from the 911 caller, was bogus. A reasonable trier of fact could infer that reasonable officers in the field, armed with this knowledge, would at the very least have entertained substantial doubt about whether anyone had been hurt or killed, or whether there was any real danger to anyone associated with the house at 10 Sanns Street, or even whether any of the many reported weapons and explosives actually existed.

**V.    A reasonable trier of fact could find that, whether or not they knew that neither Alan Smith nor his daughter had not been in Thomas Smith's home during the 911 call, Grant and Loduha employed excessive force when they threw Thomas Smith to the ground.**

The Defendants testify to putting Thomas Smith on the ground in as gentle a manner as possible, "carefully and deliberately."  (Defendants' Brief, dkt. # 23, 28.) But Jacqueline Falck disputes that.

Falck testified that they picked him up and threw him to the pavement. (PPFOF ¶ ¶ 43, Falck Deposition, 27.)  Her recollection is that they lifted him a little bit, forcefully, until he was off the ground a few inches, and threw him down forcefully. (PPFOF ¶ 44, Falck Deposition, 29-30.) She observed that they did this deliberately. (PPFOF ¶ 45, Falck Deposition, 35:11-15.)  Falck describes this as "a very forceful shove

10

to the ground." (PPFOF ¶ 46, Falck Deposition, 36:16-17.) And, contrary to the Defendants' versions, Falck states they did not maintain control of Smith continuously until he was on the ground. As she saw it, after the officers shoved Smith, their hands were not on him anymore. (PPFOF ¶ 47, Falck Deposition, 38:2-6.) They had let go before he hit the ground. (PPFOF ¶ 47, Falck Deposition, 38:14.)  And all this occurred despite the fact that Smith did not physically resist the officers or try to injure any of them at any point during the entire sequence of events. (PPFOF ¶ 54, Falck Deposition, 57.)

And, "If a jury believed [the plaintiff's] version of events and concluded that Mr. [Smith] never acted in threatening manner to the officers, it could conclude that Officer [Loduha and Deputy Grant] used unreasonable force by taking Mr. [Smith] to the ground." *Rosen v. King*, 913 F. Supp. 2d 666, 677 (N.D. Ind. 2012), citing *Chelios v. Heavener*, 520 F.3d 678, 690 (7th Cir.2008)(reversing district court's decision to grant summary judgment on excessive force claim where officers tackled plaintiff to the ground.)

Loduha testified that the only active resistance he encountered was when Loduha initially made contact, Smith pulled his arm away. (Loduha Deposition 26:18 – 27:13.)  A jury would not be compelled to accept this testimony, given Falck's version of events, but even if it did, such a minor reflex by an elderly man would not license the Defendants to throw him onto the ground face first. See, e.g., *Johnson v. Rogers*, 944 F.3d 966, 970 (7th Cir. 2019):

On-the-spot punishment, not reasonably adapted to obtain or keep control, violates the Fourth Amendment (and perhaps other rules as well). See, e.g., *Jones v. Buchanan*, 325 F.3d 520 (4th Cir. 2003) (no qualified immunity for a throw-down takedown accompanied by kneeing a suspect's soon-to-be-broken nose into the floor); . . . *Holmes v. Hoffman Estates*, 511 F.3d 673 (7th Cir. 2007) (no qualified immunity for a wristlock and throw-down followed by a face grind for a suspect who pulled his arms away); *Karels v. Storz*, 906 F.3d 740 (8th Cir. 2018) (no qualified immunity for slamming a disagreeable drunk into concrete steps).

*Johnson v. Rogers*, 944 F.3d 966, 970 (7th Cir. 2019).

See also *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013)("Pulling his arm out of Martinez's grasp, without more, is insufficient to find an immediate threat to the safety of the officers."); *Blankenhorn v. City of Orange*, 485 F.3d 463, 480-81 (9th Cir. 2007) (officers used excessive force by punching the arrestee and kneeling on him even though he refused to kneel, clenched his fists in a combative stance, and pulled his arm away during the arrest).

