# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

ESTATE OF THOMAS SMITH, by
Shannon Bryfczynski, Special Administrator,

        Plaintiff,

                                  Case No. 19-CV-972

    v.

ONEIDA COUNTY,
TOWN OF MINOCQUA,
GARY LODUHA, and
STETSON GRANT,

        Defendants.

## DEFENDANTS' RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

NOW COME Defendants, Oneida County, the Town of Minocqua, Gary Loduha, and Stetson Grant, by their undersigned attorneys, and submit the following Response to Plaintiff's Proposed Findings of Fact:

1.     As of April 7, 2017, Thomas Smith was 65 years old. (Alan Smith Declaration, ¶ 1.)

<u>Defendants' Response</u>:     No dispute.

2.     He had experienced a cerebrovascular accident (a CVA, or stroke), and had been unable to speak at all since late 2016. (Alan Smith Declaration, ¶ 2.) He communicated by writing notes. (Alan Smith Deposition, 15:19 – 16:4.)

<u>Defendants' Response</u>:     No dispute.

3.     He was suffering from a Parkinsonian-type illness called Multiple System Atrophy. (Alan Smith Declaration, ¶ 3.)

Defendants' Response:        Non-material dispute. Alan testified that, as of January 1, 2017, he understood that Thomas was having issues that doctors attributed to a stroke, but that Alan later believed was Parkinson's. [Dkt. 18, 15:4-9.] The new information from Alan's declaration, to the extent it contradicts his prior deposition testimony, is a sham and should not be considered for purposes of summary judgment. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted).

4.        He had difficulty walking and problems with coordination when performing even the simplest tasks. (Alan Smith Declaration, ¶ 4; Alan Smith Deposition, 22:2-7.)

Defendants' Response:        Non-material dispute. Alan testified that as of the beginning of April 2017, Smith's only physical limitation was that he shuffled his feet when he walked; he was otherwise able to "do everything" else with the exception of "maybe opening up a pickle jar…." [Dkt. 18, 21:2-14.] The new information from Alan's declaration, to the extent it contradicts his prior deposition testimony, is a sham and should not be considered for purposes of summary judgment. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn

2

testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted).

5.      In addition, he was an insulin-dependent diabetic.  (Alan Smith Declaration, ¶ 5.)

Defendants' Response:        No dispute.

6.      He was quite frail and slow. (Alan Smith Declaration, ¶ 6.)

Defendants' Response:        Non-material dispute. Alan testified that as of the beginning of April 2017, Smith's only physical limitation was that he shuffled his feet when he walked; he was otherwise able to "do everything" else with the exception of "maybe opening up a pickle jar…." [Dkt. 18, 21:2-14.] He also testified that his physical wellbeing was "perfect." [Dkt. 18, 14:2-4.] The new information from Alan's declaration is a sham and should not be considered for purposes of summary judgment. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted).

7.      Thomas Smith's son, Alan Smith, lived with his father to assist him with the tasks of daily living, serving as his primary caretaker. (Alan Smith Declaration, ¶ 7.) He had grown up in that house (Alan Smith Deposition, 6:2-3), and had been living there continuously since 2008

or 2009 (Alan Smith Deposition, 8:24 – 9:3), at first with both his mother and father and then, after his mother died in 2015 or 2016, with his father only (Alan Smith Deposition, 9:11-20; 11:7-10).

<u>Defendants' Response</u>:        Non-material dispute as to the contention that Alan was a primary caregiver. Alan testified that "the only thing [he] would do is drive [Thomas], take [Thomas] to the grocery store, help him grocery shop, …make sure that [Thomas'] meds were taken, and help him take care of his cats that he did have." [Dkt. 18, 21:21-22:3.] The new information from Alan's declaration, to the extent it conflicts with his deposition testimony, is a sham and should not be considered for purposes of summary judgment. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted).

No dispute as to the remaining portion of the Proposed Finding of Fact.

8.     The records from Thomas Smith's last visit to his doctor before the incident giving rise to this case, on February 8, 2017, show that he was suffering from, among other things: hypertension, asthma, degenerative joint disease, diabetes, "Bulbar weakness[1] with severe

---

[1] "Bulbar weakness (or bulbar palsy) refers to bilateral impairment of function of the lower cranial nerves IX, X, XI and XII, which occurs due to lower motor neuron lesion either at nuclear or fascicular level in the medulla or from bilateral lesions of the lower cranial nerves outside the brain-stem. Bulbar weakness is often associated with difficulty in chewing, weakness of the facial muscles, dysarthria, palatal weakness and regurgitation of fluids, dysphagia, and dysphonia. [from HPO]." National Center for Biotechnology Information, U.S. National Library of Medicine, https://www.ncbi.nlm.nih.gov/medgen/898626, last accessed November 24, 2020.

dysarthria [a motor speech disorder in which the muscles that are used to produce speech are damaged, paralyzed, or weakened] and some upper extremity weakness." (Declaration of Jeff Scott Olson, ¶ 13, Exhibit 10, pp. PLA 002-3.)

Defendants' Response:        Disputed.  Plaintiff's Proposed Fact fails to cite admissible evidence. The medical reports are inadmissible as they are hearsay and unauthenticated. *See* Fed. R. Evid. 801, 802, 901.

9.      On April 7, 2017, Alan Smith was scheduled to leave his father's home in the afternoon, to attend his daughter's birthday party. (Alan Smith Declaration, ¶ 8.)

Defendants' Response:        No dispute.

10.     As Alan prepared to leave, he observed that his father seemed in fine condition, partaking of his usual snack and asking Alan, by writing a note (Alan Smith Deposition, 24:11-14) to wish his daughter a happy birthday. (Alan Smith Declaration, ¶ 9.)

Defendants' Response:        No dispute.

11.     At the time of the arrest of Thomas Smith, Jacqueline Falck lived in a house at 804 W. Davenport St., on the corner of Sanns Street and Davenport Street, directly across the street from Thomas Smith's house at 10 Sanns St. (Jacqueline Falck Deposition, 6.)

Defendants' Response:        No dispute that Jacqueline Falck lived in a house at 804 W. Davenport St., on the corner of Sanns Street and Davenport Street, directly across the street from Thomas Smith's house at 10 Sanns Street. Plaintiff does not cite any admissible evidence to suggest that Thomas Smith was *arrested* on that date, and therefore that allegation is disputed.

12.     Falck was then and is now employed as a caregiver, providing in-home care for disabled people of all ages who are unable to care for themselves. (Falck Deposition, 55.)

<u>Defendants' Response</u>:        No dispute.

13.    She had moved in to her house on Davenport St. in October of 2015 and got to know Thomas Smith as a neighbor. (Jacqueline Falck Deposition, 7.)

<u>Defendants' Response</u>:        No dispute that Falck moved into her house on Davenport Street in October 2015. Non-material dispute regarding her knowledge of Thomas Smith; her testimony was that she knew Thomas Smith in the sense that they would exchange pleasantries when she saw him outside. [Dkt. 28, 7:12-8:15.]

