# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

ESTATE OF THOMAS SMITH, by
Shannon Bryfczynski, Special Administrator,

        Plaintiff,

            Case No. 19-CV-972

    v.

ONEIDA COUNTY,
TOWN OF MINOCQUA,
GARY LODUHA, and
STETSON GRANT,

        Defendants.

## DEFENDANTS' REPLY BRIEF
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## <u>INTRODUCTION</u>

Plaintiff's response to Defendants' motion for summary judgment relies heavily on inadmissible evidence and unsupported speculation in an attempt to fabricate a genuine issue of material fact and avoid judgment in favor of the Defendants. However, a diligent and careful examination of the evidence in this case reveals that there are not, in fact, the multitude of disputed facts as claimed by Plaintiff. The majority of Plaintiff's claimed disputes stem from unfounded speculation or inadmissible testimony from witnesses who either lack the necessary foundation to provide such testimony. Further, any disputed facts are not material and would not preclude summary judgment because, even if the differing inferences are drawn in favor of Plaintiff, the Court should still conclude that Gary Loduha and Stetson Grant's interactions with Plaintiff Thomas Smith were reasonable based on the totality of the circumstances and the information ***actually*** known to the officers at the very moment they interacted with Smith.

Additionally, to the extent this Court permits Plaintiff to proceed with personal capacity claims against Loduha or Grant, despite not actually pleading such claims in the Complaint, both Defendants are entitled to qualified immunity for their actions.

Finally, Plaintiff's request for punitive damages must be dismissed because Plaintiff has failed to cite anything beyond a desired inference to support such a claim.

For these reasons, as set forth in more detail below, this Court should grant the Defendants' pending motion for summary judgment and dismiss Plaintiff's Complaint with prejudice.

I.  **PLAINTIFF IS NOT ENTITLED TO DISREGARD THE EVIDENCE AND RELY UPON UNFOUNDED SPECULATION ABOUT WHAT LODUHA AND GRANT ALLEGEDLY KNEW AT THE TIME THEY INTERACTED WITH SMITH.**

Understanding that Loduha and Grant's actions were extremely reasonable in light of the limited information known to them at the time they encountered Smith, Plaintiff has asked this Court to assume the two individual officers had ***additional*** information about Smith and about the situation they were presented with which could have weighed against the actions they took. However, these assumptions are not only factually unfounded, they are in complete contradiction of the evidence in the record. Therefore, the requested assumptions should not be considered when analyzing the Defendants' actions for Fourth Amendment purposes.

While Plaintiff, as the non-movant, is entitled to all ***reasonable*** inferences on summary judgment, it is not entitled to many of the unfounded speculative assumptions that is is requesting this court make. Inferences "that are supported only by speculation or conjecture will not defeat a summary judgment motion." *Carmody v. Board of Trustees of University of Illinois,* 893 F.3d 397, 401 (7th Cir. 2018) (quoting *Design Basics, LLC v. Lexington Homes, Inc.,* 858 F.3d 1093, 1099 (7th Cir. 2017). Unsupported speculation, even labeled as an inference, "does not meet a party's burden of producing some defense to a summary judgment motion." *Hedberg v. Indiana Bell*

*Telephone Co., Inc.*, 47 F.3d 928, 931-32 (7th Cir. 1995) (citations omitted). "Speculation does not create a ***genuine*** issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Id*. at 932 (emphasis in original).

> **a. There is no evidence to support an inference that Loduha and Grant "had some appreciation" of the fact that Smith was apparently "feeble" and "had difficulties obeying the commands he was given."**

Plaintiff has asked this Court to disregard Loduha and Grant's observations that were made in the moment while confronting a suspect during an extremely volatile and dangerous situation. In support of its request, Plaintiff has cited the unfounded speculative assumptions of a third party lay witness.[1] Specifically, Plaintiff asks that the Court infer that Grant and Loduha (1) knew that Smith was "feeble," (2) knew that Smith had Parkinson's, and (3) knew that Smith was having trouble obeying commands. [*See* Dkt. 35, pp. 10-11.] However, the admissible evidence not only fails to support two of Plaintiff's suggestions, but it directly contradicts all three assumptions.

First, Plaintiff has not presented any admissible evidence to support that Smith was feeble ***or*** that he was physically or mentally incapable of obeying commands. Instead, Plaintiff has attempted to rely upon the unfounded and inadmissible testimony of a neighbor (who knew Smith as an acquaintance and would exchange pleasantries when they passed by each other) to try to establish these "facts." [*See* Defendants' Response to Plaintiff's Proposed Findings of Fact ("Resp. to P. PFOF") No. 14.] As a lay witness, Falck lacks the foundation necessary to opine about Smith's physical and mental capabilities. She also acknowledged that her impressions – that he seemed confused or that he was incapable of doing certain things – were merely her own

---

[1] Plaintiff proposed as a fact that Smith acted "as if he were trying to keep his balance," that he "seemed confused," and that Smith "couldn't make heads or tails of what was being asked of him." [*See* Dkt. 35, pp. 8-9 (citing Plaintiff's Proposed Findings of Fact Nos. 28, 30, 33).] These are not factual observations; they are unsupported speculation by a witness trying to be passed off as "facts." Falck could not possibly know what Smith was thinking or trying to accomplish (if anything).

perceptions and assumptions. [Resp. to P. PFOF Nos. 29, 31, 32, 34 (statements regarding Smith's capabilities all admittedly based on personal perception).] Because her testimony lacks the necessary foundation, it is inadmissible. *See* Fed. R. Evid. 602. Accordingly, there is no evidence that Smith was either physically or mentally incapable of obeying commands.

