IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ESTATE OF THOMAS SMITH, by
Shannon Bryfczynski, Special Administrator,

                              Plaintiff,                              OPINION AND ORDER

        v.                                                           19-cv-972-wmc

ONEIDA COUNTY, TOWN OF MINOCQUA,
GARY LODUHA, and STETSON GRANT,

                              Defendants.

        In this lawsuit brought under 28 U.S.C. § 1983, the Estate of Thomas Smith claims

that defendants violated Smith's Fourth Amendment rights by use of excessive force on

April 7, 2017.  Before the court is defendants' motion for summary judgment.  (Dkt. #13.)

Because there are genuine issues of material fact as to the amount of force used by

defendants, as well as the circumstances surrounding its use, the court will deny

defendants' motion, allowing this case to proceed to jury trial on July 19, 2021.


                              UNDISPUTED FACTS[1]

    A.  Overview of the Parties

        When he passed away on April 18, 2017, Thomas Smith was living at 10 Sanns

Street in Rhinelander, Oneida County, Wisconsin.   Smith's daughter, Shannon

Bryfczynski, is the special administrator of his estate.  At the time of the use of force event

precipitating this lawsuit on April 7, eleven days before his death, Smith was 65 years old,

---

[1] Unless otherwise noted, the following facts are material, undisputed and viewed in the light most
favorable to plaintiff.

and he had experienced a cerebrovascular accident (a CVA or stroke) in late 2016, which left him non-verbal.  In addition, Smith was an insulin-dependent diabetic, suffering from Multiple System Atrophy, a disease with progressive symptoms similar to Parkinson's.

Defendant Oneida County is a Wisconsin county, and defendant Town of Minocqua, also located within Oneida County, is a Wisconsin municipality.  For all times relevant to plaintiff's complaint, defendant Stetson Grant was employed as a deputy sheriff of Oneida County, and defendant Gary Loduha was a police officer for the Town of Minocqua.  Both Grant and Loduha were members of the Oneida County Special Response Team ("SRT") on April 7, 2017.  The SRT is a group of law enforcement officers from within Oneida County assigned to a specialized team to address situations like barricaded suspects, high-risk warrants, hostage situations, and any other call that is determined to be extremely high risk.  Although a Minocqua police officer at the time, there appears to be no dispute that Loduha was acting in his capacity as SRT member and, therefore, as a deputized member of the County during the events giving rise to this lawsuit.

### B. Events of April 7, 2017

#### 1. 911 Call

At approximately 6:39 p.m. on April 7, 2017, Oneida County Telecommunicator Jack Lilek received a 911 call from a landline connected to Smith's home at 10 Sanns Street in Rhinelander, which was referred to as "the Property" in the hours that followed.  Lilek identified himself to the caller and asked what the emergency was, but did not receive an audible response.  Instead, Lilek heard what he believed was a woman grunting.  Lilek asked the caller if they needed an ambulance, but again the caller did not respond.  Lilek

then asked the caller to push a button on the phone if they needed help, and the caller responded by pressing a button.  Lilek then asked the caller to press a button once if they needed an ambulance, the caller responded by pressing a button.  Lilek then asked the caller to press a button twice if they needed police, and the caller responded by pressing a button twice.  Based on this exchange, Lilek reasonably believed the caller was non-verbal and in need of some sort of assistance.

Lilek employed the button-pressing method with the caller because it is the most logical method of communication with a non-verbal caller.  He had used the method at least twice prior to April 7, 2017.  In continuing to pose questions to the caller using this button-pressing method, Lilek would change how the caller was instructed to respond, for example at times requesting the caller to press once for yes and twice for no and at other times instructing the caller to press twice for yes and once for now.  Lilek switched his directions in an effort to validate the responses.

As Lilek received information from the caller, he contemporaneously conveyed the information to members of the Oneida County Sheriff's Department over the phone and radio.  He also entered the information into the "Detail Call for Service Report," which the parties do not define but appears to be a report Lilek created either during the calls that day or immediately following them.  With respect to this proposed finding and others, plaintiff does not dispute that Lilek conveyed information, but disputes whether the information he conveyed was accurate.

In response to Lilek's inquiries, the caller indicated that a person had injured him or her, who the defendants refer to as the "suspect," that the suspect was still at the

3

Property, and looking out a window of the Property onto Davenport Street, which runs perpendicular to Sanns Street. The caller further confirmed that the suspect had a pistol and had shot the caller, possibly in the shoulder. During the course of the call, the caller also indicated that the suspect lived at the Property, his name was Thomas Smith, and the caller was Alan Smith.

Lilek had access to Sheriff's Department records from previous business involving the 10 Sanns Street address, and so was able to rely on those records to elicit information about "Thomas Smith" and "Alan Smith" by using the button-pressing method. Alan Smith is Thomas's oldest son who lived at the Property with his father and was his primary caretaker. Lilek also learned that the suspect had other weapons, possibly a bow and explosives, which were possibly rigged to the door. Finally, the caller conveyed that a nine year-old was also on the Property, that the caller and the child were unable to leave the Property, and the child may have been shot or fatally injured.

At times, the caller provided conflicting information to Lilek. When this occurred, Lilek repeated the question, asked the question a different way, or changed how the caller was instructed to respond to the question, so that he could validate the information. The majority of the information Lilek received was consistent, and Lilek believed that the caller's button presses were deliberate and intentional.

The first law enforcement officer reported arriving on scene at 6:43 p.m. A call to the SRT to respond to the reported incident at the Property also went out at approximately 6:46 p.m. At approximately 7:02 or 7:03 p.m., two other law enforcement officers reported that they had a visual of the Property.

4

Defendants Grant and Loduha both responded to the SRT call.  While en route to the staging area, Loduha heard multiple updates from Lilek over the radio, including reports about a possible explosive device and a deceased nine-year old child.  Other SRT members were en route to the Property at approximately 7:18 p.m. and reportedly arrived by approximately 7:53 p.m.  Lilek purportedly also learned from the caller that the suspect wanted law enforcement to come to the Property and was aware when they had arrived on scene.

The caller apparently hung up at approximately 7:34 p.m.  When Lilek called back at 7:36, the caller picked the phone up and indicated that:  he could hear Lilek; the suspect had heard the phone ring; and the suspect was in the room with him.  The caller hung up again at 7:37, and Lilek did not speak with the caller again.