The absence of active resistance by Smith is significant. *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (recognizing prohibition against more than minimal force against only passive resistance), citing *Phillips v. Community Insurance Corporation*, 678 F.3d 513, 525 (7th Cir. 2012) (collecting cases). Grant testified that the only active resistance he encountered was trying to handcuff Smith when he was still standing, but because he admits that he should have recorded any active resistance in his report and did not record this (PPFOF ¶ 54-55, Grant Deposition, 35:5-13), a reasonable trier of fact could find that he encountered no active resistance.

The fact that Grant and Loduha had Smith's arms restrained when they threw him down is significant, because, as at least one court has recognized, persons are more

likely to be injured when thrown down if they do not have the full use of their hands to break their falls and protect their faces. *Meirthew v. Amore*, 417 F. App'x 494, 498 (6th Cir. 2011).

Of course, there are takedowns and takedowns, and not every takedown amounts to excessive force – many are eminently reasonable. "There is no clearly established rule forbidding a clean takedown to end mild resistance . . ." *Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019)(collecting cases).

The *Johnson* case does not help the Defendants here, though, for two reasons. First, a reasonable trier of fact could find that Smith did not put up even mild resistance. Second, a reasonable trier of fact could find that the Defendants did not effect a clean takedown.

As Judge Easterbrook's discussion in *Johnson v. Rogers* makes plain, a clean takedown refers to a takedown which is not intended or reasonably expected to cause injury. Wisconsin law enforcement officers are trained in several techniques for taking suspects to the ground, under the heading of "passive countermeasures." (PPFOF ¶ 59, Olson Declaration, Exhibit 14, p. CD789.) Officers are trained to employ these "decentralization" techniques "if you reasonably believe that you will be unable to achieve control with the subject standing." (PPFOF ¶ 60, Olson Declaration, Exhibit 14, p. CD789.) Officers are trained:

> Any decentralization technique used however, must allow you to follow these critical guidelines to minimize the chance of injury to the subject:
>
> • Protect the subject's head and neck as much as possible

• Control the speed of the subject's descent

(PPFOF ¶ 61, Olson Declaration, Exhibit 14, p. CD789.)

A decentralization technique like that described by Jacqueline Falck, essentially throwing Mr. Smith on the ground with no effort to modulate his rate of descent and no effort to protect his face from impacting the pavement would not qualify as a clean takedown as the court used the term in *Johnson v. Rogers.* In that case, the defendant claimed he had effected a clean takedown with a leg sweep, and the court agreed that such a move would have been reasonable, but the court went on to hold that a reasonable jury *could* find that the defendant had delivered, not a leg sweep, but "an unnecessary kick, after [the plaintiff was] under control," *Johnson v. Rogers*, 944 F.3d 966 at 970, and that such conduct would permit a verdict for the plaintiff. Like the kick in *Johnson*, the throw-down described by Falck would take this case out of the clean takedown category and permit a verdict for the Plaintiff, even if the jury finds that Smith had put up some mild resistance.

Falck acknowledges that after Smith left his house he was walking very slowly and seemed confused. (PPFOF ¶ 28, Falck Deposition, 21.) He turned part way around and turned back and he raised his hands about as high as his shoulders. (PPFOF ¶¶ 31 - 34, Falck Deposition, 47-49.) The Defendants claim to have construed this behavior as intentional disobedience of the commands Smith was being given over the loudspeaker. Whether it was intentional or not is surely not something that a court can determine on summary judgment, and, of course, it is not controlling, here, because, as the Seventh Circuit emphasized just this month, the issue is whether a reasonable officer might have

14

perceived it as intentional resistance. "[W]hen an officer reasonably mistakes medical symptoms as resistance," *Turner v. City of Champaign*, 979 F.3d 563 (7th Cir. 2020) the Fourth Amendment permits the use of reasonable force, but "when officers observe medical symptoms that cannot reasonably be mistaken as resistance, they may not respond with force." *Id*., 979 F.3d 563 at ___.