14.    Thomas Smith had such a difficult time communicating with her that their conversations were mostly by hand gestures or yes-or-no questions that Falck would ask. (Jacqueline Falck Deposition, 7.)

<u>Defendants' Response</u>:        No dispute.

15.    Faulk observed that Thomas Smith had trouble walking. (Jacqueline Falck Deposition, 8-9.)

<u>Defendants' Response</u>:        Non-material dispute; Falck's testimony was that Thomas was able to walk, but he simply walked slower and shuffled. [Dkt. 28, 9:2-7.]

16.    His walk was like a slow shuffle. (Jacqueline Falck Deposition, 9.)

<u>Defendants' Response</u>:        Non-material dispute; Falck's testimony was that Thomas was able to walk, but he simply walked slower and shuffled. [Dkt. 28, 9:2-7.]

17.    On April 7, 2017, Jacqueline Falck went to let her dog into her house. (Jacqueline Falck Deposition, 13.)

<u>Defendants' Response</u>:        No dispute.

18.     Her dog had been tied outside the Sanns Street door of her home, and she took him in and out by that door. (Jacqueline Falck Deposition, 13.)

Defendants' Response:     No dispute.

19.     She saw a large military type vehicle (Jacqueline Falck Deposition, 13), on Sanns Street (Falck Deposition, 14).

Defendants' Response:     No dispute.

20.     She let her dog into her house, and then stood outside watching the vehicle for a few minutes. She then returned to her house and looked out the door to see where the vehicle was going to go. (Jacqueline Falck Deposition, 14, 17.)

Defendants' Response:     No dispute.

21.     She was looking through her screen door, in which the bottom was made of screen and the top was made of glass, on the Sanns Street side of her house. (Falck Deposition, 17.)

Defendants' Response:     No dispute.

22.     The vehicle was stopped on Sanns Street at a point where it blocked her view of part of Thomas Smith's driveway, but she could see his front door and about half of the driveway. (Falck Deposition, 18.)

23.     Defendants' Response:     No dispute.

24.     Faulk heard the law enforcement officers in the Bearcat giving commands. (Falck Deposition, 19-20.)

Defendants' Response:     No dispute.

25.     She heard a voice over loudspeakers saying, "Oneida County Sheriff, come out slowly with hands upon your head." (Falck Deposition, 20.)

Defendants' Response:        No dispute.

26.    She recalls hearing that command once before Smith came out of his house. (Falck Deposition, 20.)

Defendants' Response:        No dispute that Falck recalled hearing that command once, approximately five minutes before Smith came out of his house. [Dkt. 28, 20:10-20.]

27.    Before Thomas Smith left his home, Dispatcher Lilek had recorded in his Detail Call for Service Report and conveyed to the deputies of the Oneida County Sheriff's Department in the field by phone and radio (Dkt. # 15, ¶ 6), that he was "starting to get conflicting information" from inside the house. (Dkt. 15-1, p. DEF00000, 19:07:31.)

Defendants' Response:        No dispute that Dispatcher Lilek had recorded in his Detail Call for Service Report that he was "starting to get conflicting information" at 19:07:31. [Dkt. 15-1, p. DEF000006.] Plaintiff has not cited any admissible evidence to suggest that Lilek conveyed that specific message over the phone or radio, and therefore to the extent that is suggested, it is disputed.

28.    Falck saw Thomas Smith pause in his doorway and then come out. (Falck Deposition, 21.)

Defendants' Response:        No dispute.

29.    She saw Thomas Smith come down the steps from his door to his driveway, and observed that he was walking very slowly and seemed confused. (Falck Deposition, 21.)

Defendants' Response:        No dispute that Falck saw Smith come down the steps from his door to his driveway, and observed that he was walking slowly. Plaintiff does not cite any admissible evidence to support Smith's "confusion;" Falck's subjective interpretation of Smith's

purported confusion is inadmissible, as it is not based upon personal knowledge, and therefore this portion of the proposed facts is disputed. [*See* Dkt. 28, 21:24-22:13 (noting that observation was merely personal perception).] *See* Fed. R. Evid. 602.

30.    Although at this point Defendant Loduha saw a smear of a dark substance on Smith's clothing, the fact that he thought it might be blood is immaterial because this observation did not play a role in any of Loduha's subsequent decisions or actions. (Loduha Deposition, 20:2-8.)

Defendants' Response: No dispute that Loduha's observation of what he thought was blood on Smith's clothing did not play a role in his decisions or actions. However, it is undisputed that Smith's clothing (which matched the description of the suspect) and the apparent blood corroborated the reports that Grant received which included, among other things, that Smith was the individual who had injured and/or killed one or more individuals in the Property. [Dkt. 16, ¶ 8.]

31.    Smith was looking to the right and the left and up and down and his arms were raised a little bit as if he were trying to keep his balance, and he kept shuffling along until he finally stopped. (Falck Deposition, 22.)

Defendants' Response: No dispute that Falck saw Smith look to his right, left, up, and down, or that she saw his arms were not straight and were sort of raised a little bit, or that she saw him come down the steps from his door to his driveway, or that she observed that he was walking slowly. Plaintiff does not cite any admissible evidence to support that Smith was taking these actions to keep his balance; Falck's subjective interpretation of Smith's actions is inadmissible, as it is not based upon personal knowledge, and therefore this portion of the proposed fact is disputed.

[*See* Dkt. 28, 21:25-22:13 (noting that observation was merely personal perception).] *See* Fed. R. Evid. 602. No dispute that Smith shuffled until he finally stopped.

32.     As he shuffled down his driveway, he seemed confused and started to turn around, but couldn't make it all the way around and turned back. (Falck Deposition, 47.)

Defendants' Response:          No dispute that Smith shuffled down the driveway, started to turn around, but did not turn the full way. The remaining portions of the proposed fact is not supported by any admissible evidence because Falck's subjective interpretation of Smith's actions is inadmissible, as it is not based upon personal knowledge and is speculation. Therefore this portion of the proposed fact is disputed. [Dkt. 28, 48:5-20 (nothing that observation was merely personal perception).] Fed. R. Evid. 602.

33.     It took him a few steps to turn around and a few steps to turn back. (Falck Deposition, 52:21-23.)

Defendants' Response:          No dispute.

34.     It appeared to Falck that he couldn't make heads or tails of what was being asked of him. (Falck Deposition, 47.)

Defendants' Response:          Disputed. Plaintiff does not cite any admissible evidence to support this proposed fact. Falck's subjective interpretation of Smith's actions is inadmissible, as it is not based upon personal knowledge and is speculation. [Dkt. 28, 48:5-20 (noting that statement was purely personal perception).]

35.     Eventually, as he shuffled down his driveway, he got his hands about as high as his shoulders. (Falck Deposition, 49.)

10

Defendants' Response:          No dispute that at some point, Smith put his hands up by his shoulders or neck. [Dkt. 28, 49:18-21.] Plaintiff does not cite any admissible evidence to support that his put his hands up while he "shuffled down his driveway," and therefore this portion of the proposed fact is disputed.

36.    Smith said nothing throughout the entire sequence of events. (Falck Deposition, 22; Loduha Deposition, 30:23-25.)

Defendants' Response:          No dispute.