The only admissible evidence[2] regarding Smith's capabilities comes from Alan Smith's testimony wherein he noted that, as of April 2017, Smith had very few physical limitations. Indeed, Smith's only physical limitation was that he shuffled his feet when he walked; he was otherwise able to "do everything" else with the exception of "maybe opening up a pickle jar…." [Dkt. 22, PFOF No. 187.] Likewise, Alan Smith testified that Smith was independent and Alan Smith would only assist with driving, grocery shopping, ensuring Smith took his medication, and assisting Smith with his cats. [Resp. to P. PFOF No. 7.] The evidence does not suggest that Smith was feeble or mentally incompetent; rather, he was independent and physically and mentally capable of caring for himself. Therefore, Plaintiff's requested assumptions (that he was "feeble" or mentally incapable of responding to commands) are not only completely unsupported, they are directly contradicted by the evidence in the record.

Even if Plaintiff's assumptions about Smith's capabilities were accepted as true, there is still no evidence that Loduha or Grant were ***actually aware*** of those purported deficiencies. Rather, all evidence ***contradicts*** Plaintiff's speculations. As to the contention that Loduha and Grant should have concluded that Smith was too feeble to physically perform the requested tasks: (1) neither Loduha nor Grant observed that Smith had any trouble walking [Dkt. 22, PFOF No. 89]; (2) Loduha did not observe any signs or any indication that Smith was physically incapable of performing the tasks he was commanded to perform [Dkt. 22, PFOF No. 90]; and (3) both Loduha

---

[2] Plaintiff attempted to rely on inadmissible medical records, which were hearsay and unauthenticated, to support some tangentially related proposed facts. [*See, e.g.,* Resp. to P. PFOF Nos. 114-116.]

and Grant concluded that Smith appeared to be physically capable of responding to Warden Brooks' commands [Dkt. 22, PFOF No. 91]. As to the contention that Loduha and Grant should have concluded that Smith was mentally incapable of performing the requested tasks, both individuals unequivocally stated that they believed, based on Smith's actions, that he was actively choosing to not comply or only partially comply. [Dkt. 22, PFOF Nos. 96, 98, 133.] Because Fourth Amendment jurisprudence unequivocally establishes that reasonableness of an officer's actions is based on what that specific officer knew as of the exact moment they took action, it is not proper to disregard what knowledge they had and assume they held other knowledge based solely on the conflicting perceptions of an untrained, uninvolved witness. *See Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988).

Second, Plaintiff's suggestion that Loduha and Grant should have known that Smith had Parkinson's is completely unfounded. In support of the speculative conclusion, Plaintiff notes that a radio transmission that "[s]ubject has Parkinson's" was made shortly before Smith was taken into custody. [Dkt. 35, p. 9.] Plaintiff then speculates that, because Captain Hook and Alan Smith heard the transmission over the radio, Loduha and Grant must have heard it. [Dkt. 35, p. 10.] However, Plaintiff negated cite Captain Hook's testimony wherein she explained that the SRT (which included Loduha and Grant) had its own separate radio channel and that she was unsure which channel they utilized on the day at issue. [Defendants' Reply in Support of Proposed Findings of Fact ("Reply PFOF") No. 169.] Further, Loduha and Grant unequivocally stated that they did not hear *any* information about Smith's physical condition while on the SRT call at the Property. [Dkt. 22, PFOF No. 169.] Accordingly, there is simply no basis to infer that they knew about Smith's alleged Parkinson's diagnosis.[3]

---

[3] Acknowledging that Smith was, indeed, noncompliant in response to Loduha and Grant's verbal commands and initial physical contact, Plaintiff argues later in its brief that other reasonable officers would have perceived the

5

**b. There is no evidence to support an inference that Loduha and Grant "probably knew" the information they were given about the crimes was false.**

Plaintiff next suggests that Loduha and Grant should have ***instantly*** known that all information they had about the incident was questionable when Alan Smith showed up at the command post and spoke with Detective Zohimsky. [Dkt. 35, p. 11.] The suggestion is based on unfounded assumptions and should be summarily rejected as hyperbolic speculation.

The first reason Plaintiff's suggestion can be summarily rejected is because neither Loduha nor Grant were aware that Alan Smith was the alleged caller and hostage (so his presence at the command post would be completely immaterial). Indeed, there is not a single piece of evidence in the record which suggests that either officer knew the identity of the caller. SRT was informed that there was a wounded victim at the residence and, potentially, a deceased nine-year-old child in the garage [Dkt. 22, PFOF No. 58] but there is no evidence that SRT was specifically informed that Alan Smith and his daughter were the alleged victims (nor does Plaintiff cite any such evidence).[4] Therefore, Alan Smith's presence at the command post would be immaterial to Loduha and Grant.