### 2.  SRT Engagement

SRT's command post was located at the intersection of West Davenport and Maple Street, near, but outside, a direct view of the Property.  Instead, SRT members received information about the situation at the Property via the "Rave Alert" system, which was sent via text message and automated phone call.  Plaintiff does not dispute that SRT members received some information via this system, but also contends that SRT members were provided information over the radio.  Whether over the Rave Alert system or over the radio, defendants Grant and Loduha learned that there was a possible hostage situation, a deceased nine year-old in the garage of the residence, explosives at the front door and garage, and Thomas Smith was the reported suspect.  Also confirming most but not all of this, and in a less definitive manner, members of the SRT received a briefing at the

5

command center, informing them that there was possibly one armed suspect, one wounded victim, one potentially deceased nine-year-old child in the garage, and possible explosive devices on or inside the residence.  When SRT was briefed, Officer Loduha also understood that this information had come from a caller inside the residence who was trying to conceal himself from the suspect.  SRT members further learned from Detective Sergeant Brian Barber and Captain Terri Hook that the suspect was reportedly wearing a green sweatshirt and blue jeans.

The parties dispute whether defendants Loduha and Grant would have heard that Smith had Parkinson's disease.  At his deposition, Captain Terri Hook acknowledged that he heard a broadcast that Smith had Parkinson's disease, but both Officer Loduha and Deputy Grant aver that they did not hear any information about Smith's physical condition, including his inability to speak while on the SRT call at Smith's property.[2] Regardless, Loduha and Grant both aver that even if they had been aware of any alleged physical limitations or conditions, it would not have changed their actions that day.

SRT Commander Barber assigned Officer Loduha to the quick reaction team and staged him near the rear of the Bearcat, a large, armored vehicle.  Both Loduha and Deputy Grant entered the back of the Bearcat.  The windows in the back seat area allowed members of the SRT to look out.  The Bearcat drove east, along Davenport, toward the Property. While the Bearcat drove by the Property, Loduha observed a male in the window near what

---

[2] Plaintiff also emphasizes a notation in Lilek's Detail Call for Service Report that before Smith exited his residence, Lilek noted "starting to get conflicting information" from inside the house. (Pl.'s PFOFs (dkt. #34) ¶ 27.)  As defendants point out, however, there is no evidence that Lilek conveyed this message over the phone or radio.  (Defs.' Resp. to Pl.'s PFOFs (dkt. #39) ¶ 27.)

he believed to be a sink.  The person Loduha observed matched the description of the suspect, Thomas Smith.  As Loduha observed Smith, however, he moved out of sight.

The Bearcat then turned right onto Sanns Street, heading north.  When the Bearcat was parallel with the front of the Property, Loduha again observed Smith through a large front window, and it appeared to Loduha that Smith also observed the Bearcat as he was looking directly at it out of the window.  For ease of reference, the court includes the following map of the location, obtained from Google Maps:



"10 Sanns St., Rhinelander, WI 54502," Google Maps, https://www.google.com/maps/place.

At this point, with the Bearcat stopped in front of the Property, Warden Riley Brooks, a member of the SRT and driver of the Bearcat, used the Bearcat's PA system to order Smith to exit the house.  Smith closed the blinds after Warden Brooks' command, although perhaps as an explanation for Smith's closing of the blinds, plaintiff states that the Bearcat's spotlight was trained on the house as well.  Officer Loduha then observed Smith looking out through the closed blinds and also noticed him opening and closing the blinds.  At some point after Smith walked to the front door, Warden Brooks explained over the PA System that they were with the Sheriff's Department and again asked him to exit

his residence.  Smith opened his front door at approximately 8:08 p.m. and stood at the threshold, allowing both defendants Loduha and Grant to observe that Smith was wearing blue jeans and a green sweatshirt, matching the description of the suspect.  From their vantage point, Loduha and Grant also observed a dark schmear of some substance on Smith's sweatshirt that looked like blood, although Loduha testified during his deposition that this latter observation did not play a role in his subsequent decisions or actions.

At that point, Warden Brooks again commanded Smith over the PA system to approach the Bearcat slowly and raise his hands above his head.[3]  While Smith eventually began to approach the Bearcat, he did not raise his hands over his head.  Neither Loduha nor Grant observed that Smith had any trouble walking or otherwise was not capable of responding to Brooks' commands, but as detailed below, Smith's neighbor Jacqueline Falck offers a different description of Smith's faculties.  When Smith was repeatedly ordered to raise his hands, he would begin to do so, but then would bring them back down, causing Grant to form an impression that Smith was choosing to comply only partially with Brooks' commands.

At some point, Brooks next directed Smith to walk backwards, which he did.  When Smith was approximately 10 to 15 feet from the Bearcat, Brooks also told him to stop and to drop to his knees, but Smith remained standing.  Loduha noticed that Smith was glancing back toward the house at this point and Loduha was concerned that he was going

---

[3] Pointing to the lack of this detail in Brooks' report, plaintiff disputes whether Smith was also instructed to raise his shirt to allow SRT to assess whether he had any weapons, explosives or explosive triggers on him.

to head back in.[4] At this point, the decision was made to exit the Bearcat and take Smith into custody.

### 3. Alan Smith's Arrival

Smith's son Alan was attending his daughter's birthday party that same evening, when he received a telephone call from his sister at approximately 7:25 p.m., alerting him that there was some sort of active law enforcement operation near their father's home. Alan left the party and arrived in the vicinity of his father's house, which by then was teeming with police vehicles. At his deposition, Alan estimated that he arrived sometime between 7:25 and 7:45 p.m. (Alan Smith Dep. (dkt. #18) 26-27.) Alan approached Oneida County Sheriff's Department Captain Terri Hook and told her that he needed to check on his father, who had Parkinson's disease. Hook instructed Alan to wait in Detective Brian Zohimsky's squad car. Lilek testified at his deposition that since he had conveyed that Alan Smith was the caller, he would have expected officers to communicate to him when Alan arrived at the command post, although there is nothing in the record to suggest that this occurred. Of course, given the timing, Lilek likely was no longer on with the caller, having last had contact at approximately 7:37 p.m.