The Plaintiff concedes that a jury *might* find that reasonable officers in the Defendants' shoes *might* have believed they were encountering intentional disobedience, but an equally reasonable jury *might* find that *no* reasonable officer would have perceived what they were seeing as anything other than medical incapacity, especially if they had heard the information that Smith had Parkinson's disease. If a jury could resolve this issue either way, it cannot be decided on summary judgment.

But even if the Court determines on summary judgment that reasonable officers would have seen Smith's less than perfect obedience to the commands he was hearing as intentional, the "resistance" put up by Smith was at most passive resistance. The same recent Seventh Circuit decision reemphasizes the importance of the difference between passive resistance and active resistance. In that case, the plaintiff's decedent "was not offering merely passive resistance to lawful detention; in such cases significant force can violate the Fourth Amendment. Unlike when someone is passively refusing to move or follow lawful commands, the police may use significant force to subdue someone who is actively resisting lawful detention." *Turner v. City of Champaign*, 979 F.3d 563, ___, (7th Cir. 2020).

15

**VI.  A reasonable trier of fact could find that, whether or not they knew that neither Alan Smith nor his daughter had not been in Thomas Smith's home during the 911 call, Grant and Loduha employed excessive force when they threw Thomas Smith into the back of the Bearcat.**

The Defendants would have the Court find that they loaded Smith into the back of the Bearcat in a manner "similar to a downed officer." (Defendants' Brief, dkt. # 23, 25.) Loduha testified that while Smith was handcuffed behind his back he and other Special Response Team members slid him on his stomach, head-first, into the back of the Bearcat, and then turned him onto his side. (Loduha Deposition, 32:1-14.)

That might be the course of action the Fourth Amendment requires of reasonable officers in dealing with elderly non-resisting, handcuffed arrestees, but a reasonable jury could find that it is not what happened to Mr. Smith. Falck testified that the same two officers who had been engaged with Mr. Smith previously (whom she did not know but it is now undisputed were Grant and Loduha) grabbed him, one taking his hands or wrists and the other taking his feet or ankles, and picked him up, opened the door to the vehicle, and threw him in. (PPFOF ¶ 51, Falck Deposition, 33.) When they did this, they swung him back and then threw him in through the open back door of the Bearcat. (PPFOF ¶ 52, Falck Deposition, 34.)

It has been clearly established for years "that when a person is subdued and restrained with handcuffs, a 'gratuitous and completely unnecessary act of violence' is unreasonable and violates the Fourth Amendment. *Blazek v. City of Iowa City*, 761 F.3d 920, 925 (8th Cir. 2014) quoting *Henderson v. Munn*, 439 F.3d 497, 503 (8th Cir.2006). See, e.g., *Sallenger v. Oakes*, 473 F.3d 731, 741–42 (7th Cir.2007) (noting, in its evaluation of the

officers' conduct for immunity purposes, that the fact that the force was applied after the arrestee was handcuffed was a significant factor in denying immunity); *Meirthew v. Amore*, 417 F. App'x 494, 498 (6th Cir. 2011) (denying summary judgment on excessive force claim when officer threw a handcuffed and compliant arrestee to the ground); *Smoak v. Hall*, 460 F.3d 768, 783–784 (6th Cir.2006) (denying summary judgment on excessive force claim when officer threw a handcuffed arrestee to the ground); *Young v. Prince George's Cnty.*, Md., 355 F.3d 751, 757–58 (4th Cir.2004) (denying summary judgment on excessive force claim when officer placed handcuffed and compliant arrestee in headlock, threw him to the ground, and kneed him in the back).

As the Fifth Circuit put it just this month:

> Force must be reduced once a suspect has been subdued. Notably, "subdued" does not mean "handcuffed." If the suspect lacks any means of evading custody—for example, by being pinned to the ground by multiple police officers—force is not justified. So even if Joseph failed to comply and struggled against the officers at certain points throughout the encounter, that resistance did not justify force indefinitely. . . For an officer's force to be reasonable, it must be commensurate with the suspect's level of contemporaneous, active resistance.