37.    Falck had a clear view of Thomas Smith. (Falck Deposition, 23, see also Falck Declaration, ¶¶ 2-3, and Exhibit 16.)

Defendants' Response:          No dispute that Falck was able to see Smith when he first exited the house. [Dkt. 28, 23:20-24:5.] However, Falck unequivocally testified that she did not see Smith from the time officers approached him until after he was carried around the front of the Bearcat. [Dkt. 28, 25:7-20; 26:15-20.] To the extent Falck is now claiming to have seen Smith being taken into custody (when she previously testified to the contrary), her declaration is a sham and should not be considered for purposes of summary judgment. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted).

38.     The Bearcat's spotlight was illuminating the entrance to Mr. Smith's home and the driveway. (Grant Deposition, 29, 9-12.)

Defendants' Response:          No dispute.

39.     After Smith stopped, he was surrounded by several officers pointing guns at him. (Falck Deposition, 23.)

Defendants' Response:          No dispute.

40.     Although at least Loduha has been trained that when officers confront a suspect they need to control or take into custody, only one officer should do the talking (Loduha Deposition, 29, 2-6), both Loduha (Loduha Deposition, 28:24 – 29:12) and Grant (Grant Deposition, 34:7-15) yelled commands at Smith after they got out of the Bearcat.

Defendants' Response:          No dispute that Loduha was trained that when officers confront a suspect or take the suspect into custody, one officer should do the talking. No dispute that both Loduha and Grant testified that they gave commands to Smith. Plaintiff does not cite any admissible evidence to suggest either officer was yelling at Smith, and therefore this portion of the proposed fact is disputed.

41.     Defendant Grant took hold of Smith's right arm (Grant Deposition, 34:23-25), and Defendant Loduha took hold of Smith's left arm (Loduha Deposition, 24:12-24.)

Defendants' Response:          No dispute.

42.     These officers moved him forward, shuffling along, until he was out of Falck's sight on the other side of the Bearcat. (Falck Deposition 23-24.)

Defendants' Response:          To the extent this is attempting to suggest that Smith was moved out of Falck's sight after officers took hold of him, disputed, and Plaintiff's proposed fact

is unsupported by any evidence. Falck testified that Smith moved out of Falck's sight with officers around him and no officers had touched him during that time. [Dkt. 28, 23:22-24:9.]

43.    Then Falck saw Loduha and Grant shuffle Smith around the north side of Bearcat and when they were on the side of the Bearcat nearest to her, they picked him up and threw him on the ground. (Falck Deposition, 26-27.)

<u>Defendants' Response</u>:        Disputed, though any dispute of fact is not material and does not preclude summary judgment in favor of the Defendants.

When Smith refused to walk, Grant and Loduha picked Smith up a bit higher and carried him by his armpits around the front of the Bearcat to the other side of the Bearcat, away from the Property, so all three of them would be out of the area in the event an explosive device went off at the Property. [Dkt. 16, ¶ 18; Dkt. 17, ¶12.] Once Loduha, Grant, and Smith were on the other side of the Bearcat, Loduha advised Smith to get on the ground, but he refused. [Dkt. 16, ¶ 20.] When Smith refused to bend his legs so he could be lowered to the ground, Grant and Loduha each took a step forward, bent their back legs at the knee like a lunge, and leaned Smith forward to place him on the ground. [Dkt. 16, ¶ 20.] Loduha and Grant controlled Smith's movement by holding onto his upper arms and under his armpits and guiding him to the ground. [Dkt. 16, ¶ 20.] Grant and Loduha laid Smith down almost as if he were a board; Smith's toes stayed on the ground and were a fulcrum. [Dkt. 16, ¶ 20.] Grant and Loduha kept their hands on Smith's upper arms and under his armpits to control his descent until he was flat on the ground.  [Dkt. 16, ¶ 20.]

44.    The two officers were holding Mr. Smith one on each side as they came around the Bearcat, all kind of shuffling along (Falck Deposition, 30) and then they both picked him up and threw him to the pavement. (Falck Deposition, 27.)

Defendants' Response:       Disputed, though any dispute of fact is not material and does not preclude summary judgment in favor of the Defendants.

When Smith refused to walk, Grant and Loduha picked Smith up a bit higher and carried him by his armpits around the front of the Bearcat to the other side of the Bearcat, away from the Property, so all three of them would be out of the area in the event an explosive device went off at the Property. [Dkt. 16, ¶ 18; Dkt. 17, ¶12.] Once Loduha, Grant, and Smith were on the other side of the Bearcat, Loduha advised Smith to get on the ground, but he refused. [Dkt. 16, ¶ 20.] When Smith refused to bend his legs so he could be lowered to the ground, Grant and Loduha each took a step forward, bent their back legs at the knee like a lunge, and leaned Smith forward to place him on the ground. [Dkt. 16, ¶ 20.] Loduha and Grant controlled Smith's movement by holding onto his upper arms and under his armpits and guiding him to the ground. [Dkt. 16, ¶ 20.] Grant and Loduha laid Smith down almost as if he were a board; Smith's toes stayed on the ground and were a fulcrum. [Dkt. 16, ¶ 20.] Grant and Loduha kept their hands on Smith's upper arms and under his armpits to control his descent until he was flat on the ground.  [Dkt. 16, ¶ 20.]

45.     Her recollection is that they lifted him a little bit, forcefully, until he was off the ground a few inches, and threw him down forcefully. (Falck Deposition, 29-30.)

Defendants' Response:       Disputed, though any dispute of fact is not material and does not preclude summary judgment in favor of the Defendants.

When Smith refused to bend his legs so he could be lowered to the ground, Grant and Loduha each took a step forward, bent their back legs at the knee like a lunge, and leaned Smith forward to place him on the ground. [Dkt. 16, ¶ 20.] Loduha and Grant controlled Smith's movement by holding onto his upper arms and under his armpits and guiding him to the ground.

14

[Dkt. 16, ¶ 20.] Grant and Loduha laid Smith down almost as if he were a board; Smith's toes stayed on the ground and were a fulcrum. [Dkt. 16, ¶ 20.] Grant and Loduha kept their hands on Smith's upper arms and under his armpits to control his descent until he was flat on the ground. [Dkt. 16, ¶ 20.]

46.    They did this deliberately. (Falck Deposition, 35:11-15.)

Defendants' Response:       Disputed.  Plaintiff does not cite any admissible evidence to support this proposed fact. Falck's subjective interpretation of the offices' mindset is inadmissible, as it is not based upon personal knowledge. [See Dkt. 28, 35:11-15.] See Fed. R. Evid. 602.

47.    Falck describes this as "a very forceful shove to the ground." (Falck Deposition, 36:16-17.)

Defendants' Response:       Disputed, though any dispute of fact is not material and does not preclude summary judgment in favor of the Defendants.