The second reason the speculative suggestion can be rejected is because there is no evidence that Loduha or Grant knew that Alan Smith was at the command post speaking with Detective Zohimsky.[5] Accordingly, even if Loduha and Grant knew that Alan Smith was the

---

noncompliance as a "medical incapacity, ***especially if they had heard the information that Smith had Parkinson's disease***." [Dkt. 35, p. 17.] However, because Loduha and Grant unequivocally ***did not hear*** any information about Smith's physical condition, there is no basis for such speculation. Loduha and Grant had no reason to believe Smith's noncompliance stemmed from anything other than willful disobedience. As such, the reference to *Turner v. City of Champaign* is inapposite, because the officers here unequivocally did not observe any "medical symptoms." [*See* Dkt. 35, p. 17 (citing *Turner v. City of Champaign*, 979 F.3d 563 (7th Cir. 2020)).]

[4] Rather, to support Plaintiff's speculation that Loduha and Grant likely knew Alan was the alleged victim, Plaintiff relies on yet another chain of speculation. Although it is true that the 911 dispatcher conveyed to officers in the field that Alan Smith was the caller, there is no evidence that Loduha or Smith ***heard*** that information. [Dkt. 22, PFOF No. 31.] Indeed, as previously noted, Captain Hook explained that the SRT (which included Loduha and Grant) had its own radio channel and she was unsure which channel they utilized on the day at issue. [Reply PFOF No. 169.]

[5] Again, lacking any evidence to support this piece of the chain, Plaintiff asks for an "inference" that (1) Detective Zohimsky told the 911 dispatcher that Alan Smith was with him, (2) the 911 dispatcher relayed that information over the radio, and (3) Loduha and Grant heard the radio broadcast. However, there is no evidence to support ***any of these three points***. Rather, Plaintiff simply argues that "this information was so important that it was all but certain to have

reported hostage (which, as noted above, they did not) the chain of assumptions and speculation breaks because neither Loduha nor Grant were aware that Alan Smith was reportedly not in the house.

The third reason this suggestion can be rejected is because there is no basis to assume that Alan Smith's presence would have "immediately" negated or disproven "a large portion of the most important information" that law enforcement obtained from the caller. A question regarding the identity of the alleged victim would not have necessarily impacted the perceived danger and severity of the caller's report. The caller still reported that they needed medical and law enforcement assistance, that they could not speak, that they was injured, that a suspect had injured the caller, that the suspect had potentially fatally injured a child, and that there were weapons and possibly explosive devices at the property. [Dkt. 22, PFOF Nos. 16-18, 27, 33-34.] Plaintiff's hindsight analysis of the situation is irrelevant when looking at what information law enforcement had at the time and how they utilized that information. *See generally Turner v. City of Champaign*, 979 F.3d 563, 567 (7th Cir. 2020) (citation omitted).

In sum, Plaintiff cannot assume that Loduha and Grant had information about Smith's purported mental and physical capabilities or had notice that the information they were provided was incorrect. The evidence does not support such suggestions, and all Plaintiff can offer in support of its assumptions are more unfounded assumptions.

## II. LODUHA AND GRANT'S ACTIONS, IN RESPONSE TO THE EXTREMELY DANGEROUS SITUATION THEY FACED, WERE REASONABLE AND DID NOT VIOLATE SMITH'S FOURTH AMENDMENT RIGHTS.

There are three interactions which Plaintiff appears to premise the Fourth Amendment claim upon: (1) the initial interaction between Loduha, Grant, and Smith wherein Smith was

---

been broadcast…" [Dkt. 35, pp. 11-12.] Plaintiff's perceptions of the alleged importance do not warrant an inference that something actually happened. Plaintiff's assertion is pure speculation and completely unfounded.

decentralized and handcuffed; (2) the second interaction when Loduha and Grant carried Smith around the Bearcat and placed him on the ground to search him; and (3) the third interaction when Loduha and Grant placed Smith into the back of the Bearcat. There is absolutely no dispute of fact regarding what occurred during the initial contact between Loduha, Grant, and Smith, and Plaintiff does not suggest that there was anything improper or illegal about that interaction. Rather, Plaintiff contends that during the second and third interaction, Loduha and Grant's actions were unreasonable.

As to the first interaction, this Court may conclude as a matter of law that Loduha and Grant's actions were entirely reasonable and did not violate the Fourth Amendment – based on both the facts and evidence presented, as well as Plaintiff's complete failure to argue to the contrary.

As to the second and third incident (even assuming Falck's incredible version of events are accepted as true by this Court for purposes of summary judgment), the officers' actions were still reasonable in light of the overwhelming danger that Smith and the situation posed to them. Accordingly, this Court may enter judgment favor in of the Defendants on these issues as well.

a. **Plaintiff does not argue that the first interaction was improper or that it violated Smith's Fourth Amendment rights.**

Plaintiff's arguments regarding the reasonableness of Loduha and Grant's actions relate to the second and third interactions with Smith. Plaintiff has not suggested that the first interaction was unreasonable or that the officers acted inappropriately. However, in its response to Defendants' Proposed Findings of Fact, Plaintiff appears to challenge that this initial interaction actually took place. For the reasons noted in Defendants' Reply in Support of their Proposed Findings of Fact, and explained herein, Plaintiff's position is unfounded.

In the first interaction between Loduha, Grant, and Smith, Loduha and Grant approached

Smith near the front passenger door of the Bearcat and attempted to control him while he was standing. [Dkt. 22, PFOF Nos. 110-115.] Smith actively resisted, and Loduha and Grant performed a two-man decentralization technique before handcuffing Smith on the ground. [Dkt. 22, PFOF Nos. 117, 119-128.] Smith also actively resisted the officers while they placed him into the handcuffs. [Dkt. 22, PFOF No. 125.]