Detective Zohimsky also showed Alan a picture of his father, inexplicably told him that *Thomas* had been shot, and that his daughter had also been shot.[5] Alan attests to

---

[4] The record is unclear, but given Lodela's version of events, presumably Smith was again facing the Bearcat by this point.

[5] Defendants contend that the court should disregard these representations on the basis that the proposed fact is supported by a "sham declaration" in light of Alan Smith's deposition testimony. (Defs.' Resp. to Pl.'s PFOFs (dkt. #39) ¶ 72.) However, the court has reviewed the cited deposition testimony, and it does not conflict with Alan's declaration. *See Bank of Ill. v. Allied Signal Safety*

responding that his daughter was at a birthday party and was not present at 10 Sanns Street. Alan also told Detective Zohimsky that his father had Parkinson's disease. Zohimsky then asked Alan if there were any guns in the house, to which he responded there were none.[6] At that point, Zohimsky exited his squad car and asked Alan to remain, which he did for at least 10 minutes, as he testified at his deposition, or for approximately 20 minutes, as he avers in his declaration.[7]

While he was waiting, Alan also heard over the squad car radio, "[s]ubject has Parkinson's," and he further testified at his deposition and averred in his declaration that this statement was made *before* Zohimsky returned to his squad car, and before a statement was made over the radio at approximately 8:03 p.m. that "subject coming out wearing green shirt and blue jeans." (Pl.'s PFOFs (dkt. #34) ¶ 77.) As described above, however,

---

*Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996) (explaining that "[t]he 'sham declaration rule' . . . provides that parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that *contradict* their prior depositions" (emphasis added). During his deposition, Alan was asked what *questions* Detective Zohimsky asked him; he was not asked more broadly about what he was *told*. (Alan Smith Dep. (dkt. #18) 36-38.) Thus, there remains a disputed issue of fact for trial to the extent the detective has a different recollection.

[6] In his declaration, Alan also states that he told similarly Zohimsky that there were "no bombs, no bows, no weapons of any kind." (Alan Smith Decl. (dkt. #29) ¶ 17.) Here, the court agrees with defendants that the admission of this additional information is a closer question. Alan certainly did not volunteer these statements in his deposition testimony, despite which he was asked for *all* questions Zohimsky had asked him. While testifying that he was asked if there were guns in the house, and responded "no" without offering any testimony about questions as to other weapons, much less his response. As such, the court has disregarded this portion of his declaration for summary judgment. However, since a jury will have to resolve a number of other disputed facts at trial, the court will leave to the jury whether Alan's failure to volunteer this response undermines his credibility if offered at trial.

[7] Again, there is no inherent conflict between Alan Smith's deposition testimony that he waited "at least ten minutes" for Detective Zohimsky to return to his car and his declaration that he waited approximately 20 minutes.

both defendants Loduha and Grant aver that they did not hear this information over the radio or otherwise, nor would it have made any difference in their actions.[8]

### 4. Smith's Seizure

Returning to SRT's involvement, Grant, Loduha and two other SRT members, Jack Simkins and Kurt Helke, exited the back of the Bearcat, ostensibly fearing Thomas Smith's possible retreat back into the house.  Simkins and Helke got into a position to watch the perimeter, and Grant and Loduha approached Smith.  Grant and Loduha aver that because Smith had refused to obey certain of Brooks' commands, they did not know whether he had any weapons, explosives or an explosive trigger on him at the time they approached Smith.  Grant and Loduha wanted to get Smith into custody quickly so that they could move him, themselves and the other SRT members away from the Property in case of an explosion.  At the time Grant and Loduha approached Smith, Smith was standing near the front passenger door of the Bearcat.[9]

---

[8] Plaintiff submits a number of facts about the Sheriff Department's radio communication system, which are only tangentially related to the issues at stake in this case.  (Pl.'s PFOFs (dkt. #34) ¶¶ 78-85.)  The court will not recount these facts other than to note that plaintiff has raised a genuine issue of material fact as to whether information about Thomas Smith having Parkinson's was relayed over the radio before defendants Loduha and Grant used force to seize him.

[9] Plaintiff purports to dispute this and other proposed findings, but the evidence cited in support does not raise a genuine issue of material fact as to Smith's position at the time Grant and Loduha approached him and initially made contact with him.  (Defs.' Reply in Support of Defs.' PFOFs (dkt. #40) ¶ 110.)  As described below, Smith's neighbor Jacqueline Falck observed Smith walk out of his house and approach the Bearcat, then be surrounded by four or five officers; at which point, Smith and the officers moved out of her view, being blocked by the Bearcat.  (Falck Dep. (dkt. #28) 24-26.)  As such, plaintiff cannot rely on Falck's testimony to raise a genuine issue of material fact as to Grant and Loduha's initial contact with Smith.

Grant approached from Smith's right side, and Loduha approached from his left side.  Loduha had his department-issued rifle raised as he commanded Smith to get to the ground.  Smith looked at Loduha in response, but did not otherwise respond to his command.  As Loduha got closer to Smith, he transitioned his rifle down and put his right hand on Smith's upper left arm, around his armpit, and put his left hand on Smith's wrist to attempt a "solo decentralization."[10]  When Loduha began to pull on his arm, Smith looked directly at him and pulled his arm away.  Grant then approached Smith from his right side and tried to take his hand to begin to handcuff him while he was still standing, but Smith pulled his arm away from Grant as well.  Grant then took Smith's arm with both of his hands and attempted to work with Loduha to perform a two-man decentralization technique on Smith.[11]

Once on the ground, Loduha placed his left hand into a handcuff and Grant moved Smith's right hand so Loduha could place it in as well.  Grant avers that Smith tensed up when he moved Smith's right hand, making it more difficult to get him into handcuffs.  However, Smith was in handcuffs at approximately 8:10:58 p.m., after which Loduha quickly swept his hand down Smith's back, turned him on his right side, and swept his

---

[10] A solo decentralization technique requires that an officer pull the individual's arm down and towards the officer's body while turning in a circular motion, which forces the individual off balance and allows for the officer to control their descent to the ground.