*Joseph on behalf of Estate of Joseph v. Bartlett*, No. 19-30014, 2020 WL 6817823, at *11 (5th Cir. Nov. 20, 2020)(footnotes omitted).

### VII.    There is no reason to analyze *Monell* claims that were expressly waived in the pleadings.

#### A.    Any *Monell* claims were waived.

The Defendants argue that "Plaintiff's *Monell* claims against the County and Town should be dismissed" (Defendants' Brief, dkt. # 23, 30), but there are no *Monell*

claims for the Court to dismiss because the Plaintiff expressly waived them in the pleadings (dkt. # 2, ¶¶ 306-307), as the Defendants note in the first sentence of Section II of their brief (Defendants' Brief, dkt. # 23, 30).

## B. The individual Defendants are sued in their individual capacities.

The Defendants try to make this into a *Monell* case by casting the Plaintiff's claims against individual Defendants Grant and Loduha as "official capacity" claims, citing authority that "If the plaintiff wishes to sue the individual in their personal capacity as well, he or she must expressly identify that in the complaint." (Defendants' Brief, dkt. # 23, 30, n. 10.)  The Plaintiff did exactly this, in the captions of both the Complaint (dkt. # 1), and the First Amended Complaint (which is the operant pleading at the moment)(dkt. # 2). Both documents, in the case caption, denominate the Defendants as "Oneida County, the Town of Minocqua, And, in their Individual Capacities, [1] Gary Loduha and Stetson Grant."

The Defendants want to be excused for not reading the caption and want to be permitted to act as if, upon reading this brief, they are surprised by the presence of individual capacity claims in the case, because they want to be able to raise a defense of qualified immunity for the first time in their reply brief. They say as much. (Defendants' Brief, dkt. # 23, 30, n. 10: "To the extent Plaintiff raises an argument in response to

---

[1] "Personal -capacity actions are sometimes referred to as individual-capacity actions." *Kentucky v. Graham*, 473 U.S. 159, 165, n. 10 (1985).

suggest that the individual Defendants are also being sued in their personal capacity, Defendants reserve the right to argue on reply that the individual Defendants are entitled to qualified immunity.")  This ought not be permitted. "It is well settled that issues raised for the first time in a reply brief are deemed waived." *Nelson v. La Crosse County District Atty.*, 301 F.3d 820, 836 (7th Cir. 2002).[2]

## VIII.  Since Oneida County has stepped forward as Defendant Loduha's employer, the Town of Minocqua may be dismissed.

The Defendants represent that during the operation at issue, Defendant Loduha had stepped out of his role as a Town of Minocqua police officer and into the role of an employee of Oneida County. The Plaintiff has no reason to dispute this and would have happily agreed to the dismissal of the Town at any time if the Defendants had shown their evidence and requested it, instead of admitting the opposite.[3]

---

[2] There is a slightly more work-intensive path to the conclusion that this is strictly an individual capacity suit. In *Miller v. Smith*, 220 F.3d 491 (7th Cir.2000), the Seventh Circuit Court of Appeals examined a complaint which did not explicitly designate claims as being "individual capacity" claims. The court held that the contents of the complaint made it clear that the plaintiff intended to sue the defendant police officers in their individual capacities because "at no time did [the plaintiff] suggest that either Indiana or LaGrange espoused a custom or policy of robbing and beating innocent motorists," an allegation that would have been indicative of a plaintiff's intent to assert an official capacity claim. *Id*. at 494; see also *Hill v. Shelander*, 924 F.2d 1370, 1374 (7th Cir.1991) (plaintiff's complaint should have been construed as containing an individual capacity claim because "the unconstitutional conduct alleged involve[d] [the defendant's] individual actions and nowhere allude[d] to an official policy or custom") In this case, the Plaintiff explicitly pleaded that it did *not* "allege that the wrongful acts alleged herein were carried out pursuant to a custom or policy of" either municipal defendant. (Dkt. # 2, ¶¶ 306-307.) That made the case an individual capacity suit under the reasoning of these cases.