When Smith refused to bend his legs so he could be lowered to the ground, Grant and Loduha each took a step forward, bent their back legs at the knee like a lunge, and leaned Smith forward to place him on the ground. [Dkt. 16, ¶ 20.] Loduha and Grant controlled Smith's movement by holding onto his upper arms and under his armpits and guiding him to the ground. [Dkt. 16, ¶ 20.] Grant and Loduha laid Smith down almost as if he were a board; Smith's toes stayed on the ground and were a fulcrum. [Dkt. 16, ¶ 20.] Grant and Loduha kept their hands on Smith's upper arms and under his armpits to control his descent until he was flat on the ground. [Dkt. 16, ¶ 20.]

48.    After the officers shoved Smith, their hands were not on him anymore. (Falck Deposition, 38:2-6.) They had let go before he hit the ground. (Falck Deposition, 38:14.)

15

<u>Defendants' Response</u>:         Disputed, though any dispute of fact is not material and does not preclude summary judgment in favor of the Defendants.

When Smith refused to bend his legs so he could be lowered to the ground, Grant and Loduha each took a step forward, bent their back legs at the knee like a lunge, and leaned Smith forward to place him on the ground. [Dkt. 16, ¶ 20.] Loduha and Grant controlled Smith's movement by holding onto his upper arms and under his armpits and guiding him to the ground. [Dkt. 16, ¶ 20.] Grant and Loduha laid Smith down almost as if he were a board; Smith's toes stayed on the ground and were a fulcrum. [Dkt. 16, ¶ 20.] Grant and Loduha kept their hands on Smith's upper arms and under his armpits to control his descent until he was flat on the ground. [Dkt. 16, ¶ 20.]

Further, Falck's testimony equivocated on the topic; she first testified that the officers kept their hands on Smith the entire time, then testified that at some point they took their hands off, then testified that their hands were off of him when he was on the ground. [Dkt. 28, 37:22-38:22.]

49.     After he was thrown on the ground, Smith was positioned with his head to the north, parallel with Sanns Street and the Bearcat. (Falck Deposition, 31.)

<u>Defendants' Response</u>:         No dispute that Smith was positioned with his head to the north, parallel with Sanns Street and the Bearcat. Disputed that he was thrown to the ground, though any dispute of fact is not material and does not preclude summary judgment in favor of the Defendants.

Once Loduha, Grant, and Smith were on the other side of the Bearcat, Loduha advised Smith to get on the ground, but he refused. [Dkt. 16, ¶ 20.] When Smith refused to bend his legs so he could be lowered to the ground, Grant and Loduha each took a step forward, bent their back

legs at the knee like a lunge, and leaned Smith forward to place him on the ground. [Dkt. 16, ¶ 20.] Loduha and Grant controlled Smith's movement by holding onto his upper arms and under his armpits and guiding him to the ground. [Dkt. 16, ¶ 20.] Grant and Loduha laid Smith down almost as if he were a board; Smith's toes stayed on the ground and were a fulcrum. [Dkt. 16, ¶ 20.] Grant and Loduha kept their hands on Smith's upper arms and under his armpits to control his descent until he was flat on the ground.  [Dkt. 16, ¶ 20.]

50.     The officers were standing above him, and one of them said that Smith had hit his head. (Falck Deposition, 31.)

Defendants' Response:        Disputed, as neither Loduha nor Grant ever witnessed Smith hit his head at any time during their interaction with him. [Dkt. 16, ¶ 27; Dkt. 17, ¶ 14.] Further, Falck testified that she could not hear commands being given by officers. [Dkt. 28, 24:9-17 ("I just assumed they were keeping their voices down. I didn't hear anything.").] The disputed fact is not material and does not preclude summary judgment in favor of the Defendants.

51.     Almost every officer in the Bearcat said that Mr. Smith appeared to need medical attention. (Grant Deposition, 32:18 – 33:4.)

Defendants' Response:        No dispute.

52.     Mr. Smith was on the ground for some time, and then the same two officers grabbed him, one taking his hands or wrists and the other taking his feet or ankles, and picked him up, opened the door to the vehicle, and threw him in. (Falck Deposition, 33.)

Defendants' Response:        Disputed, though any dispute of fact is not material and does not preclude summary judgment in favor of the Defendants.

Grant and Loduha again picked Smith up from the ground and, again, Smith refused to stand or walk on his own. [Dkt. 16, ¶ 23; Dkt. 17, ¶ 13.] Grant and Loduha carried Smith by his armpits and upper arms to the back of the Bearcat and Loduha instructed him to step onto the back ledge so he could get into the back of the Bearcat. [Dkt. 16, ¶ 23.] Smith looked at Loduha but did not move. [Dkt. 16, ¶ 23.] Loduha again instructed Smith to step up on the ledge and Smith did not move. [Dkt. 16, ¶ 23.] Grant and Loduha then stepped up on the back ledge of the Bearcat, which was a step down from the backdoor, and Loduha again instructed Smith to step up. [Dkt. 16, ¶ 23.] When Smith did not move, Grant stepped into the back of the Bearcat and he and Loduha lifted Smith up by his arms and armpits. [Dkt. 16, ¶ 23.] As Grant moved into the Bearcat with one of Smith's arms, Loduha moved behind Smith to pick him up from his legs. [Dkt. 16, ¶ 23.] Grant pulled Smith into the Bearcat by his arm while Loduha pushed Smith in by his hips and waist. [Dkt. 16, ¶ 23.] Grant and Loduha laid Smith on his stomach and sort of slid him into the back of the Bearcat, similar to the technique they would have used for getting a downed officer into the back of the Bearcat. [Dkt. 16, ¶ 23.]

53.     The two officers swung him back and then threw him in through the open back door of the Bearcat. (Falck Deposition, 34.)

<u>Defendants' Response</u>:          Disputed, though any dispute of fact is not material and does not preclude summary judgment in favor of the Defendants.

Grant stepped into the back of the Bearcat and he and Loduha lifted Smith up by his arms and armpits. [Dkt. 16, ¶ 23.] As Grant moved into the Bearcat with one of Smith's arms, Loduha moved behind Smith to pick him up from his legs. [Dkt. 16, ¶ 23.] Grant pulled Smith into the Bearcat by his arm while Loduha pushed Smith in by his hips and waist. [Dkt. 16, ¶ 23.] Grant and

18

Loduha laid Smith on his stomach and sort of slid him into the back of the Bearcat, similar to the technique they would have used for getting a downed officer into the back of the Bearcat. [Dkt. 16, ¶ 23.]

54.     The rear of the Bearcat has two doors that open up separately onto a large flat floor with bench seats on each side. (Loduha Deposition, 31:18-21.)

Defendants' Response:        No dispute.

55.     Smith did not physically resist the officers or try to injure any of them at any point during the entire sequence of events. (Falck Deposition, 57.)

Defendants' Response:        Plaintiff's proposed fact is unsupported by admissible evidence. Falck lacks the foundation to testify about the physical resistance noted by Loduha and Grant for several reasons, including that Falck unequivocally testified that she **did not** have a view of Smith's interaction with law enforcement when he first exited the house. [Dkt. 28, 23:20-24:5.] She testified that she did not see him from the time officers approached him until after he was carried around the front of the Bearcat in handcuffs. [Dkt. 28, 25:7-20; 26:15-20; 36:24-37:11.] It was during this time that Smith exhibited physical, active resistance. [Dkt. 16, ¶ 13; Dkt. 17, ¶ 9.] Likewise, Falck could not hear whether the officers were giving commands, such that she could adequately testify about whether Smith was compliant or resisting. [*See, e.g.*, Dkt. 28, 37:12-14; 24:9-17 ("I just assumed they were keeping their voices down. I didn't hear anything.").] Accordingly, the testimony cited by Plaintiff is inadmissible because it lacks foundation.