Plaintiff attempted to rely upon Falck's testimony to refute the facts surrounding Loduha and Grant's first interaction with Smith. However, there is no genuine dispute of fact because Falck unequivocally testified that she **did not** witness the interactions between Grant, Loduha, and Smith when they were between the Bearcat and Smith's house. [Reply PFOF No. 110.] Therefore, her testimony regarding the first interaction is completely unfounded and inadmissible.

The Bearcat parked in a north-south direction on Sanns Street directly in front of Smith's property before stopping. [Dkt. 33, Plaintiff's Response to PFOF No. 72, 73, 75 (admitted by Plaintiff).] From Falck's vantage point across the street, she could see Smith's front door and half of his driveway. [Resp. to P. PFOF No. 23.] Falck could not see Smith after Loduha and Grant approached Smith with their guns drawn. [Reply PFOF No. 110.] She did not see Smith again until after Loduha and Grant carried him around the front of the Bearcat when he was in handcuffs. [Reply PFOF No. 110.] Because Falck did not witness anything between the time Loduha and Grant first approached Smith and when they carried him around the front of the Bearcat in handcuffs, which was the time period of the first interaction, Plaintiff lacks any evidence to dispute Defendants' proposed facts. Accordingly, the facts of the first incident as established by Defendants are undisputed.[6]

---

[6] Plaintiff also suggests that there was only one time that Smith was placed on the ground because Grant and Loduha's reports did not expressly state that Smith was placed on the ground twice. [Dkt. 33, Plaintiff's Response to PFOF No. 135.] This is pure speculation. The fact that an officer's subsequent testimony is more detailed than an original report is not a valid reason in and of itself to discredit the officer's testimony. *U.S. v. O'Neill*, 27 F. Supp. 1121, 1139 (E.D.

Plaintiff does not argue that the decentralization technique performed by Loduha and Grant was unreasonable. [Dkt. 35.] Rather, Plaintiff's sole argument is that the purported shove by Loduha and Grant was unreasonable. However, the allegation of shoving relates to the **second** incident – not the first.[7] Plaintiff made no argument regarding the reasonableness of the first incident. [*See* Dkt. 35.] This Court may conclude as a matter of law that the first incident was reasonable based on the facts and law outlined in the Defendants' original brief (as well as Plaintiff's failure to rebut). *See In re LaMont*, 740 F.3d 397, 410 (7th Cir. 2014) (citing *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010)) (failure to respond equates to a concession of the argument). Accordingly, judgment may be entered for the Defendants as to the first incident.

> **b. Even if Plaintiff's version of events of the second incident is accepted as true, Loduha and Grant still acted reasonably and did not violate Smith's Fourth Amendment rights.**

Because Plaintiff is entitled to all reasonable inferences in its favor on summary judgment, this Court may evaluate the reasonableness of the second incident with the understanding that Falck claimed Loduha and Smith shoved Smih in order to place him on the ground – if the Court chooses to accept Plaintiff's incredible version of events.[8] [Resp. to P. PFOF Nos. 45, 47.] However, Smith's actions prior to the alleged shove, as well as the facts regarding the

---

Wis. 1998). Further, Plaintiff's admissions regarding certain proposed facts all but confirms that there were, indeed, two separate incidents when Smith was on the ground. Plaintiff admitted that Smith was on the ground when he was handcuffed and admitted that he was lifted up off the ground afterwards. [Dkt. 33, Plaintiff's Response to PFOF Nos. 124, 131.] Falck testified that Smith was handcuffed when she saw officers carrying him around the front of the Bearcat before he went to the ground again in her line of sight. [Reply PFOF Nos. 110, 137.] Clearly, Smith had to have been on the ground on two separate occasions – once when he was handcuffed (as admitted by Plaintiff) and again during the incident when Falck actually saw him go onto the ground.

[7] See Footnote 6.

[8] Notably, Plaintiff did not successfully dispute any of the Defendants' Proposed Findings of Fact regarding this second interaction between Loduha, Grant, and Smith (and, therefore, the facts proposed by Defendant can be relied upon by this Court). [*See* Reply PFOF Nos. 131-142.] Instead, Plaintiff simply argues that the second incident never took place. [*See* Dkt. 33, Plaintiff's Response to PFOF Nos. 131-142.] However, as explained in Defendants' Reply in Support of Proposed Findings of Fact as well as Footnote 8, *supra*, the evidence undeniably confirms that there were two separate incidents when Smith was placed on the ground. Having failed to refute the Proposed Findings of Fact related to this second incident, the Court should find that Plaintiff has admitted the facts regarding that incident proposed by Defendants. Fed. R. Civ. P. 56(e)(2).

circumstances presented to the officers, must be examined when evaluating whether the shove was reasonable. When all circumstances are considered, Loduha and Grant still employed a reasonable amount of force as it relates to the second incident regardless of which version of events is accepted. Accordingly, any factual dispute is immaterial.

Loduha and Grant were interacting with Smith under the assumption that Smith had (1) held one victim hostage at gun point (and had shot that victim), (2) fatally shot a child, (3) rigged his house to explode, and (4) was actively refusing to cooperate with law enforcement by blatantly disobeying commands. Loduha and Grant had no notice or knowledge that any of this information was false in any way, and certainly had no notice that Smith had any sort of physical or mental infirmities. [*See* Section I, *supra*.] The officers needed to act quickly and promptly. Their focus was getting Smith into custody as safely and quickly as possible. [Reply PFOF No. 171.] Smith and the reported explosive devices were a perceived threat to Loduha, Grant, and the rest of the SRT members the entire time. [Reply PFOF No. 171.]