[11] The two-man decentralization technique is viewed as a more controlled and safer technique than a one-man or solo decentralization.  In this move, the officers guide the individual's arms and shoulders forward to take the individual off balance, and, as the individual goes forward to the ground, the officers control the individual's descent by holding back their upper arms.  Here, too, plaintiff purports to dispute this, but the evidence cited does not raise a genuine issue of *material* fact as to Grant and Loduha's decentralization of Smith since Falck herself testified that she did not witness the decentralization or placement of handcuffs.

hand down the front of Smith's shirt to check for any weapons or explosive devices. Loduha estimated that this took an additional, approximately 10 to 15 seconds.

At this point, Loduha and Grant wanted to move Smith and themselves out of the area in case there were explosive devices. Grant and Loduha picked Smith up by his upper arms and armpits in an attempt to stand him upright, but Smith would not -- or could not, as plaintiff maintains -- stand or walk. Loduha estimates that it took another approximately 10 to 15 seconds to stand Smith up. During this time, Grant and Loduha continued to interpret Smith's actions as a refusal to comply.[12]

When Smith refused to walk, Grant and Loduha picked Smith up a bit higher and carried him around to the other side of the Bearcat (the driver's side). At this time, as set forth below, Smith came back into Falck's line of sight. Once on the other side, Loduha further avers that he ordered Smith to get on the ground, but Smith refused. Loduha avers that they needed to place Smith on the ground to conduct a more complete search to ensure no explosive devices or triggers were on him.[13]

When Smith refused to bend his legs, Grant and Loduha each took a step forward, bent their back legs at the knee like a lunge, and leaned Smith forward to place him on the ground.[14] Loduha avers that they controlled Smith's movement by holding his upper arms

---

[12] Plaintiff points out that Grant did not state in his report, drafted after the events described, that Smith ever exhibited any active resistance and acknowledged at his deposition that this is something he should have included.

[13] Plaintiff again attempts to dispute this based on Loduha's report not mentioning Smith's non-compliance after he was handcuffed.

[14] Curiously, plaintiff purports to challenge this description based on Grant and Loduha not mentioning this second, two-man decentralization in their reports. Given its absence in the reports, plaintiff maintains that a reasonable factfinder could find that this second placement never

and under his armpits while guiding him to the ground.  Specifically, Loduha testified that Smith seemed to be actively keeping himself straight, which allowed Grant and Loduha to lay him down almost as if he were a board, with his toes remaining on the ground and acting as a fulcrum.  Loduha further avers that he and Grant kept their arms on Smith until he was flat on the ground, which he estimated took approximately 10 to 15 seconds. At that point, Loduha conducted a more thorough search, lifting Smith's shirt, checking his waistband and pants pockets and checking his ankles.  Loduha estimated that conducting the search took approximately 20 to 25 seconds.

Once the search was completed, Grant and Loduha aver that they picked Smith up from the ground once more with Smith again refusing to stand or walk on his own.  Grant and Loduha then carried Smith by his armpits and upper arms to the back of the Bearcat, which has two doors that open up separately onto a large flat floor with bench seats on each side.  Loduha then instructed Smith to get into the back of the Bearcat by stepping onto the back ledge, a step down from the backdoor.  Instead, Smith allegedly looked at Loduha but did not move, and when Loduha instructed Smith again to get in without response, Grant and Loduha then stepped up on the back ledge of the Bearcat themselves. After Loduha again instructed Smith to step up and he did not move, Loduha represents that Grant stepped into the back of the Bearcat, and he and Loduha lifted Smith up by his arms and armpits.  As Grant moved into the Bearcat with one of Smith's arms, Loduha

---

occurred.  In reviewing Jacqueline Falck's description in her deposition testimony on which plaintiff otherwise depends heavily, however, she actually *witnessed* this second takedown and the subsequent placement of Smith in the Bearcat.  Specifically, during her deposition she testified that at the point when she saw Smith forcefully taken to the ground, he was already handcuffed.  (Falck Dep. (dkt. #28) 37.)

next moved behind Smith to pick him up from his legs, then Grant pulled Smith into the Bearcat, while Loduha pushed Smith in by his hips and waist.  Finally, Grant and Loduha laid Smith on his stomach and slid him into the back of the Bearcat, using a technique which Loduha represents would be similar to getting a "downed officer" into the back of the Bearcat.  Loduha estimates that it took less than one minute to perform this entire maneuver.

While Grant was helping Smith into the Bearcat, he also asked Smith questions, including whether he needed medical attention.  Smith just stared at him and did not respond.  At that point, Grant began to suspect something was wrong with Smith.  At approximately 8:12:23 p.m., the SRT reported that it would be taking Smith back to the command post to see medics.  Loduha remained at the Property, while Simkins and Helke joined Grant in the Bearcat.  At approximately 8:13:22 p.m., the SRT advised that it was en route to the command post where an ambulance was waiting.

Once at the command post, SRT members stood Smith back up and instructed him to step down out of the back of the Bearcat, but he again just stared and did not move.  At that point, the SRT members lifted Smith up by his upper arms and armpits, moved him out of the Bearcat, and stood him up on the ground, where other individuals assisted him onto a gurney.  Consistent with defendants' representations, Alan estimated that he saw the Bearcat approaching the command center where he had remained around 8:16 p.m., and witnessed officers dragging his father out of the armored vehicle, with their arms under his arms and his hands in handcuffs.  While Smith was in an upright position, he was not

15

walking under his own power.  After moving the gurney into the ambulance, it then drove away from the scene with Smith.

### 5.  Neighbor Jacqueline Falck's Observations

At the time of the events giving rise to this lawsuit, as alluded to above, Smith's neighbor, Jacqueline Falck, lived in a house at 804 W. Davenport Street on the corner of Sanns Street and Davenport Street, across the street from Thomas Smith's house at 10 Sanns Street.  Having moved into her house in October 2015, Falck had gotten to know Smith as a neighbor.  Since Smith had difficulty communicating with her, most of their conversations involved hand gestures or yes-or-no questions.  Faulk also observed that he walked slower and shuffled.  Alan Smith also testified at his deposition that by April 2017, his father shuffled his feet when he walked and had difficulty even opening a pickle jar.

While taking her dog outside on April 7, 2017, Falck saw a large military-type vehicle outside of her home.  After observing it for a few minutes, she returned into her house but watched the ongoing scene through her screen door.  She could hear law enforcement officers in the Bearcat giving commands, including, "Oneida County Sheriff, come out slowly with hands [up on] your head."  (Pl.'s PFOFs (dkt. #34) ¶ 25 (citing Falck Dep. (dkt. #28) 20).)  At some point, Falck saw Smith come to his front door, pause, exit his house, come down the steps from his door to his driveway, and then walk slowly toward the Bearcat.