[3] Paragraph 304 of the First Amended Complaint (dkt. # 2) alleged that "At all times relevant to this lawsuit, Defendant Loduha was employed as a police officer for the Town of Minocqua, acting under color of law within the meaning of 42 U.S.C. § 1983, and within the scope of his employment as that term is used in Wis. Stats. §895.46."  The Defendants' Answer left the

## IX. The Court ought not dismiss the punitive damages claims at this juncture.

The Defendants argue that, "There is no evidence that Loduha or Grant took any actions with evil motive or ill intent." (Defendants' Brief, dkt. # 23, 32.)  There may be no evidence of hateful name-calling and no admissions of any desire to injure Mr. Smith, but the Court should hold that a jury could infer a desire to injure Mr. Smith from the Defendants' actions, if it believes the account of Ms. Falck.

The Seventh Circuit Pattern Civil Jury Instructions provide that a jury may award punitive damages against a defendant if it finds that his or her unlawful acts were "malicious or in reckless disregard of Plaintiff's rights," and explains, "Conduct is in reckless disregard of Plaintiff's rights if, under the circumstances, Defendant simply did not care about Plaintiff's . . . rights." Seventh Circuit Civil Pattern Jury Instruction 7.28.

The second, "reckless disregard," part of the standard comes from *Smith v. Wade*, 461 U.S. 30, 56 (1983)("We hold that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.")  In that case the Court rejected arguments that only a malicious intent to injure could support an award of punitive damages.

---

Plaintiff none the wiser: "Defendants admit that Defendant Gary Loduha is an adult resident of the State of Wisconsin and, at all times relevant to this lawsuit, was employed as a police officer for the Town of Minocqua. The remainder of Paragraph 304 states legal conclusions to which no response is required. To the extent an answer is required, Defendants admit. (Dkt. # 6, ¶ 304.)

The Defendants contend that, "the evidence does not suggest that Loduha or Grant recklessly disregarded Smith's Fourth Amendment rights" (Defendants' Brief, dkt. # 23, 33), but their only stated reason for this contention is "because there was no Fourth Amendment violation." The Plaintiff agrees that the punitive damages claims cannot survive the dismissal of the Fourth Amendment compensatory damages claims if that occurs, but the Defendants advance no argument at all for the dismissal of the punitive damages claims under the reckless-disregard branch of the standard in the event the Fourth Amendment claims survive.

The Court should hold that a jury could infer from the Defendants' actions, if it believes the account of Ms. Falck, that they "just did not care"[4] about Thomas Smith's Fourth Amendment rights.

## Conclusion

The Court should deny the Defendants' motion for summary judgment in its entirety except as to the Town of Minocqua, which may be dismissed.

Dated this Monday, November 30, 2020.

Respectfully submitted,

Estate of Thomas Smith,

Plaintiff

---

[4] Seventh Circuit Civil Pattern Jury Instruction 7.28.

By

WILLIAM LAMAN LAW OFFICE
WILLIAM F. LAMAN
State Bar Number 1014544
118 E Grand Ave
Eau Claire WI 54701-3638
Phone:           715 835-7779
Fax:              715 835-2573
Email:           wflamanlaw@ameritech.net

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar Number 1016284
131 West Wilson Street, Suite 1200
Madison, WI  53703
Phone:           608 283-6001
Fax:              608 283 0945
E-mail:          jsolson@scofflaw.com

/s/     Jeff Scott Olson
_____

Jeff Scott Olson

ATTORNEYS FOR PLAINTIFF

### Certificate of Service

I hereby certify that on Monday, November 30, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Lori Lubinsky and Danielle Tierney and I hereby certify that I have mailed by United States Postal Service the document to the following non ECF participants: none.

/s/ Jeff Scott Olson_____