56.     Grant wrote a report about the arrest of Smith and did not state in it that Smith ever exhibited any active resistance to the officers. (Grant Deposition, 35:5-8.)

19

Defendants' Response:          No dispute.

57.     If Smith had exhibited any active resistance, that is something that should have been in Grant's report. (Grant Deposition, 35:9-13.)

Defendants' Response:          No dispute, though Grant testified that his report was deficient and he should have noted the resistance he experienced during his interaction with Smith. [Dkt. 19, 35:9-17.]

58.     Both Loduha and Grant were trained using the Wisconsin Department of Justice Defensive and Arrest Tactics Training Guide for Law Enforcement Officers as primary authority. (Grant Deposition 8:10-16; Loduha Deposition 7:23 – 8:11.)

Defendants' Response:          No dispute.

59.     That manual requires officers to perform a "tactical evaluation" including a "threat assessment" prior to any use of force and, in doing so, to consider a subject's age, size and strength. (Declaration of Jeff Scott Olson, Exhibit 14, pp. CD747-749.)

Defendants' Response:          Disputed.   Plaintiff's proposed fact fails to cite any admissible evidence. The cited manual is inadmissible, as it is unauthenticated hearsay. Fed. R. Evid. 801, 802, 901. Additionally, the manual has **never** been identified by either party in a Rule 26(a)(1) report or produced by Plaintiff in discovery. [Declaration of Danielle Baudhuin Tierney, ¶ 3.]

60.     Wisconsin law enforcement officers are trained, using the Wisconsin Department of Justice Defensive and Arrest Tactics Training Guide for Law Enforcement Officers, in several techniques for taking suspects to the ground under the heading of passive countermeasures. (Olson Declaration, Exhibit 14, p. CD789.)

Defendants' Response:         Disputed.    Plaintiff's proposed fact fails to cite any admissible evidence. The cited manual is inadmissible, as it is unauthenticated hearsay. Fed. R. Evid. 801, 802, 901. Additionally, the manual has *never* been identified by either party in a Rule 26(a)(1) report or provided by Plaintiff in discovery [Declaration of Danielle Baudhuin Tierney, ¶ 3.].

61.    Officers are trained to employ these "decentralization" techniques "if you reasonably believe that you will be unable to achieve control with the subject standing." (Olson Declaration, Exhibit 14, p. CD789.)

Defendants' Response:         Disputed.    Plaintiff's proposed fact fails to cite any admissible evidence. The cited manual is inadmissible, as it is unauthenticated hearsay. Fed. R. Evid. 801, 802, 901. Additionally, the manual has *never* been identified by either party in a Rule 26(a)(1) report or provided by Plaintiff in discovery. [Declaration of Danielle Baudhuin Tierney, ¶ 3.]

62.    Officers are trained:

Any decentralization technique used however, must allow you to follow these critical guidelines to minimize the chance of injury to the subject:

• Protect the subject's head and neck as much as possible

• Control the speed of the subject's descent

(Olson Declaration, Exhibit 14, p. CD789.)

Defendants' Response:         Disputed.  Plaintiff's proposed fact fails to cite any admissible evidence. The cited manual is inadmissible, as it is unauthenticated hearsay. Fed. R. Evid. 801, 802, 901. Additionally, the manual has *never* been identified by either party in a Rule

26(a)(1) report or provided by Plaintiff in discovery. [Declaration of Danielle Baudhuin Tierney, ¶ 3.]

63.     Sheriff's Department Dispatcher Jack Lilek had access to Sheriff's Department records from previous business involving the 10 Sanns Street address, and from those records he learned that Thomas Smith and Alan Smith were associated with the address in some fashion, and so asked his button-pressing 911 caller about those names in particular. (Lilek Deposition, 13:9 – 14:19.)

    Defendants' Response:       No dispute.

64.     It was the Sheriff's Department in-house records that also led Lilek to ask about Alan Smith's nine-year-old daughter. (Lilek Deposition, 114:20 – 15:1.)

    Defendants' Response:       No dispute.

65.     Alan Smith, who was then at his daughter's birthday party across town, had received a telephone call from his sister Shannon at approximately 7:25 p.m. on April 7, 2017, telling him there was an active law enforcement operation of some sort near Thomas Smith's home. (Alan Smith Declaration, ¶ 7.)

    Defendants' Response:       No dispute.

66.     Alan and his fiancé, Trisha Swenson, had left his daughter's birthday party and driven to the scene, which was teeming with police vehicles and law enforcement officers, who had formed a cordon around Thomas Smith's home. (Alan Smith Declaration, ¶ 11.)

    Defendants' Response:       No dispute, though Alan Smith testified that the "scene" that he arrived at was approximately one block away from Smith's house and he could not see 10 Sanns Street. [Dkt. 18:24-29:13.]

22

67.    Alan Smith had approached Oneida County Sheriff's Department Captain Terri Hook, and told her that he needed to check on his father, who had Parkinson's disease. (Alan Smith Declaration, ¶ 12.)

Defendants' Response:        No dispute that Alan Smith had approached Oneida County Sheriff's Department Captain Terri Hook, and told her that he needed to check on his father. However, in his deposition, Alan Smith did not testify that he conveyed any other information to Hook, including that his father had Parkinson's disease. [Dkt. 18, 29:14-30:18; 31:22-25, 32:11-33:10.] The new information from Alan's declaration is a sham and should not be considered for purposes of summary judgment, and therefore this portion of the proposed fact is disputed. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted).

68.    Captain Hook had told Alan Smith to wait.  (Alan Smith Declaration, ¶ 13.)

Defendants' Response:        No dispute.

69.    Captain Hook had then spoken to a detective, whom Alan Smith did not know but who is now known to have been Brian Zohimsky (Hook Deposition, 14:8-13), who told Alan Smith to wait in the detective's squad car.  (Alan Smith Declaration, ¶ 14.)

23

<u>Defendants' Response</u>:        No dispute that Captain Hook had then spoken to a detective, whom Alan Smith did not know but who is now known to likely have been Brian Zohimsky. However, in his deposition, Alan testified that the officer (Zohimsky) asked him a number of questions when he approached Alan and asked Alan to wait in the squad car ***after*** asking him for information. [Dkt. 18, 35:15-39:14.] The new information from Alan's declaration is a sham and should not be considered for purposes of summary judgment, and therefore this portion of the proposed fact is disputed. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted). Further, Alan's recitation of Rhinelander Detective Zohimsky's statements is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

70.     Since Jack Lilek had told the officers in the field that the 911 caller with whom he was in communication was Alan Smith, if Alan Smith showed up in the vicinity of the command post and identified himself to either Sheriff's Department personnel or Rhinelander Police Department personnel, Lilek would expect the officer or officers to relay that information immediately to him. (Lilek Deposition, 18:3-15.)