There is no dispute that Loduha instructed Smith to get onto the ground prior to the alleged shove. [Reply PFOF No. 135.] There is no dispute that Smith continued to resist and defied the officer's commands, as he had done throughout the course of his dealings with the officers. [Reply PFOF No. 135; *see also* Reply PFOF Nos. 117, 119, 125, 133.] There is no dispute that Loduha and Grant needed to get Smith onto the ground so they could conduct a more complete search of Smith because they were unsure if he had any explosive devices or trigger on him, and they could not search him while he was standing because he refused to stand on his own. [Reply PFOF No. 136.] Further, while not necessarily dispositive of the issue, there is no evidence (nor has Plaintiff

even suggested) that Smith was hurt in any way after this alleged shove.[9] Finally, Loduha and Grant needed to make split-second decisions and quickly conduct a search of Smith before moving him into the Bearcat because of the immediate and impending risk posed by the explosive devices. (Indeed, only two minutes and 26 seconds elapsed from the time Smith was reportedly in custody after the first interaction until the time SRT reported that it was returning to command post with Smith – both the second **and** third interactions occurred during those 146 seconds. [Reply PFOF Nos. 82, 127, 160.])

Even though Smith was in handcuffs at the time of the shove, Smith and the reported explosive devices at the house posed a substantial threat to Loduha, Grant, SRT members, and the hostage inside the house. Despite the obvious risk posed by the explosive devices, Plaintiff omitted any discussion regarding this extreme risk and, instead, focused solely on the risk Smith posed. [*See* Dkt. 35, pp. 12-17.] Plaintiff claimed that Smith was not a threat to the officers because he was in handcuffs, and therefore no force was reasonable. This overlooks the most obvious source of harm; there was still a risk that Smith could trigger the explosive devices or that he was wearing an explosive device. [Dkt. 33, Plaintiff's Response to PFOF Nos. 94, 108 (admitting there was a risk Smith was wearing a vest or trigger);  Reply PFOF No. 136 (Plaintiff failed to rebut that officers needed to thoroughly search Plaintiff to confirm he did not have any explosive devices or a trigger on him).] Even with Smith in restraints, he still posed a substantial risk of great bodily harm to the officers. This factor weighs in favor of using some amount of force to gain Smith's compliance.

Fourth Amendment jurisprudence holds that courts do not evaluate excessive force cases

---

[9] "Evidence of injury is relevant regarding whether officers used excessive force." *Durrah v. City of Wauwatosa*, No. 07-C-0426, 2009 WL 10710621, at *8 (E.D. Wis. Mar. 30, 2009) (citing *Chelios v. Heavener*, 520 F.3d 678, 690 (7th Cir. 2008)).

in isolation; all facts regarding the circumstances presented to the officers are considered. Courts evaluate the situations in which an officer confronts an individual to assess reasonableness of an officer's actions. *See, e.g.*, *Duran v. Sirgedas*, 240 Fed. Appx. 104, 119 (7th Cir. 2007) (arrestee's actions, "coupled with the escalating situation" and other situational factors like the number of partygoers and the presence of alcohol were considered when assessing reasonableness of force used by officer). The threats presented in a situation, even if not necessarily posed directly by the suspect, must be evaluated and considered when assessing whether an officer's response was reasonable. *See, generally, Scott v. Harris*, 550 U.S. 372, 383-86, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (weighing danger and risk of harm associated with fleeing car when assessing reasonableness); *Mason-Funk v. City of Neenah*, 296 F. Supp. 3d 1006, 1013 (E.D. Wis. 2017) (noting threat of gunfire or ambush when assessing reasonableness); *Duran*, *supra*. In this case, the omnipresent threat of explosive devices posed a heightened danger to the officers and the hostage, and that risk must be taken into account when assessing the reasonableness of the officers' actions. Loduha and Grant reasonably relied on the information provided by the hostage that there were explosive devices at the property that were set to explode. At the time of the alleged shove, Loduha and Grant did not know if Smith had explosive devices or a trigger on him. [Reply PFOF No. 136.] They needed to quickly search Smith to determine if he had either of those items on him, but his refusal to cooperate was preventing them from searching him. The longer Loduha, Grant, and Smith were outside of the Bearcat, the longer they were at risk of harm in the event the reported explosive devices were triggered. Accordingly, when Smith was refusing their instructions to go to the ground, Loduha and Grant were justified in quickly and efficiently getting him to the ground with a shove. *See Williams v. Indiana State Police Dept*., 797 F.3d 468, 474-75 (7th Cir. 2015) (citing *City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 191 L. Ed.

2d 856 (2015)) (reasonable for officers to take quick action if delay would endanger lives, even if actions proved to be mistakes after a hindsight review).