Falck testified at her deposition that she thought Smith looked confused as he walked, glancing to the right, left, up and down, and raising his arms a bit as if to keep his

balance.[15]  Falck also testified that in response to a command to turn around, Smith "couldn't make it all the way around," and he "just seemed so confused, that he couldn't make heads or tails of what was being asked of him."  (Falck Dep. (dkt. #28) 47.)  Falck further testified that as he walked down the driveway, Smith eventually got his hands to his shoulder or neck level and was in that position as he approached the Bearcat.  When Smith stopped, Falck confirmed that he was surrounded by four or five officers, pointing guns at him, and these officers then moved him toward the front of the Bearcat, which blocked her view.  Falck estimates that Smith was out of her view for approximately 10 minutes.

Regardless of the exact time that elapsed, Falck's deposition testimony confirms that Grant and Loduha's first decentralized and handcuffed Smith out of her view.  Also consistent with defendant Grant's and Loduha's representations, Smith was moved around the front of the Bearcat at some point, making him visible to Falck again, who described seeing "two officers . . . shuffling him, and they picked him up and threw him to the pavement."  (Falck Dep. (dkt. #28) 26.)  When asked to clarify what she saw, Falck further testified that the two officers "lifted him a little bit, forcefully, and threw him down," emphasizing that they "didn't drop him," instead they "forcefully threw him to the ground."  (*Id.* at 29-30.)  By the time Smith hit the ground, Falck testified that the officers' hands were no longer on him, and she heard one of the officers, both of whom were

---

[15] With respect to this and other portions of Falck's deposition testimony, defendants contend that "Falck's subjective interpretation of Smith's actions is inadmissible, as it is not based upon personal knowledge."  (Defs.' Resp. to Pl.'s PFOFs (dkt. #39) ¶ 31.)  If this were a valid objection, then most observations based on her personal knowledge would be inadmissible.  Certainly, defendants may challenge the accuracy of Falck's observations, but it is not a basis to exclude her testimony.

standing over Smith, say that he had hit his head.  (*Id.* at 38.)  After Smith had been on the ground for "several minutes," Falck next witnessed "those same two officers, one of them grabbed . . . either his hands or his wrists," and "[t]he other one grabbed him by the feet or by the ankles." (Falck Dep. (dkt. #28) 33.)  The officers then "picked him up, went back around to the back . . . of the vehicle, , , , opened the door and threw him in." (*Id.*)  When asked to clarify, Falck further explained that the officers "just like swung him back and then threw him in." (*Id.* at 34.)

### C. Smith's Injuries

The paramedics in the ambulance found that Smith had a bruise and swelling above his right eye, abrasions on his right cheek and minor abrasions on his knee.[16]  Consistent with this medical record, a number of the officers in the Bearcat also believed Smith needed medical attention and he was transported to St. Mary's Hospital in Rhinelander, initially treated in the ER and then admitted.  Initially told that he could not go to the hospital to see his father, Alan was eventually driven there by Detective Zohimsky.  Alan estimates arriving at the hospital around 9:25 p.m., at which point he found an Oneida County Sheriff's deputy and a City of Rhinelander police officer present in his father's hospital

---

[16] In support, plaintiff cites to medical records attached to the declaration of plaintiff's attorney. (Pl.'s PFOFs (dkt. #34) ¶ 92 (citing Olson Decl., Ex. 11 (dkt. #32-11)).)  Defendant objects on the basis that this cited evidence is inadmissible.  (Defs.' Resp. to Pl.'s PFOFS (dkt. #39) ¶ 92.)  The court agrees that plaintiff failed to authenticate these records.  *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 578 (7th Cir. 2015) ("The mere act of producing a document in response to a discovery request based on the content of the document does not amount to an admission of the document's authenticity.").  Nonetheless, because it appears to be undisputed that Smith had an abrasion on his face and knee and because this evidence is not outcome determinative, the court adopts the proposed finding, since it certainly appears that plaintiff could obtain proper authentication of his medical records at trial.

room.  As evidenced by a photograph taken of Smith's face the following day, Smith was handcuffed to the bed, was wearing a neck brace, and had cuts to the right side of his face and big bumps on his right forehead.  (Pl.'s PFOFs (dkt. #34) ¶ 103.)  Another photograph from April 8 shows an injury to Smith's right leg as well.  (*Id.* ¶ 104.)

Once Alan arrived, the officers removed Smith's handcuffs, and he was allowed to write on a piece of paper to communicate with the officers and Alan.  Alan asked his father, "who did it?," and Smith pointed to the Sheriff's deputy.  The detective wanted to know where the bomb was located in the house.  Alan told his father to squeeze his hand in response to whether there was a bomb, to which Smith responded that there was no bomb.[17]

Neither Loduha nor Grant ever observed any physical injuries or impairment on Smith, although they acknowledge that they took Smith to the ground on two occasions.  Both also aver that they never witnessed Smith hit his head, although during his deposition Grant acknowledged, "I don't remember.  I mean, they [referring to 'scabbed abrasions to right lateral face and forehead'] could have happened, yeah."  (Pl.'s Resp. to Defs.' PFOFs (dkt. #33) ¶ 168 (quoting Grant Dep. (dkt. #19) 40).)[18]

---

[17] Because Smith was completely non-verbal, when Alan Smith communicated with his father, he used a similar technique as Lilek, asking Smith to squeeze his hand either one or two times in response to yes-or-no questions.

[18] Although plaintiff attaches Smith's medical records, plaintiff does not make any effort at summary judgment to link the injuries Smith suffered because of his interaction with defendants and his death 11 days later.

### D. Subsequent Knowledge

Ultimately, the reports of injuries, hostages, a dead child and explosives all turned out to be false, although defendants Loduha and Grant both represent that they did not learn this until after Smith was taken into custody and a thorough search of the Property was conducted.  Plaintiff purports to challenge their representation, pointing out that the belief that Alan Smith was the caller and that his nine-year-old daughter was the victim of a violent assault were known to be false by Detective Zohimsky *before* Loduha and Grant seized Smith, as described above, and arguing that a reasonable jury could infer this information was also made known to the officers involved.