<u>Defendants' Response</u>:        Disputed.    The cited testimony was objected to on foundation grounds and is inadmissible because it is not based on the declarant's personal

knowledge. Fed. R. Evid. 602. Accordingly, there is no admissible evidence to support the proposed fact.

71.   Communicating the fact that Alan Smith had shown up in the vicinity of the command post would have been quite important. (Lilek Deposition, 19:4-8.)

Defendants' Response:        No dispute.

72.   Detective Zohimsky had shown Alan Smith a picture of his father and had told him that Thomas had been shot and that Alan Smith's daughter had also been shot. (Alan Smith Declaration, ¶ 15.)

Defendants' Response:        The proposed fact is not supported by any admissible evidence because it relies upon a sham declaration. Alan testified during his deposition about the conversation he had with Zohimsky, which did not include the information cited herein. [Dkt. 18, 36:2-38:17.] The new information from Alan's declaration is a sham and should not be considered for purposes of summary judgment, and therefore this portion of the proposed fact is disputed. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted). Further, Alan's recitation of Rhinelander Detective Zohimsky's statements is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

73.    Alan Smith had replied that his daughter was at a birthday party, was not present at 10 Sanns Street.  (Alan Smith Declaration, ¶ 16.)

Defendants' Response:       The proposed fact is not supported by any admissible evidence because it relies upon a sham declaration. Alan testified during his deposition about the conversation he had with Zohimsky, which did not include the information cited herein. [Dkt. 18, 36:2-38:17.] The new information from Alan's declaration is a sham and should not be considered for purposes of summary judgment, and therefore this portion of the proposed fact is disputed. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted).

74.    Alan had told the detective that his father had Parkinson's disease. (Alan Smith Declaration, ¶ 16; Alan Smith Deposition, 37:20-23.)

Defendants' Response:       No dispute.

75.    Detective Zohimsky had asked Alan Smith if there were weapons in the home and Alan Smith had replied that there were none -- no guns, no bombs, no bows, no weapons of any kind. (Alan Smith Declaration, ¶ 17.)

Defendants' Response:       No dispute that Zohimsky asked about guns, and that Alan told Zohimsky there were no guns in the house. [Dkt. 18, 36:14-16.] However, the additional

26

information about bombs, bows, or other weapons is new information from Alan's declaration is a sham and should not be considered for purposes of summary judgment, and therefore this portion of the proposed fact is disputed. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted). Further, Alan's recitation of Rhinelander Detective Zohimsky's statements is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

76.     Detective Zohimsky had then walked to the command post (Alan Smith Deposition, 38:14-17), and Alan Smith had then been left alone in the squad car for approximately 20 minutes. (Alan Smith Declaration, ¶ 18.)

<u>Defendants' Response</u>:        No dispute that Zohimsky then walked to the command post and left Alan Smith alone. However, Alan unequivocally testified that he estimated Zohimsky was gone for 10 minutes. [Dkt. 18, 38:16-39:19.] His new statement that Zohimsky was gone for 20 minutes is a sham and should not be considered for purposes of summary judgment, and is therefore disputed. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn

testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted).

77.     During this time he heard verbal communications among the law enforcement officers on the squad car radio that included, after Detective Zohimsky had gone into he command post (Alan Smith Deposition, 41:12-16), "Subject has Parkinson's" (Alan Smith Deposition, 40:9-15), and, at 8:03 p.m., after Detective Zohimsky had returned to his squad car (Alan Smith Deposition, 41:13-15), "subject coming out wearing green shirt and blue jeans."  (Alan Smith Declaration, ¶ 19.)

<u>Defendants' Response</u>:          Dispute as to the time (8:03 p.m.). Plaintiff's Proposed Fact fails to cite admissible evidence. Alan's declaration regarding the specific time noted herein is a sham, as when he was deposed he was only able to give approximate estimations of how long it was between the time he arrived to the command post and when he heard the statement on the radio that the suspect was exiting (and he could only estimate when, within a 20 minute timespan, he actually arrived at the command post). [Dkt. 18, 26:21-27:23 (estimated that he arrived at command post somewhere between 7:25 and 7:45 p.m.); 30:15-22 (estimated that he waited 10 minutes after speaking with Captain Hook before speaking with a detective); 38:10-22 (estimated that he waited 10 minutes or more before detective returned to car; 41:6-16 (heard transmission about subject exiting property after detective returned).] Accordingly, his declaration which now contains a specific time is a sham and should not be considered on summary judgment. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars*

*($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted).

Further, contemporaneous video documentation confirmed that a radio broadcast about Smith opening the front door took place at approximately 8:08:36 p.m. [Dkt. 22, PFOF No. 82.] Plaintiff admitted that Smith opened the door at that time. [*See* Dkt. 33, Plaintiff's Response to Proposed Finding of Fact No. 82.]

No dispute as to the remaining information in the proposed fact.

78.     Captain Terri Hook heard the bulletin that the subject had Parkinson's disease, and believes that was put out over the radio to all the officers. (Hook Deposition, 15:3-14.)

Defendants' Response:        No dispute.

79.     During this operation, both the 911 dispatcher, Jack Lilek, and the law enforcement officers in the field were in constant radio contact. (Lilek Deposition, 8:25 – 9:2.)

Defendants' Response:        Disputed. The cited testimony was objected to on foundation grounds and is inadmissible because it is not based on the declarant's personal knowledge. Fed. R. Evid. 602. Accordingly, there is no admissible evidence to support the proposed fact.

80.     At the Sherriff's Department Dispatch center where Lilek does his work, a radio "channel" is a particular frequency. (Lilek Deposition, 7, 7-10.)

Defendants' Response:        No dispute.

81.     The Sheriff's Department uses one channel, the EMS uses a separate channel, and the Rhinelander Police Department uses either channel. (Lilek Deposition, 7, 8-10.)

Defendants' Response:          No dispute.

82.     Everything said over the radio, by the dispatchers or by the officers in the field goes to all the on-duty Sheriff's Department personnel and Rhinelander Police officers in the field. (Lilek Deposition, 10:9 – 11:19.)

Defendants' Response:          Disputed. The cited testimony was objected to on foundation grounds and is inadmissible because it is not based on the declarant's personal knowledge. Fed. R. Evid. 602. Accordingly, there is no admissible evidence to support the proposed fact.

83.     As was standard practice, during this operation, Lilek had both channels open at the same time. (Lilek Deposition, 11:24 – 12:3.)

Defendants' Response:          No dispute.

84.     When the officers were in their squad cars, they could hear radio communications and broadcast them over their squad car radios, and when they were out of their squad cars, they could hear and broadcast radio communications over their portable radios. (Lilek Deposition, 8:21 – 9-9.)

Defendants' Response:          Disputed. The cited testimony was objected to on foundation grounds and is inadmissible because it is not based on the declarant's personal knowledge. [*See* Dkt. 26, 8:6-13.] Fed. R. Evid. 602. Accordingly, there is no admissible evidence to support the proposed fact.