In addition to the threat posed by the explosive devices that may have been triggered by Smith, Smith was continuing to resist the officers by refusing to stand on his own (which would have ultimately permitted them to conduct the search with him standing upright) and by refusing to go to the ground. [Reply PFOF Nos. 136, 137.] Officers are granted the flexibility to utilize some amount of force to gain compliance of a willfully non-compliant suspect, even if the suspect only exhibits passive resistance. *See generally Smith v. Ball State Univ.*, 295 F.3d 763, 771 (7th Cir. 2002). It is not the law that purely passive resistance eliminates ***any*** ability to use physical force to gain compliance. Rather, only "***significant*** force" is prohibited "against a subdued suspect." *Miller v. Gonzales*, 761 F.3d 822, 829 (7th Cir. 2014) (emphasis added). Here, the officers did not kick, strike, taser, or shoot Smith; they (reportedly) pushed him. While perhaps not ideal, under the intense pressures, such an action is hardly unreasonable as a matter of law. Indeed, force up to and including deadly force is reasonable when a suspect poses a substantial risk of harm to an officer. *See Henning v. O'Leary,* No. 05-C-582-S, 2006 WL 995223, at *4 (W.D. Wis. Apr. 14, 2006), aff'd, 477 F.3d 492 (7th Cir. 2007) (citing *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)). If lethal forced is justified when an officer believes (even mistakenly) that the suspect poses a substantial risk, surely, a shove to gain compliance must be reasonable here in light of the substantial danger posed to the officers. *Id.*; *see also Findlay v. Lendermon*, 722 F.3d 895, 900 (7th Cir. 2013) (mistaken, but reasonable, belief does not necessarily equate to constitutional violation).

Having not had a chance to properly search Smith to confirm that he did not, in fact, have any explosive devices, triggers, or weapons on him, it was entirely reasonable for the officers to

quickly gain compliance by putting Smith to the ground in a quick and efficient manner. While the method (proposed by Plaintiff) may not have been "textbook," it was certainly reasonable in light of the extreme and unique situation that Loduha and Grant were presented with. Accordingly, their actions did not constitute excess force.

### c. Even if Plaintiff's version of events of the third incident is accepted as true, Loduha and Grant still acted reasonably and did not violate Smith's Fourth Amendment rights.

After having searched Smith, Loduha and Grant needed to get him quickly into the Bearcat and away from the house that was reportedly set to explode. They acted quickly and, at least according to Plaintiff, threw Smith into the back of the Bearcat. [*See* Dkt. 35, p. 18.] Although Loduha and Grant had, at that point, confirmed Smith was not armed and did not have any explosive devices or triggers on him, the risks posed by the explosive devices noted in Section II.b. still remained. Accordingly, the need to get Smith into the Bearcat and get away from the property as quick as possible remained. When Smith refused to comply with commands to enter the Bearcat, Loduha and Grant employed other methods that, under the circumstances, were reasonable and not excessive.

There is no dispute that Loduha and Grant instructed Smith to place himself into the Bearcat three separate times – and Smith was non-compliant in each instance. [Reply PFOF Nos. 147-151.] Under a time constraint and threatened by the risk of harm from a potential explosion, Loduha and Grant were reasonable justified by (according to Plaintiff) picking Smith up by his ankles and wrists and swinging him into the back of the Bearcat. Again, while perhaps not "textbook," there is no dispute that the move was quick and effective and allowed the officers to quickly get Smith out of the zone of danger posed by the explosive devices. Faced with an otherwise limp and non-responsive Smith, Loduha and Grant had limited options for quickly

placing him into the back of the Bearcat. Therefore, their actions did not constitute excessive force.

### III. PLAINTIFF HAS NOT PLED PERSONAL CAPACITY CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS.

Despite pleading only an official capacity claim against Loduha and Grant in the body of the Complaint, Plaintiff now asks this Court to overlook its own allegations and allow it to assert a personal capacity claim against both individuals. As noted by Defendants in their initial brief, Plaintiff did not allege that Loduha or Grant were being sued in their personal capacities. [Dkt. 23, n. 10.] Rather, Plaintiff alleged in its Complaint that Loduha and Grant's actions **were taken under the color of law**. [Dkt. 2, ¶¶ 304, 305.] As noted by Defendants, current Seventh Circuit case law holds that an official capacity claim is presumed with such an allegation. [Dkt. 23, n. 10 (citing *Kolar v. County of Sangamon*, 756 F.2d 564, 568 (7th Cir. 1985) (citation omitted).] Further, Plaintiff's Complaint lacked any allegation which expressly identified that Loduha or Grant were being sued in their personal capacities, which is a fundamental pleading requirement for a personal capacity claim. [Dkt. 23, n. 10 (citing *Kolar*, 756 F.2d at 569).] Accordingly, based on the substance of Plaintiff's Complaint, there was no factual or legal basis to conclude that Plaintiff had pled personal capacity claims against Loduha or Grant.

Plaintiff's sole rebuttal is that Defendants should have interpreted Plaintiff's caption as a substantive allegation and, essentially, that the allegations of Plaintiff's Complaint are not controlling. [Dkt. 35, pp. 18-19.[10]] However, it is well-established in this Circuit that "courts give effect to the **substance** of a document and **not to its caption**." *Gleash v. Yuswak*, 308 F.3d 758, 761 (7th Cir. 2002) (emphasis added; citations omitted). *See also Volkmann v. Wisconsin Laborers' Health Fund,* No. 08-CV-325-SLC, 2008 WL 5121348, at *1 (W.D. Wis. Dec. 5, 2008) (citing

---

[10] The page numbers in the docket notation do not match with the page numbers in Plaintiff's brief. For purposes of this brief, the page numbers cited refer to the docket notation.