### E. Training

The training defendants Grant and Loduha received through Defensive and Arrest Tactics training, as well as other trainings they received throughout their career, instructed them to control the scene and the suspect as quickly as possible.  In particular, Loduha and Grant were both instructed to perform each stabilization technique at 100% every time they engage with an individual, regardless of their personal perceptions of the individual, including a compliance hold, decentralization, or any further escalated force that may be needed.  Plaintiff disputes this, directing the court to the Wisconsin Department of Justice Defensive and Arrest Tactics Training Manual for Law Enforcement Officers, which both defendants acknowledged as a primary authority, in which the manual requires officers to perform a "tactical evaluation" before use of force, including a "threat assessment"

considering the subject's age, size and strength.  (Pl.'s Resp. to Defs.' PFOFs (dkt #33) ¶ 173.)[19]

## OPINION

## I.  Nature of Plaintiff's Claims

The court begins by clarifying the nature of the claims asserted against defendants. For reasons that are not entirely clear, defendants assume that plaintiff asserts claims against defendants Loduha and Grant in their *official*, rather than *individual* capacities. (Defs.' Opening Br. (dkt. #23) 30 n.10.)   In support of this unlikely assumption, defendants cite to *Kolar v. Sangamon County of State of Illinois*, 756 F.2d 564, 568 (7th Cir. 1985), for the proposition that "[w]hen a complaint alleges that a public official's actions under the color of state law give rise to a claim under § 1983, a court will assume that the official has only been sued in their official capacity."  (Defs.' Opening Br. (dkt. #23) 30 n.10.)  In *Kolar*, however, the Seventh Circuit explained that the court has "characterized as 'official capacity' suits those Section 1983 actions that fail to designate expressly the nature of the suit through utilization of the terms 'official capacity' or 'individual capacity,' but which list in the case name of the complaint the official's job title, i.e., 'Gerald M. Sonquist, Kenosha County Sheriff' and 'Carl Thomas, Sheriff.'" 756 F.2d at 568 (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 n. 12 (7th Cir. 1983)).

---

[19] Defendants object to the consideration of this manual as unauthenticated hearsay.  (Defs.' Resp. to Pl.'s PFOFs (dkt. #39) ¶ 60.)  While this manual was also simply attached to plaintiff's counsel declaration and apparently not identified in either party's Rule 26(a)(1) report or disclosed by plaintiff in discovery, the court sets forth this proposed finding for completeness's sake, without relying on it in denying summary judgment to defendants.

Here, the caption of the complaint itself identifies defendants Gary Loduha and Stetson Grant as being sued in their "individual capacities" with *no* mention of their job titles:

> Estate of Thomas Smith, by
> Shannon Bryfczynski,
> Special Administrator,
>
>      Plaintiff,
>
>      v.                                          Case No. 19-cv-972
>
> Oneida County, the City of Minocqua,
> And, in their Individual Capacities,
>  Gary Loduha and
> Stetson Grant,
>
>      Defendants.

(Compl. (dkt. #1) 1; Am. Compl. (dkt. #2) 1.) Even without this express designation, given that neither Loduha nor Grant hold leadership roles within the County or the Town, defendants' purported belief that they were only being sued in their official capacity was and is wholly unjustified. Plus, as defendants acknowledge, an official capacity lawsuit against a County Deputy Sheriff or Municipal Officer would effectively just be a claim

against Oneida County and Town of Minocqua, respectively, both of which were already separately named as defendants.[20]

Perhaps this is why, after defendants assert that the claims asserted against defendants Loduha and Grant are both sued in their official capacity only in a footnote in their opening brief, they go on to observe that "[t]o the extent Plaintiff raises an argument in response to suggest that the individual Defendants are also being sued in their personal capacity, Defendants reserve the right to argue in reply that the individual Defendants are entitled to qualified immunity."  (Defs.' Opening Br. (dkt. #23) 30 n.10.)  And, indeed, defendants attempt to raise qualified immunity as a basis for granting summary judgment for the first time in their reply brief.  Generally, that is not how summary judgment works; as a rule, a party cannot sit on arguments until a reply brief.  *See, e.g., Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited.").

However, as defendants point out, there are exceptions to this rule.  Specifically, in *United States v. Fluker*, 698 F.3d 988 (7th Cir. 2012), the Seventh Circuit explained that where the party was not aware of an argument at the time of filing the initial brief, it may be justified in only raising it in reply.  *Id*. at 1004.  However, as explained above, there is

---

[20] The court also notes, as defendants did in moving for summary judgment, that plaintiff also pursues an award of punitive damages.  If plaintiff were only pursuing a claim against the individual defendants in their official capacity, an award of punitive damages would not be available.  *See Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) ("This official-capacity claim against the Sheriff is considered one against a municipality, and municipalities are immune from punitive damages in § 1983 suits.").  Contrary to defendants' position (Defs.' Opening Br. (dkt. #23) 32), in *Smith v. Wade*, 461 U.S. 30, 35, 36 n.5 (1983), the Supreme Court set the standard for punitive damages claims against individual defendants in their individual capacities, as opposed to municipal defendants.

no basis for finding that defendants lacked knowledge -- nor even a legitimate basis for claiming a lack of knowledge -- of the nature of plaintiff's claims against defendants Loduha and Grant or the availability of a qualified immunity defense before filing their opening brief on summary judgment. On the contrary, defendants should have reviewed plaintiff's complaint carefully, sought clarification through requests for admission, *or* asserted qualified immunity in their opening brief, not bury that defense in the lame hope that plaintiffs were not pursuing claims against them in their individual capacity. That said, the fact that the court declines to take up qualified immunity at summary judgment given defendants failure to raise it in their opening brief does not wholly foreclose the availability of that defense, however much it may undercut its force in light of the now impending trial.[21]

The court also must clarify the nature of the claims against the county and municipal defendants, since defendants seek summary judgment on plaintiff's claims against Oneida County and the Town of Minocqua, arguing that there is no basis to find a policy, custom or practice as required to establish liability against them under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (Defs.' Opening Br. (dkt. #23) 30-32.) In response, plaintiff points out that "there are no *Monell* claims for the Court to dismiss