85.     If Alan Smith could hear the announcement that Thomas Smith had Parkinson's disease over the radio in the squad car where he was being detained, the law enforcement officers

in the field and the dispatchers heard it as well. (Reasonable inference from three preceding findings.)

Defendants' Response:       Disputed.  Plaintiff's proposed fact is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(2). Further, the proposal is impermissible legal argument. Finally, the undisputed evidence establishes that Loduha and Grant did not hear any information about Smith's physical condition while on the SRT call at the Property. [Dkt. 16, ¶ 28; Dkt. 17, ¶ 15.]

86.     Thomas Smith was brought down to the ambulance between ten and fifteen minutes after Alan Smith heard the announcement that the subject had Parkinson's disease. (Alan Smith Deposition, 61:13-25.)

Defendants' Response:       Disputed.  The cited testimony does not support the proposed fact.

87.     Shortly thereafter, out of Alan Smith's field of view, the above use of force upon Thomas Smith occurred.

Defendants' Response:       Disputed.  Plaintiff's proposed fact is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(2).

88.     At 8:16 p.m. Alan Smith, still in the squad car, saw the Bearcat approaching his location. (Alan Smith Declaration, ¶ 20.)

Defendants' Response:       No dispute.

89.      It stopped, and he saw two SWAT officers dragging Thomas Smith out of the armored vehicle to a waiting ambulance, with their arms under Thomas Smith's arms, and with Thomas Smith's hands in handcuffs.  (Alan Smith Declaration, ¶ 21.)

31

Defendants' Response:        No dispute.

90.    Thomas was in an upright position but not walking under his own power. (Alan Smith Deposition, 44:14 – 45:9.)

Defendants' Response:        No dispute.

91.    The ambulance then drove away from the scene. (Alan Smith Declaration, ¶ 22.)

Defendants' Response:        No dispute.

92.    The paramedics in the ambulance crew found that Smith had a bruise and swelling above his right eye, abrasions on his right cheek, and minor abrasions on his knees. (Declaration of Jeff Scott Olson, Exhibit 11, p. PLA 0028.)

Defendants' Response:        Disputed.  Plaintiff's Proposed Fact fails to cite admissible evidence. The medical reports are inadmissible as they are hearsay and unauthenticated. *See* Fed. R. Evid. 801, 802, 901.

93.    The paramedics in the ambulance crew found that the only command Smith was able to follow was to wiggle his toes. He was unable to follow any other commands. (Declaration of Jeff Scott Olson, Exhibit 11, p. PLA 0028.)

Defendants' Response:        Disputed.  Plaintiff's Proposed Fact fails to cite admissible evidence. The medical reports are inadmissible as they are hearsay and unauthenticated. *See* Fed. R. Evid. 801, 802, 901.

94.    Shortly after the ambulance drove away from the staging area, Alan Smith was told by Detective Zohimsky that he was not allowed to go to the hospital to see his father. (Alan Smith Declaration, ¶ 23.)

<u>Defendants' Response</u>:        Disputed.  Plaintiff's Proposed Fact fails to cite admissible evidence. Alan's recitation of Rhinelander Detective Zohimsky's statements is inadmissible hearsay. *See* Fed. R. Evid. 801, 802.

95.     Alan Smith gave his cellular phone to his fiancé and asked her to call his sister to find out what was going on.  (Alan Smith Declaration, ¶ 24.)

<u>Defendants' Response</u>:        No dispute.

96.     After about 40 more minutes, Detective Zohimsky came back to the squad car in which Alan Smith was being held, told Alan Smith that no one at the hospital where Thomas Smith had been taken, St. Mary's Hospital in Rhinelander, could communicate with his father, and said that Alan Smith should accompany Detective Zohimsky to the hospital to assist in the questioning of Thomas Smith.  (Alan Smith Declaration, ¶ 25.)

<u>Defendants' Response</u>:        Disputed.  Plaintiff's Proposed Fact fails to cite admissible evidence. Alan's recitation of Rhinelander Detective Zohimsky's statements is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. Further, with respect to timing, Alan's declaration is a sham, as when he was deposed he was unable to specify how much time had passed between Smith leaving in the ambulance and Zohimsky returning. [Dkt. 18, 50:15-51:3.] Indeed, his sole estimate was that "[i]t was more than half an hour" between Smith being put into the ambulance and Alan's arrival at the hospital. [Dkt. 18, 53:18-21.] Accordingly, his declaration which now contains a specific time is a sham and should not be considered on summary judgment. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact

questions by affidavit testimony that contradicts prior sworn testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted).

97.    Alan Smith was not allowed to drive himself; he and his fiancé were driven to the hospital by Detective Zohimsky.  (Alan Smith Declaration, ¶ 26.)

<u>Defendants' Response</u>:        No dispute.

98.    Alan Smith arrived at the hospital at 9:25 p.m. on April 7, 2017. (Alan Smith Declaration, ¶ 27.)

<u>Defendants' Response</u>:        Disputed.  Plaintiff's Proposed Fact fails to cite admissible evidence. Alan's declaration is a sham, as he was unable to specify time in his narration; his sole estimate was that "[i]t was more than half an hour" between Smith being put into the ambulance and Alan's arrival at the hospital. [Dkt. 18, 53:18-21.] Accordingly, his declaration which now contains a specific time is a sham and should not be considered on summary judgment. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted).

99.     At Detective Zohimsky's behest, he went into the room where his father was being held. (Alan Smith Declaration, ¶ 28.)

Defendants' Response:          No dispute that Alan walked into the room where Smith was. Dispute remainder.  The new information about being ordered by Zohimsky is a sham, as Alan testified about what happened when he arrived at the hospital and omitted any alleged order in his narration. [Dkt. 18, 53:2-7.] The additional information is a sham and should not be considered on summary judgment. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted).

100.     In his father's hospital room stood an Oneida County Sheriff's deputy and a City of Rhinelander police officer.   (Alan Smith Declaration, ¶ 29.)

Defendants' Response:          No dispute.

101.     Thomas Smith's hands were handcuffed to his bed. (Alan Smith Declaration, ¶ 30.)

Defendants' Response:          No dispute.

102.     He was wearing a neck brace, and he had cuts to the right side of his face and big bumps on his right forehead. (Alan Smith Declaration, ¶ 31.)

Defendants' Response:          No dispute.

103.    This is a photograph of the injuries to Thomas Smith's face taken on April 8, 2017.

(Declaration of Shannon Bryfczynski, ¶ 2, Exh. 15.)



Defendants' Response:        No dispute.

104.    This is a photograph of the injuries to Thomas Smith's right leg. (Declaration of

Shannon Bryfczynski, ¶ 2, Exh. 15.)



Defendants' Response:        No dispute.

105.    None of these injuries had been present when Alan Smith had last spoken with his father earlier in the day. (Alan Smith Declaration, ¶ 33.)

    Defendants' Response:        No dispute.

106.    The officers removed Thomas Smith's handcuffs and Mr. Smith was allowed to write on a piece of paper in order to communicate with the officers and Alan.   (Alan Smith Declaration, ¶ 34.)