*Smith v. Barry*, 502 U.S. 244 (1992); *Godoski v. United States*, 304 F.3d 761 (7th Cir.2002)). If there is a discrepancy between a caption and the substance of a pleading, courts rely on the substance of the pleading. *See, e.g., O'Grady v. Marathon Cty. Child Support Agency,* No. 02-C-0708-C, 2003 WL 23274562, at *1 (W.D. Wis. Jan. 6, 2003) (citing *Gleash*, 308 F.3d at 761)). Accordingly, the substance of Plaintiff's Complaint – which alleges an official capacity claim and does not allege a personal capacity claim – controls. *Yeksigian v. Nappi,* 900 F.2d 101, 104 (7th Cir. 1990) ("In the absence of any express statement that the parties are being sued in their individual capacities, an allegation that the defendants were acting under the color of law generally is construed as a suit against the defendants in their official capacities ***only***." (emphasis added; citations omitted)); *Guzman v. Sheahan*, 495 F.3d 852, 860 (7th Cir. 2007) ("…we have held that a complaint that does not make clear that it is brought in an individual capacity will be construed as having been brought only in an official capacity."); *Stevens v. Umsted,* 131 F.3d 697, 706 (7th Cir. 1997) ("A § 1983 complaint that fails to specify the capacity in which the defendants are being sued is ordinarily construed to be against them in their official capacity."). This Court should disregard Plaintiff's argument and conclude that there is no personal capacity claim pled against either Loduha or Grant based on the Plaintiff's own allegations and well-established Seventh Circuit law.

## IV. PLAINTIFF CONCEDED ITS *MONELL* CLAIMS AND CLAIMS AGAINST THE CITY OF MINOCQUA.

Despite Defendants explaining why Plaintiff's Complaint actually only official capacity claims against Loduha and Grant – as well as the well-established precedent in this circuit on the issue – Plaintiff ***still*** chose to waive *Monell* claims and not substantively respond to Defendants' arguments. [*See* Dkt. 35, p. 20.] Plaintiff also conceded that the claims against the Town of Minocqua should be dismissed, as Loduha was working as an employee of Oneida County at the

time of the incident. [Dkt. 35, p. 21.] Therefore, for the reasons set forth in Defendants' original brief and based on Plaintiff's concessions, Plaintiff's Complaint (which only pled official capacity claims) should be dismissed with prejudice.

V.  **To the Extent the Court Now Allows Plaintiff to Proceed on Personal Capacity Claims against Loduha and Grant, Both Individuals are Entitled to Qualified Immunity.**

If this Court chooses to permit Plaintiff to proceed with personal capacity claims against Loduha and Grant, both individuals are entitled to qualified immunity. Defendants did not waive this argument by not fully addressing it in their initial brief because, as noted in Section III, Plaintiff did not plead a personal capacity claim in its Complaint. Defendants had no reason to argue an issue that was not before this Court.

### a.  Defendants did not waive their qualified immunity argument.[11]

In their initial brief, Defendants outlined, in detail, why Plaintiff's Complaint only asserted official capacity claims against the individual Defendants. [Dkt. 23, n. 10.] Defendants properly relied upon the substantive allegations in Plaintiff's Complaint when defending this litigation and filing their motion with the Court. However, Defendants expressly reserved the right to assert a qualified immunity defense in the event that Plaintiff raised an argument (as it has now done) that, despite its allegations, Loduha and Grant were being sued in their personal capacities. [*Id.*] While it is typically the case that arguments raised for the first time in reply briefs are waived, it is not a bright line rule; there are exceptions. *U.S. v. Fluker*, 698 F.3d 988, 1004 (7th Cir. 2012). Indeed, one such exception is when the moving party is without certain knowledge or information at the

---

[11] Plaintiff has also asserted, in passing, that Defendants (in essence) waived any argument to oppose the notion that their actions "hastened" Smith's death. [Dkt. 35, p. 3.] However, Plaintiff has never presented any evidence to suggest that Smith's death was hastened – or related in any way – to the Defendants' actions, nor have they argued that point in their brief. [*See* Dkt. 35.] Absent any evidence or argument to even suggest such a theory, it must be disregarded by the Court.

time they filed their initial brief. *See, e.g., Fluker*, 698 F.3d at 1004.

In this case, an exception to the waiver doctrine is warranted. If this Court were to restrict Defendants from arguing qualified immunity (if the Court accepted Plaintiff's argument that it has asserted personal capacity claims despite the substance of its Complaint), Defendants would be unfairly prejudiced. As noted in the original brief, Plaintiff had not pled personal capacity claims. As such, there was no reason to argue qualified immunity. If Plaintiff is allowed to ask this Court to bring new claims in the middle of summary judgment briefing that it failed to plead in its Complaint, then Defendants should be entitled to raise applicable defenses. What's good for the goose is good for the gander.

### b. Loduha and Grant are entitled to qualified immunity.

Governmental employees are entitled to qualified immunity for federal claims made against them in their personal capacities when they perform discretionary functions and their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). (citations omitted). Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Kiesela v. Hughes,* 138 S. Ct. 1148, 1152, 200 L. Ed. 2d 449 (2018) (quoting *White v. Pauly,* 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017)). Whether qualified immunity applies involves two inquiries: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)). "Because the focus is on whether the [actor] had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of

the conduct." *Kisela*, 138 S. Ct. at 1152 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam)).