---

[21] Even if the court were to consider defendants' qualified immunity defense at the summary judgment stage, for the reasons described below, there are factual disputes as to defendants' knowledge of Smith's Parkinson's diagnosis and, more importantly, the extent of force used by defendants during the second decentralization and transfer of Smith into the back of the Bearcat that prevent its application at this stage. *See, e.g.*, *Weinmann v. McClone*, 787 F.3d 444 (7th Cir. 2015) ("The existence of a factual dispute about the circumstances surrounding McClone's decision to fire on [Weinmann] precludes a ruling on qualified immunity at this point. The district court correctly recognized this.").

because the Plaintiff expressly waived them in the pleadings (dkt. #2, ¶¶ 306-307).” (Pl.'s Opp'n (dkt. #35) 19-20.)  And, indeed, both plaintiff's original and amended complaint (filed the day after the original complaint, apparently to correct a typographical error) state plaintiff “does not allege that the wrongful acts alleged herein were carried out pursuant to a custom or policy of” either the Town of Minocqua or Oneida County.  (Am. Compl. (dkt. #2) ¶¶ 306-307.)   Instead, these municipal defendants were only named for indemnification purposes under Wisconsin Statute § 895.46.   (*Id.*)  As such, the court will deny as *moot* defendants' motion for summary judgment as to any *Monell* claims, while noting that neither the Town nor the County will be identified as defendants at trial, nor will they be listed on any jury instructions or the verdict form.

With those initial clarifications addressed, the court now turns to the crux of defendants' motion, whether genuine issue of material facts remain as to whether defendants Loduha and Grant violated Smith's Fourth Amendment in their use of force against him on April 7, 2017.

## II. Fourth Amendment Excessive Force Claim

In responding to plaintiff's proposed findings of fact or plaintiff's responses to defendants' proposed findings, defendant objected to plaintiff's characterization of Smith's seizure as an “arrest.”   (*See, e.g.*, Defs.' Resp. to Pl.'s PFOFs (dkt. #39) ¶ 10.)  While defendants' refusal to characterize the events of April 7, 2017, as an arrest is puzzling, there is no dispute that the Fourth Amendment governs plaintiff's excessive force claim here.  *See Graham v. Connor,* 490 U.S. 386, 395 (1989) (“[*A*]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory

stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." (emphasis in original)).

In considering a Fourth Amendment claim, courts must balance the interests of the government against the Fourth Amendment interests of the individual in determining the reasonableness of a particular seizure. *See id.* at 396 (internal quotation marks omitted). "An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the [seizure], the officer uses greater force than necessary to effectuate the [seizure]." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012). Since the inquiry into the totality of the circumstances surrounding the reasonableness of a particular seizure is objective, the motives and intent of the officer are not considered, and the "tense, uncertain and rapidly evolving" nature of the circumstances must be taken into account. *Graham*, 490 U.S. at 397. Moreover, the court must analyze the claim "from the perspective of a reasonable officer under the circumstances, rather than examining the officer's actions in hindsight." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015).

In determining the objective reasonableness of the officer's actions, the court must consider:

> the severity of the crime; whether the suspect posed an immediate threat to the officers or others; whether the suspect was resisting or evading arrest; whether the individual was under arrest or suspected of committing a crime; whether the individual was armed; and whether the person was interfering or attempting to interfere with the officer's duties.

*Id.* Moreover, when the facts surrounding a Fourth Amendment seizure are not in dispute, whether the force used was reasonable becomes a legal question rather than a question of

fact for the jury. *Phillips*, 678 F.3d at 519 (citing *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003)).

Understandably, the individual defendants argue that the information known to them at the time of their encounter with Smith justified their use of force. In particular, defendants point to information relayed to them and other SRT members:

> (1) there was a single armed suspect in the Property; (2) the caller was wounded and there was potentially a deceased or injured nine-year-old child; (3) there was possibly explosive devises on or inside the Property; (4) the suspect had a pistol; (5) Thomas Smith (of whom they had been provided a description) was the suspect; and (6) all information had been provided by a caller inside the Property who was trying to conceal themselves from Smith.

(Defs.' Opening Br. (dkt. #23) 20 (internal citation to proposed findings of fact omitted).) In addition, during the course of their interaction with Smith, defendants contend that his apparent refusal to comply with certain commands, including refusing to raise his hands, and what they perceived to be active resistance to being seized, justified their initial use of force and continued use of force throughout their encounter with Smith.

In response, plaintiff absurdly "swings for the fences," contending that *any* use of force was unjustified under the circumstances known to defendants at the time of Smith's seizure. In positing this argument, plaintiff describes Smith as an "elderly and feeble man who had difficulties obeying the commands he was given" and was not resisting. (Pl.'s Opp'n (dkt. #35) 7-8.) While Smith's age, which was not specifically known to defendants but perhaps could be reasonably inferred by his physical appearance under the bright lights of the Bearcat, there are certainly factual disputes as to whether the officers could reasonably be expected to discern Smith's "feebleness" or other signs that he was physically

27

unable to comply fully with the commands. Moreover, even if an objectively reasonable officer could be expected to recognize Smith was both "elderly and feeble" under ordinary circumstances, these were far from that given their immediate concerns about explosive devices, possible trigger or other weapon located on Smith's body, all of which would cause a reasonable officer to be concerned about more than the threat posed by Smith's physical power.

That said, *plaintiff* is not the one seeking summary judgment and, therefore, the record need not be so clear-cut as to *foreclose* a finding in defendants' favor. Instead, with defendants seeking summary judgment, the court must consider whether the record viewed in the light most favorable to plaintiff would permit a reasonable trier of fact to find the force used against Smith from the perspective of a reasonable officer exceeded that which was required given the totality of the circumstances known to the officers at the time of his seizure. *Graham*, 490 U.S. at 396-97.