    Defendants' Response:        No dispute.

107.    Alan Smith asked his father, "Who did it?"  (Alan Smith Declaration, ¶ 35.)

    Defendants' Response:        No dispute.

108.    Thomas Smith pointed to the Sheriff's deputy. (Alan Smith Declaration, ¶ 36.)

    Defendants' Response:        No dispute.

109.    The detective wanted to know where the bomb was located in the home. (Alan Smith Declaration, ¶ 37.)

    Defendants' Response:        No dispute.

110.    Because Thomas Smith was shaking too badly to be able to write intelligibly (Alan Smith Deposition, 54:7-13), Alan Smith told his father to squeeze his hand once for the answer: "No, there is no bomb," and twice for "Yes, there is a bomb." (Alan Smith Declaration, ¶ 38.)

    Defendants' Response:        No dispute that Alan asked Smith to squeeze his hand to communicate because he could not read Smith's writing. [Dkt. 18, 54:3-11.] However, Alan testified that he told Smith to squeeze once for yes and squeeze twice for no, and then asked Smith if there was a bomb. [Dkt. 18, 54:3-13.] To the extent his declaration now conflicts with his prior deposition testimony, it is a sham and should not be considered on summary judgment, and

therefore this portion of the proposed fact is disputed. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted).

111.    Thomas Smith squeezed Alan's hand once, signifying that there was no bomb. (Alan Smith Declaration, ¶ 39.)

<u>Defendants' Response</u>:        No dispute that Alan conveyed, via the squeeze method, that there was no bomb. Dispute as to the number of times Smith squeezed Alan's hand. Alan testified that he told Smith to squeeze once for yes and squeeze twice for no, and then asked Smith if there was a bomb. [Dkt. 18, 54:3-13.] Alan testified that Alan squeezed his hand twice, indicating no bomb. [Dkt. 18, 54:11-12.]

112.    When he was informed that it was permitted, Alan Smith went back to his father's home. (Alan Smith Declaration, ¶ 42.)

<u>Defendants' Response</u>:        Disputed. Plaintiff's Proposed Fact fails to cite admissible evidence. Alan's declaration is a sham, as he testified that he returned to the command post and then went to his girlfriend's house. [Dkt. 18, 63:22-6.] When he got a call that the scene was cleared, he testified that he did not go to the house. [Dkt. 18, 64:7-65:8.] Accordingly, his declaration which now contradicts his prior deposition testimony is a sham and should not be considered on summary judgment. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913

(W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted).

113.   When Alan Smith arrived at the home at 10 Sanns Street, he found his father's slippers and broken glasses strewn about the driveway, street, and yard. (Alan Smith Declaration, ¶ 43.)

Defendants' Response:      Disputed. Plaintiff's Proposed Fact fails to cite admissible evidence. Alan's declaration is a sham, as he testified that he returned to the command post and then went to his girlfriend's house. [Dkt. 18, 63:22-6.] When he got a call that the scene was cleared, he testified that he did not go to the house. [Dkt. 18, 64:7-65:8.] Accordingly, his declaration which now contradicts his prior deposition testimony is a sham and should not be considered on summary judgment. *See Maloney v. Central Aviation, Inc.,* 450 F.Supp.2d 905, 913 (W.D. Wis. 2006) (citations omitted); *U.S. v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("Specifically, we do not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony.") The sham affidavit rule is "designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010) (citations omitted).

114.    The ambulance crew took Thomas Smith to the St. Mary's Hospital emergency room, and the emergency room doctor there admitted him to the hospital. (Declaration of Jeff Scott Olson, Exhibit 12, p. PLA 043.)

Defendants' Response:        Disputed. Plaintiff's Proposed Fact fails to cite admissible evidence. The medical reports are inadmissible as they are hearsay and unauthenticated. *See* Fed. R. Evid. 801, 802, 901.

115.    Four days later, on April 11, 2017, Thomas Smith's physician, Dr. S. Brooks, requested that a competency evaluation of Mr. Smith be done by Harriet I. Walker, Ph.D., to determine whether or not Mr. Smith needed a guardian and/or protective placement.  (Declaration of Jeff Scott Olson, Exhibit 13, p. PLA 066.)

Defendants' Response:        Disputed. Plaintiff's Proposed Fact fails to cite admissible evidence. The medical reports are inadmissible as they are hearsay and unauthenticated. *See* Fed. R. Evid. 801, 802, 901.

116.    Dr. Walker evaluated Mr. Smith and concluded that he was neither competent nor capable of making informed healthcare decisions.   (Declaration of Jeff Scott Olson, Exhibit 13, p. PLA 068.)

Defendants' Response:        Disputed. Plaintiff's Proposed Fact fails to cite admissible evidence. The medical reports are inadmissible as they are hearsay and unauthenticated. *See* Fed. R. Evid. 801, 802, 901.

117.    On April 15, 2017, Thomas Smith was discharged to his home at 10 Sanns Street, with hospice care.  (Declaration of Jeff Scott Olson, Exhibit 13, p. PLA 081.)

Defendants' Response:          Disputed. Plaintiff's Proposed Fact fails to cite admissible evidence. The medical reports are inadmissible as they are hearsay and unauthenticated. *See* Fed. R. Evid. 801, 802, 901.

118.    He was determined to be eligible for hospice care "due to his significant weight loss, being nonverbal, [and] dramatic decline in functional capacity." (Declaration of Jeff Scott Olson, Exhibit 13, p. PLA 073.)

Defendants' Response:          Disputed. Plaintiff's Proposed Fact fails to cite admissible evidence. The medical reports are inadmissible as they are hearsay and unauthenticated. *See* Fed. R. Evid. 801, 802, 901.

119.    His discharge diagnosis included closed head injury with abrasion/laceration of the right periorbital region [the tissue surrounding the right eye]; Type 2 diabetes with hyperglycemia, chronic; multiple system atrophy, Parkinsonian type, chronic, severe, and progressive; cachectic ( a diagnosis of general ill health with emaciation) with weight loss secondary to the multiple system atrophy. (Declaration of Jeff Scott Olson, Exhibit 13, p. PLA 081.)

Defendants' Response:          Disputed.  Plaintiff's Proposed Fact fails to cite admissible evidence. The medical reports are inadmissible as they are hearsay and unauthenticated. *See* Fed. R. Evid. 801, 802, 901.

120.    Thomas A. Smith died at 6:25 a.m. on April 18, 2017, at his home at 10 Sanns Street, Rhinelander, Wisconsin. (Alan Smith Declaration, ¶ 44; Alan Smith Deposition, 71:8-10.)

Defendants' Response:          No dispute.

Dated this 10th day of December, 2020.

AXLEY BRYNELSON, LLP

*/s/ Danielle Baudhuin Tierney*
Lori M. Lubinsky, SBN 1027575
Danielle Baudhuin Tierney, SBN: 1096371
Attorneys for Defendants
P.O. Box 1767
Madison, WI  53701-1767
Telephone:  (608) 257-5661
Email: llubinsky@axley.com / dtierney@axley.com