Although "'do not use excessive force' is clearly established" by Fourth Amendment jurisprudence across the country, the principal "does not tell an officer what kinds of force, in what situations, are excessive…." *Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019). Therefore, qualified immunity is only inapplicable in excessive force cases "when precedent places the invalidity of a particular action ***beyond debate***…." *Id.* (emphasis added; citing *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 138 S. Ct. 577, 202 L. Ed. 2d 455 (2019)).

If the Court concludes that any of the three interactions with law enforcement were not reasonable, Loduha and Grant are still entitled to judgment and immunized by qualified immunity. Here, there is no clearly established law that established (1) pushing Smith to gain compliance and conduct a search when he refused to submit or (2) picking Smith up and quickly swinging him into the Bearcat when he refused to enter the back of the vehicle[12] clearly violated Fourth Amendment jurisprudence.

The cases cited by Plaintiff to suggest that force against a handcuffed individual is unreasonable are inapposite and not applicable to the present situation. Each of those cases involved situations where the officers took some action ***beyond*** that which was necessary to gain compliance – such as kicking or striking – to inflict some sort injury or punishment. *See, e.g.*, *Sallenger v. Oakes*, 473 F.3d 731,741-42 (7th Cir. 2007) (officers continued to strike individual

---

[12] There should be no dispute that the actions taken by the officers during the first interaction – when they performed a standard two-man decentralization technique – was reasonable. However, if this Court were to analyze that act for qualified immunity purposes, it is clearly established that Loduha and Grant ***were permitted*** to utilize a decentralization technique after Smith refused verbal commands and employed active resistance by pulling away from the officers when they attempted to control his movements. *See Estate of Philips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) (citation omitted) (discussing approval of escalation of force as situation evolves and escalates); *see also Fitzgerald v. Santoro*, 707 F.3d 725, 734 (7th Cir. 2013) (holding individual in "firm manner meant to induce cooperation" was an objectively reasonable response to noncompliance).

after he was restrained and then failed to render medical aid when individual stopped breathing); *Meirthew v. Amore*, 417 Fed. Appx. 494, 495-96 (6th Cir. 2011) (officer used "pain-compliance technique" on handcuffed individual and then "thrust" the individual "to the floor face first" which resulted in multiple facial fractures, lacerations, and a nosebleed); *Smoak v. Hall*, 460 F.3d 768, 783-84 (6th Cir. 2006) (officer kicked out handcuffed individual's legs and then threw individual to the ground); *Young v. Prince George's County, Maryland*, 355 F.3d 751, 757 (4th Cir. 2004) (after individual was handcuffed and lying face down on the ground, officer struck individual on the back of the head and then "pound[ed]" his knee into the individual's back). Here, there is no suggestion that Loduha or Grant took any action beyond what was necessary to gain compliance – they did not strike or hit Smith after he was in a position of compliance. The actions they took were limited to that which was required to gain compliance – namely, a shove and a swing. Therefore, these cases are inapplicable.

Because there are no cases clearly on point which establish that Loduha or Grant's actions violated clearly established Fourth Amendment rights, the officers would be entitled to qualified immunity in the event the Court did not dismiss the claims for the reasons set forth in Section II, *supra*.

## VI. TO THE EXTENT THE COURT NOW ALLOWS PLAINTIFF TO PROCEED ON PERSONAL CAPACITY CLAIMS AGAINST LODUHA AND GRANT, THERE IS NO FACTUAL OR LEGAL BASIS FOR PUNITIVE DAMAGES.

Summary judgment is the "put up or shut up" moment in litigation, and Plaintiff's claim for punitive damages must be dismissed because Plaintiff has failed to "put up" any evidence to support such a claim. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). Even if Falck's version of events was accepted by a jury, the Defendants' actions alone – a shove and a swing – do not establish ill intent or a reckless disregard for Smith's rights. Again, considering the

overwhelming danger the officers found themselves in, such actions would appear nothing more than rushed and perhaps ill-advised, but certainly not malicious or in reckless disregard for Plaintiff's rights. Plaintiff cannot simply claim that an inference *may* be found by the jury in order to save the punitive damages claim. The lack of evidence to support ill intent or reckless disregard warrants a dismissal of the punitive damages as a matter of law at summary judgment.

## **CONCLUSION**

Based on the actual information known to Loduha and Grant at the time they confronted Smith, as well as the unique and extenuating circumstances, their actions were reasonable and did not violate a clearly established Fourth Amendment right. Any dispute of facts regarding the interactions between Smith and the officers are immaterial because under either set of facts, the officers' actions were justified in light of the overwhelming danger the situation presented. Further still, if the Plaintiff is permitted to proceed on personal capacity claims (despite failing to plead such claims in its Complaint, Loduha and Grant are entitled to qualified immunity. For these reasons, judgment should be entered in favor of the Defendants and Plaintiff's Complaint should be dismissed with prejudice.

Dated this 10th day of December, 2020.

AXLEY BRYNELSON, LLP

*/s/ Danielle Baudhuin Tierney*
Lori M. Lubinsky, SBN 1027575
Danielle Baudhuin Tierney, SBN: 1096371
Attorneys for Defendants
P.O. Box 1767
Madison, WI 53701-1767
Telephone: (608) 257-5661
Email: llubinsky@axley.com / dtierney@axley.com