Here, plaintiff falls short at summary judgment of raising a genuine issue of material fact as to whether defendants Loduha and Grant knew at the time of Smith's seizure about the recent presence of Alan Smith, who had been believed to be the caller, much less about his statements that his daughter was *not* present at the Property and there were *no* guns kept on the Property. Indeed, on the current record, a trier of fact would only be speculating that any of this new information had been conveyed to *anyone* in the Bearcat, never mind the defendants. Nor, if conveyed, is it clear to the court how much credence such last-minute information should have altered a reasonable officer's understanding of the accuracy of the original information conveyed by the purported caller or the threat at

28

stake, especially coming from the "suspect's" son.  Even so, plaintiff *has* raised a genuine issue of fact as to whether defendants were made aware of Smith's Parkinson's diagnosis, and whether this would have (or should have) altered their impression of Smith, and specifically whether he was choosing not to comply fully with commands or actively resisting defendants' attempts to seize him.  In particular, while Alan's timeline is a bit uncertain, there is *no* dispute that he relayed the information about his father's health condition to both Captain Hook and Detective Zohimsky, and Alan further avers that he heard this information relayed over the radio *before* his father's seizure.  Perhaps defendants will be able to demonstrate that this information was not conveyed over the radio into the Bearcat or the individual defendants will be believed that they did not hear it in their tunnel-like focus before deciding to seize Smith, but that is for a jury to determine.

Moreover, plaintiff's neighbor Jacqueline Falck testified as to her observations of Smith's mannerisms at the time that he exited his house and as he approached the Bearcat before defendants' use of force.  A reasonable jury *might* also credit her view, and factor that into the circumstances known to defendants at the time they engaged with Smith. *Turner v. City of Champaign*, 979 F.3d 563, 570 (7th Cir. 2020) ("[W]hen officers observe medical symptoms that cannot reasonably be mistaken as resistance, they may not respond with force.").  While defendants maintain that even if they were aware of Smith's Parkinson's diagnosis, it would not have altered their actions, the question remains whether, in combination with Smith's actions as he approached the Bearcat, it should have altered a reasonable officer's view of the necessary force to use "proportional to the threat posed." *Alicea v. Thomas*, 815 F.3d 283, 289 (7th Cir. 2016).

29

More critically for the court, even if the force used was justified in their initial encounter with Smith when they first decentralized him *and* placed him in handcuffs, plaintiff has raised genuine issues of material fact as to whether defendants used excessive force in their *second* decentralization or takedown of Thomas Smith, and in their placement of him in the Bearcat after his head had purportedly (whether intentionally or not) been slammed on the ground. As the Seventh Circuit has instructed, "as the threat changes, so too should the degree of force." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010). Said another way, defendants used force at three points during their encounter with Smith: (1) the initial takedown and placement of handcuffs; (2) the second takedown for a more thorough search of his body; and (3) the placement of Smith in the back of the Bearcat. As for the first instance of force, plaintiff has failed to raise a genuine dispute of material fact that defendants use of force was excessive: plaintiff has no basis to challenge defendants' account of their method for decentralizing Smith and handcuffing him, which appears to represent a "clean takedown to end mild resistance" approved by the Seventh Circuit in *Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019), and justified under all the circumstances presented to a reasonable officer at the time. However, based on the testimony of Smith's then-neighbor Jacqueline Falck, plaintiff has raised a genuine dispute of material fact with respect to both the second take-down *and* cavalier placement of Smith in the Bearcat despite other officers present to assist.

Specifically, Falck disputes defendants' account in several, material ways. First, based on her observations, Falck states that defendants "picked him up and threw him to the pavement"; "they lifted him a little bit, forcefully, and threw him down"; they "didn't

drop him"; instead, they "forcefully threw him to the ground." (Falck Dep. (dkt. #28) 26, 29-30.) Falck also testified that by the time Smith hit the ground, the officers' hands were no longer on him, and Falck heard one of the officers acknowledge that Smith hit his head during this interaction. (*Id.* at 38.) Furthermore, with respect to the placement of Smith into the Bearcat, Falck's testimony disputes defendants' account that Grant pulled Smith from his arms while Loduha lifted his hips and legs, and they then "slid" him into the Bearcat. Instead, Falck testified that one of the officers grabbed Smiths hands or wrists while the other grabbed his feet or ankles, and they "swung him back and then threw him in." (*Id.* at 34.)

While the defendants invite the court to disregard Falck's sworn account, contending that at least a portion is inadmissible, but for all material purposes that is simply a misstatement of the basic rules of evidence as discussed in the fact section above. In their reply brief, defendants also cite to *Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988), for the proposition that "it is not proper to disregard what knowledge [the officers] had and assume they held other knowledge based solely on the conflicting perceptions of an untrained, uninvolved witness." (Defs.' Reply (dkt. #42) 5.) But that is not at all what the court is doing in this opinion. Certainly, *Sherrod* stands for the proposition that "courts and juries must determine the propriety of the officer's actions based upon a thorough review of the knowledge, facts and circumstances known to the officer *at the time* he exercised his split-second judgment as to whether the use of . . . force was warranted." *Id.* at 805 (emphasis added). Nothing in that opinion, however, suggests that a court should *not* consider conflicting testimony of a witness in determining the amount of force deployed

and whether that force was reasonable.  By all means at trial, the jury must consider what information was available to the individual defendants under the circumstances, but this includes Falck's testimony as to what the officers actually saw and did, leaving it for the jury to credit her testimony over the officers if they so choose, just as they will have to decide if the defendants' use of force exceeded that required or was consistent with the actions of an objectively reasonable officer given the exigent circumstances presented at that time.

For these reasons, the court concludes that plaintiff has put forth sufficient evidence to support a reasonable jury's finding that defendants Loduha and Grant violated Smith's Fourth Amendment rights during the course of his second takedown and placement in the Bearcat.

## III.  Punitive Damages

Finally, defendants seek summary judgment on plaintiff's punitive damages claim. Defendants argue that there is no evidence to support an award of punitive damages because there is no evidence "of evil motive or ill intent."  (Defs.' Opening Br. (dkt. #23) 32.)  .  As plaintiff points out -- and as defendants acknowledge in setting forth the proper standard -- punitive damages are also available when the conduct "involves reckless or callous indifference to the federal protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).  On this record, a reasonable jury could conclude that defendants acted with "reckless or callous indifference."  Regardless, as is its typical practice, the court will deny defendants' motion for summary judgment, but will invite defendants to renew their

32

request during the course of trial, once the court has had the benefit of reviewing the evidence submitted during the liability phase.

ORDER

IT IS ORDERED that defendants Stetson Grant, Gary Loduha, Oneida County and the Town of Minocqua's motion for summary judgment (dkt. #13) is DENIED.

Entered this 28th day of May, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge